**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

**In re:**
**THEODORE GEORGE BORREGO, JR and** Case No. 25-14217-RAM

**VERONICA PAZ-BORREGO** Chapter 13

Debtors.
______________________________________/

**ENGINEERED COMFORT SYSTEM, INC.**

Plaintiff, Adv. P. No. 25-01323-RAM

v.

**THEODORE GEORGE BORREGO, JR. and**
**VERONICA PAZ-BORREGO**

Defendants.
_______________________________________ /

**PLAINTIFF ENGINEERED COMFORT SYSTEMS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT AGAINST**
**DEFENDANT THEODORE BORREGO**

Plaintiff, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure, brings this Motion for Summary Judgment ("**Motion**") to determine the dischargeability of the debt owed to Plaintiff.

In support of its Motion, Plaintiff submits the following brief together with:

(1) all pleadings and discovery that will or have been filed in this action;

(2) the exhibits attached to the Statement of Material Facts.

## I. INTRODUCTION

This is an adversary proceeding stemming from a case filed by Plaintiff Engineered Comfort Systems, Inc. (**"Plaintiff"** or **"ECS"**) against Defendant Theodore Borrego (**"Defendant"**) and his co-Debtor spouse, Defendant Veronica Paz-Borrego. Plaintiff seeks summary judgment as a matter

of law as to Defendant, only. All claims and causes of action as against Mrs. Borrego are hereby preserved for trial.

The debt owed to Plaintiff by Defendant and Mrs. Borrego arose from Defendant's blatant exploitation of his previous employment in a position of leadership for Plaintiff. As a salaried employee responsible for developing and maintaining customer relationships, and a frequent participant in meetings regarding Plaintiff's business strategy, Defendant secretly formed and operated a competing company in violation of his employment agreement (**"Agreement"**) with Plaintiff. The Agreement clearly contained non-competition and confidentiality covenants, which Defendant does not contest. Plaintiff is in the business of HVAC installation and repair. Mrs. Borrego, formed ASAP Air Mechanical Team, Inc. (**"ASAP"**) to perform the same type of work on July 26, 2018, at least five years before Defendant departed his employment with Plaintiff. From the date of incorporation of ASAP through his departure in 2023, Defendant concealed the existence of ASAP from Plaintiff while continuing to receive his salary and benefits as Plaintiff's employee. When one of Plaintiff's longtime customers approached Defendant about concerns with services provided by Plaintiff, rather than doing what he was paid to do—protect Plaintiff's customer relationship or pursue corrective action on Plaintiff's behalf—he diverted Plaintiff's customers for his own financial gain. Defendant's decision to steer Plaintiff's business to ASAP yielded approximately $165,670.00 in business for Defendant's company, the proceeds of which were used to pay Defendant and Mrs. Borrego's personal family expenses and to make payments to ASAP's contractors, while simultaneously collecting salary and benefits from Plaintiff.

By the time Plaintiff discovered this illegal scheme, the damage was ongoing. Plaintiff promptly sought judicial relief in the United States District Court for the Eastern District of Michigan,

which granted a temporary restraining order (**"TRO"**) on July 29, 2024. (SMF[1], p. 1, ⁋ 1, and Exhibit 1). The district court subsequently entered a preliminary injunction (**"Injunction"**) on September 5, 2024. (SMF, p. 2, ⁋ 4, and Exhibit 2). Pending a hearing in the District Court on Plaintiff's Motion for Default Judgment, the underlying lawsuit was stayed following Defendant's filing for Chapter 13 bankruptcy.

11 U.S.C. § 523(a)(2)(A) bars a debtor from discharging a debt to the extent it was obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(4) separately bars discharge of a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. In this case, Defendant's false representations and actual fraud warrant a finding that the debt is nondischargeable under § 523(a)(2)(A). Defendant's embezzlement also independently warrants a finding that the debt owed to Plaintiff is nondischargeable under § 523(a)(4) of the Bankruptcy Code.

Because Defendant concealed ASAP's existence while diverting ECS's business to himself, and because he appropriated the proceeds of that diverted business for his own use, the resulting debt was obtained through the false representations and actual fraud proscribed by § 523(a)(2)(A) and through the embezzlement proscribed by § 523(a)(4) and should accordingly be declared nondischargeable under both provisions.

## I. <u>STATEMENT OF MATERIAL FACTS</u>

Plaintiff refers this Court to its Statement of Material Facts, filed separately and concurrently herewith, in accordance with Paragraph 8 of Doc 4, Order Setting Scheduling Conference and Establishing Procedure and Deadlines. **[Dkt. No. 4]**.

---

[1] The term **"SMF"** refers to Plaintiff's Statement of Material Fact, which is being concurrently filed with this Motion.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a) and made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled as a matter of law." The *Biricik* court summarized the standards for summary judgment in *In re Biricik*, 633 B.R. 427, 431-32 (Bankr. S.D. Fla. 2021). Plaintiff adopts that court's summary. Most importantly, "if the movant shows that there is no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law[,]" the court shall grant summary judgment. *Id.* at 431. "When deciding summary judgment, the Court may look to materials in the record such as depositions, documents, affidavits or declarations, and admissions. *Id.* (citations omitted). Moreover, the movant "always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 431-32 (citations omitted).

The *Friedman* court analyzed the standards for summary judgment motions with respect to 11 U.S.C. § 523(a) nondischargeability claims in *In re Friedman*, 253 B.R. 576, 578 (Bankr. S.D. Fla. 2000). The court explained that "For Section 523 purposes, the burden of proof is on the Plaintiff, who must prove that the debt is nondischargeable by a preponderance of the evidence." *Id.* (citing *Grogan v. Garner*, 498 U.S. 279 (1991)); *see also In re Freedman*, 431 B.R. 245, 257 (Bankr. S.D. Fla. 2010) (citing *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)). Plaintiff's predicate to this burden is establishing they have debt that may be subject to an exception from discharge. *In re Daly*, 655 B.R. 255, 263 (Bankr. S.D. Fla. 2023).

Applying these standards here, Defendant's own admissions establish the necessary record that this Court may rely upon to grant summary judgment. The District Court has already found that

Defendant agreed to the terms of the Agreement and that enforcing it as written was neither unduly burdensome nor against the public interest. *Engineered Comfort Sys., Inc. v. Borrego, No. 24-CV-10924, 2024 WL 4063553, at *6 (E.D. Mich. Sept. 5, 2024)*. Defendant's deposition testimony constitutes a series of uncontroverted party admissions establishing nondischargeability under §§ 523(a)(2)(A) and 523(a)(4). These include but are not limited to: instructing his wife to form and the subsequent concealment of ASAP while employed by ECS, solicitation and performance of work for Plaintiff's existing customer—Atlantic III—before disclosing his departure from Plaintiff, and his diversion of ECS's business opportunities and revenue to ASAP for Atlantic II and The Betsy Hotel, and knowing violation of the TRO. Defendant's own admissions render these factual assertions uncontested, leaving no genuine dispute as to any material fact necessary to sustain this Motion. This Court should grant summary judgment as a matter of law.

## III. LEGAL DISCUSSION

### A. Summary Judgment is Appropriate Because Defendant's False Pretenses, False Representations, and Actual Fraud in Connection with ASAP's Formation, the Diversion of ECS's Business to Atlantic III and The Betsy Hotel, and His Embezzlement of ECS's Business Opportunities Render the Resulting Debt Nondischargeable Under §§ 523(a)(2)(A) and 523(a)(4) of the U.S. Bankruptcy Code.

This Court should grant summary judgment to ECS because Defendant's debt to ECS is nondischargeable under both §§ 523(a)(2)(A) and 523(a)(4) of the U.S. Bankruptcy Code. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). Critically, these three grounds are stated in the disjunctive: a creditor need establish only one — false pretenses, a false representation, or actual fraud — to prevail. *See FTC v. Lanier (In re Lanier)*, 589 B.R. 901, 911 (Bankr. M.D. Fla. 2017) (citing *In re Lloyd*, 549 B.R. 282, 291 (Bankr. M.D. Fla. 2016)). Section 523(a)(4) separately excepts from discharge debts "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). As set forth below, Defendant's conduct satisfies any of the three prongs of § 523(a)(2)(A) and independently constitutes embezzlement under § 523(a)(4) — meaning summary judgment is warranted on any one of those theories alone.

There is no dispute that in July of 2011, Defendant signed the Agreement with ECS. (SMF, p. 4, ⁋ 16, and Exhibit 3, at 25:24-25, 26:1-2). Defendant testified that his signature appears underneath the Agreement's terms. (SMF, p. 4, ⁋ 16, and Exhibit 3, at 26:13-17). While he attempted to walk this fact back during his deposition, Defendant ultimately conceded that he "signed the package[.]" (SMF, p. 4, ⁋ 16, and Exhibit 3, at 28:12). The enforceability of the Agreement is not reasonably in dispute. The district court affirmed this fact as well. See, *Borrego, supra*, at *6.

"False pretenses" under § 523(a)(2)(A) refers to an implied misrepresentation or conduct intended to create and foster a false impression. *Carlos v. Howard (In re Howard)*, 653 B.R. 693, 704 (Bankr. S.D. Fla. 2023) (citing *Ershowsky v. Freedman* (*In re Freedman*), 431 B.R. 245, 256 (Bankr. S.D. Fla. 2010)) Unlike a false representation – which typically involves an express statement of fact known to be untrue – false pretenses encompass a course of conduct or a set of circumstances deliberately created by the debtor to deceive, even without any explicit verbal assertion. *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 918 (11th Cir. 2007) (internal citations omitted). Here, Defendant orchestrated precisely such a scheme: he created the false impression that he was a loyal, contractually compliant ECS employee by concealing ASAP's existence for five years. Yet despite continuing to accept his salary and benefits, and presenting himself to ECS's customers and leadership as exclusively on ECS's behalf, Defendant plotted to divert ECS's business to his own competing company, ASAP. This sustained course of deceptive conduct constitutes false pretenses regardless of whether any single verbal misrepresentation was made.

"Actual fraud" under § 523(a)(2)(A) encompasses any debt obtained by a fraudulent scheme, even absent a misrepresentation to the creditor directly, and requires proof of (1) a fraud, (2) that was intentional, and (3) that the debtor obtained the relevant money, property, or services by reason of the fraud. *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359-63 (2016) (holding that "actual fraud" in § 523(a)(2)(A) encompasses fraudulent transfer schemes and is not limited to misrepresentations made to the creditor). Defendant's intentional diversion of ECS's business to ASAP – which he carried out while Plaintiff compensated him as an ECS employee–constitutes actual fraud. This was an intentional scheme by which Defendant obtained property (wages, client relationships, and business opportunities) belonging to ECS by fraudulent means.

In determining whether a debtor acted with intent to deceive across any of these three prongs, a court may consider "the totality of circumstances, including the recklessness of a debtor's behavior[.]" *Freedman*, 431 B.R. at 257 (citing *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994)). A debtor's "[r]eckless disregard for the truth or falsity of a statement combined with the [..] magnitude of the result[ing] misrepresentation" may support an inference of fraudulent intent. *Id.* (citations omitted). Because Defendant's conduct satisfies false pretenses, false representation, and actual fraud, Plaintiff prevails under § 523(a)(2)(A) on any one of those alternative theories.

The totality of the circumstances here establishes Defendant's intent to deceive, and Defendant's own admissions underscore each of the requisite circumstances. First, the duration and deliberateness of his concealment weigh heavily in favor of scienter: Defendant admitted that he formed ASAP in 2018 while actively employed by ECS and admittedly waited to leave so that "the company would have already been open for a few years so it wouldn't look like it . . . just opened," concealing ASAP's existence from ECS for approximately five years. (SMF, p. 5, ⁋ 31, and Exhibit 3, at 42:2-6). Second, Defendant continued to accept wages and benefits from ECS throughout the period he was soliciting and diverting ECS's customer to his own competing company, effectively

being paid twice for the same period of service – once by ECS, which believed it retained his undivided loyalty, and once by ASAP, through revenue diverted from the very relationship he was entrusted to protect. Third, the timing and sequencing of his disclosures reveal a deliberate design to deceive his employer. Specifically, Defendant admitted that he told Atlantic III of his imminent departure from ECS at least three months before he gave ECS any notice at all, and when he did so, gave ECS only "two [to] three weeks' notice." (SMF, p. 6, ⁋ 36, and p. 7, ⁋ 46; Exhibit 3, at 50:21-24, 66:10-13, 70:15). He informed the customer he was diverting but concealed that same fact from the employer whose business he was undermining. Fourth, the scale and recurrence of the diverted business — approximately $165,670 in Atlantic III revenue over roughly a year and a half, and at least ten additional Betsy Hotel projects performed after his departure — reflect a sustained scheme rather than an isolated judgmental lapse. Fifth, ECS learned that ASAP, through Defendant, had affirmatively misrepresented its relationship to Atlantic III, representing "that it was affiliated with ECS, that ECS was being sold, or that ECS was no longer a concern," further evidencing a deliberate effort to obscure the diversion from both ECS and its customers. *Borrego*, 2024 WL 4063553, at *3. Sixth, and also by Defendant's own admission, Defendant directed his wife, Veronica Paz Borrego, to form ASAP under an alias, "Maria Veronica Montesinos," rather than in either of their own names. (SMF, p. 5, ⁋⁋ 26 and 27; Exhibit 5, at 13:15, 18:19, 30:22-24). That admitted use of an alias to incorporate the competing business — rather than operating it openly in either Defendant or Mrs. Borrego's own name — is itself probative of an intent to obscure Defendant's ownership and control of ASAP from ECS, and independently supports the inference of deceptive intent. Finally, Defendant commingled and personally spent the diverted proceeds, making no effort to delineate between ASAP's funds and his family's personal expenses, and admitted that "whatever money [he] had in [the] account [he] felt was able to be used for family expenses or otherwise." (SMF, p. 7, ⁋⁋ 44 and 45; Exhibit 3, at 78:19-22, 24-25). Taken together, this multi-year concealment, the deliberate

sequencing of disclosure to the customer but not the employer, the scale of the diverted revenue, the admitted use of an alias entity to obscure his control, and the commingling of proceeds — each independently established by Defendant's own testimony — reflect, at minimum, a reckless disregard for the truth of Defendant's continued representations of loyalty to ECS. The resulting magnitude of harm to ECS independently supports an inference of fraudulent intent under the totality of the circumstances.

Defendant's violation of the Employment Agreement is therefore nondischargeable under § 523(a)(2)(A) of the U.S. Bankruptcy Code because Defendant concealed ASAP's formation and his communications with Atlantic III while working as a salaried employee and representative of ECS. The work he diverted as an ECS employee violated the Agreement and its accompanying non-competition and confidentiality covenants. Even after leaving ECS, Defendant solicited business from and performed work for The Betsy Hotel on more than ten occasions, in contravention of the valid and enforceable restrictive period contained in the Agreement. This included three jobs performed in between the time the Court granted the TRO and when it entered the Injunction. (SMF, p. 8, ⁋ 51, and Exhibit 8, pp 10-12). Finally, the debt resulting from Defendant's violation of the Employment Agreement is nondischargeable under § 523(a)(4) of the U.S. Bankruptcy Code because Defendant embezzled funds by cultivating and diverting the Atlantic III relationship while employed by ECS, and continuously serviced the Betsy Hotel after leaving ECS and in violation of the Agreement.

**1. Defendant's Concealment of ASAP and Diversion of ECS's Business with Atlantic III and The Betsy Hotel Renders the Resulting Debt Nondischargeable Under § 523(a)(2)(A) of the U.S. Bankruptcy Code Because He was Silent as to Material Facts while Owing Contractual Duties to ECS.**

Defendant's nondisclosure constitutes fraudulent misrepresentation within the statutory meaning of § 523(a)(2)(A) of the U.S. Bankruptcy Code. § 523(a)(2)(A) of the U.S. Bankruptcy Code requires proof of the traditional elements of common law fraud. *In re Howard*, 653 B.R. 693, 704

(Bankr. S.D. Fla. 2023) (citing *Bilzerian*, 153 F.3d at 1281). A creditor must establish that: "(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." *Id.* (citing *Bilzerian*, 153 F.3d at 1282).

***a. False Representation or Nondisclosure to Deceive Plaintiff***

First, silence or nondisclosure may constitute fraud when the debtor has a "'legal or a moral duty to speak or when an [unanswered] inquiry . . . would be intentionally misleading.'" *In re Richert*, 632 B.R. 877, 897 (Bankr. M.D. Fla. 2021) (citing *Becks v. Emery-Richardson, Inc.*, No. 86-6866-CIVGONZALEZ, 1990 WL 303548, at *42 (S.D. Fla. Dec. 21, 1990)); *see also In re Wood*, 245 F. App'x 916, 918 (11th Cir. 2007). Here, Defendant's legal duty to disclose arose directly from the Agreement: he expressly agreed not to solicit or sell services to ECS's customers during his employment, not to disclose ECS's proprietary information, including its customer identities and files, to any third party, and not to solicit ECS's employees. Those express contractual undertakings obligated him to disclose — or at minimum, not conceal — his formation of a competing business and his solicitation of ECS's own customers. Defendant's silence in the face of those undertakings was inherently misleading with respect to his continued compliance with the Agreement. Thus, a misrepresentation may exist even when "the debtor did not 'affirmatively state a misrepresentation or was never asked to disclose pertinent facts.'" *In re Janssens*, 449 B.R. 42, 75 (Bankr. D. Md. 2010) (citation omitted) (holding that a debtor's silence caused the creditor to believe he was faithfully serving the creditor rather than diverting corporate opportunities to competitors).

In this case, Defendant admits that when he formed ASAP in 2018, he was actively working for ECS at the time, and all the way until he left ECS in 2023, Defendant never informed ECS about ASAP's existence. (SMF, p. 5, ⁋ 30, and Exhibit 3, at 47:21-24). "[T]he company would have already been open for a few years so it wouldn't look like it . . . just opened." (SMF, p. 5, ⁋ 31, and Exhibit

3, at 42:2-6). Moreover, at least three months before departing ECS, Defendant solicited Atlantic III, a "longtime client of ECS," and provided a quote to them to replace their heat pumps. (SMF, p. 6, ⁋ 35, and Exhibit 3, at 70:8-12, 89:14-15; *see also Borrego*, 2024 WL 4063553, at *3). "They knew [..] [Defendant] was leaving ECS" because he told them. (SMF, p. 6, ⁋ 36, and Exhibit 3, at 66:10-13, 70:15). Meanwhile, Defendant only gave ECS "two [to] three weeks' notice" before leaving. (SMF, p. 7, ⁋ 46, and Exhibit 3, at 50:21-24). In concealing his communications with Atlantic III, in addition to the subsequent quote and work he provided for Atlantic III, Defendant's nondisclosure constitutes fraudulent misrepresentation as to his contractual obligations.

***b. ECS Relied on the Nondisclosure***

Plaintiff relied on Defendant's representations in the Agreement and his silence and failure to disclose that he was operating his own competing company while soliciting and performing services for Plaintiff's customers. That silence caused Plaintiff to continue treating him as a trustworthy salaried employee entrusted with its client relationships, rather than as the operator of a competing business. Because Defendant concealed ASAP's existence throughout his employment, ECS continued to pay him wages and benefits, continued to rely on him as its principal salesperson responsible for the Atlantic III account, and did not reassign or safeguard that relationship. *Borrego*, 2024 WL 4063553, at *1, *3. Had ECS known of ASAP's existence and Defendant's solicitation of Atlantic III, it would not have continued to entrust him with that client relationship or continued to compensate him as a loyal, longstanding employee.

***c. Plaintiff's Reliance Was Justified***

Second, justifiable reliance exists unless "'the plaintiff's conduct [is] . . . so utterly unreasonable, in the light of the information apparent to him," that the loss is his own responsibility.'" *Freedman*, 431 B.R. at 259 (citing *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995)). The inquiry turns on "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which

may fairly be charged against him from the facts within his observation in the light of his individual case.'" *Id.* (citing *Vann*, 67 F.3d at 283); *see also Field v. Mans*, 516 U.S. 59, 73-75 (1995) (holding that plaintiff must establish justifiable – but not objectively reasonable – reliance). A plaintiff must investigate when "facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived[.]" *Id.* (citing *Vann*, 67 F.3d at 283).

Here, ECS justifiably relied on the presumption that Defendant was compliant with the terms of the Agreement. Defendant admitted he signed the Agreement with ECS in 2011, and that it is his signature that appears under the corresponding confidentiality and non-competition covenants. (SMF, p. 4, ⁋ 16, and Exhibit 3, 26:1-2, 13-24). Both Defendant and ECS "agreed that these restrictions were 'fair and reasonable in all respects, including the length of time that they shall remain in effect . . . ." *Borrego*, 2024 WL 4063553, at *2. ECS learned through its own communications with Atlantic III that ASAP "had represented that it was affiliated with ECS, that ECS was being sold, or that ECS was no longer a concern." *Id.* at *3. Shortly thereafter, ECS was provided with emails between Atlantic III and ASAP showing that Defendant repeatedly solicited and provided services to Atlantic III. *Id.* Because ECS had valid and enforceable confidentiality and non-competition covenants encompassed in the Agreement with Defendant, ECS had no knowledge of his violations of the same. ECS justifiably relied on the contractual obligations to which Defendant had agreed.

***d. ECS Sustained a Loss as a Result of the Misrepresentation***

ECS's losses are directly attributable to Defendant's nondisclosure, not to any independent cause. Because ECS did not know Defendant had formed a competing company or that he was soliciting Atlantic III, it took no steps to protect that relationship, and Defendant diverted approximately $165,670 in Atlantic III business to ASAP between August 2022 and the end of 2023, all while continuing to collect his salary and benefits as an ECS employee. (SMF, p. 6, ⁋ 40; Exhibit

3, at 90:7-12, 22, 91:1-2, 24; Exhibit 6). Defendant thus was paid twice for the same period of service to ECS's detriment: once by ECS, which believed it retained his undivided loyalty, and once by ASAP, through revenue diverted from the very ECS customer relationship he was entrusted to protect. ECS also lost The Betsy Hotel relationship, which ASAP continued to provide service on at least ten occasions after Defendant's departure. (SMF, p. 8, ⁋⁋ 49 and 50; Exhibit 3, at 92:16-25, 93:1, 5-7, 95:2-7). Absent Defendant's concealment, ECS would have had the opportunity to intervene, reassign the accounts, terminate his employment, or enforce the Agreement before losing this revenue to a then-active employee.

***e. Defendant's Nondisclosure Was the Direct and Proximate Cause of Plaintiff's Loss***

Lastly, causation is established when an employer does not unduly delay action upon learning of an employee's misrepresentation or omission. *In re DeMasi*, 542 B.R. 13, 26-28 (Bankr. M.D. Fla. 2015) (finding no causation where employer did not terminate the employee and waited more than four years to terminate a related contract after learning of the employee's financial interest in the contracting party); *see also In re Janssens*, 449 B.R. 42, 77 (Bankr. D. Md. 2010) (finding proximate causation where the defendant concealed his work for the plaintiff's competitors while using the plaintiff's proprietary information to divert sales).

Causation is established here, and Defendant's own admissions remove any genuine dispute on the point. Defendant admitted that he caused the formation of ASAP in 2018 while actively employed by ECS and deliberately waited to leave so that "the company would have already been open for a few years so it wouldn't look like it . . . just opened." (SMF, p. 5, ⁋ 31, and Exhibit 3, at 42:2-6). He admitted that "ASAP was doing jobs while [he] was at ECS." (SMF, p. 5, ⁋ 32, and Exhibit 3, at 56:14). He admitted that he never informed ECS about ASAP's existence at any point before his departure. (SMF, p. 5, ⁋ 30, and Exhibit 3, at 47:21-24). He admitted that he solicited and quoted Atlantic III, a longtime ECS customer, at least three months before he left ECS, and that he

told Atlantic III he was leaving ECS at the time he did so. (SMF, p. 6, ⁋⁋ 35-36, and Exhibit 3, at 66:10-13, 70:8-12, 89:14-15). He admitted he gave ECS only "two [to] three weeks' notice" before departing, despite having solicited Atlantic III's business months earlier. (SMF, p. 7, ⁋ 46, and Exhibit 3, at 50:21-24). And he admitted that he performed work through ASAP for at least two customers he knew to be dissatisfied with ECS's services. (SMF, p. 6, ⁋ 33, and Exhibit 3, at 54:1-4). These admissions are not disputed. Together they establish that his concealment, not any independent cause, directly enabled the diversion of ECS's business. For had Defendant disclosed ASAP's existence or his solicitation of Atlantic III at any point before his admitted departure, ECS would have had the opportunity to intervene before the business was lost. Yet since ECS did not know that one of its longest tenured employee had formed a competing company and was soliciting its longtime customer, ECS was unable to take any steps to preserve the Atlantic III relationship, address the customer's complaints itself, or otherwise protect the account. Defendant was the one ECS employee positioned to intervene, and his own admitted nondisclosure foreclosed any opportunity for ECS to do so. The resulting diversion of approximately $165,670 in Atlantic III business, and subsequent loss of The Betsy Hotel account, stemmed directly from that concealment. Causation is further shown by the timing and directness of the connection. Defendant solicited Atlantic III while still employed and entrusted with the account, continued to draw a salary from ECS throughout, and only revealed the scheme's existence when ECS independently uncovered it through its own communications with Atlantic III. There is no intervening cause between Defendant's admitted concealment and ECS's loss of that business and revenue.

Here, ECS did not wait for further damage; it promptly sought relief after discovering Defendant's diversion of its customers to a competing business—one that Defendant did not disclose even existed. ECS learned of it only through its own communications with Atlantic III, which revealed that ASAP "had represented that it was affiliated with ECS, that ECS was being sold, or that ECS

was no longer a concern." *Id.* at *3. ECS then obtained emails showing that Defendant repeatedly solicited and performed services for Atlantic III. *Id.* Based on that information, ECS sought a preliminary injunction on April 10, 2024, the same day Defendant performed his second project for The Betsy Hotel and nearly four months before his final Betsy Hotel project that September. *Id.* at *1; Borrego Dep. 95:2-5. During the time period between when Plaintiff petitioned the district court for an injunction and when it was granted, ASAP performed ***nine additional Betsy Hotel projects***, diverting tens of thousands of dollars more from ECS to ASAP. (SMF, p. 8, ¶¶ 50 and 52; Exhibit 3, 95:2-5; Exhibit 8). ECS therefore did not unreasonably delay, but instead acted swiftly once it discovered the breach and the continuing losses caused by Defendant's concealment and unlawful theft of business.

Defendant's nondisclosure caused the debt. Entrusted to preserve ECS's customer relationships, he concealed the formation of ASAP, withheld Atlantic III's repeated concerns, and diverted ECS's work for Atlantic III and The Betsy Hotel to his own competing business. ECS acted promptly once it discovered the scheme, yet Defendant's unlawful actions continued for months. Because the resulting debt arose from business obtained through actual fraud, this Court should grant summary judgment in ECS's favor and hold that Defendant's debt is nondischargeable under § 523(a)(2)(A).

This case is distinguishable from *In re Maxxim*, where the court found a creditor did not establish causation when the creditor's losses resulted from its own operational failures rather than the debtor's misconduct. See *In re Maxxim Med. Grp., Inc.*, 434 B.R. 660, 668 (Bankr. M.D. Fla. 2010). In *Maxxim*, a former sales representative violated a covenant not to compete by leaving the plaintiff and working for a competitor. *Id.* During the same period, however, the plaintiff was unable to satisfy customer demand, experienced product-quality problems, and lost an exclusive supplier agreement. *Id.* at 678-680. The court concluded that the plaintiff failed to prove damages caused by

the defendant because the "[l]oss of goodwill and [..] customer relationships resulted from [plaintiff's] own failures[.]" *Id.* at 694. Even assuming the noncompete agreement was enforceable, the plaintiff "suffered no damages as a result of [defendant's] actions." *Id.* at 695.

That underlying concern is absent here. Unlike *Maxxim*, where the plaintiff's loss of goodwill and customers stemmed from its own operational failures, Defendant helped sever the very customer relationships he was paid to protect. He testified that he "like[d] to be on site for customer relationships and to make sure that everything went well[,]" and was positioned as a salaried ECS to manage those relationships on ECS's behalf. (SMF, p. 5, ⁋ 24, and Exhibit 3, 18:15-16). Yet when Atlantic III "kept trying to get quotes from [ECS]" and allegedly complained "[m]ultiple, multiple times[,]" Defendant did not preserve the relationship or pursue corrective action. (SMF, p. 6, ⁋ 39, and Exhibit 3, at 66:18-19; 67:24). He claims the "service and subsequent invoices . . . drove them away from ECS[,]" yet Defendant's own testimony does not indicate that he meaningfully attempted to resolve those complaints. (SMF, p. 6, ⁋ 39, and Exhibit 3, at 68:13-14). If Defendant met with ECS's owner and Mr. Gandor "to discuss strategy for ECS[,]" retaining ECS's customers or protecting its goodwill necessarily formed part of that strategy. (*See generally*, SMF, p. 4, ⁋ 21, and Exhibit 3 at 22:12-18). Moreover, *Maxxim* did not involve an employee who, while still employed by the plaintiff, created a competing business and diverted the plaintiff's customers to it. The defendant in that case merely left to join an existing competitor. That distinction further weakens *Maxxim*'s analogy to the causation element here. ECS's loss cannot be attributed solely to independent operational shortcomings where Defendant's conduct and role directly targeted and diverted the very customer relationships that ECS lost.

**2. Defendant's Diversion of ECS's Business Constitutes Embezzlement and Renders the Resulting Debt Nondischargeable Under § 523(a)(4) Because Defendant Appropriated Business Developed During His Employment for His Own Benefit.**

Defendant also committed embezzlement. § 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The fiduciary capacity requirement modifies only the "fraud or defalcation" prong. *In re Piercy*, 21 F.4th 909, 919 (6th Cir. 2021); *see also In re Brady*, 101 F.3d 1165, 1173 (6th Cir. 1996). Embezzlement is "'the fraudulent appropriation of property by [the debtor] to whom such property has been entrusted, or into whose hands it has lawfully come.'" *In re Case*, 636 B.R. 852, 858 (Bankr. S.D. Fla. 2022) (citing *Moore v. U.S.*, 160 U.S. 268, 269 (1895)). Larceny is the "fraudulent taking and carrying away of property of another with intent to convert such property to his use without consent of another." *In re Disbrow*, 2019 WL 4439897, at *15 (Bankr. S.D. Fla. 2018) (citing *In re Pupello*, 281 B.R. 763, 768 (Bankr. M.D. Fla. 2002)). Once it is established that specific money or property has been obtained by fraud, however, "'any debt' arising therefrom is excepted from discharge." *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998).

A creditor establishes embezzlement by proving that "(1) he entrusted property to the debtor, (2) the debtor appropriated the property for a use other than that for which it was entrusted, and (3) the circumstances indicate fraud." *In re Howard*, 658 B.R. 693, 705 (Bankr. S.D. Fla. 2023) (citing *Case*, 636 B.R. at 858). Larceny is defined as the fraudulent taking and carrying away of property of another with the intent to convert such property to his own use without the consent of another. *In re Jacobs*, 243 B.R. 836, 845 (Bankr. M.D. Fla. 2000) (holding defendant, as an officer of the plaintiff, committed larceny by fraudulently appropriating $240,000 in commission received on behalf of the plaintiff for his own benefit).

***a. ECS Entrusted Defendant with Its Client Relationships and Business Opportunities***

The evidence satisfies each element of embezzlement. Three months before leaving ECS, Defendant agreed to provide services to Atlantic III and ultimately appropriated the business opportunity of Plaintiff's existing customer, Atlantic III, resulting in business revenue of $165,670.

At ECS, Defendant was responsible for "generat[ing] new and reoccurring business opportunities from ECS's new and existing clients" in Florida and had "direct access to and communications with ECS's existing clients[.]" *Borrego*, 2024 WL 4063553, at *1. His role thus entrusted him with managing valuable client relationships, including the Atlantic III relationship, on ECS's behalf.

#### *b. Defendant Appropriated ECS's Business Opportunity for a Use Other Than That for Which It Was Entrusted*

When Atlantic III approached Defendant because "[t]hey . . . wanted to . . . replace some heat pumps[,]" Defendant claims "they knew that [he] was leaving ECS" because he told them. (SMF, p. 6, ⁋ 36, and Exhibit 3, at 66:13, 70:15). But beyond Defendant's self-serving account, no evidence shows that Atlantic III approached Defendant for work outside ECS's scope. Instead, Defendant admitted that he arranged and performed the Atlantic III work while still employed by ECS, and that "ASAP was doing jobs while [he] was at ECS." (SMF, p. 5, ⁋ 32, and Exhibit 3, at 56:14). ASAP began servicing and billing Atlantic III in August 2022 and continued through January 2024. *Borrego*, 2024 WL 4063553, at *3. None of the approximately $165,670 generated from ECS's longtime client went to ECS. (SMF, p. 6, ⁋ 40, and Exhibit 3, 90:7-12, 22, 91:1-2, 24). Defendant also admitted that he performed ASAP work for at least two customers he knew were unhappy with ECS's services, confirming that he actively diverted dissatisfied ECS customers to his own company rather than addressing their concerns in his role at ECS. (SMF, p. 6, ⁋ 33, and Exhibit 3, at 54:1-4). By securing and diverting that business while still employed, and by his own admission continuing to do so through his departure, Defendant wrongfully appropriated it from ECS.

#### *c. The Totality of the Circumstances Prove Fraud*

Defendant then used the diverted proceeds for unauthorized purposes through an account that functioned neither solely as ASAP's or Defendant's. A June 2023 account statement revealed expenditures on food, retail, restaurants, and Amazon. (SMF, p. 7, ⁋ 42, and Exhibit 3, 78:4-15; *see also* SMF, p. 7, ⁋⁋ 42, 43, and 45, and Exhibit 7). In December of 2023, Defendant used the same

account to make two payments totaling $6,850 to Oscar Rodriguez, a former ECS employee, and another payment in February of 2024. *Borrego*, 2024 WL 4063553, at *4; (SMF, p. 7, ⁋ 43, and Exhibit 3, at 80:1-6, 83:10-11). Defendant admitted that he made no effort to delineate between ASAP, the business he operated from his house, and personal expenses, and admitted that "whatever money [he] had in [the] account [he] felt was able to be used for family expenses or otherwise," was used as such. (SMF, pp. 5-7, ⁋⁋ 29 and 44-45; Exhibit 3, 62:2, 78:19-22, 24-25). He further admitted that he signed the Agreement containing the non-competition and confidentiality covenants he violated, and ultimately conceded that he "signed the package." (SMF, p. 4, ⁋ 16, and Exhibit 3, at 26:13-17, 28:12). These admissions — that he formed and concealed a competing company while employed, diverted a customer's business to it, commingled and personally spent the resulting proceeds, and does not dispute having signed the very Agreement he violated – leave no genuine issue of material fact. Together, the absence of any accounting or segregation of funds, and Defendant's own admitted use of diverted business revenues for personal family expenses rather than any legitimate business purpose, independently establish that Defendant misappropriated ECS's business opportunity under circumstances indicating fraud.

***d. In the Alternative, Defendant's Conduct Also Constitutes Larceny***

In the alternative, the same core conduct establishes larceny under § 523(a)(4). A creditor proves larceny by showing the fraudulent and wrongful taking of the creditor's property (a) without the owner's consent and (b) with intent to convert the property to the taker's own use. Defendant took the Atlantic III business opportunity — an asset of ECS developed and maintained through ECS's client relationships – without ECS's knowledge or consent, and used ASAP to divert approximately $165,670 in revenue from that relationship to himself and while soliciting business opportunities for his own company in direct competition to Plaintiff, he accepted a salary from Plaintiff. Because

Defendant took ECS's business opportunity without consent and with the intent to convert it to his own benefit, the resulting debt is independently nondischargeable as larceny under § 523(a)(4).

Defendant turned a client relationship that ECS paid him to protect into approximately $165,670 for himself, then treated the proceeds as his own, and made no effort to separate company expenses from personal expenses. This Court should grant summary judgment in ECS's favor and hold that the resulting debt is nondischargeable under § 523(a)(4).

## IV. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiff respectfully requests that this Court grant summary judgment in favor of Plaintiff, and hold that Defendant Theodore Borrego's debt is nondischargeable under §§ 523(a)(2)(A) and 523(a)(4) of the U.S. Bankruptcy Code.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER, LLP**

Date: August 14, 2026

/s/Kimberly Ross Clayson
Stuart M. Schwartz (P62752)
Kimberly Ross Clayson (P69804)
Andrew M. Creal (P83806)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
sschwartz@taftlaw.com
kclayson@taftlaw.com
acreal@taftlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I served a copy of the forgoing and this ***Certificate of Service*** via first class mail and email upon Defendants' counsel of record, James Schwitalla at:

jws@MiamiBKC.net

and

The Bankruptcy Law Offices of James Schwitalla, P.A.
Park Place II
12954 SW 133 Court
Miami, FL 33186

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Date: August 14, 2026

*/s/Kimberly Ross Clayson*
Stuart M. Schwartz (P62752)
Kimberly Ross Clayson (P69804)
Andrew M. Creal (P83806)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
sschwartz@taftlaw.com
kclayson@taftlaw.com
acreal@taftlaw.com

*Attorneys for Plaintiff*