**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

**In re:**
**THEODORE GEORGE BORREGO, JR and** Case No. 25-14217-RAM

**VERONICA PAZ-BORREGO** Chapter 13

Debtors.
_____________________________________/

**ENGINEER COMFORT SYSTEM, INC.**

Plaintiff, Adv. P. No. 25-01323-RAM

v.

**THEODORE GEORGE BORREGO, JR. and**
**VERONICA PAZ-BORREGO**

Defendants.
_____________________________________ /

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT THEODORE BORREGO**

1. Plaintiff, Engineered Comfort System, Inc., (**"Plaintiff"** or **"ECS"**) is a commercial heating, ventilation, and air conditioning contractor that provides sales, installation, and maintenance servicing both residential and commercial consumers. (**Exhibit 1**, Order Granting TRO and Setting Hearing for Preliminary Injunction Motion dated July 29, 2024, Case: 2:24-cv-10924-GAD-EAS, ECF No. 21, PageID 250-251)(the **"TRO"**).

2. The TRO specifically barred Defendant Theodore Borrego (**"Defendant"**) from, among other things, "(a) soliciting or communicating with any person or firm serviced or solicited

by ECS within the two years immediately preceding the termination of Borrego's employment with ASAP; and (b) soliciting or communicating with any ECS employees or contractors who were employed by ECS at or after the time that Borrego signed the Employment Agreement." (**Exhibit 1**, ECF No. 21, PageID.254-255).

3. The TRO also ordered that Defendant Borrego shall not provide services on behalf of ASAP or any other business that offers services competitive with those offered by ECS. (**Exhibit 1**, ECF No. 21, PageID.255).

4. The TRO was converted into a Preliminary Injunction (**"Injunction"**) on September 5, 2024 by the district court sitting in the Easter District of Michigan. (**Exhibit 2**, Preliminary Injunction Order dated September 5, 2024, Case: 2:24-cv-10924-GAD-EAS, ECF No. 21, ECF No. 30, Page ID.331-344).

5. ECS is headquartered in Michigan, but in 2011, expanded operations into Florida. (**Exhibit 3**, Deposition of Defendant Theodore Borrego at 10:13).

6. To execute that expansion, ECS hired Defendant as a "New Business Development Director" to "generat[e] new and reoccurring business opportunities from ECS's new and existing clients" in Florida. (**Exhibit 2**, ECF No. 30, PageID.332-333).

7. Upon his hiring, Defendant executed an Employment Agreement (**"Agreement"**) with ECS, which is governed by Michigan law, and contained specific non-solicitation and non-competition provisions. (**Exhibit 1**, ECF No. 21, PageID.251-252).

8. Defendant has spent approximately twenty-five years in the HVAC field, and "always worked solely in the sales world." (**Exhibit 3**, at 8:6-9, 9:15).

9. Manny Gandor, Defendant's former boss at a previous employer, was also hired by Plaintiff to serve as Vice President of Operations for Florida. (**Exhibit 3**, at 11:13-14, 23-2, 24:17-18.

10. With a territory spanning Miami into the rest of Dade and Broward counties, Defendant gained "direct access to and communications with ECS's existing clients" and "to ECS's confidential and proprietary information, including without limitation, ECS's competitive pricing data, and [..] supplier and client contacts . . . cultivated by ECS over . . . [twelve]-plus years." *Engineered Comfort Systems, Inc. v. Borrego*, 2024 WL 4063553, at *1.

11. The Agreement prohibited Defendant from "directly or indirectly calling upon, soliciting, or selling or attempting to sell services to ECS's customers" through the duration of his employment "and two years after [..] termination." (**Exhibit 4**, Employment Agreement, and *see also* Case: 2:24-cv-10924-GAD-EAS, *supra*, ECF No. 1-1)

12. The Agreement also prohibited Defendant from "encourag[ing], solicit[ing], or otherwise attempt[ing] to persuade any other employee of [ECS] to leave [ECS's] employ[.]" (*Id.* ¶ 4).

13. With respect to confidentiality, the Agreement provided that Defendant "shall not communicate or disclose, directly or indirectly, to any person or firm, or at any time, any of [ECS's] proprietary information, whether or not such information was developed or obtained by [Defendant]." (*Id.* at ¶ 3).

14. "[P]roprietary information" referred to:

> [T]he identity of customers and prospective customers of [ECS]; customer files and detailed information concerning customer needs and requirements; proposals designed to meet customer needs or requirements; product designs, drawings, and specifications, or their drafts; formulas, product planning information, market surveys and forecasts; pricing, cost, and

> margin information; and other financial information and records of Corporation.

(*Id.* at ¶ 3).

15. Both Defendant and ECS "agreed that these restrictions were 'fair and reasonable in all respects, including the length of time that they shall remain in effect . . . ."(*Id.* at ¶ 4).

16. The District Court found that Defendant "agreed to the terms of the Employment Agreement[.]" *Borrego, supra,* 2024 WL 4063553 at *6.

17. When Defendant argued against enforcing the Agreement because it would cause "undue hardship," the District Court reasoned that "refusing to enforce valid agreements 'would create an incentive for other [employees] to violate their agreements without fear of reprisal[,]'" and held that it was "neither unduly burdensome, nor against the public interest, to enforce the [..] Agreement as written." *Id.* at *6.

18. Defendant was a salaried employee at ECS. (**Exhibit 3** at 15:1).

19. Defendant worked closely with Mr. Gandor, both to report proposals from prospective customers for Mr. Gandor's review and by dividing up proposal oversight through a "regular split system." (*Id*, at 15:22-24, 16:12-16).

20. In some cases, Mr. Gandor told Defendant to finish proposals off or to "take care of [them]" himself. (*Id*, at 18:10-12).

21. On other occasions, Defendant would meet with ECS's owner and Mr. Gandor together "to discuss strategy for ECS[,]" and "talk about . . . how the guys are doing" with respect to the business. (*Id*, at 22:12-18).

22. Defendant frequented meetings with ECS's senior leadership with respect to the performance of the company. (*Id*, at 24:5-7).

23. Although Mr. Gandor occasionally worked in a sales role, Defendant was the only full-time salesperson present in those meetings. (*Id*, at 24:13-14).

24. Defendant was routinely on-site for contracted work to foster and maintain Plaintiff's customer relationships. (*Id*, at 18:15-16).

25. On July 26, 2018, while Defendant held an active position of authority with ECS, ASAP filed Articles of Incorporation in Florida by an individual named "Maria Veronica Montesinos," an alias for Defendant's wife, Veronica Paz-Borrego. (**Exhibit 5**, Deposition of Defendant Veronica Paz-Borrego Deposition, at 16:17-23).

26. Defendant Paz-Borrego testified that she had nothing to do with the company beyond its formation and that Defendant "was managing the Company." (*Id*, at 13:15, 18:19).

27. She testified that she wouldn't ask questions and signed documents at Defendant's directive. (*Id*, at 30:22-24).

28. Like ECS, ASAP performed both commercial and residential HVAC services. (**Exhibit 3**. 39:20-21.

29. ASAP operated its business solely out of the Defendant's and Ms. Borrego's residence. (**Exhibit 3**, at 62:2).

30. Despite Defendant's goal to leave ECS in or around 2023, Defendant never informed ECS about ASAP's existence. (*Id*, at 47:21-24).

31. Defendant testified that the purpose of forming ASAP was so that "the company would have [..] been open for a few years so it wouldn't look like it . . . just opened." (*Id*, at 42:2-6).

32. Defendant admitted that "ASAP was doing jobs while [he] was at ECS." (*Id*, at 56:14).

33. Defendant claims he did not use ASAP to target customers he knew were unhappy with ECS, but he concedes that "[d]id I work for them? Yes. Two of them." (*Id*, at 54:1-4).

34. Defendant's last day at ECS was October 23, 2023. (*Id*, at 55:12).

35. At least three months before departing ECS, however, Defendant spoke with Atlantic III, a "longtime client of ECS," and provided them a quote to replace their heat pumps. (*Id*, at 70:8-12, 89:14-15;

36. Atlantic III knew Defendant was planning to leave ECS because Defendant told them. (*Id*, 66:10-13, 70:15).

37. "[They] didn't tell me that they . . . wanted quotes from ECS[,]" but asked, "'Teddy, can you give me pricing on this?'" (*Id*, at 67:17-19).

38. Defendant claimed ECS's "prices were too high because [Atlantic III] came complaining every single day to the office of the invoices[,]" and were "frustrated on invoices for services . . . being double billed[.]" (*Id*, at 67:20-22, 68:8-9).

39. Defendant claimed that Atlantic III complained "[m]ultiple, multiple times." (*Id*, at 67:24). He claimed the "service and subsequent invoices . . . drove them away from ECS[.]" (*Id*, at 68:13-14.

40. Rather than address these concerns in his position of authority with Plaintiff or bring them to ownership's attention in Michigan, Defendant diverted Plaintiff's customer to ASAP. ASAP performed services and billed Atlantic III from August 2022 through the end of 2023, receiving approximately $165,670.00. *Borrego, supra*, 2024 WL 4063553, at *3; (*Id*, 90:7-12, 22, 91:1-2, 24; *see also* partial Atlantic III Invoices, **Exhibit 6** (the **"Invoices"**).

41. In addition, Defendant solicited Oscar Rodriguez, Jorge Pezoa, and Maury Tarrago, three employees of ECS, including one of whom subject to a confidentiality and non-competition

agreement "substantially similar to [Defendant's] [..] Agreement." *Borrego*, 2024 WL 4063553, at *4.

42. According to a June 2023 account statement from ASAP, Defendant used ASAP funds for expenses beyond the company, including purchases for food, retail, restaurants, and Amazon. (**Exhibit 3**, at 78:4-15; See also **Exhibit 7,** the "Bank Statements", pp 1-5).

43. In December of 2023, Defendant used the same ASAP company account to make two payments totaling $6,850 to Oscar Rodriguez, and another in February of 2024 for services on behalf of ASAP. (**Exhibit 3**, at 80:1-6, 83:10-11; *see* also **Exhibit 7**, p 7).

44. Defendant affirmed that he did not make any effort to delineate between ASAP expenses and personal expenses. (**Exhibit 3**, at 78:19-22).

45. Defendant testified that "whatever money [he] had in [the] account [he] felt was able to be used for family expenses or otherwise" was used as such, and the Bank Statements support that testimony. (*Id*, at 78:24-25, 79:1; *See generally*, **Exhibit 7**).

46. Defendant only gave ECS two to three weeks' notice before his departure. (*Id*, at 50:21-24).

47. ECS learned through its own communications with Atlantic III that ASAP "had represented that it was affiliated with ECS, that ECS was being sold, or that ECS was no longer a concern." (**Exhibit 2**, ECF No. 30, PageID.337).

48. Shortly thereafter, ECS obtained emails between Atlantic III and ASAP showing that Defendant repeatedly solicited and provided services to Atlantic III. *Id.* Despite his ongoing solicitation, Defendant continued to collect wages and benefits as an ECS employee. *Id.*

49. Four months after leaving ECS, ASAP performed work for The Betsy Hotel, a former ECS client he had known from performing services for them and acquired while soliciting on behalf of ECS. (**Exhibit 3**, at 92:16-25, 93:1, 5-7; *See also*, **Exhibit 8**, The Betsy Hotel Invoices).

50. ASAP continued to perform work for The Betsy Hotel on at least ten more occasions, with the last job completed on September 3, 2024 – six months after ECS moved for preliminary injunction based on Defendant's illegal actions. (*Id*, at 95:2-7; **Exhibit 8**).

51. ASAP performed at least three jobs for the Betsy Hotel in between the time when the United States District Court for the Eastern District of Michigan issued its TRO (**Exhibit 1**) and the Injunction (**Exhibit 2**). (See also, **Exhibit 8**, pp 10-12).

52. ECS filed its motion for preliminary injunction in the underlying case in the United States District Court for the Eastern District of Michigan on April 10, 2024, the same day Defendant performed his second project for the Betsy Hotel. (*Id*, Borrego Dep. 95:2-7).

53. The injunction was granted one on September 5, 2024. (**Exhibit 2**).

54. On February 19, 2025, ECS moved for a default judgment due to Defendant's and ASAP's ongoing violations of an Order to Compel previously filed by ECS. (*See* Case: 2:24-cv-10924-GAD-EAS, *supra*, ECF No. 46).

55. On April 24, 2025, the District Court set hearing for Plaintiff's Motion for Default Judgment on May 13, 2025. (*Id*, at ECF No. 50).

56. Shortly thereafter, the underlying case was stayed upon the district court's receipt of notice filing of Defendant and Mrs. Borrego's Chapter 13 bankruptcy. (*Id*, ECF No. 51).

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER, LLP**

Date: August 14, 2026

/s/Kimberly Ross Clayson
Stuart M. Schwartz (P62752)
Kimberly Ross Clayson (P69804)
Andrew M. Creal (P83806)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
sschwartz@taftlaw.com
kclayson@taftlaw.com
acreal@taftlaw.com

# EXHIBIT LIST

Exhibit 1 - Order Granting TRO and Setting Hearing on Plaintiff's Motion

Exhibit 2 - Preliminary Injunction Order

Exhibit 3 - Theodore Borrego Deposition Transcript

Exhibit 4 - Employment Agreement

Exhibit 5 - Veronica Paz-Borrego Deposition Transcript

Exhibit 6 - Atlantic III Invoices

Exhibit 7 - Bank Statements

Exhibit 8 - The Betsy Hotel Invoices

**Exhibit 1**

Order Granting TRO and Setting Hearing on Plaintiff's Motion

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENGINEERED COMFORT SYSTEMS, INC.,
a Michigan corporation,

Plaintiff, vs.

THEODORE BORREGO, an individual;
VERONICA PAZ-BORREGO, an individual;
ASAP AIR MECHANICAL TEAM, INC., a
Florida corporation,

Defendants.

Case No. 2:24-cv-10924

Hon. Gershwin A. Drain
Mag. Judge Elizabeth A. Stafford

---

**TEMPORARY RESTRAINING ORDER AND ORDER SETTING HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Engineered Comfort Systems, Inc. ("ECS"), moved for temporary injunctive relief under Fed. R. Civ. P. 65 against Defendants Theodore Borrego ("Borrego"), Veronica Paz-Borrego ("Paz-Borrego"), and ASAP Air Mechanical Team, Inc. ("ASAP," and collectively with Borrego and Paz-Borrego, "Defendants") on or about July 18, 2024. The Court, having been fully informed in the premises, finds and orders as follows:

1. ECS is a commercial heating, ventilation, and air conditioning ("HVAC") contractor that, among other things, provides sales, installation and maintenance services to private businesses, educational institutions, condominium

associations, and homeowners. ECS is headquartered in Taylor, Michigan, but also operates an office in South Florida.

2. ECS originally hired Borrego as its New Business Development Director in or around July 2011. In his role, Borrego was responsible for, among other things, generating new and reoccurring business opportunities from ECS's existing clients. Borrego also had direct access to and communications with ECS's existing clients, as well as direct access to ECS's confidential and proprietary information, including without limitation, ECS's competitive pricing data, and various supplier and client contacts that had been cultivated by ECS over a period of years. Borrego was often the primary point of contact for clients with respect to quoting, pricing, and project management.

3. Upon his hiring, Borrego executed an Employment Agreement (ECF No. 1-1), which is governed by Michigan law. Under the Employment Agreement, Borrego agreed to refrain from, among other things:

a. calling upon, soliciting, and/or selling or attempting to sell any products or services similar to or in competition with those offered by ECS, directly or indirectly, either on his own behalf or in conjunction with another person or organization, to any customer serviced or solicited by ECS during the two years prior to his termination (Employment Agreement, § 4);

b. encouraging, soliciting, or otherwise attempting to persuade any of ECS's other employees from terminating their employment with ECS (Employment Agreement, § 5); and

c. using or disclosing ECS's confidential and proprietary information without the express consent of ECS (Employment Agreement, § 3).

4. In July 2018, while Borrego was still employed with ECS, ASAP filed its Articles of Incorporation with the Florida Secretary of State. ASAP was incorporated by a person named "Maria Veronica Montesinos." According to a real estate conveyance document filed with the Miami-Dade County Recorder's Office a few months prior, "Maria Veronica Montesinos" was Borrego's wife and lived with him at 4160 NE 20th Street in Homestead, Florida.

5. In July 2020—while Borrego was still employed with ECS— ASAP filed a reinstatement with the Florida Secretary of State, listing Paz-Borrego (Borrego's current wife) as its new President. ASAP listed a new registered address and principal place of business at 4160 NE 20th Street in Homestead, Florida. (Id.) As noted, this is Borrego's personal address.

6. Beginning in April 2022 (at the latest), ASAP, through Paz-Borrego, allegedly began quoting and providing services to the Atlantic III Condominium Association in Aventura, Florida ("Atlantic III"), which is a longtime client of ECS.

7. As early as June 2023, Borrego was personally copied on communications between Atlantic III and ASAP. At this time, Borrego was still employed by ECS and was responsible for servicing Atlantic III.

8. ASAP obtained Atlantic III's business by representing to Atlantic III that it was affiliated with ECS, which Plaintiff says was not true. ECS allegedly learned

this after speaking to a representative of Atlantic III, who provided ECS with numerous emails demonstrating ASAP solicitation of, and provision of services to, Atlantic III.

9. ECS has also allegedly learned that Borrego and/or Paz-Borrego solicited at least three of ECS's employees to work for ASAP, including Oscar Rodriguez, Jorge Pezoa and Maury Tarrago. At least one of these employees, Oscar Rodriguez, is subject to a Confidentiality and Non-Competition Agreement that is substantially similar to Borrego's Employment Agreement.

10. The Court finds that ECS has met its burden of demonstrating a likelihood of success on the merits on its claim for breach of contract against Borrego. The Employment Agreement is reasonably limited in scope, duration, and line of business under Michigan law. Plaintiff has a high likelihood of demonstrating that Borrego breached the terms of the Employment Agreement by participating in a business that competes with ECS and provides services to at least one of ECS's clients, both during his employment with ECS and within two years afterward.

11. The Court likewise finds that ECS has met its burden of demonstrating a high likelihood of success on the merits on its claim for tortious interference with contract against all Defendants. Public documents purportedly show that ASAP is operated by Paz-Borrego (Borrego's alleged wife), and Borrego's wife was likely aware that Borrego was subject to an Employment Agreement that prohibited him from soliciting customers of ECS. ASAP has also allegedly solicited at least one

other ECS employee who is subject to a non-compete agreement. The Court therefore finds that Plaintiff has a high likelihood of demonstrating that ASAP and Paz-Borrego, acting in concert with Borrego, have knowingly induced the breach of Borrego's contract and attempted to induce the breach of a contract with at least one other ECS employee.

12. If Borrego continues his purported violations of the Employment Agreement, and ASAP and Paz-Borrego continue to assist him in doing the same, ECS will suffer irreparable harm, including, but not limited to, loss of goodwill, damage to ECS's client and employment relationships, and loss of future business opportunities.

13. The Court further finds that an injunction will cause minimal harm to third parties.

14. Finally, the Court finds that the public interest is served by enforcing the bargained-for provisions of the Employment Agreement.

Therefore, **IT IS ORDERED** that Defendants shall be and are hereby immediately enjoined, restrained, and otherwise prohibited from:

(a) Soliciting or communicating with any person or firm serviced or solicited by ECS within the two years immediately preceding the termination of Borrego's employment with ASAP;

(b) Soliciting or communicating with any ECS employees or contractors who were employed by ECS at or after the time that Borrego signed the Employment Agreement;

(c) Using or disclosing any nonpublic information related to ECS's business.

**IT IS FURTHER ORDERED** that Borrego shall not provide services on behalf of ASAP or any other business that offers services competitive with those offered by ECS.

**IT IS FURTHER ORDERED** that Defendants shall return any and all documents, files, or other information pertaining to ECS's business with seven days of entry of this Order.

**IT IS FURTHER ORDERED** that the Court will hold a hearing on ECS's Motion for Preliminary Injunction on **August 9, 2024**.

**IT IS FURTHER ORDERED** that the provisions of this Order shall remain in effect until this Court rules on ECS's Motion for Preliminary Injunction.

**IT IS FURTHER ORDERED**, pursuant to Fed. R. Civ. P. 65(d)(2), unless otherwise stated in this Order, the provisions of this Order shall apply to all persons who received actual notice of it by personal service or otherwise, including Defendants; their respective officers, agents, servants, employees, and attorneys; and any persons acting in concert with Defendants or their respective officers, agents, servants, employees, and attorneys.

**IT IS SO ORDERED.**

Dated: July 29, 2024

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on July 29, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Deputy Clerk

**Exhibit 2**
Preliminary Injunction Order

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENGINEERED COMFORT SYSTEMS, INC.,
*A MICHIGAN CORPORATION*

Plaintiff,

v.

Case No. 24-cv-10924

THEODORE BORREGO, *AN INDIVIDUAL;*
VERONICA PAZ-BORREGO, *AN INDIVIDUAL.*
ASAP AIR MECHANICAL TEAM, INC., *A FLORIDA CORPORATION.*

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

Defendants.

_________________________/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 19]**

## I. Introduction

On April 10, 2024, Engineered Comfort systems, Inc. ("Plaintiff" or "ECS") commenced the instant action. The complaint alleges violations of the Employment Agreement ECS had with Theodore Borrego ("Borrego"). Though Theodore was the only Defendant employed by ECS, the complaint also alleges claims against Theodore's wife, Veronica Paz-Borrego ("Paz-Borrego"), and a corporation they allegedly formed named ASAP Air Mechanical Team, Inc. ("ASAP"). ECS brings claims for monetary damages and injunctive relief for "Defendants' independent,

collective and/or concerted (a) breach of and/or tortious interference with certain restrictive employment agreements (e.g., non-competition agreements) between ECS and its employees; (b) tortious interference with, and usurpation of ECS's contractual and business relationships with its clients; (c) embezzlement and/or theft; (d) violations of the Lanham Act; and (e) various forms of fraud." ECF No. 1, PageID.2.

Before the Court is ECS's Motion for Temporary Restraining Order and Preliminary Injunction. [ECF No. 19]. Defendants responded on August 1, 2024, and Plaintiff replied on August 5, 2024. The Motion is fully briefed. The Court entered a Temporary Restraining Order on July 29, 2024, and held preliminary injunction hearings on August 9, 2024 and September 4, 2024. For the reasons set forth below, ECS's motion is **GRANTED**.

## II. Factual Background

ECS is a commercial heating, ventilation, and air conditioning ("HVAC") contractor that provides sales, installation and maintenance services to private businesses, educational institutions, condominium associations, and homeowners. *See* ECF No. 19, PageID.151. ECS has its headquarters in Michigan but also operates in South Florida. It hired Borrego as its "New Business Development Director" in July 2011 and he worked in that position until October 2023. Among other things, Borrego was responsible for "generating new and reoccurring business

opportunities from ECS's new and existing clients." ECF No. 19, PageID.151. Borrego also had "direct access to and communications with ECS's existing clients, as well as direct access to ECS's confidential and proprietary information, including without limitation, ECS's competitive pricing data, and various supplier and client contacts that had been cultivated by ECS over a period of 12-plus years." *Id*. Borrego was allegedly the primary point of contact for clients with respect to developing relationships, quoting, pricing, and scheduling. *See id*.

Upon his hiring, Borrego executed an Employment Agreement, which included non-competition, non-solicitation, and non-disclosure provisions (the "Restrictive Covenants"). *See* ECF No. 1-1, § § 3-6.

**(1) The Employment Agreement**

The "Noncompetition" provision of the Employment Agreement contains a forum selection clause for Michigan. The agreement prohibits Borrego from directly or indirectly calling upon, soliciting, or selling or attempting to sell services to ECS's customers, either individually or on behalf of another business. *Id*., § 4. The provision remains effective through the duration of Borrego's employment and two years after his termination. *Id*. Specifically, § 4 provides:

> 4. Noncompetition: a) In consideration for (his/her) employment, between the date of signing this Agreement and the date of Employee's [i.e., Borrego] termination, and subject to termination as set forth in Section 2 above, Employee agrees that, during the period of (his/her) employment with Corporation [i.e., ECS] and for a period of two (2) years after (his/her) employment with Corporation terminates, whether

> such termination is voluntary or involuntary, (he/she) shall not directly or indirectly, either individually or on behalf of another person or firm
>
> (i) Call upon, solicit, or sell or attempt to sell any products or services similar to or in competition with those offered by Corporation to any person or firm that (1) was a customer of Corporation during the two (2) year period immediately preceding termination of Employee's employment with Corporation, or that (2) was solicited by Corporation or otherwise had any contact with Corporation during the two (2) year period preceding the termination of Employee's employment with Corporation. Notwithstanding the foregoing sentence, Employee shall not be deemed to be in violation of this section if (he/she) bids or attempts to bid upon work in connection with a project which is publicly advertised by the owner for competitive bids.

*Id*., at § 4(a)(i). The parties agreed that these restrictions were "fair and reasonable in all respects, including the length of time that they shall remain in effect . . . ." *Id*., at § 4(b). Additionally, the agreement states that "[i]f any provisions of this Section are ever held by a court to be unreasonable . . . this Section shall be enforced to the extent it is deemed to be reasonable." *Id*., at § 4(c).

The Restrictive Covenants also prohibit Borrego from soliciting ECS employees to leave ECS: 5. "No Interference with Employment Relations: Employee agrees that (he/she) will not, either before or after termination of (his/her) employment with Corporation encourage, solicit, or otherwise attempt to persuade any other employee of Corporation to leave the employ of Corporation." *Id*., at § 5. Moreover, the Restrictive Covenants provide that Borrego "shall not communicate or disclose, directly or indirectly, to any person or firm, or use at any time, any of

[ECS's] proprietary information, whether or not such information was developed or obtained by Employee." *Id.*, at § 3(b).

Under the Employment Agreement, "proprietary information" refers to "the identity of customers and prospective customers of [ECS]; customer files and detailed information concerning customer needs and requirements; proposals designed to meet customer needs or requirements; product designs, drawings, and specifications, or their drafts; formulas, product planning information, market surveys and forecasts; pricing, cost, and margin information; and other financial information and records of Corporation." *Id.*, at § 3(a). The agreement acknowledges that the foregoing types of proprietary information are highly confidential to Corporation, are valuable, give a competitive advantage to Corporation, and could not, without great expense and difficulty, be obtained or duplicated by others who have not been able to acquire such information by virtue of employment with Corporation. *Id.*, at § 3(a). Borrego agreed to return all "proprietary information" to ECS upon the termination of his employment. *Id.*, at § 6. The agreement further acknowledged that "[ECS] would be irreparably harmed, damages would be difficult to establish, and [ECS] would not have an adequate remedy at law if [Borrego] were to breach this Agreement." *Id.*, at § 7.

Therefore, the Employment Agreement expressly authorizes various remedies for violations of the Restrictive Covenants, including:

(a) an injunction restraining Employee from disclosing or using any proprietary information of Corporation in breach of Section 3 and liquidated damages of $10,000.00 for each violation or breach of Section 3;

(b) an injunction restraining Employee from engaging in a competitive business in breach of Section 4(i) and liquidated damages of $500.00 for each day in which Employee is found to have been in breach of Section 4(i);

(c) . . . an injunction restraining Employee from breaching Section 5 and liquidated damages of $1,000.00 for each employee of Corporation which Employee encourages, solicits, attempts to persuade or persuades to leave the employ of Corporation;

(d) an injunction or other order requiring Employee to return Proprietary Information to the Corporation and liquidated damages of $500.00 per day that Employee retains proprietary information in breach of Section 6.

*Id*., at§ 7 (line breaks added). Finally, ECS and Borrego agreed that ECS "shall also be entitled to the award of its costs and its actual attorney fees incurred in enforcing this Agreement." *Id*.

**(2) Factual Detail Regarding the Alleged Breach of the Employment Agreement**

In July 2018, while Borrego was still employed by ECS, ASAP filed Articles of Incorporation in Florida. ASAP was incorporated by an individual named "Maria Veronica Montesinos." Plaintiff asserts that Montesinos is an assumed name used by Borrego's wife, Paz-Borrego. Accordingly, Plaintiff believes that ASAP was incorporated by Paz-Borrego, who was allegedly living with Borrego in Florida at the time he was still employed by ECS. Because ASAP advertises to customers that

it offers "commercial and residential HVAC services[,]" Plaintiff believes that ASAP's services are "directly competitive with ECS's services." ECF No. 19, PageID.156.

ECS also alleges that, beginning in early 2022, Borrego began quoting services to Atlantic III Condominium Association in Aventura Florida ("Atlantic III"). Plaintiff says that "Atlantic III is a longtime client of ECS." *Id.*, at PageID.157. As alleged, in an email dated April 14, 2022, Paz-Borrego sent a quote to Atlantic III on behalf of ASAP for services described as "WSHP Unit Replacemenmt [sic] and New Ductwork." *Id.* ASAP apparently performed these services and billed Atlantic III for them in August 2022. *Id.* ASAP continued to quote and bill Atlantic III for services throughout 2022 and 2023. *Id.* This included at least one major project worth over $50,000. Notably, "Ted Borrego" was copied on an email dated June 6, 2023. *Id.*

ECS says that, in a conversation with Atlantic III, it learned that ASAP "had represented that it was affiliated with ECS, that ECS was being sold, or that ECS was no longer a concern." *Id.*, at PageID.159. Upon learning of its misapprehension, Atlantic III allegedly provided ECS with the various emails with ASAP that are attached to this brief (along with many others) showing that Borrego, Paz-Borrego, and ASAP repeatedly solicited and provided services to Atlantic III. *Id.*

Additionally, ECS says that it also learned that Borrego and/or Paz-Borrego solicited and performed HVAC services and installations for the following ECS customers on behalf of ASAP:

a. Colonnades Condominiums;

b. Jones Lang Lasalle at various Truist Bank buildings;

c. 2600 Island Blvd Condos;

d. Fendi Château Residences;

e. Cristelle Condominiums; and

f. Eloquence on the Bay Condominiums.

*Id*. Borrego and/or Paz-Borrego also allegedly solicited at least three of ECS's employees to work for ASAP and/or its affiliates, including Oscar Rodriguez, Jorge Pezoa and Maury Tarrago. *Id*. Finally, Plaintiff alleges that, "at least one of these employees, Oscar Rodriguez, is subject to a Confidentiality and Non-Competition Agreement that is substantially similar to Borrego's Employment Agreement." *Id*.

ECS believes that Defendants "are soliciting and/or providing services to other clients of ECS." *Id*. "As a result of ASAP's diversion of ECS's business[,]" Plaintiff says, "certain ECS personnel have stood idle while ECS continued to pay their wages and benefits so they could support their families." *Id*. As alleged, the damages include "the loss of goodwill, damage to ECS's client and employment relationships, and loss of future business opportunities." *Id*., at PageID.161.

Accordingly, ECS moves for injunction relief. The Court will discuss the applicable law and analysis below.

### III. Legal Standard

In evaluating a motion for preliminary injunction, the court considers four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. S. *Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 849 (6th Cir. 2017). Because preliminary injunctions necessarily happen before the parties have had an opportunity to fully develop the record, the movant "is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511 F.3d 535, 542 (6th Cir. 2007).

However, "[a] preliminary injunction is an extraordinary and drastic remedy" that "should not be granted lightly." *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (internal quotation marks omitted). Indeed, the Supreme Court has held that a preliminary injunction should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). And the Sixth

Circuit has cautioned "that [the preliminary injunction factors are] to be balanced, not prerequisites to be met." *Certified Restoration*, 511 F.3d at 542. It is well established, however, that "'a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed[.]' " *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir.2010) (*quoting Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997)). However, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (citation omitted).

**II. Analysis**

As a reminder, Plaintiff demands injunctive relief for "Defendants' independent, collective and/or concerted (a) breach of and/or tortious interference with certain restrictive employment agreements (e.g., non-competition agreements) between ECS and its employees; (b) tortious interference with, and usurpation of ECS's contractual and business relationships with its clients; (c) embezzlement and/or theft; (d) violations of the Lanham Act; and (e) various forms of fraud." ECF No. 1, PageID.2.

The Court finds that ECS has demonstrated a strong likelihood of success on the merits. As argued, Defendants acknowledge that Borrego is party to a contract

with ECS that prohibits, inter alia, soliciting or servicing ECS's customers and attempting to hire ECS's employees. ECF No. 22, PageID.261. Defendants also freely admit to servicing at least two of ECS's customers, *id*., PageID.262, do not dispute attempting to hire ECS's employees, *see id*., PageID.263, and acknowledge that Borrego "obtained . . . the identity of [ECS's] clients" through his employment with ECS, *id*., PageID.267. Notably, Defendants acknowledge that Paz-Borrego formed ASAP for the purpose of subverting Borrego's non-competition obligations (or as Defendants euphemize it, facilitating Borrego's attempt to "explore working independently"). *Id*., at PageID.266.

Defendants advance several arguments in response. First, Defendants say the Employment Agreement is geographically overbroad because it has no facial geographic limitation. A non-compete agreement is reasonable in scope if it mirrors the territory of an employer's business. *See Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (noting that a non-compete with no geographic limitations "can be reasonable if the employer actually has legitimate business interests throughout the world"). The Restrictive Covenants are enforceable if they (i) protect a reasonable competitive interest, and (ii) are reasonable in duration, geographical area, and line of business. Mich. Comp. Laws § 445.774a.

The Employment Agreement is narrowly tailored in its effect because it prohibits Borrego from servicing or soliciting ECS's actual or prospective customers

and recruiting its employees—who would be located in the Michigan and Florida markets that ECS services. *See* ECF No. 19-2, ¶4. The Employment Agreement tracks the geographic territory in which ECS operates. *See id*. To the extent that the agreement is facially overbroad, the Court will "limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited." Mich. Comp. Laws § 445.774a(1). The scope of the agreement is limited to the states in which ECS operates—Michigan and Florida.

Second, Defendants assert that the agreement unreasonably restrains Borrego from relying on his "generalized knowledge and skill" and does not protect any proprietary information. ECF No. 22, PageID.266-67. However, an employer has a "reasonable business interest . . . in restricting its former employees from enticing away the employer's old customers." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511 F.3d 535, 548 (6th Cir. 2007) (cleaned up). And "confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract." *Follmer, Rudzewicz & Co., P.C. v. Kosco*, 420 Mich. 394, 402–03 (1984) (emphasis added).

Third, Defendants claim that Borrego did not breach the Employment Agreement because each of ECS's customers "came to Defendants of their own volition." ECF No. 22, PageID.262. The Employment Agreement prohibits Borrego from soliciting or servicing ECS's customers, and Defendants admit that they

serviced at least two of ECS's customers. *Id*. Whether Borrego or the customers first initiated contact; either way Plaintiff demonstrates that Borrego likely violated the Employment Agreement with Defendants' assistance.

Fourth, Defendants argue that ECS will not suffer irreparable harm, and the request for injunctive relief is moot, because ASAP has "ceased its operations." [Id. at PageID.268.] However, Defendants clarify in a footnote that they only "intend" to dissolve ASAP but have not taken the proper steps to do so. *Id*., at PageID.263. Regardless, "[a] party's voluntary cessation of an allegedly illegal activity does not moot the issue of whether prospective injunctive or declaratory relief is proper." *Dixie Fuel Co. v. Comm'r of Soc. Sec*., 171 F.3d 1052, 1056 (6th Cir. 1999). The undisputed facts show that Borrego breached the Employment Agreement, and Paz-Borrego helped him do it by forming ASAP.

Fifth, Defendants argue that the Court should not enforce the Employment Agreement as written because it would cause an "undue hardship" to Borrego and harm the public interest in free competition. ECF No. 22, PageID.269-70. But even if enforcing restrictive covenants as written may result in hardship to employees, refusing to enforce valid agreements "would create an incentive for other [employees] to violate their agreements without fear of reprisal." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 780 (E.D. Mich. 1999). Borrego agreed to the terms of the Employment Agreement, and it is not unjust for

the Court to enforce those terms. Similarly, the Sixth Circuit has rejected the view that the reduction in competition imposed by an injunction against one business should prevent courts from entering injunctions. ECF No. 19, PageID.171-72 (*quoting Certified Restoration Dry Cleaning Network*, 511 F.3d at 551). It is neither unduly burdensome, nor against the public interest, to enforce the Employment Agreement as written.

## IV. Conclusion

The Court will **GRANT** Plaintiff's Motion for Preliminary Injunction. The Terms of the injunction will follow this Opinion.

**SO ORDERED.**

Dated: September 5, 2024

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 5, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Deputy Clerk

**Exhibit 3**

Theodore Borrego Deposition Transcript

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re: Theodore G. Borrego and Veronica Paz Borrego, Debtors. ____________/ — Case Number 25-14217-RAM

Engineered Comfort Systems, Inc., Plaintiff, — Adversary Number: 25-1323-RAM

-vs-

Theodore G. Borrego and Veronica Paz Borrego, Defendants. ____________/

VIDEO DEPOSITION OF THEODORE BORREGO

taken by the Plaintiff on the 20th day of May, 2026, via Zoom, at 10:01 a.m.

APPEARANCES:

For the Plaintiff: MR. ANDREW M. CREAL (P83806)
Taft, Stettinius & Hollister, LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 727-1564
acreal@taftlaw.com

For the Defendant: MR. JAMES SCHWITALLA
The Bankruptcy Law Offices of
James Schwitalla, PA
Park Place II
12954 SW 133 Court
Miami, Florida 33186
jws@MiamiBKC.net

Videographer: Sean Duffy
Reported by: Angela L. Chritz, RPR, CSR-4305

FORTZ Legal

**Premier Litigation Support Solutions**

- Court Reporting
- Process Service
- eDiscovery
- Document Solutions
- Trial Support

production@fortzlegal.com
844.730.4066

FULL SERVICE LITIGATION SUPPORT FORTZ Legal

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re: Theodore G. Borrego and Veronica Paz Borrego,
Debtors.
_____________________________/

Case Number 25-14217-RAM

Engineered Comfort Systems, Inc.,
Plaintiff,

Adversary Number: 25-1323-RAM

-vs-

Theodore G. Borrego and Veronica Paz Borrego,
Defendants.
_____________________________/

VIDEO DEPOSITION OF THEODORE BORREGO

taken by the Plaintiff on the 20th day of May, 2026, via Zoom, at 10:01 a.m.

APPEARANCES:

For the Plaintiff: MR. ANDREW M. CREAL (P83806)
Taft, Stettinius & Hollister, LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 727-1564
acreal@taftlaw.com

For the Defendant: MR. JAMES SCHWITALLA
The Bankruptcy Law Offices of James Schwitalla, PA
Park Place II
12954 SW 133 Court
Miami, Florida 33186
jws@MiamiBKC.net

Videographer: Sean Duffy
Reported by: Angela L. Chritz, RPR, CSR-4305

TABLE OF CONTENTS


| WITNESS: THEODORE BORREGO | PAGE |
|---|---|
| Examination by Mr. Creal | 6 |
| Examination by Mr. Schwitalla | 100 |

| EXHIBITS: | IDENTIFIED |
|---|---|
| Exhibit Number 1 (ECS Confidentiality and Non Competition Agreement) | 26 |
| Exhibit Number 2 (Florida Department of State Filing for ASAP Air Mechanical Team, Inc.) | 42 |
| Exhibit Number 2(A) (Electronic Articles of Incorporation for ASAP Air Mechanical Team, Inc.) | 43 |
| Exhibit Number 3 (2019 Schedule K-1 for ASAP) | 45 |
| Exhibit Number 4 (ASAP Canceled Checks to Theodore Borrego dated 10/9/2023 and 10/23/2023) | 55 |
| Exhibit Number 5 (ASAP Canceled Checks dated April 2023) | 60 |
| Exhibit Number 6 (Defendants' Responses to Requests for Admission) | 64 |
| Exhibit Number 7 (Defendants' Responses to Interrogatories) | 71 |
| Exhibit Number 8 (Defendants' Responses to Requests to Produce) | 74 |
| Exhibit Number 9 (ASAP Truist Account Statement for 6/30/2023) | 77 |




TABLE OF CONTENTS (cont.)


| EXHIBITS: | IDENTIFIED |
|---|---|
| Exhibit Number 10 (ASAP Truist Account Statement for 12/29/2023) | 79 |
| Exhibit Number 11 (ASAP Truist Account Statement for 2/29/2024) | 83 |
| Exhibit Number 12 (ASAP Truist Account Statement for 4/30/2024) | 85 |
| Exhibit Number 13 (ASAP Truist Account Statement for 6/28/2024) | 86 |
| Exhibit Number 14 (ASAP Invoices for Atlantic III) | 88 |
| Exhibit Number 15 (ASAP Invoices for The Betsy Hotel) | 92 |




Wednesday, May 20, 2026 - 10:01 a.m.

VIDEOGRAPHER: We are now on the record. The time is 10:01 a.m. on May 20th, 2026. This begins the videotaped deposition of Theodore Borrego taken in the matter of Engineered Comfort Systems v. Theodore Borrego, et al, Case Number 24-CV-10924.

My name is Sean Duffy, legal videographer.

Counsel, will your please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. CREAL: Andrew Creal on behalf of Plaintiff Engineered Comfort Systems, Inc.

MR. SCHWITALLA: James Schwitalla on behalf of the defendants.

And we need to once again correct the record, the case referenced a moment ago is not the correct case reference. We're here in a deposition in an adversary proceeding within a bankruptcy. I think you have those case numbers. I can get them for you, if you need them.

VIDEOGRAPHER: Sure. Maybe at a break.

MR. SCHWITALLA: Okay.

VIDEOGRAPHER: Thank you.

MR. CREAL: All right. Mr. Borrego, good morning. My name is Andrew Creal, as stated, I'm the attorney for the plaintiff. Thanks for being here today.



Let me ask you first -- have you ever been deposed?

MR. BORREGO: Excuse me?

MR. CREAL: Have you ever been deposed?

COURT REPORTER: I didn't swear in the witness. I'm sorry.

MR. CREAL: All right.

COURT REPORTER: Would you raise your right hand, sir.

Do you swear or affirm that the testimony you are about to give in this case will be the truth, the whole truth and nothing but the truth?

MR. BORREGO: Yes.

THEODORE BORREGO,

(At 10:03 a.m., having been called by the Plaintiff and sworn as a witness, testified as follows):

COURT REPORTER: Thank you.

MR. CREAL: All right. Let's try this again.

This is the date and time set for the deposition of Theodore Borrego taken pursuant to the federal and bankruptcy rules and to be used for all proper purposes thereunder.

Mr. Borrego, my name is Andrew Creal. I'm the attorney for the plaintiff today.

Page 6

EXAMINATION

BY MR. CREAL:

Q. Have you ever been deposed, sir?

**A. I don't know what deposed means. I'm sorry.**

Q. This is a deposition. Have you ever sat for a deposition before?

**A. No. Never.**

Q. Okay. So we're just going to go over some brief ground rules. This is not a memory test. I'm here to figure out what you know about the case and the questions I'm about to ask you.

If you don't understand a question, please let me know and I will re-ask it. However, if you answer the question, I'm going to assume that you both heard and understood the question. Is that fair?

**A. Yes.**

Q. Okay. I need you to give verbal answers. You're off to a good start, but while we can see each other and I might understand what you're saying by shaking your head or nodding your head or something of the like, we have a court reporter taking down everything that we say to create a transcript so it's important that you give verbal answers. Fair?

**A. Yes.**

Q. I'll ask that you wait for me to answer -- or ask my

Page 7

question before you answer, and I'll give you the same courtesy in return. Again, that's just to create a clear transcript. Okay?

**A. Yes.**

Q. If you need to take a break at any time, just let me know and I'll ask that you answer the pending question on the table, and then we will take a break and we'll come back. All right?

**A. Yes.**

Q. All right. Mr. Borrego, what is your age and date of birth?

**A. I am 52 years old. My date of birth is June 10th, 1973.**

Q. And what is your educational background?

**A. High school. High school.**

Q. Where did you go to high school?

**A. Hialeah High.**

Q. Where's that?

**A. Miami, Florida. Well, Hialeah, Florida.**

Q. Were you born in Miami?

**A. Yeah.**

Q. Lived there your whole life?

**A. Yes.**

Q. After high school, what did you do for work?

**A. After high school I worked at a company called Mako Boats. I worked there for a few years. Then after that,**

Page 8

**I got into the AC industry. Started my first job was for Affordable Air. And from Affordable Air, I went to Air Tech Air Conditioning. From there I went to Cool Breeze Air Conditioning. And then from there I went to ECS.**

Q. Thank you for that.

So it's fair to say you've been in the air conditioning and heating and cooling industry for 25 years?

**A. Yeah. Give or take, yes.**

Q. Okay. To become an HVAC professional, do you have to get any licenses or certifications?

**A. Depends on -- well, yes.**

Q. Okay. Do you have any licenses or certifications?

**A. No.**

Q. Okay. What does those -- what does the "depends" depend on?

**A. You -- if you don't have a license, you get what they call a "qualifier."**

Q. What is qualifier?

**A. A person that qualifies your company to work mechanical. We're talking about mechanical.**

Q. So you can perform HVAC services without a license, but you need a qualifier to certify that you basically know what you're doing?

**A. Yes. The qualifier will -- will back you up with their**

Page 9

**license, yes.**

Q. Okay. So are you working underneath that qualifier, under their license? Or they just certify to whatever applicable board that you are competent in the industry?

**A. You're working -- they're basically backing you up.**

Q. I guess maybe asked a better way, you know, similar to the construction industry where you work under a builder's license, are you working under your qualifier's license or they are simply affirming your competency in the field?

**A. You will be working under their license.**

Q. Okay. Who -- who was your qualifier prior to ECS?

**A. No one. I worked doing sales for companies.**

Q. Okay. You worked solely in the sales of HVAC equipment?

**A. I've always worked solely in the sales world.**

Q. You've never performed HVAC services yourself?

**A. Never.**

Q. When did you start working at ECS?

**A. It was like 2011.**

Q. Okay. And I think you know, but I'll refer to ECS, that's Engineered Comfort Systems, Inc., that's who you understand it to be?

**A. Yes.**

Q. Tell me how you began working at ECS.

**A. I was working for a company called Cool Breeze, and I was**

Page 10

**approached by a technician that used to work with Ron in Michigan. So he basically asked me if I would meet with Ron, that he was thinking of opening up a company here in Florida. And I met with Ron.**
Q. And Ron is Ron Rodorigo?
**A. Yeah.**
Q. Who is Ron Rodorigo vis-a-vis ECS?
**A. Ron Rodorigo is the owner of ECS.**
Q. Do you know when Ron Rodorigo founded ECS?
**A. Got no clue.**
Q. What were your first conversations like with Ron Rodorigo after you were introduced to him?
**A. Regular conversation. He wanted to open up in Florida. He seemed pretty hyped up about it. And he, you know, basically motivated me to do the business with him and open up the company here and I do sales.**
Q. Okay. So at the time in 2011, he had already -- ECS was already formed as a company in Michigan, and he was exploring expansion into Florida?
**A. Right.**
Q. And you were his guy to be that expansive reach, right?
**A. I would be, yes, I would be the salesman.**
Q. Okay. What proposed terms did -- I presume Ron at some point offered you a position, correct?
**A. Yes. Sales.**

Page 11

Q. You were the head of sales for the Florida region?
**A. I was not the head of sales. I was just a salesman.**
Q. Okay.
**A. He brought on -- he brought on -- okay. Go ahead.**
Q. Yeah, no. Expand on what your position was in 2011 when you were brought on to ECS.
**A. Sales.**
Q. And what was your territory?
**A. Miami then Broward County, Dade and Broward County.**
Q. Did your hiring trigger ECS opening up a physical office in Florida?
**A. Yes.**
Q. Who was in charge of that office?
**A. Manny Gandor.**
Q. Can you spell the last name?
**A. G-a-n-d-o-r.**
Q. Did you know Manny Gandor before you met Ron Rodorigo?
**A. Yes.**
Q. What was your relationship to Manny Gandor?
**A. He was my boss at Cool Breeze.**
Q. Was he the individual that introduced you to Ron?
**A. He was not.**
Q. Okay. So you were introduced to Ron, and then Ron said we're looking to bring over Manny Gandor as well to run the Florida office?

Page 12

**A. Yes.**
Q. And then that's eventually what happened?
**A. Yes.**
Q. Okay. How many employees were working out of the ECS Florida office besides you and Manny Gandor when it first opened?
**A. I believe like two techs or three. I'm not sure.**
Q. So you would go out, get the sales, the two or three techs would go and do the work and Manny kind of oversaw the whole thing and reported directly to Ron?
**A. Yes.**
Q. Did you have any direct reporting obligations to Ron during those first couple years?
**A. No.**
Q. What was your next position at ECS after you were a salesman?
**A. Sales. That's all I did was sales.**
Q. Okay. Were you ever given a title of new business development director?
**A. No.**
Q. So it's your testimony that from 2011 to 2023 you had the same position at ECS?
**A. Yes.**
Q. What were your general duties as the salesman or what did you see your duties as?

Page 13

**A. Find work for the guys.**
Q. How many employees did ECS in the Miami office grow to over your tenure at ECS?
**A. I believe eight.**
Q. And that's eight including you and Manny?
**A. No. That's technicians.**
Q. Just technicians.
Okay. Is Manny Gandor still with ECS?
**A. No.**
Q. When did he leave?
**A. I believe it was -- I'm not sure, I believe it was mid-'22 or something like that.**
Q. Okay. How did you go about obtaining leads in the -- in your territory?
**A. Knocking on doors.**
Q. You went door to door just asking people if they needed HVAC systems?
**A. Yeah.**
Q. Being that you were in Florida, was it primarily selling air conditioning units?
**A. Yes.**
Q. But you were a full-service HVAC company?
**A. Yes.**
Q. What -- what generally were your hours working at ECS?
**A. I would say from 7:00 -- from 7:00 to 5:00.**

Page 14

Q. How many -- no, go ahead.
**A. Monday through Friday.**
Q. Is that pretty consistent throughout your 12 years at ECS?
**A. Yes.**
Q. Did you ever work weekends?
**A. If we had a project, yes.**
Q. What type of project would require you as a salesman to work the weekends?
**A. If I sold a job and I felt it was a big enough project I'd like to be there with the guys just to make sure that everything goes good.**
Q. More of a customer relation type of role?
**A. Yeah. Yeah, you could say that.**
Q. Have you had any training in the actual installation of HVAC equipment such that your presence on site would be able to determine whether something was going right or wrong?
**A. I -- no training, no. No, no one trained me. It's what I saw.**
Q. You learned through 12 years -- or 29 years in the industry how certain things were put together and worked, fair?
**A. Yes.**
Q. Okay. How were you compensated at ECS?

Page 15

**A. I was a salary employee, okay? That's it.**
Q. Okay. In 2011, how much were you making as a salary?
**A. 80,000.**
Q. Did you earn any -- were there any commission incentives?
**A. No.**
Q. Was that typical in the industry?
**A. Yes and no. Depends on -- on if you work off of commissions only or you work as a salary.**
Q. So there's not really a hybrid setup?
**A. No.**
Q. Would you have preferred to have been a commissioned employee?
**A. I would have liked to get commissions on my jobs, yes.**
Q. Because you were good at what you did in selling units?
**A. I tried my best and I gave the company a hundred percent.**
Q. Aside from the -- so you go into -- you knock on a door, a customer says they're interested, you work through the different options, they sign presumably some sort of purchase order or contract and then you turn it over to the office and the technicians for the rest of the work, is that fair?
**A. I will do the proposal. It will be -- it will be looked at by Manny Gandor, and then from there if they approve the work, then it was dispatched to the guys.**
Q. You were --

Page 16

**A. Dispatched out of Michigan.**
Q. I apologize for breaking my own rule. I'll let you finish.
You prepared the proposals yourself?
**A. Depending on the project.**
Q. Depending on the size of the project?
**A. Yes. If it was small, then I do it myself. If it was big projects, Manny Gandor would do it.**
Q. Okay. Was the difference between a small and a big project just based on the price that was quoted or how did that work?
**A. If it was a regular install, like a regular split system, then I could do the -- I could do the proposal. But if it was a project where you were dealing with bigger things, then that wasn't my forte so Manny -- Manny will take over that.**
Q. Okay. Was your sales directive limited to residential homes or were there also commercial properties?
**A. It was commercial -- okay. I'm sorry. It was commercial properties. But I take care of what was the small units. Manny Gandor took care of everything that was the big units.**
Q. Okay. Just ballpark for me approximately how much would you charge a customer for a big unit?
**A. Again, Manny Gandor is the one that would do those for those projects, those proposals.**

Page 17

Q. All right. Let me ask this way: What typically were you quoting customers in your proposals for your smaller units?
**A. It depends. I mean it could have been 10,000, $15,000 units. It's -- I stuck to the small stuff in the company. Manny was all the big units.**
Q. Okay. So you prepared proposal on a smaller unit, it would go to Manny for approval. If he signed off on it, then you said it went up to Michigan?
**A. If we -- if Manny signed off on it and the customer approved it, then it will be dispatched to the guys through Michigan. Ron's dispatcher was a -- a dispatcher out of Michigan. It wasn't in Florida.**
Q. Okay. But he would still dispatch Florida technicians to go out and do the work obviously?
**A. Correct. That was done by -- by what was this guy's name? Jerry.**
Q. How many proposals would you say that you were able to execute in a given month, on average?
**A. During the winter, really bad. Maybe one, two, three maximum. Doesn't mean that they got approved. During the summer, it was more like 15 proposals, give or take.**
Q. Okay. So if I said you were doing around 100 proposals a year, is that about right?

Page 18

A. **Yes.**
Q. And once you turned a proposal over to Manny, did he handle the final execution with the customer or was that then given back to you on your jobs to finalize the deal with the customer?
A. **Manny. Manny will do that.**
Q. So after you met the customer, gauged interest, drafted a proposal, gave it to Manny, is it fair to say that your responsibilities at that point were essentially over?
A. **Yes. Unless Manny would tell me, "Hey, do me a favor, just finish it off, take care of it or whatever." That's the way it went on.**
Q. Okay. But for those special ones where you wanted to be on site and make sure that it was all done correctly?
A. **I would like to be on site for customer relationship and to make sure that everything went well. In other words, people aren't slacking and sitting down when, you know, they're supposed to be working.**
Q. Sure.
A. **Yeah.**
Q. So how much discretion did you have when you were drafting proposals as to what pricing to -- to quote a customer?
A. **I would -- it was -- it was -- it was a program. For example, they need to replace a five-ton system, I call, get the price for the five-ton system, put it in there. I knew the labor was 16 hours, you put the 16 hours in there, and Ron's whole setup will tell you exactly how it's going to be.**

Page 19

Q. So Ron's system, you said his system had the markup already built in, and subcontractor, everything else, you plugged in the unit that was going to be installed and you knew the labor hours based on your experience?
A. **Yes.**
Q. What did -- what was ECS's typical markup from -- on any given project?
A. **I can't give you a definite answer on that because it all depended on the customer.**
Q. Okay. Let's take the smaller units that you routinely worked on. I mean can you give me a range of a percentage markup that was typically --
A. **For -- for example, when I came -- when I came aboard with Ron, I brought contracts. Truist was one of my contracts, okay? And Truist's markup was 20 percent.**
Q. Truist Bank?
A. **Yes.**
Q. When you say you "brought one of your contracts," elaborate on that.
A. **It's -- it's a contract that -- it's a customer that I had for years and years and years. And I brought with me when I came to -- to ECS.**

Page 20

Q. Okay. Did you negotiate anything with Ron to benefit yourself --
A. **No.**
Q. -- for bringing contracts to ECS?
A. **No.**
Q. Was Ron aware that you were bringing contracts to ECS?
A. **Of course he was.**
Q. How many contracts did you say you brought to ECS?
A. **I'd say a good six, seven.**
Q. And are those customers still customers at ECS?
A. **Nope.**
Q. Who do they go to for their HVAC servicing now?
A. **I have no idea.**
Q. Did they depart ECS when you departed ECS?
A. **No. He went losing them through -- through time.**
Q. Why did he lose them? In your opinion.
A. **My opinion's the facts, man. He -- he -- the -- the overcharging that he was doing and double billing, and it just it got really bad. It got really bad. And to a point that we started losing customers and it was just more greed and more greed and more greed and it's just -- it got bad, man.**
Q. When did you -- when did you first start feeling like that was occurring?

Page 21

A. **Probably I'd say about three years into it. It all -- he sat -- well, he sat down with us in -- in the office and he tells us that the company wasn't doing good. That -- when I say "us," I mean Manny Gandor and I. And that we needed to get more profit. And he didn't know. And then he asked me if there was any way that I could help him with my salary and he'd give me back the money. And he took 10 percent out of my salary, okay? I was all fine because I wanted the company to get big, I wanted to, you know, make the company a big company. And so I did. Manny Gandor didn't give back 1 percent. Nothing. I gave 10 percent to Ron.**
**We start getting complaints about the people, about -- about customers with the overbidding, blah, blah, blah. Greed. Greed started getting in there, okay? He never gave me back the money. Like two years more, for three years more, we had already lost a shit load of customers. And he says the company is struggling again. And then this guy gives him another 10 percent out of my payroll. Okay. "Teddy, I'll give you back your money, I'll give you back your money."**
**He had never gave me back the first 10 percent that he take out. But now he's got 20 percent out of my payroll. And then customers keep complaining. Customers are leaving. You try to get them back. They don't want**

Page 22

**to come back. They don't want to deal with it.**
**He wanted to run Miami like if it was a Michigan outfit, and they're two different animals. So he lost customers. He lost customers and overbilling and it was just -- it was insane. He lost big customers just because of that.**
Q. All right. I want to unpack that a little bit. So this would have been these initial meetings with you, Manny and Ron were around, what, 2014?
**A. I'd say, yeah, 20 -- around 2013, 2014. That was the first time that we sat down, if I'm not mistaken.**
Q. And those meetings, were those common that the three of you would get together to discuss strategy for ECS?
**A. Yes and no. If -- they had a lot of meetings between themselves. It was once in a blue moon, they'll tell me, "Ted, come in and sit down so we can have a meeting and we'll talk about the guys and how the guys are doing and this and that." And that's about it. Everything that had to do with like numbers and all that was between Manny and Ron.**
Q. When those meetings occurred, was the -- was the salesman from the Michigan office brought in as well or just you?
**A. No. No. No salesman in Michigan. There was a dispatcher in Michigan that used to dispatch Florida.**
Q. So for all intents and purposes, the company was solely

Page 23

doing work in the State of Florida?
**A. The Florida office was doing work in Miami, Broward area. But all -- all the other -- the backgrounds of the company, the billing, the -- the dispatching, everything was coming -- it will go through Michigan.**
Q. Right. But there were no technicians in Michigan performing work on Michigan properties?
**A. You broke -- you broke up.**
Q. There was no technicians in Michigan performing work on Michigan properties?
**A. Florida technicians, no. The Michigan techs, yeah, he had -- his company in Michigan has like 20-something employees, if I'm not mistaken.**
Q. Okay. That's what's odd to me is in those meetings that you were involved in with Manny and Ron, if there were performance issues related to sales, why there was no salesman from Michigan involved in those meetings.
MR. CREAL: I think we lost him. Let's go off the record, please.
VIDEOGRAPHER: Going off the record. The time is 10:30 a.m.
(At 10:30 a.m., off the record.)
(At 10:39 a.m., back on the record.)
VIDEOGRAPHER: We are now back on the record. The time is 10:39 a.m.

Page 24

BY MR. CREAL:
Q. All right. We took a brief break there. Teddy, we were talking -- do you mind if I call you Teddy?
**A. No, that's fine.**
Q. We were talking about these meetings between you and Manny and Ron with respect to the performance of the company in 2014-2015ish, right?
**A. Right.**
Q. And we were talking about, and I asked you whether there were any other salespeople besides yourself in these meetings.
**A. Correct.**
Q. And there were no other salespeople besides yourself in those meetings, correct?
**A. Well, Manny and I. Manny also did sales.**
Q. Okay. So Manny was kind of a dual sales/office manager?
**A. Manny was the vice president of operations for Florida. And he also did sales.**
Q. Okay.
**A. He will do the bigger units, I'll do the smaller stuff.**
Q. Now, I take it you did more volume than he did, but he did revenue-wise probably a little more than you because of the size?
**A. Yes.**
Q. Okay. But for all intents and purposes, you were the

Page 25

lead sales guy in your -- in the smaller unit division, so to speak, of ECS in Florida, fair?
**A. Yeah. Manny also. I mean Manny did the big units, but he also did small units. It wasn't just me.**
Q. And we talked about how Ron reduced your salary on two different occasions by 10 percent so you went from 80,000 to 72 to 64?
**A. He reduced it because he told me that the company needed help, okay? And he asked me if I would give him 10 percent of my salary, and he'd give me back the money. And I said yes the first time. Time went by, he never paid me back. We came -- years after, we came to the same thing again, and of course Teddy wanting the company to expand and get bigger said yes. So he basically took 20 percent of my salary that he was supposed to give me back and never did.**
Q. Okay. So that first reduction was around the 2014-2015 window, about three years in for you?
**A. Yes.**
Q. And then when was that second one?
**A. About a couple of years after that.**
Q. 2017-2018-ish?
**A. Yeah. Somewhere around there, yes.**
Q. We'll get to that time frame here in a minute. When you first came on board with ECS in 2011, did you sign any

Page 26

sort of employment contract?
**A. Yes.**
Q. And as part of that employment contract, was there a confidentiality noncompete agreement associated with that?
**A. I never saw a noncompete. Until today, I don't remember ever signing a noncompete.**
Q. I'm going to share my screen here.
**A. Mm-hmm.**
Q. Let me know if you cannot see what I'm about to show you. This is marked as Exhibit 1.
**A. Okay.**
Q. The header says "ECS Engineered Comfort Systems Confidentiality and Non Competition Agreement." You'd agree that is what this says and that your name is listed as the employee here, Mr. Borrego?
**A. Yes, I do.**
Q. Do you agree that you joined the company ECS on or about July 25th of 2011?
**A. Yes, I do.**
Q. And do you agree with me that at the bottom here this is your signature underneath the employee named Theodore G. Borrego?
**A. Yes. It looks like my signature, yes.**
Q. Okay. I recognize it was 15 years ago. So I appreciate

Page 27

your testimony that you don't recall signing this. But do you have any reason to believe that this is not an authentic document?
**A. I'm not sure. I'm not sure if it's authentic or not. You'd be surprised what happens in Michigan.**
Q. Okay. Who signed this as the VP of operations?
**A. That right -- I don't even know who -- I believe that's Michelle in Michigan.**
Q. Who's Michelle?
**A. Yes. Michelle is Ron's right hand. Because that's -- if you notice and you look to the left, it says "Engineered Comfort Systems." I worked for Engineered Comfort Solutions.**
Q. Okay. What did you understand the difference between the two companies to be?
**A. Two different companies.**
Q. Right. But what was their relationship?
**A. Ron was the owner.**
Q. He was the owner of both?
**A. Yes.**
Q. Right. But did they do -- did they do separate tasks or was one a holding company?
**A. I -- that part I'm not sure how he did it, but I know that, like I said, he -- he would take money out of the company from Florida to use it as paid, like if he was**

Page 28

**paying his people of Michigan for helping Florida, I don't know what he did there.**
Q. Okay. So fair to say all you knew is that they were owned by the same individual and had similar names?
**A. Yes.**
Q. But you have no insight through your role with ECS as to what specifically those two different companies did?
**A. Well, Systems was Michigan, and Solutions was Florida.**
Q. Okay. You would agree with me that this confidentiality/ noncompetition agreement is between you and Engineered Comfort Systems, Inc.?
**A. When I signed the package, okay? I did not realize that it said "Systems." To me was ECS. So I signed the package. See, that's the thing. They -- they kept moving stuff like from -- from Engineered Comfort Solutions to Engineered Comfort Systems, back and forth. I don't know what they did. I'm being honest. I don't know what. . .**
Q. All I can do is ask you to be honest, sir. But I guess my --
**A. Yeah.**
Q. -- the question from that is what does it matter to you whether or not it was "Systems" or "Solutions" insofar as it affected your job?
**A. Personally, nothing.**

Page 29

Q. Well, it seems that distinction that you are drawing here has some significance. So I'm just trying to get at what -- what is that significance in your mind?
**A. Just trying to explain to you that Florida -- we had the company in Florida and everything else was through Michigan and I just want you to understand that. Us working here in Florida wasn't just the Florida people. It was Michigan running Florida.**
Q. I understand that.
Did you ever see any other employment agreements or noncompetition agreements between Engineered Comfort Systems or Solutions and any other employees?
**A. No.**
Q. So you wouldn't know one way or the other whether there was any difference in the language in these agreements between the System people and the Solution people?
**A. No.**
Q. What do you understand about this confidentiality/ noncompetition agreement? Let's talk about the confidentiality part. What do you understand about the confidentiality requirements of this agreement?
**A. There's a noncompete. But I -- I also want to say if I bring customers with me, how can I complete against myself?**

Q. We'll get to that. But my question first and foremost is the confidentiality. There's obviously two portions to this, right? There is a confidentiality part and a noncompetition part. Do you agree with me on that?
**A. Yes.**
Q. So the confidentiality part, insofar as I can tell, relate to certain proprietary information within the company. Is that fair to say?
**A. Yes.**
Q. And in your industry, that proprietary information would be customer lists, pricing details, the margins we talked about. Would you agree with that characterization?
**A. I -- I would agree to the customers and -- yeah. Yes.**
Q. Okay. So let's talk about the stuff that you don't agree to. You're saying that margins, what -- what ECS, be it Solutions or Systems, marked up, you don't believe that to be confidential information within ECS?
**A. No. I do. I believe it's confidential.**
Q. Okay. Okay. So fair to say customer lists, pricing details, you know, your purchase order language, are those all what you would deem to be confidential as to ECS?
**A. I wouldn't be able to answer that a yes or no because after I do a proposal, someone else can come in and change everything around like they did a hundred times.**



**So I -- I can't say yes or no.**
Q. Okay. But those changes, to the extent they were made from your proposal, were made by somebody within ECS, right?
**A. Yes.**
Q. Would you agree in your experience in this field of 25 years that if you were to give a competitor your proposal --
**A. Mm-hmm.**
Q. -- that they could take that proposal and utilize it to undercut the offer that you were making to a customer?
**A. Okay. Can you repeat the question?**
Q. Yeah, of course. So would you agree with me that in your experience in the field, that if you were to take a proposal to Mr. Smith, for example --
**A. Mm-hmm.**
Q. -- and then you gave that same proposal to a competitor, they reviewed it, that they could utilize that proposal to make a better offer to Mr. Smith?
**A. Yes, they can. I believe they could do that.**
Q. Okay. Let's talk about the noncompetition part of this Exhibit 1. So Section 4, you talked about some of the -- if I'm hearing you correctly, your testimony is that your issue is you should not be prohibited from competing with a company like ECS for customers that you believe you



brought to ECS from your previous jobs, correct?
**A. No.**
Q. No, it's not correct?
**A. No, it's not correct.**
Q. Okay. Then clarify for me what your issue with this noncompetition agreement language is.
**A. Again, I don't remember signing this paper ever, okay? And second, a noncompete is a noncompete.**
Q. Right. Let's set aside your dispute about whether you signed this or not.
**A. Okay.**
Q. I want to focus more on what you believe the obligations are under a noncompete with respect to ECS. So is it your position that assuming you did sign this, you're prohibited from competing with ECS from any of their existing customers for two years?
**A. Yes.**
Q. Fair?
Okay. Is it also your position and testimony that those six or seven customers you brought to ECS from Cool Breeze, that you should be able to -- to reengage them after you leave?
**A. If they're no longer a customer of Ron, yes.**
Q. Okay. So your position is if -- if a customer is no longer doing business with ECS, that that customer and



therefore your obligations to ECS, are excluded from this agreement?
**A. Okay. If -- if I am no longer with ECS, and a customer that was with ECS is not with ECS any more, okay? And they call me, okay? I don't solicit them. I don't think there's -- there's anything wrong with me giving them service. If I don't do it, somebody else is.**
Q. Okay. Do you agree with me that this Section 4 (a)(1), reads that you shall not directly or indirectly either individually or on behalf of another person or firm call upon, solicit, sell or attempt to sell any products or services similar to or in competition with those offered by Corporation, which is ECS, to any person or firm that was a customer of the corporation during the two-year period immediately preceding the termination of your employment? Do you agree that's what that says?
**A. Yes, that's what it says.**
Q. Okay. So is it your understanding based on that sentence that -- I understand what you believe to be the just analysis of this -- but that the agreement itself reads if a customer was with ECS for the two-year period prior to you being terminated, that they were not able to be a customer of any subsequent company that you created; is that fair?
**A. Yes.**

Q. Okay. Is it also fair that if you were still employed by -- by ECS, it stands to reason you could not solicit previous -- two-year previous or existing customers of ECS for future business?
**A. Yes. It's a noncompete.**
Q. Okay. And I want to drill down a little bit deeper on -- I mean you don't -- you don't recall signing this agreement or you -- you do not believe that you signed this agreement?
**A. I do not believe that I signed that agreement.**
Q. What is the basis for that belief?
**A. During my employment with Mr. Rodorigo, okay? Multiple times he asked me to sign the noncompete, and I told him no. Multiple times I told him no. Throughout the years he would always -- he make everybody do new employment packages, okay? Because he changed the noncompete and I would always tell him no, I'm not signing the noncompete, I'm not signing a noncompete. Then when all of this happens, all of a sudden, this paper's in my package in the one that the court sent me. And I was like what? So do I believe that I signed this paper? No.**
Q. Okay. So did you sign subsequent employment packages when Mr. Borrego -- or excuse me, when Mr. Rodorigo approached you about that during your tenure at ECS?
**A. I did sign a package when I first started working there.**



Q. Okay. And do you recall seeing any noncompete in that package?
**A. No, I don't.**
Q. And then how soon thereafter were you offered a new employment package?
**A. Years after. It was -- it was -- it was I'd say probably three years into it. And I didn't sign no new package or nothing.**
Q. So you never signed a new employment package or a new noncompete other than what we have --
**A. No.**
Q. -- the one? I understand your objection to its authenticity.
**A. Yes.**
Q. Is that fair?
**A. Yes.**
Q. Okay. So we talked about how you took a pay cut in 2014-2015 at Mr. Rodorigo's request, and then again in 2017-2018 area. Is that fair?
**A. I took a pay cut to help the company that he was going to return me my money that he never did.**
Q. How did he propose returning you the money? by a salary? by a bonus?
**A. No, he just told me. He says, "Teddy, once the company starts doing better, I'll give you back the money and all**



**the money that I took from you."**
**And -- and -- and the other gentleman didn't even give a dollar.**
Q. He said the words "the money that I took from you"?
**A. Yes. The 10 percent.**
Q. How did you believe that money was going to be repaid?
**A. I believed that once the -- what he said that the company would do better, he -- what he basically told me was I'll be -- he will give me my money back. He says, "You're helping me out with the 10 percent, okay? I'm going to give you your money back, okay?"**
**And I said, "Are you going to give me my money back, what, on my salary? Or are you going to give me back the money you took from me?"**
**"I'll give you the money that I took out."**
**Okay. I gave him that 10 percent. Time goes by, he did it again, okay? And I was dumb enough to let him do it again, okay? And he never gave me the money back.**
Q. Okay. So when -- when you took your second pay cut based on the representations that you just discussed --
**A. Yes.**
Q. -- at what point, if at all, did you realize I'm not getting this money back?
**A. When I sat down with him one day and I told him, "Hey, I**



**need you to give me more money."**
**And he goes to me, straight up, he goes to me, "Well, if you" -- mind you I'm already working the five days a week. "If you want me to give you more money towards your salary, well, you need to start working on the weekends." I told him no.**
Q. When was that conversation?
**A. This conversation was at a building called The Hyde. I don't remember exactly what they. . .**
Q. What year?
**A. I don't know. Maybe '19. '20.**
Q. Okay. In 2018 is it fair to say your role with ECS was the exact same as it was in 2011?
**A. Yes.**
Q. Prior to any of the pay cuts we discussed, did you receive any pay raises from 2011 to 2014?
**A. I never got one raise in all the time that I worked there.**
Q. Aside from the time in 2019-2020 that you approached Mr. Rodorigo about a raise, did you ever ask for another raise?
**A. Yes.**
Q. And what was his response?
**A. "We'll get to it. We'll talk about it later. We'll talk about it later." And time kept going and kept going and**

Page 38

**kept going.**
Q. Have you ever heard of the company ASAP Air Mechanical Team, Inc.?
**A. Excuse me?**
Q. Have you heard of a company called ASAP --
**A. Yes.**
Q. -- Air --
**A. Sorry to cut you off. Yes.**
Q. -- Inc.?
All right. I'm going to refer to that as "ASAP," throughout the rest of this deposition. What is ASAP?
**A. ASAP was a mechanical company.**
Q. A mechanical company that performed what services?
**A. Unit replacement.**
Q. For --
**A. Repair.**
Q. -- air conditioners?
**A. Yes.**
Q. Residential and commercial?
**A. Yes. Light. Light commercial.**
Q. Light commercial?
**A. Light commercial. Basic. It's like residential units.**
Q. Explain that to me if it's light commercial, but you're saying it's residential?

Page 39

**A. If you get -- if you get -- if you get the AC unit out of your house and put it in a building, they call it "light commercial."**
Q. Okay. And how was ASAP's business similar to that which ECS did?
**A. ECS was full commercial. Was -- they did a lot of stuff that -- that ASAP never did.**
Q. Is it fair to say that there -- that ECS's scope was broad, broader than ASAP's scope?
**A. Yes.**
Q. Is it also fair to say that the work performed by ASAP in the light commercial space was also performed by ECS?
**A. No.**
Q. ECS never performed any light commercial HVAC services?
**A. Light commercial, but not residential.**
Q. Okay. So the distinction that I believe you're drawing is that ECS did not perform residential HVAC services, but did perform light commercial?
**A. Yes.**
Q. And ASAP performed light commercial and residential?
**A. Yes.**
Q. What was the origin of the idea for -- to create ASAP?
**A. Eventually to -- to go on my own.**
Q. You were tired of pay cuts and you wanted to become your own business owner?

Page 40

**A. It's embarrassing to say, but it got pretty demoralizing working with Ron.**
Q. Was it just related to pay or were there other issues you had with Ron's leadership?
**A. When Ron sold the whole picture to me at the beginning, it sounded great. Everything was good. And then he -- he got involved with who is his wife now and -- and he became a racist pig.**
Q. Who was his wife prior to being his wife?
**A. His wife prior to being his wife, I don't remember her name. I never dealt with her because they were in Michigan. But Ron changed, man. Or he was always the same and he was just, you know, he was, you know, doing what he had to do in order for him to -- to succeed. I -- I honestly -- it got bad, man.**
**The technicians left because of the same thing. All the racial slurs and the banana republic and -- and the mistreating that he did to the -- to the employees, including me. I had a heart attack. I was in a hospital, okay? And it doesn't -- I mean it doesn't really matter, but if you feel like you're part of something, you know, not even a phone call, okay? And then I get out of the hospital, and I wasn't paid because I was told I didn't have any vacation time. He -- he -- he changed, man. He changed. Just it got really bad.**

Page 41

**And I used to like Ron a lot. I'm not going to lie, I used to like Ron a lot.**
Q. When did you notice these changes that caused you so much aggravation?
**A. It started getting worse once he started doing all the -- all these trips to Ukraine and -- and I don't know. It felt like he was, you know, I don't know. It just like everything changed. I mean even the way he treated customers. It got horrible, man. It -- I didn't want to be a part of that any more, man. And -- and it just, you know, what happened happened.**
Q. Well, so I'm trying to pinpoint a time frame. I know it probably didn't happen overnight, in your view. But when did you first start to notice issues that you're talking about right now?
**A. Oh, I'd probably say right before COVID.**
Q. Okay. So late 2019? 2019 area?
**A. Maybe a little bit earlier. Maybe 2018 things started getting weird.**
Q. And in 2018, did you begin discussing or deciding yourself or with yourself and your wife to create a new company, ASAP?
**A. My wife had nothing to do with it.**
Q. I understand. But -- we'll get to that in a second. My question really is what is -- what was the impetus? What

Page 42

drove you to say I'm going to create a company?
**A. When I created the company, I did it so that eventually one day when I move on by myself, okay? The company would have already been open for a few years so it wouldn't look like it was a company that just opened, okay? And that was the idea of doing -- of opening ASAP.**
Q. Okay. I'm going to mark Exhibit 2. This is a Florida Department of State, Division Corporation Filing for ASAP Air Mechanical Team, Inc. Shows it was filed on July 26th, 2018. You would agree with me that this is a filing that you created?
**A. Yes.**
Q. Principal address 4160 NE 20th Street, Homestead, Florida 33033. Is that your home address?
**A. Yes.**
Q. And the registered agent is Veronica Paz-Borrego. That is your wife, correct?
**A. Yes.**
Q. Okay. I understand based on your testimony what led to this and what you were trying to do. Why did you create the name to have your -- why did you create the company to have your wife be a registered agent?
**A. Because a woman owner gets preference when it comes to -- to bids. The minority.**
Q. Okay. You were still working for ECS at this time

Page 43

obviously?
**A. Yes.**
Q. So your testimony is that she was the registered agent and owner. And I'll also introduce here Exhibit 2(A), which is the articles of incorporation listing Maria Veronica Montesinos, who your wife testified that is her?
**A. That's -- that's her -- that was her -- her -- her name before, yeah.**
Q. Yeah. Okay. So same person?
**A. Yes, same person. Same person.**
Q. Your testimony is that you created this company with her as a registered agent because of the minority-owned business preference, not because you were concerned about being currently employed with ECS?
**A. No. I did it because it was for minority.**
Q. Okay. What type of preference do you understand that minority-owned businesses get in respect to this type of work?
**A. Minority small business woman owned gets -- gets preferences like if you want to do a -- try to get into a -- like a new construction site that they're going to start building houses or whatever, you get -- you've got preference to get those contracts.**
Q. That's only for the contracts that are bid out, correct?
**A. Yes.**

Page 44

Q. Were there any advantages to having your wife as the owner for contracts that you generated leads from as you would any other contract?
**A. No.**
Q. Is it that she had to be the sole owner or she just had to be the majority owner of the business to get the preference?
**A. She was the sole owner.**
Q. I understand that she was the sole owner. I'm asking you did she -- did she have to be the sole owner or was she only required to be the majority owner in your understanding to get the preference that you sought?
**A. I never even looked into that, to be honest with you.**
Q. Okay. So this was filed on July 26th, 2018. Did you have any conversation with anybody at ECS thereafter about forming a company and naming your wife to do some more work?
**A. No.**
Q. Did you view you forming a company that had at least some overlap between ECS's work as a violation of your noncompete?
**A. Please re-ask the question.**
Q. Sure. When you formed ASAP, did any part of you think that this was a violation of any noncompete agreement you may or may not have had with ECS?

Page 45

**A. No.**
Q. In fairness to you at the time, you didn't believe you were under a noncompete?
**A. Yes. I believed that I was not under a noncompete.**
Q. But you would agree that you were actively working with ECS at the time, right?
**A. I was working for ECS at the time that I formed ASAP.**
Q. Okay. What was the first action you took after forming ASAP to generate any sort of customers?
**A. The company was open for awhile and nothing was done with the company. It wasn't -- it wasn't being used.**
Q. All right. I'm going to introduce Exhibit 3. This is a tax return --
**A. Mm-hmm.**
Q. -- K-1 form produced. This lists Maria Montesinos as the shareholder, hundred percent owner, we talked about. And an ordinary business income for the year 2019 of negative $5,186. Do you agree that's accurate?
**A. That's what it says.**
Q. Is it -- do you know off the top of your head what this business -- this negative business income represents?
**A. I don't recall.**
Q. Do you recall if there was any business generated by ASAP in the year 2019?
**A. No, I don't.**

Page 46

Q. Do you recall soliciting any customers for business in the year 2019?
**A. No, I don't.**
Q. Do you recall who the first customer you actually obtained at ASAP was?
**A. No.**
Q. When you created ASAP, there was no capital contribution by either you or your wife other than maybe a hundred bucks to open up an account?
**A. That's exactly what it was, a hundred bucks to open account.**
Q. And that was that Truist account?
**A. Yes.**
Q. ASAP never held any business or professional license, correct?
**A. Nope.**
Q. Did you have to get a separate qualifier for ASAP to be able to perform work since you were not licensed?
**A. I had a qualifier, yes.**
Q. Who was the qualifier?
**A. But not -- not in 2019. I didn't have a qualifier for years. I didn't -- I didn't do any kind of work.**
Q. Okay. Who was the qualifier that eventually --
**A. That was a gentleman. His name was also Manny. I don't remember his last name.**

Page 47

Q. Was he the same -- was Manny the same guy who qualified -- who was your qualifier previous to ECS?
**A. I never had a qualifier previous to ECS. I only had a qualifier when I was at ASAP.**
Q. Okay. You don't recall when you met or needed Manny to be your qualifier?
**A. No.**
Q. Was it after COVID?
**A. Yes. I was laid off.**
Q. So it was after 2023?
**A. Yes.**
Q. You never disclosed the formation of ASAP to Ron Rodorigo? Ron Rodorigo or anybody?
**A. Yes.**
Q. Yes, you did?
**A. Yes. I told Ron.**
Q. You told Ron that you formed a new company?
**A. Well, yes, I -- I told Ron one night when I was going to leave that I had that company open. And he -- he was fine with it.**
Q. All right. But from 2018 when you formed it to 2023 when you left ECS, you never informed Ron or anybody else about ASAP's existence?
**A. No.**
Q. Okay. You told Ron when you were terminated from ECS

Page 48

that you had a -- you had formed a competing company years prior?
**A. No. I did tell him that I opened up a company. But I didn't tell him years prior.**
Q. All right. What were the circumstance that led to your exit from ECS?
**A. I just I couldn't deal with ECS any more, man. It was -- it was a toxic environment.**
Q. So what -- if this was as bad as you testified earlier in 2018-2019 --
**A. Yeah.**
Q. -- why did you stick around for another four years?
**A. Because I didn't have the balls to leave. I kept telling myself, man, this is going to change. And it didn't. It just kept getting worse and worse and worse.**
Q. What was the final straw for you?
**A. Just the way he was treating the guys was horrible. And -- and I believe in -- I believe in family. I believe, you know, just the type of person that I am, that just because you're -- you're one of the technicians that works there doesn't make me or anybody else any better than you, okay? And we all need to respect each other. And every time that Ron would walk into that office, man, and the things that he do, it just it got really bad. It got really bad. A lot of technicians**

Page 49

**left. They couldn't deal with him any more.**
Q. And you're talking about when Ron walked into the office. He flew down to Florida pretty often?
**A. Ron would walk into that office and five minutes after he's into that office, he's yelling at everybody. He's -- he's -- he's just -- he's toxic, man. It got really toxic.**
Q. How did the company's revenue perform during COVID and thereafter?
**A. I don't know because I never saw numbers. I only heard what Ron would say.**
Q. What did you hear Ron say?
**A. Ron -- to Ron, we're always in the negative. We were always in the negative. I had -- I have one of my accounts was 130 banks of Truist, okay? We would be doing work for them constantly. We'd do work for everybody else. When it came towards the end of the year, he'd flat out tell you to your face the company's in the red. And you're like how -- how is that possible? You know?**
**And it just -- it got really bad there, man. It got really bad. Everybody left. Everybody. Everybody left. That's why he's got so much turnaround with everybody that works there. That's why they call him "Ron the Con." He's got his own nickname and**

Page 50

**everything. From Michigan. Not from Miami. Just from Michigan. Ron the Con.**
Q. Did Manny leave because of the same issues that you're talking about?
A. **Yes. Yes. Then Ron tried -- Manny was making a lot more money, a lot more money than me, okay? Manny had a lot more experience than me. And then from one day to another, you know, he started having problems with Ron, and -- and Manny left. Manny wasn't going to deal with it. I mean they had arguments and everything in front of me. I was like dude, I'm out, you know. It's just, I don't get it, man.**
Q. That was in 2022, right, that Manny left?
A. **Yeah. I believe it was 2022.**
Q. And after Manny left, were you promoted to any sort of --
A. **No.**
Q. -- additional role?
A. **Negative. I was still a sales guy. Now the worst part is I'm reporting directly to Ron.**
Q. And after about a year you said I'm done, and you quit?
A. **I'm done. I'm done. I couldn't take it any more. He -- yeah. That's exactly what I did. I gave him -- I didn't just quit from one day to another. I gave him I believe it was two or three weeks' notice. Even after I left, I helped Ron. It's just -- so you can see my mentality**

Page 51

**with this guy.**
Q. How long after you left did you start trying to get -- let me ask it this way: Was it not until you left that you started trying to get customers for ASAP?
A. **After I left, I was -- I was going to start. I wanted to build up ASAP. I wanted to build a big company with ASAP. And -- and what happened was, again, they introduced me to another company owner from CSM that wanted to open up in Florida. Was highly recommended by Ron's dispatcher. He had gone -- Jerry, he had gone to work for these people, these people were great, they seemed like really good people.**
**So at the end, I did a few jobs with ASAP, and then I didn't do nothing else with ASAP because I started working for these people.**
Q. Is that where you're currently working now?
A. **Negative.**
Q. Where are you working right now?
A. **I started at a company called First Choice Mechanical. And I don't know -- I don't know how much longer I'm going to be there because it's -- I got -- I got this whole situation with Ron has really killed me in the industry. He's -- he just -- I don't know what you guys call it, but. . . In the whole industry, he's badmouthed me and he killed me. He killed me. It's -- he won, man.**

Page 52

**At the end of the day, he won. Because that's Ron.**
**He -- he was under the impression that I took the banks from him. That's what lit the fire. I never took the banks from him. I can't do banks with ASAP Air Mechanical. He knew it.**
**That's the first thing he told me when I was leaving, he goes to me, "Are you going to take the banks from me?"**
**And I told him, "No, I'm not going to take the banks from you. I can't do the banks. I don't know. I don't have manpower. I don't have nothing. I can't do the banks."**
**And then I guess like six-months later, he lost the banks and he, I don't know, he -- I don't know.**
Q. Who was your connection -- you're talking about Truist Bank?
A. **Yeah.**
Q. Who was your connection at Truist Bank?
A. **A gentleman by the name of Patrick Powers.**
Q. Did you ever have a conversation with Patrick Powers about why he left ECS?
A. **No. No.**
Q. Have you talked to him at all since you left ECS?
A. **No. No.**
Q. Okay. Let's talk about ASAP once you left ECS.

Page 53

A. **Mm-hmm.**
Q. Since you don't do any mechanical work yourself, what were your first -- like were you trying to generate leads first or were you trying to hire subcontractors? What was your thought process?
A. **I would -- like let's say I'd find a job. I'd get -- I'd pay somebody to go do the job. And then I'd make -- I'd make a small commission on top.**
Q. Okay. So who would you -- those early jobs, who did you -- who did you use to do the work?
A. **A gentleman by the name of Hanoi.**
Q. H-a-n-o-i?
A. **O-i, yeah.**
Q. How did you know Hanoi?
A. **I just met him. I met him on the street.**
Q. On the street?
A. **Yeah. I met him. Yeah.**
Q. Did you go back to your door to door or how did you pursue leads?
A. **I didn't -- yeah, I guess some people, I would visit some people or somebody would tell me, hey, these people want to replace an air condition or whatever. Stuff like that. I never. . .**
Q. Word of mouth?
A. **Yeah, word of mouth.**

Page 54

Q. Did you target any customers that you knew were unhappy or had already left ECS?
**A. Did I target them? No. Did I do work for them? Yes. Two of them.**
Q. Okay. We'll talk about those in a little bit. But, yeah, correct me if I'm wrong, but at the time, according to your testimony, between 2023 and when you were served with the lawsuit in 2024, you were not under the impression that you were under a noncompete; is that fair?
**A. Yes.**
Q. So in your mind, you didn't believe there were any restrictions with respect to former or existing ECS customers as you tried to get ASAP off the ground; is that fair?
**A. I didn't believe that I had a noncompete signed, okay? And to today, okay? Except for those two buildings that called me to today, I have never approached one of Ron's customers.**
Q. How many jobs would you say ASAP performed in the first year after you left ECS?
MR. SCHWITALLA: I'm sorry, you broke up a little bit. "In the first year after. . ."
BY MR. CREAL:
Q. After you left ECS?

Page 55

**A. No, not many.**
Q. How were you paid during those -- that first couple years?
**A. Whatever commission that I had left.**
Q. And what was that commission percentage?
**A. If -- if the job cost 5,000, if they charged me $5,000 to do the job, I put six or I'd put 55 or I'd put 65 depending on how much I could sell it for.**
Q. Do you recall your last month at ECS?
**A. Yes.**
Q. What was that month?
**A. October 23rd, 2023, was my last day.**
Q. All right. I'm going to introduce Exhibit 4. Can you see this?
**A. Yes.**
Q. These appear to be two checks issued on ASAP Air Mechanical Team, Inc. Checks number 226951 and 226952. Do you agree with me?
**A. Yes.**
Q. These checks are made out to you?
**A. Correct.**
Q. Your signature is on at least this first one for $3,000, correct?
**A. Yes.**
Q. And it was dated 10/9 of 2023?

Page 56

**A. Yes.**
Q. So two weeks before you left ECS on your last day you paid yourself $3,000 from ASAP Air Mechanical Team, Inc.?
**A. Yes.**
Q. Okay. Where did that money come from?
**A. Came from work.**
Q. Work for who?
**A. I -- I don't know. I don't have an exact person where it came from.**
Q. Okay. Can you -- when did you start doing jobs for ASAP though?
**A. I don't remember the exact date.**
Q. 20 --
**A. ASAP was doing jobs while I was at ECS.**
Q. Okay. That's what I want to get at is when did -- what time frame did ASAP -- you said it was post-COVID, you met your --
**A. Yes.**
Q. -- your guy who's going to be your qualifier, Manny. So when did that --
**A. It was after COVID. Manny was after COVID, yeah.**
Q. Right. After COVID. So when though? I mean between COVID, you know, which was March 2020 to October 2023, when did ASAP start doing jobs regularly?
**A. I don't recall an exact date. The exact month. I don't recall.**

Page 57

Q. All right. Well, two weeks later you paid yourself again $3300, and it was signed by -- and this says "payroll," right? You'd agree with me?
**A. Yes.**
Q. So are you the only person on the payroll?
**A. That -- that's getting checks, yes.**
Q. Okay. I guess my confusion is was there a payroll system set up or was it you were paying yourself --
**A. I was paying myself.**
Q. -- commission checks based off work performed?
**A. Correct.**
Q. So there was no regular payroll with which you were paying yourself?
**A. No.**
Q. All right. But this is two weeks later on 10/23/2023, which is your last day at ECS, correct?
**A. Correct. That's what it says.**
Q. Who signed this check at the bottom right?
**A. I'm not sure if I signed that or if Veronica signed that. Oh, Veronica signed it.**
Q. All right. Aside from signing checks for a company which she was the sole owner, what other work did Veronica perform for ASAP?
**A. Nothing.**

Page 58

Q. Well, you were able to pay yourself on this check. Why did you require that she sign the second check?
**A. I don't -- I don't recall.**
Q. She testified yesterday that basically if you said she had to do something, she just -- she just did it is kind of how it worked?
**A. Yes.**
Q. All right. And I apologize if I missed this, but what was your general commission that you would take on a particular job?
**A. It all depends.**
Q. Ballpark it for me.
**A. I can't. I can't ballpark it. I mean it depends on the job. I can't tell you exactly. Could be $100. Could be $500. Could be $1,000. It all depends on what's getting done.**
Q. And then you would pay yourself from the commission at the time in which the customer paid ASAP?
**A. Sometimes.**
Q. There was no regular -- there was no regular schedule with which you'd pay yourself? It was kind of whenever jobs came in, you determined you needed money, you'd pay yourself out of the ASAP account?
**A. Correct.**
Q. And that ASAP account was with Truist Bank?

Page 59

**A. Yes.**
Q. Did ASAP have a lease?
**A. No.**
Q. Did it have any physical office space?
**A. No. You look at the address, it's out of the house.**
Q. No, I understand that. But I just don't know if you had any holding ground for any of your subcontractors to place materials at?
**A. No.**
Q. Did you have stuff that you -- when you ordered parts and the like were they shipped to your house?
**A. Very rarely. Usually whoever I give the work to, they do everything.**
Q. Your -- so your -- your subcontractors would have the wholesale materials delivered to their business or their home to then take and go perform the job?
**A. Yeah. Usually those small units usually you go and you pick them up at a supply house and they do it the same day.**
Q. Okay. Did you typically pay the subcontractors by the hour or you just paid them a flat fee?
**A. Flat fee.**
Q. Okay. What was the typical flat fee?
**A. No. I can't tell you that because I don't know. Depends on the job.**

Page 60

Q. Right. But say it's a $10,000 job. I mean you have to have an idea based on your 25 years of experience what you would pay a subcontractor.
**A. Again, it depends on the job. Just because you charge $10,000, it depends on the job. It depends on the job.**
Q. What are the factors though? Is it the cost of the material? Is it the time of year? Is it -- what goes into that?
**A. You got -- you got -- you got the cost of the material and you've got the cost of the labor that they're charging you to do the work. So it all depends. And that's how you pay them.**
Q. So your flat fee that you provide to them was based in part on what I'm hearing you say cost of the material and what they told you their hourly rate was?
**A. There was no hourly rate. It was a flat rate.**
Q. But you just said, sir, that they would set the price in which they would work for you?
**A. They would set the price on how much they would charge me to do a job.**
Q. Okay. You took that number plus the wholesale price, plus whatever you want to charge commission, and that's the price you gave the customer?
**A. Yes.**
Q. Okay. All right. I'm going to introduce Exhibit 5. So

Page 61

you testified that there was -- you just ran the business out of your house. But my question is this check number 226927 for $4200 appears to be made out to your wife on April 1st, 2023 --
**A. Mm-hmm.**
Q. -- for rent from January, February and March for $4200. Do you agree with that?
**A. Yes.**
Q. All right. Why were you paying your wife rent for -- on a company check that there was no space for the company?
**A. Well, if you get a piece of your house and you -- if you put a desk and you work out of there, you can charge.**
Q. Okay. So you were then -- you were declaring basically your home as the home business for purposes of taxes and paying rent from the company to your wife who was the owner?
**A. Yes.**
Q. And does this $4200 represent your entire mortgage payment or just the pro rata share of your office?
**A. No, it says the rent for January, February and March.**
Q. Yeah, I understand that. But does -- does the 1400 per month that this represents --
**A. Mm-hmm.**
Q. -- is that your entire mortgage payment or is it the pro rata share of the business office that you use at your

house?
**A. That's for the office that we use out of the house for those months.**
Q. Okay. Your wife said you guys bought that house in 2017; is that right?
**A. Yes.**
Q. What did you buy it for?
**A. $354,000.**
Q. What do you pay on a monthly basis for your mortgage?
**A. $3,105.**
Q. What's your interest rate?
**A. Really?**
Q. I want to see if the math makes sense.
**A. Four -- 4.25.**
Q. Have you taken a second mortgage out on that house?
**A. No. Second mortgage from when I was -- when I was laid off during COVID that we put a second mortgage on the house.**
Q. Were you ever privy when you were at ECS to ECS's entire customer list?
**A. Yeah. There was a list that was on the system, yeah.**
Q. How would you utilize those customer lists?
**A. You don't use those lists unless you're going to do a proposal for them.**
Q. As a salesman down in the Miami area, were you tasked



with following up with customers who had previously had services done and make sure that they were satisfied with the work?
**A. If the work -- if we performed the job there and we finish the job today, I would always follow up a week later or something, make sure everything was going good. Once in a blue moon I would, you know, ask them how they're doing, if they needed anything.**
Q. Okay. But you didn't have like every year like once a year follow-up just make sure everything was working right?
**A. No. I'm sorry.**
Q. That's all good.
So correct me if I'm wrong, but after you did a job for a customer and they went into a customer list, you were never contacting that customer again unless they contacted you?
**A. Yeah. They call the office.**
Q. All right. What's the typical life span on a unit that you were selling at ECS?
**A. Twenty years.**
Q. It would have been rare for you to follow up with a customer that you made a proposal for that ECS performed work on because that -- it would still be in that life span of the unit?



**A. Well, maybe it wasn't for that unit. Maybe they'd call to get another unit checked out or stuff like that, yeah.**
Q. Okay. When you left ECS, did you take with you any materials, customer lists, proposals that you had drafted?
**A. No.**
Q. Did you download any documents from ECS's system or server?
**A. No.**
Q. Did you have numbers in your phone saved of customers that you had worked with while at ECS?
**A. No. I gave my phone in.**
Q. You had a company phone?
**A. Yes.**
Q. Did you have a company e-mail address?
**A. Yes.**
Q. I assume that was deactivated pretty quickly thereafter?
**A. I have no idea. I turned that in.**
Q. All right. I'm going to introduce Exhibit 6. How are you doing, sir? Do you need a break at all?
**A. No, no. I'm good.**
Q. Okay. You recall my office sent you and your wife discovery requests in this adversary case, correct?
**A. Yes.**
Q. Do you recall preparing these responses with your



attorney?
**A. Yes.**
Q. All right. I don't want to know any of those conversations you had with your attorney or your wife, frankly. But I just want to understand your impressions and what you did to prepare for these responses. Okay?
**A. Okay.**
Q. These are requests for admissions. And I want to draw your attention to Request Number 4. The request was that "Admit that, after ASAP was formed, 2018, and while Defendant Borrego was still employed by ECS, that ASAP solicited or performed HVAC work for at least one ECS customer."
You state that you deny -- Defendants deny that ASAP was formed and while Defendant Borrego was still employed by ECS that you solicited work, but you admit that you performed work for at least one former customer at ECS while you were still employed there. Correct?
**A. Yes.**
Q. So in performing that work, you managed the day-to-day operations of ASAP, you just coordinated that work, correct?
**A. Yes.**
Q. Who was that customer?
**A. Atlantic III.**

Q. And how did you first come into contact with Atlantic III in your capacity with ASAP?
**A. It's one of the companies I took to -- it's one of the buildings I took to the company.**
Q. Those are one of the six or seven contracts that you brought to ECS in the first place?
**A. Yes.**
Q. And then how did Atlantic III realize that you were no longer with ECS?
**A. They knew that I wasn't with them any more. They knew that I had left.**
Q. Yeah. How did they know that?
**A. I told them.**
Q. So you told them you were no longer with ECS, and at some point they contacted you and said we need you to do some work?
**A. Yes. Well, they weren't doing work with ECS already before I got that work. They -- okay. Let me rephrase that. They kept trying to get quotes from Ron, okay? And the prices were too high. And that's why I got that work.**
Q. Okay. So they were a customer of ECS from 2011 until 2022 area; is that fair to say?
**A. Yes.**
Q. And then they were asking for quotes on additional work



that they felt were too high and they came to you and asked for a different quote?
**A. They asked me for a quote because I was leaving ECS.**
Q. All right. So they approached you prior to you leaving ECS?
**A. Yes, they did.**
Q. You had informed them prior to that discussion that you were intending to leave ECS later that year in 2023?
**A. I really don't recall how the whole thing went down.**
Q. All right. But let's just play this out logically. I mean you were informing them that you were leaving ECS in the near term, right?
**A. Yes, yes.**
Q. And then they said well, we went to ECS and asked for a couple quotes, we don't like the pricing, can you quote us something different. Fair?
**A. They didn't tell me that they -- that they wanted the quotes from ECS or anything like that. He just asked me, "Teddy, can you give me pricing on this?" I already knew that the prices were too high because they came complaining every single day to the office of the invoices.**
Q. Atlantic III complained to the office about the invoices?
**A. Yes. Multiple, multiple times.**
Q. And you learned that through conversations with Manny?



**A. No. At that point I was already dealing directly with Ron.**
Q. Okay. Who was your point of contact at Atlantic?
**A. Pedro. The -- the building engineer.**
Q. Do you know what ECS was quoting them that made them frustrated with the pricing?
**A. I don't recall. They were frustrated -- I'm sorry. They were frustrated on invoices for services that have been done there that were being double billed, okay? And too many call backs.**
Q. All right. So it was your understanding that it wasn't necessarily the quotes that they were upset with, it was the service and the subsequent invoices that followed that drove them away from ECS?
**A. Yes. And -- and our pricing was too high.**
Q. You said that a lot. I'm curious just in your experience in the industry, what -- how did -- how did you know that it was too high? I mean some would say that the market is what somebody's ready to pay for something.
**A. If you get, for example, if you -- for example, you got a business, your idea is to bring people so they keep reoccurring business, right? So you markup -- you markup a job 20 percent, whatever, but when you're marking up 40 to 60 percent on work, or -- or for example, it's too expensive, man. It started getting -- it started getting**



**crazy. I'm telling you Ron lost his hinges. I -- I don't know what happened there.**
Q. When you say "too expensive," Teddy, I mean if it's too expensive, the customer has the option to go somewhere else.
**A. They do.**
Q. That's the market?
**A. Correct.**
Q. In your opinion --
**A. Yeah.**
Q. -- whether it was too much or too little or just about right, I guess I'm just trying to understand how you -- what is your evidence that it was too much because customers were complaining or because they weren't showing up?
**A. Customers were complaining. Customers are like you guys -- you guys are too expensive.**
Q. But your complaints with Atlantic III or what you learned that the complaints were, was not that it was too expensive, it was that, as you allege, they were double billed and the work required multiple call backs?
**A. Correct. And also -- and also that our pricings were too expensive.**
Q. For the service rendered the pricing was too expensive?
**A. For whatever proposal they had asked for, it -- it just**

Page 70

**it started getting too expensive.**
Q. But Atlantic, you'd agree with me, was agreeing to those prices, even if they were complaining about them, they were just upset with how those jobs were performed?
**A. I can't answer for them, but I don't know. I can't answer that. If they were agreeing that the prices were good, I can't say that.**
Q. All right. So Atlantic III comes to you in or around the fall of 2023 and asks you to quote one job or multiple jobs?
**A. They -- they wanted me to -- they wanted to quote a -- to replace some heat pumps. Small heat pumps.**
Q. And did they know that you were -- you had your own company?
**A. They knew that I was leaving ECS.**
Q. Okay. Did you provide quotes to them prior to leaving ECS?
**A. Yes, I did.**
Q. And that was on ASAP letterhead?
**A. That was on our ASAP letterhead, yes.**
Q. Who did you use or who were you intending to use as technicians on those jobs?
**A. I'd get the job and then I'd find the technician to go do it.**
Q. Right. But you obviously got --

Page 71

**A. In this case -- in this case it was Hanoi.**
Q. Along with Hanoi, how many other technicians did you have kind of at your disposal?
**A. Really he's the one that -- the one I go to. If he can't do it, then he'll get me somebody to do it or whatever.**
Q. All right. I'm going to go back to the discovery here. This is Exhibit 7. Do you recall responding to these interrogatories?
**A. Yes.**
Q. This is your signature here at the bottom along with your wife's?
**A. Yes.**
Q. We talked a little earlier about the tax returns filed by ASAP in 2019. You state here in Interrogatory Response Number 4 that ASAP's last filed tax return was for the 2019 tax year. Do you see that?
**A. Yes.**
Q. Was that the only year that ASAP filed tax returns?
**A. I -- I'm not sure. I'm not sure. I think -- I think -- I think we -- we did tax returns another year, and then -- and then the -- the accountant did -- what was it called? And then -- an extension to the taxes, and that's what I can remember.**
Q. Okay. Well, an extension just gives you until August of that same tax year. But let's assume that there was even

Page 72

one more filing.
**A. Yeah.**
Q. Why has ASAP not filed any tax returns in the 2020s?
**A. I wouldn't be able -- well, I know for a fact that my accountant died. So I don't even know what he did with all the paperwork. But I wouldn't be able to answer that.**
Q. When did your accountant die?
**A. I don't recall the -- the exact year.**
Q. Was it before or after COVID?
**A. It was after COVID.**
Q. Do you have a new accountant?
**A. No. I don't even have the company. The company's been closed.**
Q. I'm more just -- you file personal tax returns, do you not?
**A. I file taxes, yes, personally.**
Q. Okay. So your testimony is that once your accountant died sometime after COVID, the company never filed tax returns and you don't know if he was authorized to do so?
**A. Yes.**
Q. Well, did you provide him documentation of the company's revenues for 2020, 2021?
**A. Yes. Whatever -- whatever we had. We do the taxes together.**

Page 73

Q. You and your accountant?
**A. Yeah.**
Q. Well, you just said you did your taxes by yourself.
**A. I did my taxes -- I don't do my taxes by myself. I do my taxes with my accountant.**
Q. Okay. Well, who's your new accountant?
**A. The guy's name is Juan something.**
Q. Did Juan something handle ASAP's or --
**A. No.**
Q. -- did he handle ASAP's taxes after your other accountant passed away?
**A. All those files. They're in the same office, but all those files, they disappeared. Everything. Not just ASAP. Everything that had to do with that account.**
Q. He was a solo practitioner. Once he died, his entire office --
**A. I -- I can't answer that. I can't answer that.**
Q. Did you ask --
**A. Yes. Yes.**
Q. -- to try --
**A. When you guys were asking for information, I personally went to the office and tried to get information, but there was no information to get.**
Q. I understand, sir. But if he died in 2021 or 2022, I mean there was obviously several years in between that

and our discovery requests of last year.
**A. Everything that I have was provided to your office.**
Q. I don't dispute that. What I'm asking is that why you were doing jobs for Atlantic, and we'll get to the other one, but why did you not hire another accountant to do the tax returns of the company?
**A. Stupidity.**
Q. Okay. Introducing Exhibit 8. These are your requests for production responses. You did, as you noted, produce about 350 pages of documents, mostly bank statements, tax returns to the extent they exist. One thing that was not produced at all were any communications between any ASAP employees, agent or representatives and any customer. My question to you is why not?
**A. I don't have any.**
Q. You don't communicate with customers via e-mail?
**A. No.**
Q. Well, how do you provide them invoices?
**A. All of that -- all of that information I have on a computer that I would use for ASAP, okay? That computer crashed or I don't know what happened, and we weren't able to get any more information out of that. But most of that is done over the phone.**
Q. Okay. So you state here the only communications described in this request that existed were e-mails and



text messages between you and Atlantic III and the Betsy Ross Hotel, however, you don't have any of those communications in your possession, custody or control?
**A. Correct.**
Q. Because the computer crashed?
**A. No. I just don't have any of that information any more.**
Q. Well, do you have an e-mail address you use for ASAP?
**A. It doesn't exist any more.**
Q. Why does it not exist?
**A. Why would it -- why -- it doesn't exist because I don't have the company any more. The company doesn't exist for three years already.**
Q. I understand that, sir. But I mean unless you actively shut down the e-mail account?
**A. Okay.**
Q. Which if you're telling me that, then please tell me that, you actively shut down the e-mail account that the company was affiliated with?
**A. Well, what I told you was that the computer where I had all that on there crashed.**
Q. But if I have a Gmail account and my computer in front of me crashes, I can still access my Gmail account from a different device?
**A. I can't. I don't have access to get into that account.**
Q. What about your text messages?



**A. What about the text messages?**
Q. Did you search your phone for text messages between you and Pedro and you and --
**A. I don't have -- I don't have any text messages with Pedro on my phone.**
Q. Did you look?
**A. Yes.**
Q. I'm going to direct your attention here to request Number 7, which requested any operating agreements, partnership agreements, shareholder agreements, membership agreements, LLC agreements, or similar documents relating to any business entity in which you, Defendant Borrego, holds or held any ownership, management or financial interest in other than ECS from 2018 to present.
You replied the only business entity in which Defendant Borrego holds or held any ownership, management or financial interest to present was ASAP. Is that correct?
**A. Yes.**
Q. And just to be clear, you do not contend that you had any ownership interest in ASAP, but just that you had a financial interest in that you benefitted from jobs the company performed at your direction?
**A. Yes.**
Q. There were no other employees at ASAP ever?



**A. No.**
Q. It was just subcontractors that you contacted and paid per job?
**A. Yes.**
Q. All right. We're going to talk now about some bank statements, and then we're going to talk about invoices with Atlantic III and Betsy Ross, and then that should be it. Do you want to take any break or do you want to just power through?
**A. Let's go. Let's do it.**
COURT REPORTER: Can I have a break? I'm sorry, I hate to ask, can I just have a few minutes?
MR. SCHWITALLA: Of course.
VIDEOGRAPHER: We are now off the record. The time is now 12:01 p.m.
(At 12:01 p.m., off the record.)
(At 12:16 p.m., back on the record.)
VIDEOGRAPHER: Back on the record. The time is 12:16 p.m.
BY MR. CREAL:
Q. All right. We talked about your discovery responses, Mr. Borrego. Thank you for that.
We are going to move now to the bank statements that were produced pursuant to our discovery requests. I'll re-share my screen. And this is introduction of

Page 78

Exhibit 9. This, to your knowledge, is the ASAP Air Mechanical Team, Inc. bank account with Truist Bank?
**A. Yes.**
Q. All right. I'm looking at a -- well, this is a June 2023 account statement. This is the only bank that ASAP had any accounts with, correct?
**A. Yes.**
Q. Just reviewing these on a high level, you know, a lot of debit card purchases, but a lot of them relate to food, retail, restaurants, Amazon --
**A. Okay.**
Q. -- Publix I've seen a lot of. Is it fair to say that this account, the credit card attached to this account, was used for expenses beyond just the company?
**A. Yes.**
Q. Okay. Was that a frequent habit to use company funds for what I'll call personal expenses?
**A. No.**
Q. All right. Did you make any effort to delineate the difference between a company expense and a personal expense?
**A. No.**
Q. All right. Was it kind of just whatever money you had in this account you felt was able to be used for family expenses or otherwise?

Page 79

**A. Yes.**
Q. Introduction of Exhibit 10. Same account. This is for December of 2023. I'm going to ask you, generally speaking, did you -- was there anybody other than you who authorized transactions to come from this account?
**A. No.**
Q. All right. Looking at this transaction on 12/4 ACH Corp Debit Phone Payment to Capital One Veronica Paz-Borrego. Do you happen to know what that charge would be attributable to?
**A. No.**
Q. What about this payment for 26,544.99 to a Gemaire Distribution?
**A. That was -- that's a supply house.**
Q. All right. Would you buy from a supply house in bulk for a certain number or would you only purchase as to what's needed on agreed contracts?
**A. What's needed on agreed contract.**
Q. Okay. And then these, we talked about these would ship directly to your subcontractor and/or the home at which it was going to be installed at?
**A. Or picked up on site.**
Q. Okay. There's a -- I see a lot of these is Winsupply. What is that?
**A. Same thing. It's a supply house.**

Page 80

Q. Okay. There's a 2750 payment and $400 payment to -- $4100 payment to an Oscar Rodriguez. Who's Oscar Rodriguez?
**A. Oscar is a friend of mine.**
Q. Okay. Why are you paying Oscar Rodriguez from a company account?
**A. Well, I didn't -- I didn't realize it would be a problem for me to pay him through there. Oscar does -- on the side I also do like boat restorations or stuff like that. Oscar's the one that does my interiors and all that. Or repairs for interior. Upholstery.**
Q. When you say you "do boats." You coordinate contractors to repair boats in the area in which you live?
**A. Yes.**
Q. Do you do any of that work yourself?
**A. Depends what it is.**
Q. What is an example of work that you would do for yourself?
**A. I don't know. Maybe little things on a boat or -- or just stuff like that. Nothing -- nothing big.**
Q. Okay. And it's your testimony that Oscar Rodriguez only worked on your side --
**A. Yes.**
Q. -- boat?
**A. Yes, sir.**

Page 81

MR. SCHWITALLA: I'm going to ask that we go back to our stated ground rules. Mr. Borrego, if you could please wait for Mr. Creal to finish his question before you --
**THE WITNESS: Yes.**
MR. SCHWITALLA: -- answer. That way we'll have a clean record. And more importantly, you will be answering the question that was asked, and perhaps not answering a question that isn't about to be asked.
**THE WITNESS: Okay. I apologize.**
BY MR. CREAL:
Q. How do you know Oscar Rodriguez?
**A. Through -- through furniture. Through upholstery. That's how I met him. I met him on Marketplace.**
Q. You met him on Facebook Marketplace?
**A. Yes, I did.**
Q. Because you were looking for somebody to help you with your boats?
**A. Yeah. I met him -- actually he did -- he did some cushions for me.**
MR. SCHWITALLA: Some what?
**THE WITNESS: Cushions.**
MR. SCHWITALLA: Cushions.
BY MR. CREAL:
Q. Did Oscar Rodriguez ever work for ECS?

A. **Yes. I took him into work as a driver when he started there.**
Q. You took him -- I don't understand.
A. **Okay. Oscar's -- Oscar's relationship with me was upholstery, okay? One day we get into talking, because he had fallout with his partner, okay? In the upholstery. And he tells me, "Teddy, what is it that you do?"**
**I said, "Well, we're mechanical contractors."**
**And he basically asked me, he says, "Hey, you think there's any way that you can get me into" -- mind you, he had just got here from Cuba, okay? Not too long ago. And when we let go of one of the drivers, we brought him in as a driver. And -- and he worked there with me for, shit, I don't know, maybe five years. And he went learning, and -- and that's it.**
**But he still keeps doing upholstery and all that. That's what he -- that's what he does in his spare time.**
Q. What does a driver for ECS entail? I guess I don't understand how that plays into it.
A. **Okay. A driver is the gentleman that goes to -- to the shop, picks up whatever the guys need, takes it to the guys, to the job site. He's the runner, how's that? Runner for the company. For Ron and everybody.**



Q. Okay. So he -- he delivers parts and materials for the technicians to perform the work?
A. **Correct.**
Q. And is he still working there?
A. **No.**
Q. Same kind of situation. Got sick of --
A. **Yes.**
Q. -- setup?
Okay. All right. I'm going to introduce Exhibit 11. This is an account statement from February 29th, 2024. A payment to Oscar.
Who is Manuel Reboiro?
A. **Well, that's the guy that was the -- the guy that was the qualifier. I didn't remember his last name.**
Q. So did he have to qualify ASAP for each job that it did?
A. **No. Even if you didn't do a job, you still had to pay him, I think it was like 1200 or $1400 a month. Something like that.**
Q. So -- so he basically was on retainer to be your license --
A. **Qualifier.**
Q. -- and you paid a monthly fee of 1200 bucks?
A. **Yes.**
Q. What is this "Internet Payment Upgrade, Inc." for $2500?
A. **I have no idea. Oh, Upgrade. I think -- I think that's**



**one of the cards that I used for the business. I'm not sure.**
Q. How many cards did you have open for the business?
A. **None.**
Q. None?
A. **Right now I don't have anything.**
Q. No. How many did you have when the business was running in --
A. **No, I had -- I had -- those were all my personal credit cards that I would use.**
Q. Okay. So -- so you would pay personal credit cards with company funds is what you're saying?
A. **I would pay personal credit cards that I used to buy company stuff.**
Q. Well, did you -- you used personal funds to reimburse yourself for Outback Steakhouse?
A. **No.**
Q. Okay. What is City -- what was done at City of Adven -- Adventura?
A. **City of Adventura was done when I went to pay for a permit when I did the work for Atlantic III.**
Q. There's several transfers in here to an account ending in 4522. Your wife didn't know what that account was. Do you?
A. **No, I don't. I don't remember.**



Q. Do you have another bank -- what is your family bank account?
A. **Chase.**
Q. Your wife testified that this is not the Chase bank account.
A. **Correct. That's not a Chase bank account. So I don't remember who that was transferred to.**
Q. Could have been transferred to an account that's controlled by you?
A. **I don't have another account. I got Chase.**
Q. Okay. There are several -- and when I say "several," I mean we're in the tens of thousands of dollars throughout these bank statements of an account transfer all in round numbers that ends in 4522. You're telling me your testimony is that you have no idea what that is?
A. **Yes, sir.**
Q. All right. Introducing Exhibit 12, April 2024 charge -- or excuse me, April 2024 statement. We talked about Winsupply.
A. **Mm-hmm.**
Q. Santander, "Internet Payment Consumer Santander."
A. **That's my truck.**
Q. Okay. That's your monthly fee for your truck?
A. **Yes, sir.**
Q. Is your truck registered in the company's name?

**A. No.**
Q. Is it in your personal name?
**A. Yes.**
Q. Several payments to Oscar. You talked about Hanoi's one of your subcontractors?
**A. Yes.**
Q. What about Joshua or Bev, same thing?
**A. Yes.**
Q. Do you keep a ledger or a QuickBooks with your company as to how you're making distributions to your contractors?
**A. No. No.**
Q. I don't mean this in a derogatory way, sir, but was this simply just a fly-by-the-seat-of-your-pants type of business?
**A. Yes.**
Q. Do you recall in April 2024 a job that you would have done for $75,355.07?
**A. How much? I'm sorry, how much?**
Q. $75,355.07?
**A. Atlantic III.**
Q. This would have been the time frame of the Atlantic III jobs?
**A. Yeah. Yes.**
Q. All right. Last bank statement, introducing Exhibit Number 13. This is what I was getting at with the



transfer to a mobile account 4522. There's a $5,000 payment, a $10,000 payment in June of 2024. Another $5,000 payment. Go ahead.
**A. No, no, go ahead. I'm sorry.**
Q. It's just odd. I mean there's $17,000 worth of transfers in a -- I'm sorry, $20,000 worth of transfers in a five-day period. I would know what that is, if it was me, but I'm curious under oath if you can tell me.
**A. I'm not sure if that was payments maybe to -- to Hanoi's account or I'm not sure. I honestly I'm not sure. Because I sent him money sometimes, a lot of times, through Zelle. But when they were bigger amounts, I'd send it through -- through a bank. But I can't tell you. I'm not going to lie to you. I don't know.**
Q. Okay. Who's Stephanie Villanueva?
**A. Stephanie Villanueva is the owner of a company called Ancium.**
Q. Ancium?
**A. Vendor. Yeah.**
Q. What does Ancium do?
**A. They do coil coating.**
Q. Okay. Do you know what a company called Daikin is?
**A. Supply house. And there you go. It was all over. Overdraft fee, overdraft fee, overdraft fee.**
Q. When did you close up shop at ASAP?



**A. On that -- those -- in that date. The company was closed in -- it was closed in early '24, but I don't remember what month it was.**
Q. When you ran out of money basically in July-ish?
**A. No, no, the company wasn't -- it was before that.**
Q. A lot of these are company expenses. I mean were you just paying off the debts or why is --
**A. Paying off -- paying off debts.**
Q. Okay. And when this bank account ran out of money, you essentially just said all right, we're closing up shop?
**A. No. We closed up shop before we ran out of money.**
Q. Why did you close up shop before you ran out of money if you were still getting jobs?
**A. Honestly, I didn't want to deal with it any more. And I was working for another company and I didn't want to -- I just didn't want to deal with it any more.**
Q. Was this before or after you were involved in a lawsuit with ECS?
**A. Before.**
Q. This is when you were working for CSM?
**A. Yes. Yeah.**
Q. Okay. All right. I'm introducing Exhibit 14. These are what appears to be ASAP Air Mechanical Team Invoices to Atlantic III dated July 12th, 2023, to a Pedro Chambachumbi?



**A. Chambachumbi.**
Q. Spell the name.
**A. It's a --**
COURT REPORTER: I'm sorry, I didn't. . .
**THE WITNESS: Chambachumbi.**
BY MR. CREAL:
Q. Chambachumbi. Yeah.
**A. Chambachumbi. Yeah.**
Q. So this was a 46 -- almost $47,000 job. Was this the first quote that you were asked to provide Pedro and Atlantic III?
**A. I don't remember.**
Q. Well, this fits our timeline from earlier where you were -- this was three months before you left ECS. He was asking about getting a quote done for this job. Do you have any reason to believe that there was other quotes provided before this date?
**A. I honestly I don't remember. Whatever I had I turned it in. I can't tell you.**
Q. Well, it's just it's a little odd because this is in July of '23 --
**A. Mm-hmm.**
Q. -- and how long do you think a job like this would have taken to complete?
**A. That job, they did it in two days.**

Page 90

Q. Okay. So then you would have gotten paid based on the terms here 50 percent down and the rest of it upon completion, right?
**A. Yes. If -- if -- even if it says that, the deposit takes a long time for you to get it and then to actually receive the units, it takes a long time.**
Q. Okay. I only have three invoices from Atlantic -- or two Atlantic III. The last one being January 16th, 2024. Second invoice for just shy of $54,000, and before I get to some more detailed questions about this, I'm just trying to square that with Exhibit 12 from April of '24 that had $75,000 in deposits at least for one date.
**A. Okay.**
Q. So can you help me understand why the bulk of your work with Atlantic II was in 2023, but the deposit that you testified was related to Atlantic III was not until April of '24?
**A. I wouldn't be able to explain that to you right now.**
Q. Were there other jobs that you were working besides that and the Betsy Ross Hotel?
**A. No.**
Q. In April of '24 would that have been around the time that you would have deemed ASAP to be closing?
**A. Yes.**
Q. All right. Let's look at this first one from July 12th

Page 91

on Exhibit 14. Excuse me. On a $46,670 job what was your take home from that? I'll show you the -- here's the prices of the materials.
**A. Okay. That was the total of the job was 46,000?**
Q. It looks like you get --
**A. Yes.**
Q. -- 44,300 and --
**A. I probably -- I probably get, I don't know, about five grand.**
Q. Okay. I mean these units here themselves, 38, 46, I mean it's almost a wholesale quote, at least based on this. Or was your markup baked into the units?
**A. That's already in the units.**
Q. Okay.
**A. That's the breakdown.**
Q. Understood.
So five grand-ish. Little bit more you maybe get seven or eight grand on this $54,000 job?
**A. Maybe -- maybe six. Can't push them too hard either.**
Q. All right. Correct me if I'm wrong, but it seems like your cut, more or less, was around 10 percent?
**A. Between -- between 6 and 10 percent.**
Q. Okay. That's fair.
And then this third job in January of 2024, outside of these three, are there any other jobs that you

Page 92

were aware of that you on behalf of ASAP performed for --
**A. No, sir. Not that I recall, no.**
MR. SCHWITALLA: I didn't hear the end of the question, Ted. So we're going to have to -- I'm going to ask Mr. Creal to ask the complete question. And I'm going to ask you to wait to hear the complete question so you can answer it.
**THE WITNESS: Sorry.**
BY MR. CREAL:
Q. Outside of these three invoices and three jobs for Atlantic III, are there any other jobs that you're aware of that ASAP performed for Atlantic III?
**A. Not that I recall.**
Q. Okay. Introducing Exhibit 15. This is the last exhibit. What is The Betsy Hotel?
**A. The Betsy Hotel is a beach -- a beach. A hotel that's on Ocean Drive and like 14th. Somewhere around there. Yeah 1440 Ocean Drive.**
Q. How do you -- what is your relationship outside of these invoices to The Betsy Hotel?
**A. Repeat that question.**
Q. Yeah. What is your relationship to The Betsy Hotel? How do you know anything about The Betsy Hotel?
**A. Doing work there.**
Q. You did work there when you were at ECS?

Page 93

**A. Yes, I did.**
Q. Okay. Were they one of the customers that you brought to ECS from Cool Breeze?
**A. No, sir.**
Q. So you initiated that relationship when you were pursuing leads on behalf of ECS?
**A. Knocking on the door, sir. Yes.**
Q. Okay. How did this first invoice from February 9th of 2024, I believe that's the earliest date on here, so this would have been about four months after you left ECS, give or take, fair?
**A. Yes.**
Q. How did you first come into this particular job where there's two actuators that were provided?
**A. Brandon called me.**
Q. Brandon Campbell is who in relation to The Betsy Hotel?
**A. He's the building engineer.**
Q. And was he the person you dealt with when you were at ECS?
**A. Yes, sir.**
Q. He called you like your cell phone?
**A. Yes.**
Q. And he had that number saved from the time that you were at ECS?
**A. No, he got it from another engineer from another**

**building.**
Q. What was the other building?
**A. I don't remember the name of the building. The guy's name was Yoanny. He would do work -- he would do work there with him.**
Q. His name was Yoanny?
**A. Yoanny, Y-o-a-n-n-y.**
Q. At the time Brandon reached out to you about this particular job, did he know that you had left ECS?
**A. Yes.**
Q. Did he know before he called you?
**A. I wouldn't be able to answer that.**
Q. Well, did you -- did you inform him on that call that you left ECS is my question?
**A. No. I think -- I think if my mind recollects correctly, he called my ECS cell phone number and it was disconnected.**
Q. Okay. So he had your other cell phone from just your past work and so he called your personal cell?
**A. He got my personal number, he got it from the guy Yoanny.**
Q. Okay.
COURT REPORTER: From the -- oh, sorry. Yoanny, or whatever his name was?
**THE WITNESS: It's Y-o-a-n-n-y.**
COURT REPORTER: Thank you.



BY MR. CREAL:
Q. It looks like obviously he was happy with the work as you guys were back there on April 10th, April 12th, May 1st, May 31st twice. Twice on June 30th. Once on July 30th. Once on August 22nd. Once on September 3rd of 2024. Pretty regular customer, fair to say?
**A. Yes.**
Q. Why did -- why did you stop doing work for Betsy Ross? Or Betsy Hotel, excuse me.
**A. I stopped doing work with them because that's it, I wanted nothing else with ASAP. I wanted to just work for -- I can't -- I couldn't deal with this, man. It was me by myself. And as you can clearly see, I'm not, you know, inclined to run a company unless I know how to do it, you know, and it was just too much for me and I said that's it, I'm done.**
Q. Okay. So I mean you folded up shop with ASAP in April of '24-ish, you testified. So you were basically just doing these six or so jobs after that as kind of a favor to this guy?
**A. Yes.**
Q. Did you use Hanoi or your regulars on these jobs?
**A. Yes.**
Q. And after September '24 you just told him not doing this any more?



**A. Yes.**
Q. Okay. You stated right now you're at First Choice Mechanical?
**A. Yes.**
Q. Are you doing sales work there?
**A. Yes.**
Q. Same type of stuff you were doing at ECS and on behalf of --
**A. We're -- we're trying to get into more the residential side. We want to get into residential. That's the -- that's the plan.**
Q. How long have you been there?
**A. Couple months.**
Q. Is Edwin Martinez the owner?
**A. Yes.**
Q. What's he like?
**A. He's a cool guy. I mean real business kind of guy. I mean I like him. I think he's a good person.**
Q. You don't seem like you're happy at the place earlier. What is the basis for that?
**A. Because when I -- when I first got together with Edwin I thought, you know, that we would do a certain line of work. I wanted to get into like heat exchangers and changing gaskets on heat exchangers and that kind of work, you know what I mean? And now it's, you know,**



**let's not even worry about heat exchangers. Let's go 100 percent into residential, you know. And he's trying to start up a marketing strategy, okay? To -- to get into that.**
Q. So it's different work than you what you thought you were going to be doing, but it seems like you're at least willing to give it a try?
**A. Yes.**
Q. Do you know an individual by the name of Maury Perrigo?
**A. Who?**
Q. Maury Perrigo?
**A. Marty -- Maury Terrego, that guy?**
Q. He used to be an ECS employee with you.
**A. Yeah. Yeah.**
MR. SCHWITALLA: How do you spell the last name, please? Or could you pronounce it more clearly for me?
**THE WITNESS: It's -- it's --**
MR. CREAL: It's M-a-u-r-y, right?
**THE WITNESS: M-a-u-r-y. And the last name I think was T-a-r-r-a-d-o or something like that. G-o. G-o. Ended in g-o.**
MR. SCHWITALLA: Tarrago.
**THE WITNESS: Tarrago, yes.**
BY MR. CREAL:

Page 98

Q. What's -- what's his deal?
**A. No deal. He was working with Ron.**
Q. I mean just that reaction I'm curious what his background is?
**A. All right, man. His background is he was -- he was a police officer in Cuba for the Communist Party. We don't -- in Miami, that don't fly.**
Q. Oh, yeah, I would imagine. Not something he advertises, I'd say.
**A. No, man. And he just, he's -- I mean he's not a bad person, man. He just -- he gets annoying.**
Q. Was he a technician?
**A. He was a technician, yes.**
Q. Okay. Did he do any work for you at ASAP?
**A. No.**
Q. How did he end up at First Choice with you?
**A. He's not at First Choice with me.**
Q. Oh, he's not?
**A. No. He doesn't work with me.**
Q. So he no longer works for ECS, but he's not with you anywhere in any professional context?
**A. Nope.**
Q. Do you know what he's doing for work?
**A. I imagine he's still doing mechanical contracting. A mechanic.**

Page 99

**It's funny that you bring that up, because I overheard that he's suing Ron.**
Q. Interesting. I did not know that.
**A. Yeah. For -- for defamation of character. Defamation of character and racist remarks, is what I heard in the street. So that's your guy.**
Q. What else have you heard in the street?
**A. Nothing much, to be honest with you. Except that the business is crazy here right now. Believe it or not, it's really hot, but it's really slow.**
Q. The business is crazy in a good way or it's just --
**A. Slow. It's really slow.**
Q. Slow. Okay.
**A. Yeah.**
Q. You're approaching your busy season, right?
**A. It's supposed to be the busy season, but nobody wants to spend any money. They're scared.**
Q. What is -- what was part of your decision to file for bankruptcy?
**A. I was way, way in over my head. I didn't even realize how over my head I was. And I -- I just -- I was done. Like I didn't have a life.**
Q. Feel like you've gotten some of that back from this process?
**A. What do you mean?**

Page 100

Q. Have you gotten some of your life back in this process by having some of those debts extinguished?
**A. Yeah. Yeah, it was -- it's -- it's another process, you know. You can't succeed, you have to wait five years before you can do anything. It's -- it's another process. But I'm glad. I just want to start off at zero and just start again and, you know, try my best to get on the right path to -- to do things differently.**
Q. How would you do things differently?
**A. Man, this has been really hard on me and my family. More than you can ever imagine, okay? What I've been going through, I will never in my life want somebody to go through this too. It's been like that. It's horrible.**
Q. Mr. Borrego, do you think I've given you an opportunity to say everything you want to say in response to my questions today?
**A. Yes.**
Q. Is there anything else that you want to say while you're on video deposition for the record?
**A. No.**
MR. CREAL: I don't have any questions for you any more. I thank you for your time today.
**THE WITNESS: Thank you.**

EXAMINATION

BY MR. SCHWITALLA:

Page 101

Q. Briefly I want to revisit, Mr. Borrego, that whole concept that Mr. Creal was speaking with you about before and you were describing a situation where Ron asked you to contribute back 10 percent of your salary. Do you remember earlier today Mr. Creal asking you questions about that and you answering those questions?
**A. Yes.**
Q. How did that work? Did it work as follows: That he simply cut your salary by 10 percent so you were no longer receiving 80,000, you were receiving 72,000? Or did you remain receiving a salary of 80,000 and you were expected to give him money back?
**A. No. He -- he cut my -- from 80 -- my salary from 80 to 72,000.**
Q. Okay. And then again later it went down another 10 percent, and it was the same situation. He -- you weren't kicking him back part of your salary, he reduced your salary?
**A. Yes, sir.**
MR. SCHWITALLA: Okay. That's it.
VIDEOGRAPHER: Anything further?
MR. CREAL: No.
VIDEOGRAPHER: The time is 12:52 p.m. This concludes today's deposition. We are now off the record.
MR. CREAL: We are off the record.

Page 102

I'll take a mini, please.
MR. SCHWITALLA: We will read, please.
COURT REPORTER: Okay. Thank you very much.
(At 12:51 p.m., deposition concluded.)

Page 103

STATE OF ____________ )
)
COUNTY OF ___________ )

I, ______________________, being first duly sworn, depose and say: That I have read the transcript of the deposition given by me on the 20th day of May, 2026, at or about 10:01 a.m., via Zoom; that the same is correct and is an exact transcript of my testimony in the above-captioned case subject to the corrections hereinafter listed; and further, deponent says nothing.

SUBSCRIBED AND SWORN TO BEFORE ME ON THE ________ day of ____________________, 2026.

_________________________________
Notary Public

My commission expires: __________

Page 104

STATE OF MICHIGAN )
) SS
COUNTY OF MIDLAND )

I certify that this transcript, consisting of 103 pages, is a complete, true, and correct record of the testimony of THEODORE G. BORREGO, held in this case on May 20, 2026.

I also certify that prior to taking this deposition THEODORE G. BORREGO, was duly sworn to tell the truth.

May 31, 2026 Angela L. Chritz
_____________________________
Angela L. Chritz, RPR, CSR-4305

Notary Public
Midland County; Midland, MI
My Commission Expires: 6-11-2031

**Exhibits**

**Exhibit 1** 2:8 26:11 31:22

**Exhibit 2** 2:10,12 42:7 43:4

**Exhibit 2A**

**Exhibit 3** 2:14 45:12

**Exhibit 4** 2:15 55:13

**Exhibit 5** 2:17 60:25

**Exhibit 6** 2:19 64:19

**Exhibit 7** 2:21 71:7

**Exhibit 8** 2:22 74:8

**Exhibit 9** 2:24 78:1

**Exhibit 10** 3:3 79:2

**Exhibit 11** 3:4 83:10

**Exhibit 12** 3:6 85:17 90:11

**Exhibit 13** 3:7 86:24,25

**Exhibit 14** 3:9 88:22 91:1

**Exhibit 15** 3:10 92:14

**Exhibit 16**

**$**

**$1,000** 58:15

**$10,000** 60:1,5 87:2

**$100** 58:14

**$1400** 83:17

**$15,000** 17:5

**$17,000** 87:5

**$20,000** 87:6

**$2500** 83:24

**$3,000** 55:22 56:3

**$3,105** 62:10

**$3300** 57:3

**$354,000** 62:8

**$400** 80:1

**$4100** 80:2

**$4200** 61:3,6,18

**$46,670** 91:1

**$47,000** 89:9

**$5,000** 55:6 87:1,3

**$5,186** 45:18

**$500** 58:15

**$54,000** 90:9 91:18

**$75,000** 90:12

**$75,355.07** 86:17,19

**(**

**(a)(1)** 33:8

**1**

**1** 21:11 26:11 31:22

**10** 21:8,12,19,22 25:6,9 36:5,10, 16 79:2 91:21,22 101:4,9,15

**10,000** 17:5

**10/23/2023** 57:16

**10/9** 55:25

**100** 17:24 97:2

**10:01** 4:1,3

**10:03** 5:15

**10:30** 23:21,22

**10:39** 23:23,25

**10th** 7:12 95:3

**11** 83:10

**12** 14:3,21 85:17 90:11

**12/4** 79:7

**1200** 83:17,22

**12:01** 77:15,16

**12:16** 77:17,19

**12:51** 102:4

**12:52** 101:23

**12th** 88:24 90:25 95:3

**13** 86:25

**130** 49:15

**14** 88:22 91:1

**1400** 61:21

**1440** 92:18

**14th** 92:17

**15** 17:23 26:25 92:14

**16** 19:2

**16th** 90:8

**19** 37:11

**1973** 7:12

**1st** 61:4 95:3

**2**

**2** 42:7

**2(A)** 43:4

**20** 4:1 19:19 21:23 22:10 25:15 37:11 56:13 68:23

**20-something** 23:12

**2011** 9:19 10:17 11:5 12:21 15:2 25:25 26:19 37:13,16 66:22

**2013** 22:10

**2014** 22:9,10 37:16

**2014-2015** 25:17 35:18

**2014-2015ish** 24:7

**2017** 62:4

**2017-2018** 35:19

**2017-2018-ish** 25:22

**2018** 37:12 41:18,20 42:10 44:14 47:21 65:10 76:14

**2018-2019** 48:10

**2019** 41:17 45:17,24 46:2,21 71:14,16

**2019-2020** 37:19

**2020** 56:23 72:23

**2020s** 72:3

**2021** 72:23 73:24

**2022** 50:13,14 66:23 73:24

**2023** 12:21 47:10,21 54:7 55:12, 25 56:23 61:4 67:8 70:9 78:4 79:3 88:24 90:15

**2024** 54:8 83:11 85:17,18 86:16 87:2 90:8 91:24 93:9 95:5

**2026** 4:1,3

**20th** 4:3 42:13

**226927** 61:3

**226951** 55:17

**226952** 55:17

**22nd** 95:5

**23** 89:21

**23rd** 55:12

**24** 88:2 90:11,17,22 95:24

**24-CV-10924** 4:6

**24-ish** 95:18

**25** 8:8 31:7 60:2

**25th** 26:19

**26,544.99** 79:12

**26th** 42:10 44:14

**2750** 80:1

**29** 14:21

**29th** 83:11

### 3

**3** 45:12

**30th** 95:4

**31st** 95:4

**33033** 42:14

**350** 74:10

**38** 91:10

**3rd** 95:5

### 4

**4** 31:22 33:8 55:13 65:9 71:15

**4.25** 62:14

**40** 68:23

**4160** 42:13

**44,300** 91:7

**4522** 84:23 85:14 87:1

**46** 89:9 91:10

**46,000** 91:4

### 5

**5** 60:25

**5,000** 55:6

**50** 90:2

**52** 7:12

**55** 55:7

**5:00** 13:25

### 6

**6** 64:19 91:22

**60** 68:24

**64** 25:7

**65** 55:7

### 7

**7** 71:7 76:9

**72** 25:7

**72,000** 101:10,14

**7:00** 13:25

### 8

**8** 74:8

**80** 101:13

**80,000** 15:3 25:6 101:10,11

### 9

**9** 78:1

**9th** 93:8

### A

**a.m.** 4:1,3 5:15 23:21,22,23,25

**able** 14:17 17:19 30:23 32:21 33:22 46:18 58:1 72:4,6 74:22 78:24 90:18 94:12

**aboard** 19:17

**about** 5:11 6:10,11 8:21 10:14 13:13 17:25 21:1,13,14 22:17,18 24:5,9 25:5,18,21 26:10,18 29:19, 20,21 30:12,14 31:21,22 32:9 34:24 35:17 37:20,24,25 41:15 43:13 44:16 45:16 47:23 49:2 50:4,20 52:15,21,25 54:5 67:23 69:11 70:3 71:13 74:10 75:25 76:1 77:5,6,21 79:12,19 81:9 85:18 86:4,7 89:15 90:10 91:8 92:23 93:10 94:8 97:1 101:2,6

**AC** 8:1 39:1

**access** 75:22,24

**according** 54:6

**account** 46:9,11,12 58:23,25 73:14 75:14,17,21,22,24 78:2,5, 13,24 79:2,5 80:6 83:10 84:22,23 85:2,5,6,8,10,13 87:1,10 88:9

**accountant** 71:21 72:5,8,12,18 73:1,5,6,10 74:5

**accounts** 49:15 78:6

**accurate** 45:18

**ACH** 79:7

**action** 45:8

**actively** 45:5 75:13,17

**actual** 14:15

**actually** 46:4 81:19 90:5

**actuators** 93:14

**additional** 50:17 66:25

**address** 42:13,14 59:5 64:15 75:7

**admissions** 65:8

**admit** 65:10,16

**advantages** 44:1

**Adven** 84:18

**Adventura** 84:19,20

**adversary** 4:17 64:23

**advertises** 98:8

**affected** 28:24

**affiliated** 75:18

**affirm** 5:10

**affirming** 9:9

**Affordable** 8:2

**after** 4:9 7:23,24,25 10:12 12:15 18:7 25:12,21 30:24 32:22 35:6 45:8 47:8,10 49:4 50:15,20,24 51:2,5 54:21,23,25 56:21,22 63:14 65:10 72:10,11,19 73:10 88:17 93:10 95:19,24

**again** 4:15 5:19 7:2 16:25 21:19 25:13 32:7 35:18 36:17,18 51:7 57:2 60:4 63:16 100:7 101:15

**against** 29:24

**age** 7:10

**agent** 42:16,22 43:3,12 74:13

**aggravation** 41:4

**ago** 4:16 26:25 82:13

**agree** 26:15,18,21 28:9 30:4,12, 13,14 31:6,13 33:8,16 42:10 45:5, 18 55:18 57:4 61:7 70:2

**agreed** 79:17,18

**agreeing** 70:2,6

**agreement** 26:4,14 28:10 29:20, 22 32:6 33:2,20 34:8,9,10 44:24

**agreements** 29:11,16 76:9,10,11

**ahead** 11:4 14:1 87:3,4

**air** 8:2,3,4,6 13:20 38:2,7,18 42:9 52:4 53:22 55:16 56:3 78:1 88:23

**allege** 69:20

**almost** 89:9 91:11

**along** 71:2,10

**already** 10:17,18 19:6 21:17 37:3 42:4 54:2 66:17 67:19 68:1 75:12 91:13

**also** 16:18 24:15,18 25:3,4 29:23 32:19 34:1 39:11,12 43:4 46:24 69:22 80:9

**always** 9:15 34:15,17 40:12 49:13,14 63:5

**am** 7:12 33:3 48:19

**Amazon** 78:10

**amounts** 87:12

**analysis** 33:20

**Ancium** 87:17,18,20

**and/or** 79:20

**Andrew** 4:11,24 5:24

**animals** 22:3

**annoying** 98:11

**another** 21:19 33:10 37:20 48:12 50:8,23 51:8 64:2 71:20 74:5 85:1,10 87:2 88:15 93:25 100:3,5 101:15

**answer** 6:13,25 7:1,6 19:12 30:23 70:5,6 72:6 73:17 81:6 92:7 94:12

**answering** 81:8,9 101:6

**answers** 6:17,23

**any** 7:5 8:11,13 12:12 14:15 15:4 19:10 21:6 24:10 25:25 27:2 29:10,12,16 32:15 33:4,11,13,23 35:1 37:15,16 39:14 40:24 41:10 44:1,3,15,23,24 45:9,23 46:1,14, 22 48:7,21 49:1 50:15,21 53:2 54:1,12 59:4,7 64:3,7 65:3 66:10 72:3 74:12,13,15,22 75:2,6,8,11 76:4,9,12,13,16,20 77:8 78:6,19 80:15 82:11 88:14,16 89:16 91:25 92:11 95:25 98:14,21 99:17 100:21,22

**anybody** 44:15 47:13,22 48:21 79:4

**anything** 20:2 33:6 63:8 67:18 84:6 92:23 100:5,18 101:21

**anywhere** 98:21

**apologize** 16:2 58:8 81:10

**appear** 55:16

**appears** 61:3 88:23

**applicable** 9:4

**appreciate** 26:25

**approached** 10:1 34:24 37:19 54:18 67:4

**approaching** 99:15

**approval** 17:9

**approve** 15:23

**approved** 17:12,22

**approximately** 16:23

**April** 61:4 85:17,18 86:16 90:11, 16,22 95:3,17

**area** 23:2 35:19 41:17 62:25 66:23 80:13

**aren't** 18:17

**arguments** 50:10

**around** 17:24 22:9,10 25:17,23 30:25 48:12 70:8 90:22 91:21 92:17

**articles** 43:5

**ASAP** 38:2,5,11,12,13 39:7,11, 20,22 41:22 42:6,8 44:23 45:7,9, 23 46:5,7,14,17 47:4,12 51:4,6,7, 13,14 52:4,25 54:14,20 55:16 56:3,10,14,16,24 57:24 58:18,23, 25 59:2 65:10,11,15,21 66:2 70:19,20 71:14,18 72:3 73:14 74:12,20 75:7 76:17,21,25 78:1,5 83:15 87:25 88:23 90:23 92:1,12 95:11,17 98:14

**ASAP's** 39:4,9 47:23 71:15 73:8, 10

**aside** 15:16 32:9 37:19 57:22

**ask** 5:1 6:11,25 7:6 17:2 28:19 37:20 51:3 63:7 73:18 77:12 79:3 81:1 92:5,6

**asked** 9:6 10:2 21:6 24:9 25:9 34:13 67:2,3,14,18 69:25 81:8,9 82:10 89:10 101:3

**asking** 13:16 44:9 66:25 73:21 74:3 89:15 101:5

**asks** 70:9

**associated** 26:4

**assume** 6:14 64:17 71:25

**assuming** 32:14

**Atlantic** 65:25 66:1,8 67:23 68:3 69:18 70:2,8 74:4 75:1 77:7 84:21 86:20,21 88:24 89:11 90:7,8,15, 16 92:11,12

**attached** 78:13

**attack** 40:19

**attempt** 33:11

**attention** 65:9 76:8

**attorney** 4:25 5:25 65:1,4

**attributable** 79:10

**August** 71:24 95:5

**authentic** 27:3,4

**authenticity** 35:13

**authorized** 72:20 79:5

**average** 17:20

**aware** 20:7 92:1,11

**away** 68:14 73:11

**awhile** 45:10

**B**

**back** 7:7 8:25 18:4 21:7,11,16,20, 21,22,25 22:1 23:23,24 25:10,12, 16 28:16 35:25 36:9,11,13,14,19, 24 53:18 71:6 77:17,18 81:2 95:3 99:23 100:1 101:4,12,17

**background** 7:13 98:3,5

**backgrounds** 23:3

**backing** 9:5

**backs** 68:10 69:21

**bad** 17:21 20:20,23 40:15,25 48:9,25 49:21,22 98:10

**badmouthed** 51:24

**baked** 91:12

**ballpark** 16:23 58:12,13

**balls** 48:13

**banana** 40:17

**bank** 19:20 52:16,18 58:25 74:10 77:5,23 78:2,5 85:1,4,6,13 86:24 87:13 88:9

**bankruptcy** 4:18 5:22 99:19

**banks** 49:15 52:3,4,7,10,12,14

**based** 16:10 19:8 33:18 36:20 42:19 57:11 60:2,13 90:1 91:11

**Basic** 38:23

**basically** 8:23 9:5 10:2,15 25:14 36:8 58:4 61:13 82:10 83:19 88:4 95:18

**basis** 34:11 62:9 96:20

**beach** 92:16

**became** 40:8

**because** 15:14 19:12 21:9 22:6 24:22 25:8 27:10 30:23 34:16 40:11,16,23 42:23 43:12,13,15 48:13,20 49:10 50:3 51:14,21 52:1 59:24 60:4 63:24 67:3,20 69:13,14 75:5,10 81:17 82:5 87:11 89:20 95:10 96:21 99:1

**become** 8:10 39:24

**been** 5:1,4,15 6:3 8:6 15:11 17:5 22:8 42:4 63:22 68:8 72:13 85:8 86:21 90:22 93:10 96:12 100:10, 11,13

**before** 6:6 7:1 11:17 41:16 43:8 56:2 66:18 72:10 81:4 88:5,11,12, 17,19 89:14,17 90:9 94:11 100:5 101:2

**began** 9:24

**begin** 41:20

**beginning** 40:5

**begins** 4:3

**behalf** 4:11,13 33:10 92:1 93:6 96:7

**being** 4:25 13:19 28:17 33:22 40:9,10 43:14 45:11 68:9 90:8

**belief** 34:11

**believe** 12:7 13:4,11 27:2,7 30:16,18 31:20,25 32:12 33:19 34:8,10,21 36:6 39:16 45:2 48:18, 19 50:14,23 54:12,16 89:16 93:9 99:9

**believed** 36:7 45:4

**benefit** 20:2

**benefitted** 76:22

**besides** 12:5 24:10,13 90:19

**best** 15:15 100:7

**Betsy** 75:1 77:7 90:20 92:15,16, 20,22,23 93:16 95:8,9

**better** 9:6 31:19 35:25 36:8 48:22

**between** 16:9 22:14,19 24:5 27:14 28:10 29:11,17 44:20 54:7 56:22 73:25 74:12 75:1 76:2 78:20 91:22

**Bev** 86:7

**beyond** 78:14

**bid** 43:24

**bids** 42:24

**big** 14:10 16:8,9,21,24 17:7 21:9, 10 22:5 25:3 51:6 80:20

**bigger** 16:14 24:20 25:14 87:12

**billed** 68:9 69:21

**billing** 20:19 23:4

**birth** 7:11,12

**bit** 22:7 34:6 41:18 54:5,23 91:17

**blah** 21:14,15

**blue** 22:15 63:7

**board** 9:4 25:25

**boat** 80:9,19,24

**boats** 7:25 80:12,13 81:18

**bonus** 35:23

**born** 7:19

**Borrego** 4:4,5,23 5:3,13,14,21, 24 7:10 26:16,23 34:23 65:11,15 76:12,16 77:22 81:2 100:14 101:1

**boss** 11:20

**both** 6:14 27:19

**bottom** 26:21 57:19 71:10

**bought** 62:4

**Brandon** 93:15,16 94:8

**break** 4:20 7:5,7 24:2 64:20 77:8, 11

**breakdown** 91:15

**breaking** 16:2

**Breeze** 8:3 9:25 11:20 32:21 93:3

**brief** 6:8 24:2

**Briefly** 101:1

**bring** 11:24 29:24 68:21 99:1

**bringing** 20:5,7

**broad** 39:9

**broader** 39:9

**broke** 23:8 54:22

**brought** 11:4,6 19:18,22,25 20:9 22:22 32:1,20 66:6 82:14 93:2

**Broward** 11:9 23:2

**bucks** 46:9,10 83:22

**build** 51:6

**builder's** 9:8

**building** 37:8 39:2 43:22 68:4 93:17 94:1,2,3

**buildings** 54:17 66:4

**built** 19:6

**bulk** 79:15 90:14

**business** 10:15 12:18 32:25 34:4 39:4,25 43:13,19 44:6 45:17,21, 23 46:1,14 59:15 61:1,14,25 68:21,22 76:12,15 84:1,3,7 86:14 96:17 99:9,11

**businesses** 43:17

**busy** 99:15,16

**buy** 62:7 79:15 84:13

## C

**call** 8:18 18:25 24:3 33:5,10 39:2 40:22 49:24 51:24 63:18 64:1 68:10 69:21 78:17 94:13

**called** 5:15 7:24 9:25 37:8 38:5 51:19 54:18 71:22 87:16,22 93:15,21 94:11,16,19

**came** 19:17 20:1 25:12,25 49:17 56:6,9 58:22 67:1,20

**Campbell** 93:16

**can** 4:19 6:18 8:22 11:15 19:15 22:16 28:19 29:24 30:6,24 31:12, 20 50:25 55:13 56:10 61:12 67:15,19 71:23 75:22 77:11,12 82:11 87:8 90:14 92:7 95:13 100:5,11

**can't** 19:12 31:1 52:4,10,11 58:13,14 59:24 70:5,7 71:4 73:17 75:24 87:13 89:19 91:19 95:12 100:4

**cannot** 26:10

**capacity** 66:2

**capital** 46:7 79:8

**card** 78:9,13

**cards** 84:1,3,10,11,13

**care** 16:20,21 18:11

**case** 4:6,16,19 5:11 6:10 64:23 71:1

**caused** 41:3

**cell** 93:21 94:16,18,19

**certain** 14:22 30:7 79:16 96:22

**certifications** 8:11,13

**certify** 8:23 9:3

**Chambachumbi** 88:25 89:1,5,7, 8

**change** 30:25 48:14

**changed** 34:16 40:12,25 41:8

**changes** 31:2 41:3

**changing** 96:24

**character** 99:4,5

**characterization** 30:12

**charge** 11:13 16:24 60:4,19,22 61:12 79:9 85:17

**charged** 55:6

**charging** 60:11

**Chase** 85:3,4,6,10

**check** 57:19 58:1,2 61:2,10

**checked** 64:2

**checks** 55:16,17,20 57:7,11,22

**Choice** 51:19 96:2 98:16,17

**circumstance** 48:5

**City** 84:18,20

**clarify** 32:5

**clean** 81:7

**clear** 7:2 76:20

**clearly** 95:13 97:16

**close** 87:25 88:12

**closed** 72:14 88:1,2,11

**closing** 88:10 90:23

**clue** 10:10

**coating** 87:21

**coil** 87:21

**come** 7:7 22:1,16 30:24 56:5 66:1 79:5 93:13

**comes** 42:23 70:8

**Comfort** 4:5,12 9:21 26:13 27:12 28:11,15,16 29:12

**coming** 23:5

**commercial** 16:18,19 38:20,21, 22,23,24 39:3,6,12,14,15,18,20

**commission** 15:4 53:8 55:4,5 57:11 58:9,17 60:22

**commissioned** 15:11

**commissions** 15:8,13

**common** 22:12

**communicate** 74:16

**communications** 74:12,24 75:3

**Communist** 98:6

**companies** 9:13 27:15,16 28:7 66:3

**company** 7:24 8:20 9:25 10:3, 16,18 13:22 15:15 17:7 21:3,9,10,

18 22:25 23:4,12 24:7 25:8,13 26:18 27:22,25 29:5 30:8 31:25 33:23 35:20,24 36:7 38:2,5,13,14 41:22 42:1,2,3,5,21 43:11 44:16, 19 45:10,11 47:17,19 48:1,3 51:6, 8,19 57:22 61:10,15 64:13,15 66:4 70:14 72:13,19 74:6 75:11, 18 76:23 78:14,16,20 80:5 82:25 84:12,14 86:9 87:16,22 88:1,5,6, 15 95:14

**company's** 49:8,18 72:13,22 85:25

**compensated** 14:25

**competency** 9:9

**competent** 9:4

**competing** 31:24 32:15 48:1

**competition** 26:14 33:12

**competitor** 31:7,17

**complained** 67:23

**complaining** 21:24 67:21 69:14, 16 70:3

**complaints** 21:13 69:18,19

**complete** 29:24 89:24 92:5,6

**completion** 90:3

**computer** 74:20 75:5,19,21

**Con** 49:25 50:2

**concept** 101:2

**concerned** 43:13

**concluded** 102:4

**concludes** 101:24

**condition** 53:22

**conditioners** 38:18

**conditioning** 8:3,4,7 13:20

**confidential** 30:17,18,21

**confidentiality** 26:4,14 28:9 29:19,21,22 30:2,3,6

**confusion** 57:8

**connection** 52:15,18

**consistent** 14:3

**constantly** 49:16

**construction** 9:7 43:21

**Consumer** 85:21

**contact** 66:1 68:3

**contacted** 63:17 66:15 77:2

**contacting** 63:16

**contend** 76:20

**context** 98:21

**contract** 15:19 19:24 26:1,3 44:3 79:18

**contracting** 98:24

**contractors** 80:12 82:9 86:10

**contracts** 19:18,19,22 20:5,7,9 43:23,24 44:2 66:5 79:17

**contribute** 101:4

**contribution** 46:7

**control** 75:3

**controlled** 85:9

**conversation** 10:13 37:7,8 44:15 52:20

**conversations** 10:11 65:4 67:25

**cool** 8:3 9:25 11:20 32:21 93:3 96:17

**cooling** 8:7

**coordinate** 80:12

**coordinated** 65:21

**Corp** 79:7

**corporation** 33:13,14 42:8

**correct** 4:15,16 10:24 17:17 24:12,14 32:1,3,4 42:17 43:24 46:15 54:6 55:21,23 57:12,17,18 58:24 63:14 64:23 65:18,22 69:8, 22 75:4 76:18 78:6 83:3 85:6 91:20

**correctly** 18:14 31:23 94:15

**cost** 55:6 60:6,9,10,14

**could** 14:14 16:13 17:5 21:6 31:10,18,20 34:2 55:8 58:14,15 81:3 85:8 97:16

**couldn't** 48:7 49:1 50:21 95:12

**Counsel** 4:8

**County** 11:9

**couple** 12:13 25:21 55:2 67:15 96:13

**course** 20:8 25:13 31:13 77:13

**court** 4:9 5:5,8,18 6:21 34:20 77:11 89:4 94:22,25 102:3

**courtesy** 7:2

**COVID** 41:16 47:8 49:8 56:21,22, 23 62:17 72:10,11,19

**crashed** 74:21 75:5,20

**crashes** 75:22

**crazy** 69:1 99:9,11

**Creal** 4:11,23,24 5:4,7,19,24 6:2 23:18 24:1 54:24 77:20 81:3,11, 24 89:6 92:5,9 95:1 97:19,25 100:21 101:2,5,22,25

**create** 6:22 7:2 39:22 41:21 42:1, 20,21

**created** 33:23 42:2,11 43:11 46:7

**credit** 78:13 84:9,11,13

**CSM** 51:8 88:20

**Cuba** 82:12 98:6

**curious** 68:16 87:8 98:3

**currently** 43:14 51:16

**cushions** 81:20,22,23

**custody** 75:3

**customer** 14:13 15:17 16:24 17:11 18:3,5,7,15,23 19:13,24 30:11,19 31:11 32:23,24,25 33:3, 14,21,23 46:4 58:18 60:23 62:20, 22 63:15,16,23 64:4 65:13,17,24 66:22 69:4 74:13 95:6

**customers** 17:3 20:11,21 21:14, 18,24 22:4,5 29:24 30:13 31:25 32:16,20 34:3 41:9 45:9 46:1 51:4 54:1,14,19 63:1 64:10 69:14,16 74:16 93:2

**cut** 35:17,20 36:20 38:8 91:21 101:9,13

**cuts** 37:15 39:24

## D

**Dade** 11:9

**Daikin** 87:22

**date** 5:20 7:10,12 56:12,25 88:1 89:17 90:12 93:9

**dated** 55:25 88:24

**day** 36:25 42:3 50:7,23 52:1 55:12 56:2 57:17 59:19 67:21 82:5

**day-to-day** 65:20

**days** 37:4 89:25

**deactivated** 64:17

**deal** 18:4 22:1 48:7 49:1 50:9 88:14,16 95:12 98:1,2

**dealing** 16:14 68:1

**dealt** 40:11 93:18

**debit** 78:9 79:8

**debts** 88:7,8 100:2

**December** 79:3

**deciding** 41:20

**decision** 99:18

**declaring** 61:13

**deem** 30:21

**deemed** 90:23

**deeper** 34:6

**defamation** 99:4

**Defendant** 65:11,15 76:12,16

**defendants** 4:14 65:14

**definite** 19:12

**delineate** 78:19

**delivered** 59:15

**delivers** 83:1

**demoralizing** 40:1

**deny** 65:14

**depart** 20:15

**departed** 20:15

**Department** 42:8

**depend** 8:15

**depended** 19:13

**depending** 16:5,6 55:8

**depends** 8:12,15 15:7 17:5 58:11,13,15 59:24 60:4,5,11 80:16

**deposed** 5:2,4 6:3,4

**deposit** 90:4,15

**deposition** 4:4,17 5:21 6:5 38:11 100:19 101:24 102:4

**deposits** 90:12

**derogatory** 86:12

**described** 74:25

**describing** 101:3

**desk** 61:12

**detailed** 90:10

**details** 30:11,20

**determine** 14:17

**determined** 58:22

**development** 12:19

**device** 75:23

**did** 7:15,23 9:18 10:23 11:10,17 12:12,17,24 13:2,10,13 14:6 15:4, 14 16:11 18:2,21 19:10 20:2,9,15, 17,24 21:10 24:15,18,21,22 25:3, 4,16,25 27:14,21,23 28:2,7,12,17 29:10 30:25 32:14 34:22,25 35:21,22 36:6,17,23 37:15,20 39:5,6,7,17,18 40:18 41:3,14,20 42:2,20,21 43:15 44:10,14,19,23 46:17 47:15 48:3,12 49:8,12 50:3, 22 51:2,13 52:20 53:9,10,14,18 54:1,3 56:5,10,15,16,20,24 57:23 58:2,5 59:2,4,10,20 62:7 63:14 64:3,7,10,15 65:6 66:1,8,12 67:6 68:17 70:13,16,18,21 71:2,20,21 72:5,8,22 73:3,4,8,10,18 74:5,9 76:2,6 78:19 79:4 81:16,19,25 83:15 84:3,7,15,21 87:25 88:12 89:25 92:25 93:1,8,13 94:9,11,13 95:8,22 98:14,16 99:3 101:8,11

**didn't** 5:5 21:5,11 35:7 36:2 40:24 41:9,13 45:2 46:21,22 48:4, 13,14 50:22 51:14 53:20 54:12,16 63:9 67:17 80:7 83:14,16 84:23 88:14,15,16 89:4 92:3 99:20,22

**die** 72:8

**died** 72:5,19 73:15,24

**difference** 16:9 27:14 29:16 78:20

**different** 15:18 22:3 25:6 27:16 28:7 67:2,16 75:23 97:5

**differently** 100:8,9

**direct** 12:12 76:8

**direction** 76:23

**directive** 16:17

**directly** 12:10 33:9 50:19 68:1 79:20

**director** 12:19

**disappeared** 73:13

**disclosed** 47:12

**disconnected** 94:17

**discovery** 64:23 71:6 74:1 77:21,24

**discretion** 18:21

**discuss** 22:13

**discussed** 36:21 37:15

**discussing** 41:20

**discussion** 67:7

**dispatch** 17:15 22:24

**dispatched** 15:24 16:1 17:12

**dispatcher** 17:13 22:24 51:10

**dispatching** 23:4

**disposal** 71:3

**dispute** 32:9 74:3

**distinction** 29:1 39:16

**Distribution** 79:13

**distributions** 86:10

**division** 25:1 42:8

**document** 27:3

**documentation** 72:22

**documents** 64:7 74:10 76:11

**does** 8:15 28:22 61:18,21 75:9 80:8,10 82:18,20 87:20

**doesn't** 17:22 40:20 48:21 75:8, 10,11 98:19

**doing** 8:24 9:13 17:24 20:19 21:3 22:17 23:1,2 32:25 35:25 40:13 41:5 42:6 49:16 56:10,14,24 63:8 64:20 66:17 74:4 82:17 92:24 95:8,10,18,24 96:5,7 97:6 98:23, 24

**dollar** 36:3

**dollars** 85:12

**don't** 6:4,12 8:17 21:25 22:1 26:6 27:1,7 28:2,17 30:14,16 32:7 33:5,7 34:7 35:3 37:9,11 40:10 41:6,7 45:22,25 46:3,24 47:5 49:10 50:12 51:20,23 52:10,11,14 53:2 56:8,12,25 58:3 59:6,24 62:23 65:3 67:9,15 68:7 69:2 70:5 72:5,9,13,20 73:4 74:3,15,16,21 75:2,6,10,24 76:4 80:19 82:3,15, 20 84:6,25 85:6,10 86:12 87:14 88:2 89:12,18 91:8 94:3 96:19 98:7 100:21

**done** 17:17 18:14 45:10 50:20,21 58:16 63:2 68:9 74:23 84:18,20 86:17 89:15 95:16 99:21

**door** 13:16 15:16 53:18 93:7

**doors** 13:15

**double** 20:19 68:9 69:20

**down** 6:21 18:17 21:2 22:11,16 34:6 36:25 49:3 62:25 67:9 75:14, 17 90:2 101:15

**download** 64:7

**drafted** 18:7 64:5

**drafting** 18:22

**draw** 65:8

**drawing** 29:1 39:16

**drill** 34:6

**Drive** 92:17,18

**driver** 82:1,14,20,22

**drivers** 82:13

**drove** 42:1 68:14

**dual** 24:16

**dude** 50:11

**Duffy** 4:7

**dumb** 36:17

**during** 12:13 17:21,22 33:14 34:12,24 49:8 55:2 62:17

**duties** 12:24,25

## E

**e-mail** 64:15 74:16 75:7,14,17

**e-mails** 74:25

**each** 6:18 48:22 83:15

**earlier** 41:18 48:9 71:13 89:13 96:19 101:5

**earliest** 93:9

**early** 53:9 88:2

**earn** 15:4

**ECS** 8:4 9:12,18,20,24 10:7,8,9, 17 11:6,10 12:4,15,22 13:2,3,8,24 14:4,25 20:1,5,7,9,11,15 22:13 25:2,25 26:13,18 28:6,13 30:15, 17,22 31:3,25 32:1,13,15,20,25 33:1,3,4,13,21 34:2,4,24 37:12 39:5,6,12,14,17 42:25 43:14 44:15,25 45:6,7 47:2,3,22,25 48:6,7 52:21,23,25 54:2,13,21,25 55:9 56:2,14 57:17 62:19 63:20, 23 64:3,11 65:11,12,16,18 66:6,9, 14,17,22 67:3,5,8,11,14,18 68:5, 14 70:15,17 76:14 81:25 82:20 88:18 89:14 92:25 93:3,6,10,19, 24 94:9,14,16 96:7 97:13 98:20

**ECS's** 19:10 39:8 44:20 62:19 64:7

**educational** 7:13

**Edwin** 96:14,21

**effort** 78:19

**eight** 13:4,5 91:18

**either** 33:9 46:8 91:19

**elaborate** 19:23

**else** 19:6 29:5 30:24 33:7 47:22 48:21 49:17 51:14 69:5 95:11 99:7 100:18

**embarrassing** 40:1

**employed** 34:1 43:14 65:11,16, 18

**employee** 15:1,12 26:16,22 97:13

**employees** 12:4 13:2 23:13 29:13 40:18 74:13 76:25

**employment** 26:1,3 29:10 33:16 34:12,15,22 35:5,9

**end** 49:17 51:13 52:1 92:3 98:16

**Ended** 97:22

**ending** 84:22

**ends** 85:14

**engineer** 68:4 93:17,25

**Engineered** 4:5,12 9:21 26:13 27:11,12 28:10,15,16 29:12

**enough** 14:10 36:17

**entail** 82:20

**entire** 61:18,24 62:19 73:15

**entity** 76:12,15

**environment** 48:8

**equipment** 9:14 14:16

**essentially** 18:9 88:10

**et al** 4:6

**even** 27:7 36:3 40:22 41:8 44:13 50:24 70:3 71:25 72:5,13 83:16 90:4 97:1 99:20

**eventually** 12:2 39:23 42:2 46:23

**ever** 5:1,4 6:3,5 12:18 14:6 26:7 29:10 32:7 37:20 38:2 52:20 62:19 76:25 81:25 100:11

**every** 48:23 63:9 67:21

**everybody** 34:15 49:5,17,22,23, 24 82:25

**everything** 6:21 14:12 16:21 18:16 19:6 22:18 23:4 29:5 30:25 40:6 41:8 50:1,10 59:13 63:6,10 73:13,14 74:2 100:15

**evidence** 69:13

**exact** 37:13 56:8,12,25 72:9

**exactly** 19:3 37:9 46:10 50:22 58:14

**EXAMINATION** 6:1 100:24

**example** 18:25 19:17 31:15 68:20,24 80:17

**Except** 54:17 99:8

**exchangers** 96:23,24 97:1

**excluded** 33:1

**excuse** 5:3 34:23 38:4 85:18 91:1 95:9

**execute** 17:20

**execution** 18:3

**exhibit** 26:11 31:22 42:7 43:4 45:12 55:13 60:25 64:19 71:7 74:8 78:1 79:2 83:10 85:17 86:24 88:22 90:11 91:1 92:14

**exist** 74:11 75:8,9,10,11

**existed** 74:25

**existence** 47:23

**existing** 32:16 34:3 54:13

**exit** 48:6

**expand** 11:5 25:14

**expansion** 10:19

**expansive** 10:21

**expected** 101:12

**expense** 78:20,21

**expenses** 78:14,17,25 88:6

**expensive** 68:25 69:3,4,17,20, 23,24 70:1

**experience** 19:8 31:6,14 50:7 60:2 68:16

**explain** 29:4 38:24 90:18

**exploring** 10:19

**extension** 71:22,24

**extent** 31:2 74:11

**extinguished** 100:2

**F**

**face** 49:18

**Facebook** 81:15

**fact** 72:4

**factors** 60:6

**facts** 20:18

**fair** 6:15,23 8:6 14:23 15:21 18:8 25:2 28:3 30:8,19 32:18 33:24 34:1 35:15,19 37:12 39:8,11 54:10,15 66:23 67:16 78:12 91:23 93:11 95:6

**fairness** 45:2

**fall** 70:9

**fallout** 82:6

**family** 48:18 78:24 85:1 100:10

**favor** 18:10 95:19

**February** 61:6,20 83:11 93:8

**federal** 5:22

**fee** 59:21,22,23 60:13 83:22 85:23 87:24

**feel** 40:21 99:23

**feeling** 20:24

**felt** 14:10 41:7 67:1 78:24

**few** 7:25 42:4 51:13 77:12

**field** 9:10 31:6,14

**figure** 6:9

**file** 72:15,17 99:18

**filed** 42:9 44:14 71:13,15,18 72:3, 19

**files** 73:12,13

**filing** 42:8,11 72:1

**final** 18:3 48:16

**finalize** 18:4

**financial** 76:13,17,22

**find** 13:1 53:6 70:23

**fine** 21:8 24:4 47:20

**finish** 16:3 18:11 63:5 81:3

**fire** 52:3

**firm** 33:10,13

**first** 5:1 8:1 10:11 12:5,13 20:24 21:22 22:11 25:11,17,25 30:1 34:25 41:14 45:8 46:4 51:19 52:6 53:3,4 54:20,23 55:2,22 66:1,6 89:10 90:25 93:8,13 96:2,21 98:16,17

**fits** 89:13

**five** 37:3 49:4 82:15 91:8,17 100:4

**five-day** 87:7

**five-ton** 18:25 19:1

**flat** 49:18 59:21,22,23 60:13,16

**flew** 49:3

**Florida** 7:18 10:4,13,19 11:1,11, 25 12:5 13:19 17:14,15 22:24 23:1,2,11 24:17 25:2 27:25 28:1,8 29:4,5,7,8 42:7,13 49:3 51:9

**fly** 98:7

**fly-by-the-seat-of-your-pants** 86:13

**focus** 32:12

**folded** 95:17

**follow** 63:5,22

**follow-up** 63:10

**followed** 68:13

**following** 63:1

**follows** 5:17 101:8

**food** 78:9

**foremost** 30:1

**form** 45:15

**formation** 47:12

**formed** 10:18 44:23 45:7 47:17, 21 48:1 65:10,15

**former** 54:13 65:17

**forming** 44:16,19 45:8

**forte** 16:15

**forth** 28:16

**founded** 10:9

**four** 48:12 62:14 93:10

**frame** 25:24 41:12 56:16 86:21

**frankly** 65:5

**frequent** 78:16

**Friday** 14:2

**friend** 80:4

**from** 8:2,3,4 12:21 13:25 15:16, 23 19:10 22:22 23:17 25:6 27:25 28:15,22 31:3,24 32:1,15,20 33:1 36:1,4,14 37:16,19 44:2 47:21,25 48:6 50:1,7,23 51:8 52:3,4,8,10 56:3,5,6,9 57:22 58:17 61:6,15 62:16 64:7 66:19,22 67:18 68:14 75:22 76:14,22 79:5,15 80:5 82:12 83:10 89:13 90:7,11,25 91:2 93:3,8,23,25 94:18,20,22 99:23 101:13

**front** 50:10 75:21

**frustrated** 68:6,7,8

**full** 39:6

**full-service** 13:22

**funds** 78:16 84:12,15

**funny** 99:1

**furniture** 81:13

**further** 101:21

**future** 34:4

**G**

**G-A-N-D-O-R** 11:16

**g-o** 97:21,22

**Gandor** 11:14,17,19,24 12:5 13:8 15:23 16:8,21,25 21:4,11

**gaskets** 96:24

**gauged** 18:7

**gave** 15:15 18:8 21:12,16,22 31:17 36:16,18 50:22,23 60:23 64:12

**Gemaire** 79:12

**general** 12:24 58:9

**generally** 13:24 79:3

**generate** 45:9 53:3

**generated** 44:2 45:23

**gentleman** 36:2 46:24 52:19 53:11 82:22

**gets** 42:23 43:19 98:11

**getting** 21:13,15 36:24 41:5,19 48:15 57:7 58:15 68:25 70:1 86:25 88:13 89:15

**give** 5:11 6:17,22 7:1 8:9 17:23 19:12,15 21:7,11,20,21 25:9,10, 15 31:7 35:25 36:3,9,11,12,13,15 37:1,4 59:12 67:19 93:11 97:7 101:12

**given** 12:18 17:20 18:4 19:11 100:14

**gives** 21:19 71:24

**giving** 33:6

**glad** 100:6

**Gmail** 75:21,22

**go** 6:8 7:15 11:4 12:8,9 13:13 14:1 15:16 17:9,16 20:13 23:5,18 39:23 53:7,18 59:16,17 69:4 70:23 71:4,6 77:10 81:1 82:13 87:3,4,23 97:1 100:12

**goes** 14:12 36:16 37:2 52:7 60:7 82:22

**going** 6:8,14 14:17 19:4,7 23:20 26:8 35:20 36:6,10,12,13 37:25 38:1,10 41:1 42:1,7 43:21 45:12 47:18 48:14 50:9 51:5,21 52:7,9 55:13 56:19 60:25 62:23 63:6 64:19 71:6 76:8 77:5,6,23 79:3,21 81:1 83:9 87:14 92:4,6 97:6 100:11

**gone** 51:10

**good** 4:23 6:18 14:12 15:14 20:10 21:3 40:6 51:12 63:6,13 64:21 70:7 96:18 99:11

**got** 8:1 10:10 17:22 20:20,23 21:23 37:17 40:1,7,15,25 41:9 43:22 48:24,25 49:6,21,22,23,25 51:21 60:9,10 66:18,20 68:20 70:25 82:12 83:6 85:10 93:25 94:20 96:21

**gotten** 90:1 99:23 100:1

**grand** 91:9,18

**grand-ish** 91:17

**great** 40:6 51:11

**greed** 20:22 21:15

**ground** 6:8 54:14 59:7 81:2

**grow** 13:2

**guess** 9:6 28:20 52:13 53:20 57:8 69:12 82:20

**guy** 10:21 21:19 25:1 47:1 50:18 51:1 56:19 83:13 94:20 95:20 96:17 97:12 99:6

**guy's** 17:17 73:7 94:3

**guys** 13:1 14:11 15:24 17:12 22:17 48:17 51:23 62:4 69:17 73:21 82:23,24 95:3

**H**

**H-A-N-O-I** 53:12

**habit** 78:16

**had** 10:17 12:21 14:7,15 19:5,25 21:17,22 22:14,19 23:12 28:4 29:4 40:4,14,19 41:23 44:5,19,25 46:19 47:3,19 48:1 49:14 50:6,10 51:10 54:2,16 55:4 58:5 59:6 63:1 64:4,11,13 65:4 66:11 67:7 69:25 70:13 72:24 73:14 75:19 76:20,21 78:5,23 82:6,12 83:16 84:9 89:18 90:12 93:23 94:9,18

**hand** 5:9 27:10

**handle** 18:3 73:8,10

**Hanoi** 53:11,14 71:1,2 95:22

**Hanoi's** 86:4 87:9

**happen** 41:13 79:9

**happened** 12:2 41:11 51:7 69:2 74:21

**happens** 27:5 34:19

**happy** 95:2 96:19

**hard** 91:19 100:10

**has** 23:12 29:2 51:22 69:4 72:3 100:10

**hate** 77:12

**have** 4:18 5:1,4 6:3,5,20 8:10,13, 17 12:12 14:15 15:11,13 17:5 18:21 20:14 22:8,16 27:2 28:6 35:10 38:2,5 40:24 42:4,21,22 44:10,15,25 46:17,21 48:13 49:14 52:11,20,23 54:18 56:8 59:2,4,10, 14 60:1,2 62:15 63:9,22 64:10,15, 18 68:8 71:2 72:12,13 74:2,15,19 75:2,6,7,11,21,24 76:4 77:11,12 81:7 83:15,25 84:3,6,7 85:1,8,10, 15 86:16,21 89:16,23 90:1,7,22, 23 92:4 93:10 96:12 99:7,22 100:1,4,21

**having** 5:15 44:1 50:8 100:2

**he'd** 21:7 25:10 49:18

**he'll** 71:5

**he's** 21:23 49:5,6,23,25 51:23,24 71:4 82:24 93:17 96:17,18 97:2 98:10,17,18,20,23,24 99:2

**head** 6:19,20 11:1,2 45:20 99:20, 21

**header** 26:13

**hear** 49:12 92:3,6

**heard** 6:14 38:2,5 49:10 99:5,7

**hearing** 31:23 60:14

**heart** 40:19

**heat** 70:12 96:23,24 97:1

**heating** 8:7

**held** 46:14 76:13,16

**help** 21:6 25:9 35:20 81:17 90:14

**helped** 50:25

**helping** 28:1 36:10

**here** 4:17,25 6:9 10:3,16 25:24 26:8,16,21 29:1,7 43:4 71:6,10,14 74:24 76:8 82:12 84:22 90:2 91:10 93:9 99:9

**here's** 91:2

**hey** 18:10 36:25 53:21 82:10

**Hialeah** 7:16,18

**high** 7:14,15,16,23,24 66:20 67:1, 20 68:15,18 78:8

**highly** 51:9

**hinges** 69:1

**hire** 53:4 74:5

**hiring** 11:10

**holding** 27:22 59:7

**holds** 76:13,16

**home** 42:14 59:16 61:14 79:20 91:2

**homes** 16:18

**Homestead** 42:13

**honest** 28:17,19 44:13 99:8

**honestly** 40:15 87:10 88:14 89:18

**horrible** 41:9 48:17 100:13

**hospital** 40:20,23

**hot** 99:10

**hotel** 75:2 90:20 92:15,16,20,22, 23 93:16 95:9

**hour** 59:21

**hourly** 60:15,16

**hours** 13:24 19:2,8

**house** 39:2 59:5,11,18 61:2,11 62:1,2,4,15,18 79:14,15,25 87:23

**houses** 43:22

**how** 9:24 12:4 13:2,13 14:1,22,25 15:2 16:10,23 17:19 18:21 19:3 20:9 22:17 25:5 27:23 29:24 35:4, 17,22 36:6 39:4 49:8,19 51:2,20 53:14,18 54:20 55:2,8 58:6 60:12, 19 62:22 63:7 64:19 66:1,8,12 67:9 68:17 69:12 70:4 71:2 74:18 81:12,14 82:21 84:3,7 86:10,18 89:23 92:19,22 93:8,13 95:14 96:12 97:15 98:16 99:21 100:9 101:8

**how's** 82:24

**however** 6:13 75:2

**hundred** 15:15 30:25 45:16 46:8, 10

**HVAC** 8:10,22 9:14,16 13:17,22 14:16 20:13 39:14,17 65:12

**hybrid** 15:9

**Hyde** 37:8

**hyped** 10:14

**I**

**I'D** 14:11 20:10 21:1 22:10 35:6 41:16 53:6,7 55:7 70:23 87:12 98:9

**I'LL** 6:25 7:1,6 9:20 16:2 21:20,21 24:20 35:25 36:8,15 43:4 77:25 78:17 91:2 102:1

**I'M** 4:24 5:6,24 6:4,9,10,14 12:7 13:11 16:19 22:11 23:13 26:8,10 27:4,23 28:17 29:2 31:23 34:17, 18 36:10,23 37:3 38:10 41:1,12 42:1,7 44:9 45:12 50:11,19,20,21 51:20 52:9 54:6,22 55:13 57:20 60:14,25 63:12,14 64:19,21 68:7, 16 69:1,12 71:6,19 72:15 74:3 76:8 77:11 78:4 79:3 81:1 83:9 84:1 86:18 87:4,6,8,9,10,14 88:22 89:4 90:10 91:20 92:4,5 95:13,16 98:3 100:6

**I'VE** 9:15 78:12 100:11,14

**idea** 20:14 39:22 42:6 60:2 64:18 68:21 83:25 85:15

**II** 90:15

**III** 65:25 66:1,8 67:23 69:18 70:8 75:1 77:7 84:21 86:20,21 88:24 89:11 90:8,16 92:11,12

**imagine** 98:8,24 100:11

**immediately** 33:15

**impetus** 41:25

**important** 6:22

**importantly** 81:7

**impression** 52:2 54:9

**impressions** 65:5

**Inc** 4:12 9:21 28:11 38:3,9 42:9 55:17 56:3 78:2 83:24

**incentives** 15:4

**inclined** 95:14

**including** 13:5 40:19

**income** 45:17,21

**incorporation** 43:5

**indirectly** 33:9

**individual** 11:21 28:4 97:9

**individually** 33:10

**industry** 8:1,7 9:4,7 14:22 15:6 30:10 51:23,24 68:17

**inform** 94:13

**information** 30:7,10,17 73:21, 22,23 74:19,22 75:6

**informed** 47:22 67:7

**informing** 67:11

**initial** 22:8

**initiated** 93:5

**insane** 22:5

**insight** 28:6

**insofar** 28:23 30:6

**install** 16:12

**installation** 14:15

**installed** 19:7 79:21

**intending** 67:8 70:21

**intents** 22:25 24:25

**interest** 18:7 62:11 76:14,17,21, 22

**interested** 15:17

**Interesting** 99:3

**interior** 80:11

**interiors** 80:10

**Internet** 83:24 85:21

**interrogatories** 71:8

**Interrogatory** 71:14

**introduce** 43:4 45:12 55:13 60:25 64:19 83:9

**introduced** 10:12 11:21,23 51:8

**introducing** 74:8 85:17 86:24 88:22 92:14

**introduction** 77:25 79:2

**invoice** 90:9 93:8

**invoices** 67:22,23 68:8,13 74:18 77:6 88:23 90:7 92:10,20

**involved** 23:15,17 40:7 88:17

**isn't** 81:9

**issue** 31:24 32:5

**issued** 55:16

**issues** 23:16 40:3 41:14 50:3

**it's** 6:22 8:6 12:21 14:19 17:6 19:4,24 20:22 27:4 30:18 32:3,4 34:5 38:23,24,25 40:1 50:11,25 51:21,25 59:5 60:1 66:3 68:24 69:3 79:25 80:21 87:5 89:3,20 91:11 94:24 96:25 97:5,18,19 99:1,10,11,12,16 100:3,5,13

**itself** 33:20

**J**

**James** 4:13

**January** 61:6,20 90:8 91:24

**Jerry** 17:18 51:10

**job** 8:1 14:10 28:24 53:6,7 55:6,7 58:10,14 59:16,25 60:1,4,5,20 63:4,5,15 68:23 70:9,23 77:3 82:24 83:15,16 86:16 89:9,15,23, 25 91:1,4,18,24 93:13 94:9

**jobs** 15:13 18:4 32:1 51:13 53:9 54:20 56:10,14,24 58:22 70:4,10, 22 74:4 76:22 86:22 88:13 90:19 91:25 92:10,11 95:19,22

**joined** 26:18

**Joshua** 86:7

**Juan** 73:7,8

**July** 26:19 42:10 44:14 88:24 89:20 90:25 95:4

**July-ish** 88:4

**June** 7:12 78:4 87:2 95:4

**just** 6:8 7:2,5 9:3 11:2 13:7,16 14:11 16:10,23 18:11 20:20,21,22 22:5,22 25:4 29:2,4,6,7 33:19 35:24 36:21 40:3,13,25 41:7,10 42:5 44:5 48:7,15,17,19,20,24 49:6,21 50:1,11,23,25 51:23 53:15 58:5 59:6,21 60:4,17 61:1, 19 63:10 65:5,21 67:10,18 68:16 69:11,12,25 70:4 71:24 72:15 73:3,13 75:6 76:20,21 77:2,8,12 78:8,14,23 80:20 82:12 86:13 87:5 88:7,10,16 89:20 90:9,10 94:18 95:11,15,18,24 98:3,10,11 99:11,21 100:6,7

**K**

**K-1** 45:15

**keep** 21:24 68:21 86:9

**keeps** 82:17

**kept** 28:14 37:25 38:1 48:13,15 66:19

**kicking** 101:17

**killed** 51:22,25

**kind** 12:9 24:16 46:22 58:5,21 71:3 78:23 83:6 95:19 96:17,24

**knew** 19:2,8 28:3 52:5 54:1 66:10 67:19 70:15

**knock** 15:16

**Knocking** 13:15 93:7

**know** 6:4,10,13 7:5 8:23 9:6,20 10:9,14 11:17 18:17 21:5,10 26:10 27:7,23 28:2,17,18 29:15 30:20 37:11 40:13,22 41:6,7,11, 12 45:20 48:19 49:10,20 50:8,11 51:20,23 52:10,14 53:14 56:8,23 59:6,24 63:7 65:3 66:12 68:5,17 69:2 70:5,13 72:4,5,20 74:21 78:8 79:9 80:19 81:12 82:15 84:23 87:7,14,22 91:8 92:23 94:9,11 95:14,15 96:22,25 97:2,9 98:23 99:3 100:4,7

**knowledge** 78:1

**L**

**labor** 19:2,8 60:10
**laid** 47:9 62:16
**language** 29:16 30:20 32:6
**last** 11:15 46:25 55:9,12 56:2 57:17 71:15 74:1 83:14 86:24 90:8 92:14 97:15,20
**late** 41:17
**later** 37:24,25 52:13 57:2,16 63:6 67:8 101:15
**lawsuit** 54:8 88:17
**lead** 25:1
**leadership** 40:4
**leads** 13:13 44:2 53:3,19 93:6
**learned** 14:21 67:25 69:18
**learning** 82:16
**lease** 59:2
**least** 44:19 55:22 65:12,17 90:12 91:11 97:6
**leave** 13:10 32:22 47:19 48:13 50:3 67:8
**leaving** 21:25 52:7 67:3,4,11 70:15,16
**led** 42:19 48:5
**ledger** 86:9
**left** 27:11 40:16 47:22 49:1,22,23 50:9,13,15,24 51:2,3,5 52:21,23, 25 54:2,21,25 55:4 56:2 64:3 66:11 89:14 93:10 94:9,14
**legal** 4:7
**less** 91:21
**let** 5:1 6:12 7:5 16:2 17:2 26:10 36:17 51:3 66:18 82:13
**let's** 5:19 19:14 23:18 29:20 30:14 31:21 32:9 52:25 53:6 67:10 71:25 77:10 90:25 97:1
**letterhead** 70:19,20
**level** 78:8
**license** 8:17,22 9:1,3,8,9,11 46:14 83:20
**licensed** 46:18
**licenses** 8:11,13
**lie** 41:1 87:14
**life** 7:21 63:19,24 99:22 100:1,12
**light** 38:21,22,23,24 39:2,12,14, 15,18,20
**like** 6:20 9:19 10:11 12:7 13:12 14:11 16:12 17:23 18:15 20:24 21:16 22:2,19 23:12 26:24 27:24, 25 28:15 30:25 31:25 34:20 38:23 40:21 41:1,2,7 42:5 43:20,21 49:19 50:11 51:12 52:13 53:3,6, 22 59:11 63:9 64:2 67:15,18 69:16 80:9,20 83:17,18 89:23 91:5,20 92:17 93:21 95:2 96:16, 18,19,23 97:6,21 99:22,23 100:13
**liked** 15:13
**limited** 16:17
**line** 96:22
**list** 62:20,21 63:15
**listed** 26:15
**listing** 43:5
**lists** 30:11,19 45:15 62:22,23 64:4
**lit** 52:3
**little** 22:7 24:22 34:6 41:18 54:5, 23 69:11 71:13 80:19 89:20 91:17
**live** 80:13
**Lived** 7:21
**LLC** 76:11
**load** 21:18
**logically** 67:10
**long** 51:2 82:12 89:23 90:5,6 96:12
**longer** 32:23,25 33:3 51:20 66:9, 14 98:20 101:10
**look** 27:11 42:5 59:5 76:6 90:25
**looked** 15:22 44:13
**looking** 11:24 78:4 79:7 81:17
**looks** 26:24 91:5 95:2
**lose** 20:17
**losing** 20:16,21
**lost** 21:17 22:4,5 23:18 52:13 69:1
**lot** 22:14 39:6 41:1,2 48:25 50:5,6 68:16 78:8,9,12 79:23 87:11 88:6

**M**

**M-A-U-R-Y** 97:19,20
**made** 31:2,3 55:20 61:3 63:23 68:5
**majority** 44:6,11
**make** 14:11 18:14,16 21:10 31:19 34:15 48:21 53:7,8 63:2,6,10 78:19
**makes** 62:13
**making** 15:2 31:11 50:5 86:10
**Mako** 7:24
**man** 20:18,23 40:12,15,25 41:9, 10 48:7,14,24 49:6,21 50:12 51:25 68:25 95:12 98:5,10,11 100:10
**managed** 65:20
**management** 76:13,16
**manager** 24:16
**Manny** 11:14,17,19,24 12:5,9 13:5,8 15:23 16:8,15,21,25 17:7, 9,11 18:2,6,8,10 21:4,11 22:8,20 23:15 24:6,15,16,17 25:3 46:24 47:1,5 50:3,5,6,9,13,15 56:19,21 67:25
**manpower** 52:11
**Manuel** 83:12
**many** 12:4 13:2 14:1 17:19 20:9 54:20 55:1 68:10 71:2 84:3,7
**March** 56:23 61:6,20
**margins** 30:11,15
**Maria** 43:5 45:15
**mark** 42:7

**marked** 26:11 30:16

**market** 68:18 69:7

**marketing** 97:3

**Marketplace** 81:14,15

**marking** 68:23

**markup** 19:5,10,16,19 68:22 91:12

**Martinez** 96:14

**Marty** 97:12

**material** 60:7,9,14

**materials** 59:8,15 64:4 83:1 91:3

**math** 62:13

**matter** 4:5 28:22 40:21

**Maury** 97:9,11,12

**maximum** 17:22

**may** 4:1,3 44:25 95:3,4

**maybe** 4:20 9:6 17:21 37:11 41:18 46:8 64:1 80:19 82:15 87:9 91:17,19

**mean** 17:5,22 19:15 21:4 25:3 34:7 40:20 41:8 50:10 56:22 58:13 60:1 67:11 68:18 69:3 73:25 75:13 85:12 86:12 87:5 88:6 91:10 95:17 96:17,18,25 98:3,10 99:25

**means** 6:4

**mechanic** 98:25

**mechanical** 8:20,21 38:2,13,14 42:9 51:19 52:5 53:2 55:17 56:3 78:2 82:9 88:23 96:3 98:24

**meet** 10:2

**meeting** 22:16

**meetings** 22:8,12,14,21 23:14, 17 24:5,11,14

**membership** 76:10

**memory** 6:9

**mentality** 50:25

**messages** 75:1,25 76:1,2,4

**met** 10:4 11:17 18:7 47:5 53:15, 17 56:17 81:14,15,19

**Miami** 7:18,19 11:9 13:2 22:2 23:2 50:1 62:25 98:7

**Michelle** 27:8,9,10

**Michigan** 10:2,18 16:1 17:10,13, 14 22:3,22,23,24 23:5,6,7,9,10, 11,12,17 27:5,8 28:1,8 29:6,8 40:12 50:1,2

**mid-'22** 13:12

**might** 6:18

**mind** 24:3 29:3 37:3 54:12 82:11 94:15

**mine** 80:4

**mini** 102:1

**minority** 42:24 43:15,19

**minority-owned** 43:12,17

**minute** 25:24

**minutes** 49:4 77:12

**missed** 58:8

**mistaken** 22:11 23:13

**mistreating** 40:18

**Mm-hmm** 26:9 31:9,16 45:14 53:1 61:5,23 85:20 89:22

**mobile** 87:1

**moment** 4:16

**Monday** 14:2

**money** 21:7,16,21 25:10 27:24 35:21,22,25 36:1,4,6,9,11,12,14, 15,18,24 37:1,4 50:6 56:5 58:22 78:23 87:11 88:4,9,11,12 99:17 101:12

**Montesinos** 43:6 45:15

**month** 17:20 55:9,11 56:25 61:22 83:17 88:3

**monthly** 62:9 83:22 85:23

**months** 62:3 89:14 93:10 96:13

**moon** 22:15 63:7

**more** 14:13 17:23 20:22 21:5,17 24:21,22 32:12 33:4 37:1,4 41:10 44:17 48:7 49:1 50:5,6,7,21 66:10 72:1,15 74:22 75:6,8,11 81:7 88:14,16 90:10 91:17,21 95:25 96:9 97:16 100:10,22

**morning** 4:24

**mortgage** 61:18,24 62:9,15,16, 17

**most** 74:22

**mostly** 74:10

**motivated** 10:15

**mouth** 53:24,25

**move** 42:3 77:23

**moving** 28:15

**Mr** 4:11,13,21,23 5:3,4,7,13,19,24 6:2 7:10 23:18 24:1 26:16 31:15, 19 34:12,23 35:18 37:20 54:22,24 77:13,20,22 81:1,2,3,6,11,21,23, 24 89:6 92:3,5,9 95:1 97:15,19, 23,25 100:14,21,25 101:1,2,5,20, 22,25 102:2

**much** 15:2 16:23 18:21 41:3 49:23 51:20 55:8 60:19 69:11,13 86:18 95:15 99:8 102:3

**multiple** 34:12,14 67:24 69:21 70:9

**my** 4:7,24 5:24 6:25 7:12 8:1 11:20 15:13,15 16:2,15 19:18 20:18 21:7,8,20,23 25:10,15 26:8, 24 28:20 30:1 34:12,19 35:21 36:9,12,13 39:23 41:23,24 49:14 50:25 55:12 57:8 61:2 64:12,22 72:4 73:4,5 74:13 75:21,22 76:5 77:25 80:10 84:9 85:22 94:14,15, 16,20 99:20,21 100:7,10,12,15 101:13

**myself** 16:7 29:25 42:3 48:14 57:10 73:4 95:13

### N

**name** 4:7,8,24 5:24 11:15 17:18 26:15 40:11 42:21 43:7 46:24,25 52:19 53:11 73:7 83:14 85:25 86:2 89:2 94:3,4,6,23 97:9,16,20

**named** 26:22

**names** 28:4

**naming** 44:16

**NE** 42:13

**near** 67:12

**necessarily** 68:12

**need** 4:15,19 6:17 7:5 8:23 18:25 37:1,5 48:22 64:20 66:15 82:23

**needed** 13:16 21:5 25:8 47:5 58:22 63:8 79:17,18

**negative** 45:17,21 49:13,14 50:18 51:17

**negotiate** 20:2

**never** 6:7 9:16,17 21:16,22 25:11,16 26:6 35:9,21 36:18 37:17 39:7,14 40:11 44:13 46:14 47:3,12,22 49:10 52:3 53:23 54:18 63:16 72:19 100:12

**new** 12:18 34:15 35:4,7,9 41:21 43:21 47:17 72:12 73:6

**next** 12:15

**nickname** 49:25

**night** 47:18

**no** 6:7 8:14 9:13 10:10 11:5 12:14,20 13:6,9 14:1,19 15:5,7,10 20:4,6,14,16 22:14,23 23:6,9,11, 16 24:4,13 28:6 29:14,18 30:18, 23 31:1 32:2,3,4,23,24 33:3 34:14,17,21 35:3,7,11,24 37:6 39:13 43:15 44:4,18 45:1,25 46:3, 6,7 47:7,24 48:3 50:16 52:9,22,24 54:3 55:1 57:13,15 58:20 59:3,5, 6,9,24 60:16 61:10,20 62:16 63:12 64:6,9,12,18,21 66:8,14 68:1 72:13 73:9,23 74:17 75:6 76:25 77:1 78:18,22 79:6,11 83:5, 16,25 84:7,9,17,25 85:15 86:1,11 87:4 88:5,11 90:21 92:2 93:4,25 94:15 98:2,10,15,19,20 100:20 101:9,13,22

**nobody** 99:16

**nodding** 6:20

**Non** 26:14

**noncompete** 26:4,6,7 29:23 32:8,13 34:5,13,16,17,18 35:1,10 44:21,24 45:3,4 54:9,16

**noncompetition** 28:10 29:11,20 30:4 31:21 32:6

**None** 84:4,5

**Nope** 20:12 46:16 98:22

**noted** 74:9

**nothing** 5:12 21:11 28:25 35:8 41:23 45:10 51:14 52:11 57:25 80:20 95:11 99:8

**notice** 27:11 41:3,14 50:24

**number** 4:6 55:17 60:21 61:2 65:9 71:15 76:8 79:16 86:25 93:23 94:16,20

**numbers** 4:19 22:19 49:10 64:10 85:14

**O**

**O-I** 53:13

**oath** 87:8

**objection** 35:12

**obligations** 12:12 32:12 33:1

**obtained** 46:5

**obtaining** 13:13

**obviously** 17:16 30:2 43:1 70:25 73:25 95:2

**occasions** 25:6

**occurred** 22:21

**occurring** 20:25

**Ocean** 92:17,18

**October** 55:12 56:23

**odd** 23:14 87:5 89:20

**off** 6:17 15:7 17:9,11 18:11 23:18, 20,22 38:8 45:20 47:9 54:14 57:11 62:17 77:14,16 88:7,8 100:6 101:24,25

**offer** 31:11,19

**offered** 10:24 33:12 35:4

**office** 11:10,13,25 12:5 13:2 15:20 21:2 22:22 23:2 48:24 49:2, 4,5 59:4 61:19,25 62:2 63:18 64:22 67:21,23 73:12,16,22 74:2

**officer** 98:6

**often** 49:3

**oh** 41:16 57:21 83:25 94:22 98:8, 18

**okay** 4:21 6:8,17 7:3 8:10,13,15 9:2,12,14,20 10:17,23 11:3,4,23 12:4,18 13:8,13 14:25 15:1,2 16:9,17,19,23 17:8,15,24 18:13 19:14,19 20:2 21:8,16,20 23:14 24:16,19,25 25:9,17 26:12,25 27:6,14 28:3,9,12 30:14,19 31:2, 12,21 32:5,7,11,19,24 33:3,4,5,8, 18 34:1,6,12,16,22 35:1,17 36:10, 11,16,17,18,20 37:12 39:4,16 40:20,22 41:17 42:3,6,7,19,25 43:9,16 44:14 45:8 46:23 47:5,25 48:22 49:15 50:6 52:25 53:9 54:5, 16,17 56:5,10,15 57:8 59:20,23 60:21,25 61:13 62:4 63:9 64:3,22 65:6,7 66:18,19,22 68:3,9 70:16 71:24 72:18 73:6 74:8,20,24 75:15 78:11,16 79:19,23 80:1,5, 21 81:10 82:4,5,6,12,22 83:1,9 84:11,18 85:11,23 87:15,22 88:9, 22 90:1,7,13 91:4,10,14,23 92:14 93:2,8 94:18,21 95:17 96:2 97:3 98:14 99:13 100:11 101:15,20 102:3

**old** 7:12

**once** 4:15 18:2 22:15 35:24 36:7 41:5 52:25 63:7,9 72:18 73:15 95:4,5

**one** 9:13 14:19 16:25 17:21 19:18,22 25:20 27:22 29:15 34:20 35:12 36:25 37:17 42:3 47:18 48:20 49:14 50:7,23 54:18 55:22 65:12,17 66:3,5 70:9 71:4 72:1 74:5,11 79:8 80:10 82:5,13 84:1 86:4 90:8,12,25 93:2

**ones** 18:13

**only** 15:8 43:24 44:11 47:3 49:10 57:6 71:18 74:24 76:15 78:5 79:16 80:21 90:7

**open** 10:13,16 42:4 45:10 46:9, 10 47:19 51:9 84:3

**opened** 12:6 42:5 48:3

**opening** 10:3 11:10 42:6

**operating** 76:9

**operations** 24:17 27:6 65:21

**opinion** 20:17 69:9

**opinion's** 20:18

**opportunity** 100:14

**option** 69:4

**options** 15:18

**order** 15:19 30:20 40:14

**ordered** 59:10

**ordinary** 45:17

**origin** 39:22

**Oscar** 80:2,4,5,8,21 81:12,25 83:11 86:4

**Oscar's** 80:10 82:4

**other** 6:18 18:16 23:3 24:10,13 29:10,12,15 35:10 36:2 40:3 44:3 46:8 48:23 57:23 71:2 73:10 74:4 76:14,25 79:4 89:16 90:19 91:25 92:11 94:2,18

**otherwise** 78:25

**Outback** 84:16

**outfit** 22:3

**outside** 91:25 92:10,19

**over** 6:8 11:24 13:3 15:19 16:16 18:2,9 74:23 87:23 99:20,21

**overbidding** 21:14

**overbilling** 22:4

**overcharging** 20:19

**overdraft** 87:24

**overheard** 99:2

**overlap** 44:20

**overnight** 41:13

**oversaw** 12:9

**own** 16:2 39:23,25 49:25 70:13

**owned** 28:4 43:19

**owner** 10:8 27:18,19 39:25 42:23 43:4 44:2,5,6,8,9,10,11 45:16 51:8 57:23 61:16 87:16 96:14

**ownership** 76:13,16,21

**P**

**p.m.** 77:15,16,17,19 101:23 102:4

**package** 28:12,14 34:19,25 35:2,5,7,9

**packages** 34:16,22

**pages** 74:10

**paid** 25:12 27:25 40:23 55:2 56:3 57:2 58:18 59:21 77:2 83:22 90:1

**paper** 32:7 34:21

**paper's** 34:19

**paperwork** 72:6

**part** 26:3 27:23 29:21 30:3,4,6 31:21 40:21 41:10 44:23 50:18 60:14 99:18 101:17

**particular** 58:10 93:13 94:9

**partner** 82:6

**partnership** 76:9

**parts** 59:10 83:1

**Party** 98:6

**passed** 73:11

**past** 94:19

**path** 100:8

**Patrick** 52:19,20

**pay** 35:17,20 36:20 37:15,16 39:24 40:3 53:7 58:1,17,21,22 59:20 60:3,12 62:9 68:19 80:8 83:16 84:11,13,20

**paying** 28:1 57:9,10,14 61:9,15 80:5 88:7,8

**payment** 61:19,24 79:8,12 80:1,2 83:11,24 85:21 87:2,3

**payments** 86:4 87:9

**payroll** 21:20,24 57:3,6,8,13

**Paz-borrego** 42:16 79:8

**Pedro** 68:4 76:3,4 88:24 89:10

**pending** 7:6

**people** 13:16 18:17 21:13 28:1 29:7,17 51:11,12,15 53:20,21 68:21

**per** 61:21 77:3

**percent** 15:15 19:19 21:8,11,12,19,22,23 25:6,10,15 36:5,10,16 45:16 68:23,24 90:2 91:21,22 97:2 101:4,9,16

**percentage** 19:16 55:5

**perform** 8:22 39:17,18 46:18 49:8 57:24 59:16 83:2

**performance** 23:16 24:6

**performed** 9:16 38:14 39:11,12,14,20 54:20 57:11 63:4,23 65:12,17 70:4 76:23 92:1,12

**performing** 23:7,9 65:20

**perhaps** 81:8

**period** 33:15,21 87:7

**permit** 84:21

**Perrigo** 97:9,11

**person** 8:20 33:10,13 43:9,10 48:19 56:8 57:6 93:18 96:18 98:11

**personal** 72:15 78:17,20 84:9,11,13,15 86:2 94:19,20

**personally** 28:25 72:17 73:21

**phone** 40:22 64:10,12,13 74:23 76:2,5 79:8 93:21 94:16,18

**physical** 11:10 59:4

**pick** 59:18

**picked** 79:22

**picks** 82:23

**picture** 40:5

**piece** 61:11

**pig** 40:8

**pinpoint** 41:12

**place** 59:8 66:6 96:19

**plaintiff** 4:11,25 5:16,25

**plan** 96:11

**play** 67:10

**plays** 82:21

**please** 4:8 6:12 23:19 44:22 75:16 81:3 97:16 102:1,2

**plugged** 19:7

**plus** 60:21,22

**point** 10:24 18:9 20:21 36:23 66:15 68:1,3

**police** 98:6

**portions** 30:2

**position** 10:24 11:5 12:15,22 32:14,19,24

**possession** 75:3

**possible** 49:19

**post-covid** 56:16

**power** 77:9

**Powers** 52:19,20

**practitioner** 73:15

**preceding** 33:15

**preference** 42:23 43:13,16,23 44:7,12

**preferences** 43:20

**preferred** 15:11

**prepare** 65:6

**prepared** 16:4 17:8

**preparing** 64:25

**presence** 14:16

**present** 76:14,17

**president** 24:17

**presumably** 15:18

**presume** 10:23

**pretty** 10:14 14:3 40:1 49:3 64:17 95:6

**previous** 32:1 34:3 47:2,3

**previously** 63:1

**price** 16:10 19:1 60:17,19,21,23

**prices** 66:20 67:20 70:3,6 91:3

**pricing** 18:22 30:11,19 67:15,19 68:6,15 69:24

**pricings** 69:22

**primarily** 13:19

**Principal** 42:13

**prior** 9:12 33:21 37:15 40:9,10 48:2,4 67:4,7 70:16

**privy** 62:19

**pro** 61:19,24

**probably** 21:1 24:22 35:6 41:13,16 91:8

**problem** 80:7

**problems** 50:8

**proceeding** 4:18

**process** 53:5 99:24 100:1,3,6

**produce** 74:9

**produced** 45:15 74:12 77:24

**production** 74:9

**products** 33:11

**professional** 8:10 46:14 98:21

**profit** 21:5

**program** 18:24

**prohibited** 31:24 32:15

**project** 14:7,8,10 16:5,6,10,14 19:11

**projects** 16:8 17:1

**promoted** 50:15

**pronounce** 97:16

**proper** 5:23

**properties** 16:18,20 23:7,10

**proposal** 15:22 16:13 17:8 18:2,8 30:24 31:3,8,10,15,17,18 62:24 63:23 69:25

**proposals** 16:4 17:1,3,19,23,24 18:22 64:4

**propose** 35:22

**proposed** 10:23

**proprietary** 30:7,10

**provide** 60:13 70:16 72:22 74:18 89:10

**provided** 74:2 89:17 93:14

**Publix** 78:12

**pumps** 70:12

**purchase** 15:19 30:20 79:16

**purchases** 78:9

**purposes** 5:23 22:25 24:25 61:14

**pursuant** 5:21 77:24

**pursue** 53:19

**pursuing** 93:5

**push** 91:19

**put** 14:22 19:1,2 39:2 55:7 61:12 62:17

**Q**

**qualified** 47:2

**qualifier** 8:18,19,23,25 9:2,12 46:17,19,20,21,23 47:2,3,4,6 56:19 83:14,21

**qualifier's** 9:8

**qualifies** 8:20

**qualify** 83:15

**question** 6:12,14,15 7:1,6 28:22 30:1 31:12 41:25 44:22 61:2 74:14 81:3,8,9 92:4,5,6,21 94:14

**questions** 6:10 90:10 100:16,21 101:5,6

**Quickbooks** 86:9

**quickly** 64:17

**quit** 50:20,23

**quote** 18:22 67:2,3,15 70:9,11 89:10,15 91:11

**quoted** 16:10

**quotes** 66:19,25 67:15,18 68:12 70:16 89:17

**quoting** 17:3 68:5

**R**

**racial** 40:17

**racist** 40:8 99:5

**raise** 5:8 37:17,20,21

**raises** 37:16

**ran** 61:1 88:4,9,11,12

**range** 19:15

**rare** 63:22

**rarely** 59:12

**rata** 61:19,25

**rate** 60:15,16 62:11

**re-ask** 6:13 44:22

**re-share** 77:25

**reach** 10:21

**reached** 94:8

**reaction** 98:3

**read** 102:2

**reads** 33:9,20

**ready** 68:19

**real** 96:17

**realize** 28:12 36:23 66:8 80:7 99:20

**really** 15:9 17:21 20:20 40:21,25 41:25 48:25 49:7,21,22 51:12,22 62:12 67:9 71:4 99:10,12 100:10

**reason** 27:2 34:2 89:16

**Reboiro** 83:12

**recall** 27:1 34:7 35:1 45:22,23 46:1,4 47:5 55:9 56:25 57:1 58:3 64:22,25 67:9 68:7 71:7 72:9 86:16 92:2,13

**receive** 37:16 90:6

**receiving** 101:10,11

**recognize** 26:25

**recollects** 94:15

**recommended** 51:9

**record** 4:2,15 23:19,20,22,23,24 77:14,16,17,18 81:7 100:19 101:24,25

**red** 49:19

**reduced** 25:5,8 101:17

**reduction** 25:17

**reengage** 32:21

**refer** 9:20 38:10

**reference** 4:17

**referenced** 4:16

**region** 11:1

**registered** 42:16,22 43:3,12 85:25

**regular** 10:13 16:12 57:13 58:20 95:6

**regularly** 56:24

**regulars** 95:22

**reimburse** 84:15

**relate** 30:7 78:9

**related** 23:16 40:3 90:16

**relating** 76:11

**relation** 14:13 93:16

**relationship** 11:19 18:15 27:17 82:4 92:19,22 93:5

**remain** 101:11

**remarks** 99:5

**remember** 26:6 32:7 37:9 40:10 46:25 56:12 71:23 83:14 84:25 85:7 88:2 89:12,18 94:3 101:5

**rendered** 69:24

**rent** 61:6,9,15,20

**reoccurring** 68:22

**repaid** 36:6

**repair** 38:17 80:13

**repairs** 80:11

**repeat** 31:12 92:21

**rephrase** 66:18

**replace** 18:25 53:22 70:12

**replacement** 38:15

**replied** 76:15

**reported** 12:10

**reporter** 4:9 5:5,8,18 6:21 77:11 89:4 94:22,25 102:3

**reporting** 12:12 50:19

**represent** 4:9 61:18

**representations** 36:21

**representatives** 74:13

**represents** 45:21 61:22

**republic** 40:17

**request** 35:18 65:9 74:25 76:8

**requested** 76:9

**requests** 64:23 65:8 74:1,8 77:24

**require** 14:8 58:2

**required** 44:11 69:21

**requirements** 29:22

**residential** 16:17 38:20,23,25 39:15,17,20 96:9,10 97:2

**respect** 24:6 32:13 43:17 48:22 54:13

**responding** 71:7

**response** 37:23 71:14 100:15

**responses** 64:25 65:6 74:9 77:21

**responsibilities** 18:9

**rest** 15:20 38:11 90:2

**restaurants** 78:10

**restorations** 80:9

**restrictions** 54:13

**retail** 78:10

**retainer** 83:19

**return** 7:2 35:21 45:13 71:15

**returning** 35:22

**returns** 71:13,18,20 72:3,15,20 74:6,11

**revenue** 49:8

**revenue-wise** 24:22

**revenues** 72:23

**reviewed** 31:18

**reviewing** 78:8

**revisit** 101:1

**right** 4:23 5:7,8,19 7:8,10 10:20, 21 14:17 17:2,25 22:7 23:6 24:2, 7,8 27:7,10,17,21 30:3 31:4 32:9 38:10 41:15,16 45:6,12 47:21 48:5 50:13 51:18 55:13 56:22 57:2,4,16,19,22 58:8 60:1,25 61:9 62:5 63:11,19 64:19 65:3 67:4,10, 12 68:11,22 69:12 70:8,25 71:6 77:5,21 78:4,19,23 79:7,15 83:9 84:6 85:17 86:24 88:10,22 90:3, 18,25 91:20 96:2 97:19 98:5 99:9, 15 100:8

**Rodorigo** 10:5,7,8,9,11 11:17 34:12,23 37:20 47:13

**Rodorigo's** 35:18

**Rodriguez** 80:2,3,5,21 81:12,25

**role** 14:13 28:6 37:12 50:17

**Ron** 10:1,3,4,5,7,8,9,11,23 11:17, 21,23 12:10,12 19:18 20:2,7 21:12 22:9,20 23:15 24:6 25:5 27:18 32:23 40:2,5,12 41:1,2 47:12,13,16,17,18,22,25 48:23 49:2,4,11,12,13,25 50:2,5,8,19,25 51:22 52:1 66:19 68:2 69:1 82:25 98:2 99:2 101:3

**Ron's** 17:13 19:3,5 27:10 40:4 51:10 54:18

**Ross** 75:2 77:7 90:20 95:8

**round** 85:13

**routinely** 19:14

**rule** 16:2

**rules** 5:22 6:9 81:2

**run** 11:24 22:2 95:14

**runner** 82:24,25

**running** 29:8 84:7

**S**

**said** 11:23 17:10,24 19:5 25:11, 14 27:24 28:13 36:4,7,12 50:20 56:16 58:4 60:17 62:4 66:15 67:14 68:16 73:3 82:9 88:10 95:15

**salary** 15:1,2,8 21:7,8 25:5,10,15 35:22 36:13 37:5 101:4,9,11,13, 17,18

**sales** 9:13,14,15 10:16,25 11:1,2, 7 12:8,17 16:17 23:16 24:15,18 25:1 50:18 96:5

**sales/office** 24:16

**salesman** 10:22 11:2 12:16,24 14:8 22:21,23 23:17 62:25

**salespeople** 24:10,13

**same** 7:1 12:22 25:13 28:4 31:17 37:13 40:13,16 43:9,10 47:1 50:3 59:18 71:25 73:12 79:2,25 83:6 86:7 96:7 101:16

**Santander** 85:21

**sat** 6:5 21:2 22:11 36:25

**satisfied** 63:2

**saved** 64:10 93:23

**saw** 14:20 26:6 49:10

**say** 6:21 8:6 13:25 14:14 17:19 18:8 19:22 20:9,10 21:1,4 22:10 28:3 29:23 30:8,19 31:1 35:6 37:12 39:8,11 40:1 41:16 42:1 49:11,12 53:6 54:20 60:1,14 66:23 68:18 69:3 70:7 78:12 80:12 85:11 95:6 98:9 100:15,18

**saying** 6:19 30:15 38:25 84:12

**says** 15:17 21:18 26:13,15 27:11 33:16,17 35:24 36:9 45:19 57:3, 18 61:20 82:10 90:4

**scared** 99:17

**schedule** 58:20

**school** 7:14,15,23,24

**Schwitalla** 4:13,21 54:22 77:13 81:1,6,21,23 92:3 97:15,23 100:25 101:20 102:2

**scope** 39:8,9

**screen** 26:8 77:25

**Sean** 4:7

**search** 76:2

**season** 99:15,16

**second** 25:20 32:8 36:20 41:24 58:2 62:15,16,17 90:9

**Section** 31:22 33:8

**see** 6:18 12:25 26:10 28:14 29:10 50:25 55:14 62:13 71:16 79:23 95:13

**seeing** 35:1

**seem** 96:19

**seemed** 10:14 51:12

**seems** 29:1 91:20 97:6

**seen** 78:12

**sell** 33:11 55:8

**selling** 13:19 15:14 63:20

**send** 87:13

**sense** 62:13

**sent** 34:20 64:22 87:11

**sentence** 33:18

**separate** 27:21 46:17

**September** 95:5,24

**served** 54:7

**server** 64:8

**service** 33:7 68:13 69:24

**services** 8:22 9:16 33:12 38:14 39:14,17 63:2 68:8

**servicing** 20:13

**set** 5:20 32:9 57:9 60:17,19

**setup** 15:9 19:3 83:8

**seven** 20:10 32:20 66:5 91:18

**several** 73:25 84:22 85:11 86:4

**shaking** 6:19

**shall** 33:9

**share** 26:8 61:19,25

**shareholder** 45:16 76:10

**she** 43:3 44:5,8,9,10 57:23 58:2, 4,5

**ship** 79:19

**shipped** 59:11

**shit** 21:17 82:15

**shop** 82:23 87:25 88:10,11,12 95:17

**should** 31:24 32:21 77:7

**show** 26:10 91:2

**showing** 69:15

**Shows** 42:9

**shut** 75:14,17

**shy** 90:9

**sick** 83:6

**side** 80:9,22 96:10

**sign** 15:18 25:25 32:14 34:13,22, 25 35:7 58:2

**signature** 26:22,24 55:22 71:10

**signed** 17:9,11 27:6 28:12,13 32:10 34:8,10,21 35:9 54:16 57:3, 19,20,21

**significance** 29:2,3

**signing** 26:7 27:1 32:7 34:7,17, 18 57:22

**similar** 9:6 28:4 33:12 39:4 76:11

**simply** 9:9 86:13 101:9

**since** 46:18 52:23 53:2

**single** 67:21

**sir** 5:9 6:3 28:19 60:17 64:20 73:24 75:13 80:25 85:16,24 86:12 92:2 93:4,7,20 101:19

**sit** 22:16

**site** 14:16 18:14,15 43:21 79:22 82:24

**sitting** 18:17

**situation** 51:22 83:6 101:3,16

**six** 20:10 32:20 55:7 66:5 91:19 95:19

**six-months** 52:13

**size** 16:6 24:23

**slacking** 18:17

**slow** 99:10,12,13

**slurs** 40:17

**small** 16:7,9,20 17:6 25:4 43:19 53:8 59:17 70:12

**smaller** 17:3,8 19:14 24:20 25:1

**Smith** 31:15,19

**so** 6:8,22 8:6,22 9:2 10:2,17 11:23 12:8,21 15:9,16 16:15 17:8, 24 18:7,21 19:5 21:10 22:3,7,16, 25 24:16 25:2,6,14,17 26:25 28:3, 13 29:2,15 30:6,14,19 31:1,13,22 32:13,24 33:18 34:20,22 35:9,17 36:20 39:16 41:3,12,17 42:2,4 43:3,9 44:14 47:10 48:9 49:23 50:25 51:13 53:9 54:12 56:2,19, 22 57:6,13 59:14 60:11,13,25 61:13 63:14 65:20 66:14,22 67:4 68:11,21,22 70:8 72:5,18,20 74:24 83:1,15,19 84:11 85:6 89:9 90:1,14 91:17 92:4,6 93:5,9 94:18,19 95:17,18,19 97:5 98:20 99:6 101:9

**sold** 14:10 40:5

**sole** 44:5,8,9,10 57:23

**solely** 9:14,15 22:25

**solicit** 33:5,11 34:2

**solicited** 65:12,16

**soliciting** 46:1

**solo** 73:15

**Solution** 29:17

**Solutions** 27:13 28:8,16,23 29:12 30:16

**some** 6:8 10:23 15:18 29:2 31:22 44:16,19 53:20 66:14,15 68:18 70:12 77:5 81:19,21 90:10 99:23 100:1,2

**somebody** 31:3 33:7 53:7,21 71:5 81:17 100:12

**somebody's** 68:19

**someone** 30:24

**something** 6:20 13:12 14:17 40:22 58:5 63:6 67:16 68:19 73:7, 8 83:18 97:21 98:8

**sometime** 72:19

**sometimes** 58:19 87:11

**somewhere** 25:23 69:4 92:17

**soon** 35:4

**sorry** 5:6 6:4 16:19 38:8 54:22 63:12 68:7 77:12 86:18 87:4,6 89:4 92:8 94:22

**sort** 15:18 26:1 45:9 50:15

**sought** 44:12

**sounded** 40:6

**space** 39:12 59:4 61:10

**span** 63:19,25

**spare** 82:18

**speak** 25:2

**speaking** 79:4 101:2

**special** 18:13

**specifically** 28:7

**spell** 11:15 89:2 97:15

**spend** 99:17

**split** 16:12

**square** 90:11

**stands** 34:2

**start** 6:18 9:18 20:24 21:13 37:5 41:14 43:22 51:2,5 56:10,24 97:3 100:6,7

**started** 8:1 20:21 21:15 34:25 41:5,18 50:8 51:4,14,19 68:25 70:1 82:1

**starts** 35:25

**state** 4:8 23:1 42:8 65:14 71:14 74:24

**stated** 4:24 81:2 96:2

**statement** 78:5 83:10 85:18 86:24

**statements** 74:10 77:6,23 85:13

**Steakhouse** 84:16

**Stephanie** 87:15,16

**stick** 48:12

**still** 13:8 17:15 20:11 34:1 42:25 50:18 63:24 65:11,15,18 75:22 82:17 83:4,16 88:13 98:24

**stop** 95:8

**stopped** 95:10

**straight** 37:2

**strategy** 22:13 97:3

**straw** 48:16

**street** 42:13 53:15,16 99:6,7

**struggling** 21:18

**stuck** 17:6

**stuff** 17:6 24:20 28:15 30:14 39:6 53:22 59:10 64:2 80:9,20 84:14 96:7

**Stupidity** 74:7

**subcontractor** 19:6 60:3 79:20

**subcontractors** 53:4 59:7,14,20 77:2 86:5

**subsequent** 33:23 34:22 68:13

**succeed** 40:14 100:4

**such** 14:16

**sudden** 34:19

**suing** 99:2

**summer** 17:23

**supply** 59:18 79:14,15,25 87:23

**supposed** 18:18 25:15 99:16

**sure** 4:20 12:7 13:11 14:11 18:14, 16,19 27:4,23 44:23 57:20 63:2,6, 10 71:19 84:2 87:9,10

**surprised** 27:5

**swear** 4:10 5:5,10

**sworn** 5:16

**system** 16:12 18:25 19:1,5 29:17 57:8 62:21 64:7

**systems** 4:5,12 9:21 13:17 26:13 27:12 28:8,11,13,16,23 29:12 30:16

**T**

**T-A-R-R-A-D-O** 97:21

**table** 7:7

**take** 7:5,7 8:9 16:16,20 17:23 18:11 19:14 21:23 24:21 27:24 31:10,14 50:21 52:7,9 58:9 59:16 64:3 77:8 91:2 93:11 102:1

**taken** 4:4 5:21 62:15 89:24

**takes** 82:23 90:4,6

**taking** 6:21

**talk** 22:17 29:20 30:14 31:21 37:24 52:25 54:5 77:5,6

**talked** 25:5 30:11 31:22 35:17 45:16 52:23 71:13 77:21 79:19 85:18 86:4

**talking** 8:21 24:3,5,9 41:14 49:2 50:4 52:15 82:5

**target** 54:1,3

**Tarrago** 97:23,24

**tasked** 62:25

**tasks** 27:21

**tax** 45:13 71:13,15,16,18,20,25 72:3,15,19 74:6,10

**taxes** 61:14 71:22 72:17,24 73:3, 4,5,10

**Team** 38:3 42:9 55:17 56:3 78:2 88:23

**Tech** 8:3

**technician** 10:1 70:23 98:12,13

**technicians** 13:6,7 15:20 17:15 23:6,9,11 40:16 48:20,25 70:22 71:2 83:2

**techs** 12:7,9 23:11

**Ted** 22:16 92:4

**Teddy** 21:20 24:2,3 25:13 35:24 67:19 69:3 82:7

**tell** 9:24 18:10 19:3 22:15 30:6 34:17 48:3,4 49:18 53:21 58:14 59:24 67:17 75:16 87:8,13 89:19

**telling** 48:13 69:1 75:16 85:14

**tells** 21:3 82:7

**tens** 85:12

**tenure** 13:3 34:24

**term** 67:12

**terminated** 33:22 47:25

**termination** 33:15

**terms** 10:23 90:2

**Terrego** 97:12

**territory** 11:8 13:14

**test** 6:9

**testified** 5:16 43:6 48:9 58:4 61:1 85:4 90:16 95:18

**testimony** 5:10 12:21 27:1 31:23 32:19 42:19 43:3,11 54:7 72:18 80:21 85:15

**text** 75:1,25 76:1,2,4

**than** 24:21,22 35:10 39:9 46:8 48:22 50:6,7 76:14 79:4 97:5 100:11

**thank** 4:22 5:18 8:5 77:22 94:25 100:22,23 102:3

**Thanks** 4:25

**that** 5:10 6:14,15,21,22,25 7:6,17, 25 8:5,20,23 9:2,4 10:1,3,21 11:13,21 12:21 13:12,19 14:3,11, 14,16 15:6,21 16:10,11,15,16,21, 25 17:17,19,22,25 18:3,6,8,9,14, 16 19:7,12,14,16,23,24 20:7,19, 21,25 21:3,4,6,23 22:6,7,10,11, 12,18,19,24 23:14 25:8,15,17,20, 21,24 26:3,5,15,18,21 27:1,2,7, 23,24 28:3,9,12,22 29:1,3,4,6,9 30:1,4,8,10,12,14,15,16,23 31:7, 10,11,13,14,17,18,20,23,25 32:14,20,21,25 33:4,8,9,13,16,18, 19,20,22,23,24 34:1,8,10,11,20, 21,24 35:1,15,19,20,21 36:1,4,6, 7,15,16,21 37:7,17,19 38:10,14, 24 39:4,7,8,11,16,17 40:18 41:3, 10,14,24 42:2,5,6,10,11,14,16 43:3,6,7,11,16,21,24 44:2,5,9,12, 13,19,24 45:4,5,7 46:12,23,24 47:17,19 48:1,3,5,19,20,21,23,24 49:4,5,19,24 50:3,13 51:3,8,16

52:2 53:23 54:1,9,15,16,17 55:2, 4,5,11 56:5,20 57:7,20 58:2,4,9, 25 59:6,10,24 60:8,10,13,17,21 61:1,7,10,21,22,24,25 62:2,4,5, 15,17,21 63:2,16,19,23,24 64:1,2, 4,11,17,18 65:9,10,11,14,16,17, 20,21,24 66:5,8,10,11,12,18,19, 20,23 67:1,7,8,11,17,18,20,25 68:1,5,8,9,11,12,13,14,16,17,18 69:13,19,20,22 70:6,7,13,15,19, 20 71:4,15,16,18,25 72:4,7,18 73:14,17,25 74:2,3,11,19,20,22, 23,25 75:6,13,16,17,19,20,24 76:17,20,21,22 77:2,7,22,24 78:5, 12,16 79:9,14,24 80:9,10,15,17, 20,21 81:1,6,8,9 82:7,11,18,21, 22,24 83:13,15,18 84:1,10,13,23 85:4,7,14,15 86:16 87:7,9 88:1,5 89:10,16,25 90:4,11,12,15,18,19, 22 91:2,4,25 92:1,2,11,12,13,21 93:2,5,14,23 94:9,12,13 95:19 96:20,22,24 97:4,12,21 98:3,7 99:1,2,3,8,23 100:13,18 101:1,2, 6,8

**that's** 7:2 9:21 12:2,17 13:5,6 15:1 18:11 22:18 23:14 24:4 27:7, 10 28:14 33:16,17 43:7,24 45:18, 19 46:10 49:23,24 50:22 52:1,3,6 56:15 57:7,18 60:12,22 62:2 63:13 66:20 69:7 71:23 79:14 81:14 82:16,18 83:13,25 85:6,8, 22,23 91:13,15,23 92:16 93:9 95:10,16 96:10,11 99:6 101:20

**their** 8:25 9:3,11 20:13 27:17 32:15 59:15 60:15

**them** 4:19 20:16,17 21:25 32:22 33:5,6 49:16 54:3,4 59:18,21 60:12,13 62:24 63:7 66:10,13,14 67:7,11 68:5,14 70:3,5,16 74:18 78:9 91:19 95:10

**themselves** 22:15 91:10

**then** 7:7,25 8:4 11:9,23 12:2 15:19,23,24 16:7,13,15 17:10,12 18:4 21:5,19,24 25:20 31:17 32:5 34:18 35:4,18 40:6,23 50:5,7 51:14 52:13 53:7 58:17 59:16 61:13 66:8,25 67:14 70:23 71:5, 21,22 75:16 77:6,7 79:19 90:1,5 91:24 101:15

**Theodore** 4:4,5 5:14,21 26:22

**there** 7:21,25 8:3,4 14:11 15:4,23 16:18 19:1,3 21:6,15 22:23 23:6, 9,15,16 24:2,9,13 25:23 26:3 28:2 29:15 30:3 34:25 37:18 39:8 40:3 44:1 45:23 46:7 48:21 49:21,24 51:21 54:12 57:8,13 58:20 60:16 61:1,10,12 62:21 63:4 65:18 68:9 69:2 71:25 73:23,25 75:20 76:25 79:4 80:8 82:2,14 83:4 85:11 87:23 89:16 90:19 91:25 92:11, 17,24,25 94:5 95:3 96:5,12 100:18

**there's** 15:9 29:23 30:2 33:6 79:23 80:1 82:11 84:22 87:1,5 93:14

**thereafter** 35:4 44:15 49:9 64:17

**therefore** 33:1

**thereunder** 5:23

**these** 22:8 24:5,10 29:16 41:3,6 51:11,15 53:21 55:16,20 64:25 65:6,8 71:7 74:8 78:8 79:19,23 85:13 88:6,22 91:10,25 92:10,19 95:19,22

**they** 8:17 9:3,9 13:16 15:18,23 17:22 18:25 20:13,15 21:25 22:1, 14 27:21 28:3,14,17 30:25 31:2, 10,18,20 33:5,22 37:9 39:2,6 40:11 49:1,24 50:10 51:7,11 55:6 59:11,12,18 60:15,17,18,19 63:2, 8,15,16,18 66:10,12,15,17,18,19, 22,25 67:1,3,4,6,14,17,20 68:7, 12,21 69:6,14,20,25 70:3,6,11,13, 15 73:13 74:11 87:12,21 89:25 93:2

**they'd** 64:1

**they'll** 22:15

**they're** 9:5 15:17 18:18 22:3 32:23 43:21 60:10 63:8 73:12 99:17

**thing** 12:10 25:13 28:14 40:16 52:6 67:9 74:11 79:25 86:7

**things** 14:22 16:15 41:18 48:24 80:19 100:8,9

**think** 4:18 9:20 23:18 33:5 44:23 71:19,20 82:11 83:17,25 89:23 94:15 96:18 97:21 100:14

**thinking** 10:3

**third** 91:24

**this** 4:3 5:11,19,20 6:5,9 17:2,17 21:19 22:7,18 26:11,15,21 27:1,2, 6 28:9 29:19,22 30:3 31:6,21 32:5,7,10,14 33:1,8,20 34:7,9,18, 19,21 36:24 37:8 38:11 42:7,10, 20,25 43:11,17 44:14,24 45:12, 15,20,21 48:9,14 51:1,3,21 55:14, 22 57:3,16,19 58:1,8 61:2,18,22 64:23 67:10,19 71:1,7,10 74:25 77:25 78:1,4,5,13,24 79:2,5,7,12 83:10,24 85:4 86:12,21,25 88:9, 17,20 89:9,13,14,15,17,20,23 90:10,25 91:11,18,24 92:14 93:8, 9,13 94:8 95:12,20,24 99:23 100:1,10,13 101:23

**those** 4:18 8:15 12:13 16:25 17:1 18:13 20:11 22:12,21 23:14,17 24:14 28:7 30:21 31:2 32:20 33:12 43:23 53:9 54:5,17 55:2 59:17 62:3,22,23 65:3 66:5 70:2, 4,22 73:12,13 75:2 84:9 88:1 100:2 101:6

**though** 56:11,22 60:6

**thought** 53:5 96:22 97:5

**thousands** 85:12

**three** 12:7,8 17:21 21:1,17 22:12 25:18 35:7 50:24 75:12 89:14 90:7 91:25 92:10

**through** 14:2,21 15:17 17:13 20:16 23:5 28:6 29:5 67:25 77:9 80:8 81:13 87:12,13 100:12,13

**throughout** 14:3 34:14 38:11 85:12

**time** 4:3 5:20 7:5 10:17 20:16 22:11 23:20,25 25:11,24 36:16 37:17,19,25 40:24 41:12 42:25 45:2,6,7 48:23 54:6 56:16 58:18 60:7 77:15,18 82:19 86:21 90:5,6, 22 93:23 94:8 100:22 101:23

**timeline** 89:13

**times** 30:25 34:13,14 67:24 87:11

**tired** 39:24

**title** 12:18

**today** 4:25 5:25 26:6 54:17,18 63:5 100:16,22 101:5

**today's** 101:24

**together** 14:22 22:13 72:25 96:21

**told** 25:8 34:13,14 35:24 36:8,25 37:6 40:24 47:16,17,18,25 52:6,9 60:15 66:13,14 75:19 95:24

**took** 16:21 21:8 24:2 25:14 35:17, 20 36:1,4,14,15,20 45:8 52:2,4 60:21 66:3,4 82:1,3

**top** 45:20 53:8

**total** 91:4

**towards** 37:5 49:17

**toxic** 48:8 49:6,7

**trained** 14:19

**training** 14:15,19

**transaction** 79:7

**transactions** 79:5

**transcript** 6:22 7:3

**transfer** 85:13 87:1

**transferred** 85:7,8

**transfers** 84:22 87:5,6

**treated** 41:8

**treating** 48:17

**tried** 15:15 50:5 54:14 73:22

**trigger** 11:10

**trips** 41:6

**truck** 85:22,23,25

**Truist** 19:18,20 46:12 49:15 52:15,18 58:25 78:2

**Truist's** 19:19

**truth** 5:11,12

**try** 5:19 21:25 43:20 73:20 97:7 100:7

**trying** 29:2,4 41:12 42:20 51:2,4 53:3,4 66:19 69:12 90:11 96:9 97:2

**turn** 15:19

**turnaround** 49:23

**turned** 18:2 64:18 89:18

**Twenty** 63:21

**twice** 95:4

**two** 12:7,8 17:21 21:16 22:3 25:5 27:15,16 28:7 30:2 32:16 50:24 54:4,17 55:16 56:2 57:2,16 89:25 90:7 93:14

**two-year** 33:14,21 34:3

**type** 14:8,13 43:16,17 48:19 86:13 96:7

**typical** 15:6 19:10 59:23 63:19

**typically** 17:2 19:16 59:20

## U

**Ukraine** 41:6

**under** 9:3,7,8,11 32:13 45:3,4 52:2 54:8,9 87:8

**undercut** 31:11

**underneath** 9:2 26:22

**understand** 6:12,19 9:22 27:14 29:6,9,19,21 33:19 35:12 41:24 42:19 43:16 44:9 59:6 61:21 65:5 69:12 73:24 75:13 82:3,21 90:14

**understanding** 33:18 44:12 68:11

**understood** 6:15 91:16

**unhappy** 54:1

**unit** 16:24 17:8 19:7 25:1 38:15 39:1 63:19,25 64:1,2

**units** 13:20 15:14 16:20,22 17:4, 6,7 19:14 24:20 25:3,4 38:23 59:17 90:6 91:10,12,13

**unless** 18:10 62:23 63:16 75:13 95:14

**unpack** 22:7

**until** 26:6 51:3 66:22 71:24 90:16

**up** 8:25 9:5 10:3,13,14,16 11:10 17:10 23:8 30:16 37:2 46:9 48:3 51:6,9 54:22 57:9 59:18 63:1,5,22 68:23 69:15 79:22 82:23 87:25 88:10,11,12 95:17 97:3 98:16 99:1

**Upgrade** 83:24,25

**upholstery** 80:11 81:13 82:5,7, 17

**upon** 33:11 90:2

**upset** 68:12 70:4

**us** 21:2,3,4 29:6 67:16

**use** 27:25 53:10 61:25 62:2,23 70:21 74:20 75:7 78:16 84:10 95:22

**used** 5:22 10:1 22:24 41:1,2 45:11 78:14,24 84:1,13,15 97:13

**usually** 59:12,17

**utilize** 31:10,18 62:22

## V

**vacation** 40:24

**Vendor** 87:19

**verbal** 6:17,23

**Veronica** 42:16 43:6 57:20,21,23 79:8

**very** 59:12 102:3

**via** 74:16

**vice** 24:17

**video** 100:19

**videographer** 4:2,7,20,22 23:20, 24 77:14,18 101:21,23

**videotaped** 4:4

**view** 41:13 44:19

**Villanueva** 87:15,16

**violation** 44:20,24

**vis-a-vis** 10:7

**visit** 53:20

**volume** 24:21

**VP** 27:6

## W

**wait** 6:25 81:3 92:6 100:4

**walk** 48:23 49:4

**walked** 49:2

**want** 21:25 22:1,7 29:6,23 32:12 34:6 37:4 41:9 43:20 53:21 56:15 60:22 62:13 65:3,5,8 77:8 88:14, 15,16 96:10 100:6,12,15,18 101:1

**wanted** 10:13 18:13 21:9 22:2 39:24 51:5,6,9 67:17 70:11 95:11 96:23

**wanting** 25:13

**wants** 99:16

**was** 8:1 9:12,19,25 10:3,17,18 11:2,5,8,13,19,20,21,22 12:15,17 13:11,19 14:10,17 15:1,6,24 16:7, 9,10,12,14,17,19,20,21 17:7,13, 17,23 18:3,14,24 19:2,7,10,16,18, 19 20:7,8,19,21,25 21:6,8 22:2,5, 10,15,19,21,23,25 23:2,5,9,16 24:16,17 25:15,17,20 26:3,25 27:17,18,19,22,25 28:8,13,23 29:5,8,16 33:4,14,21 34:20 35:6, 20 36:6,8,17 37:7,8,12,13,23 38:13 39:4,6,8,12,22 40:3,6,9,12, 13,19,24 41:7,25 42:5,6,9 43:3,7, 15 44:8,9,10,14,24 45:4,7,8,10,23 46:5,7,10,12,20,23,24 47:1,2,4,8, 9,10,18,19 48:7,8,9,16,17 49:15 50:5,11,13,14,18,24 51:3,5,7,9 52:2,6,15,18 53:5 55:5,11,12,25 56:14,16,21,23 57:3,8,9,10,13,23 58:9,20,21,25 59:23 60:13,15,16 61:1,10,15 62:16,21 63:6,10 64:17 65:9,10,11,15,24 67:3 68:1, 3,5,11,12,15,18 69:11,13,19,20, 24 70:2,15,19,20 71:1,15,18,21, 25 72:10,11,20 73:15,23,25 74:2, 11 75:18,19 76:17 77:2 78:14,16, 23,24 79:4,14,21 81:8 82:4 83:13, 17,19 84:7,18,20,23 85:7 86:12, 25 87:7,9,23 88:1,2,3,5,15,17 89:9,14,15,16 90:15,16 91:1,4,12, 21 93:18 94:2,4,6,16,23 95:2,12, 15 97:21 98:2,5,12,13 99:18,20, 21 100:3 101:2,16

**wasn't** 16:15 17:14 21:3 25:4 29:7 40:23 45:11 50:9 64:1 66:10 68:11 88:5

**way** 9:6 17:2 18:12 21:6 29:15 41:8 48:17 51:3 81:6 82:11 86:12 99:11,20

**We'd** 49:16

**we'll** 7:7 22:17 25:24 30:1 37:24 41:24 54:5 74:4 81:6

**we're** 4:17 6:8 8:21 11:24 49:13 77:5,6 82:9 85:12 88:10 92:4 96:9

**Wednesday** 4:1

**week** 37:4 63:5

**weekends** 14:6,9 37:6

**weeks** 56:2 57:2,16

**weeks'** 50:24

**weird** 41:19

**well** 7:18 8:12 11:24 18:16 21:2 22:22 24:15 28:8 29:1 37:3,5 41:12 47:18 57:2 58:1 61:11 64:1 66:17 67:14 71:24 72:4,22 73:3,6 74:18 75:7,19 78:4 80:7 82:9 83:13 84:15 89:13,20 94:13

**went** 8:2,3,4 13:16 17:10 18:12, 16 20:16 25:6,11 63:15 67:9,14 73:22 82:16 84:20 101:15

**were** 7:19 10:11,12,21 11:1,6,23 12:4,15,18,24 13:19,22,24 14:22, 25 15:2,4,14,25 16:14,18 17:2,19, 24 18:9,21 20:7 22:9,12 23:6,15 24:2,5,9,10,13,25 28:3 31:2,3,7, 11,14 33:22 34:1 35:4 39:24 40:3, 11 42:20,25 43:13 44:1 45:3,5 46:18 47:25 48:5 49:13 50:15 51:11 53:3,4 54:1,7,8,9,12 55:2 57:9,13 58:1 59:11 61:9,13 62:19, 25 63:2,16,20 65:18 66:8,14,20, 22,25 67:1,8,11,20 68:7,8,9,12 69:14,16,19,20,22 70:3,4,6,13,21 73:21 74:4,12,25 76:25 77:24 81:17 84:9 87:12 88:6,13,17,20 89:10,14 90:19 92:1,25 93:2,5,14, 18,23 95:3,18 96:7 97:5 101:3,9, 10,11

**weren't** 66:17 69:14 74:21 101:17

**what** 6:4,10,19 7:10,13,23 8:15, 17,19,24 10:11,23 11:5,8,19 12:2, 15,24 13:24 14:8,19 15:14 16:20 17:2,17 18:22 19:10 22:9 26:10, 15 27:5,14,17 28:2,7,17,18,22 29:3,19,21 30:15,21 32:5,12 33:16,17,19 34:11,20 35:10 36:7, 8,13,23 37:9,10,23 38:11,14 39:22 40:14 41:11,25 42:19,20 43:16 45:8,19,20 46:10 48:5,9,16 49:11,12 50:22 51:7,23 52:3 53:2, 4 55:5,11 56:15 57:18,23 58:8 59:23 60:2,6,7,14,15 62:7,9 65:6 68:5,17,19 69:2,13,18 71:21,23 72:5 74:3,21 75:19,25 76:1 78:17 79:9,12,24 80:16,17 81:21 82:7, 18,20 83:24 84:12,18,23 85:1,15 86:7,25 87:7,20,22 88:3,23 91:1 92:15,19,22 94:2 96:20,25 97:5 98:3,23 99:5,7,18,25 100:11

**what's** 23:14 58:15 62:11 63:19 79:16,18 96:16 98:1

**whatever** 9:3 18:11 43:22 53:22 55:4 60:22 68:23 69:25 71:5 72:24 78:23 82:23 89:18 94:23

**when** 9:18 10:9 11:5 12:5 13:10 18:17,21 19:17,22 20:1,15,24 21:4 22:21 25:20,24 28:12 34:18, 23,25 36:20,25 37:7 40:5 41:3,13 42:2,3,23 44:23 46:7 47:4,5,18, 21,25 49:2,17 52:6 54:7 56:10,15, 20,22,24 59:10 62:16,19 64:3 68:23 69:3 72:8 73:21 80:12 82:1, 13 84:7,20,21 85:11 87:12,25 88:4,9,20 92:25 93:5,18 96:21

**whenever** 58:21

**where** 7:15 9:7 16:14 18:13 51:16,18 56:5,8 75:19 89:13 93:13 101:3

**Where's** 7:17

**whether** 14:17 24:9 28:23 29:15 32:9 69:11

**which** 4:9 33:13 39:4 43:5 56:23 57:13,17,22 58:18,21 60:18 75:16 76:9,12,15 79:20 80:13

**while** 6:18 56:14 64:11 65:10,15, 18 100:18

**who** 9:12,21 10:7 11:13 20:13 27:6,7 40:7,9 43:6 46:4,20,23 47:1,2 52:15,18 53:9,10 56:7 57:19 61:15 63:1 65:24 68:3 70:21 79:4 83:12 85:7 93:16 97:10

**who's** 27:9 56:19 73:6 80:2 87:15

**whoever** 59:12

**whole** 5:12 7:21 12:10 19:3 40:5 51:22,24 67:9 101:1

**wholesale** 59:15 60:21 91:11

**whom** 4:9

**why** 20:17 23:16 42:20,21 48:12 49:23,24 52:21 58:1 61:9 66:20 72:3 74:3,5,14 75:9,10 80:5 88:7, 12 90:14 95:8

**wife** 40:7,9,10 41:21,23 42:17,22 43:6 44:1,16 46:8 61:3,9,15 62:4 64:22 65:4 84:23 85:4

**wife's** 71:11

**willing** 97:7

**window** 25:18

**Winsupply** 79:23 85:19

**winter** 17:21

**within** 4:18 30:7,17 31:3

**without** 8:22

**witness** 4:10 5:5,16 81:5,10,22 89:5 92:8 94:24 97:18,20,24 100:23

**woman** 42:23 43:19

**won** 51:25 52:1

**word** 53:24,25

**words** 18:16 36:4

**work** 7:23 8:20 9:7 10:1 12:9 13:1 14:6,9 15:7,8,17,20,24 16:11 17:16 23:1,2,7,9 39:11 43:18 44:17,20 46:18,22 49:16 51:11 53:2,10 54:3 56:6,7 57:11,23 59:12 60:11,18 61:12 63:3,4,24 65:12,16,17,20,21 66:16,17,18, 21,25 68:24 69:21 80:15,17 81:25 82:1 83:2 84:21 90:14 92:24,25 94:4,19 95:2,8,10,11 96:5,23,25 97:5 98:14,19,23 101:8

**worked** 7:24,25 9:13,14,15 14:22 19:15 27:12 37:17 58:6 64:11 80:22 82:14

**working** 9:2,5,8,11,18,24,25 12:4 13:24 18:18 29:7 34:25 37:3,5 40:2 42:25 45:5,7 51:15,16,18 63:10 83:4 88:15,20 90:19 98:2

**works** 48:21 49:24 98:20

**world** 9:15

**worry** 97:1

**worse** 41:5 48:15

**worst** 50:18

**worth** 87:5,6

**would** 5:8 10:2,22 12:8,9 13:25 14:8,16 15:11,13 16:8,23,25 17:9, 15,19 18:10,15,24 22:8,13 25:9 27:24 28:9 30:10,12,13,21 31:6, 13 34:15,17 36:8 42:4,10 44:3 45:5 48:23 49:4,11,15 53:6,9,20, 21 54:20 58:9,17 59:14 60:3,17, 18,19 62:22 63:5,7,22,24 68:18 74:20 75:10 79:9,15,16,19 80:7, 17 84:10,11,13 86:16,21 87:7 89:23 90:1,22,23 93:10 94:4 96:22 98:8 100:9

**wouldn't** 29:15 30:23 42:5 72:4,6 90:18 94:12

**wrong** 14:18 33:6 54:6 63:14 91:20

### Y

**Y-O-A-N-N-Y** 94:7,24

**yeah** 7:20 8:9 10:6 11:5 13:18 14:14 18:20 22:10 23:11 25:3,23 28:21 30:13 31:13 43:8,9 48:11 50:14,22 52:17 53:13,17,20,25 54:6 56:21 59:17 61:21 62:21 63:18 64:2 66:12 69:10 72:2 73:2 81:19 86:23 87:19 88:21 89:7,8 92:17,22 97:14 98:8 99:4,14 100:3

**year** 17:25 37:10 45:17,24 46:2 49:18 50:20 54:21,23 60:7 63:9, 10 67:8 71:16,18,20,25 72:9 74:1

**years** 7:12,25 8:8 12:13 14:3,21 19:25 21:1,16,17 25:12,18,21 26:25 31:7 32:16 34:14 35:6,7 42:4 46:22 48:2,4,12 55:3 60:2 63:21 73:25 75:12 82:15 100:4

**yelling** 49:5

**yes** 5:13 6:16,24 7:4,9,22 8:9,12, 25 9:1,23 10:22,25 11:12,18 12:1, 3,11,23 13:21,23 14:5,7,24 15:7, 13 16:7 18:1,10 19:9,21 22:14 24:24 25:11,14,19,23 26:2,17,20, 24 27:10,20 28:5 30:5,9,13,23 31:1,5,20 32:17,23 33:17,25 34:5 35:14,16 36:5,22 37:14,22 38:6,8, 19,21 39:10,19,21 42:12,15,18 43:2,10,25 45:4 46:13,19 47:9,11, 14,15,16,18 50:5 54:3,11 55:10, 15,19,24 56:1,4,18 57:5,7 58:7 59:1 60:24 61:8,17 62:6 64:14,16, 24 65:2,19,23 66:7,17,24 67:6,13, 24 68:15 70:18,20 71:9,12,17 72:17,21,24 73:19 76:7,19,24 77:4 78:3,7,15 79:1 80:14,23,25 81:5,16 82:1 83:7,23 85:16,24 86:3,6,8,15,23 88:21 90:4,24 91:6 93:1,7,12,20,22 94:10 95:7,21,23 96:1,4,6,15 97:8,24 98:13 100:17 101:7,19

**yesterday** 58:4

**Yoanny** 94:4,6,7,20,23

**you'd** 26:14 27:5 57:4 58:21,22 70:2

**you're** 6:17,19 8:24 9:5 30:15 32:14 36:9 38:24 39:16 40:21 41:14 48:20 49:2,19 50:3 51:16 52:15 62:23 68:23 75:16 84:12 85:14 86:10 92:11 96:2,19 97:6 99:15 100:18

**you've** 8:6 9:16 43:22 60:10 99:23

**your** 4:8 5:8 6:19,20 7:10,13,21 8:20 9:8,9,12 10:11 11:5,8,10,19 12:15,21,24,25 13:3,14,24 14:3, 16 16:17 17:3 18:4,8 19:8,22 20:17 21:21 25:1,5 26:15,22 27:1 28:6,24 29:3 30:10,20 31:3,6,7, 13,23 32:1,5,9,14,19,24 33:1,15, 18 34:24 35:12 36:11,20 37:5,12 39:2,24 41:13,21 42:14,17,19,21, 22 43:3,6,11 44:1,11,16,20 45:20 46:8 47:2,6 48:5 49:18 52:15,18 53:3,5,18 54:7,12 55:9,22 56:2, 17,19 57:17 58:9 59:7,11,14 60:2, 13 61:2,3,9,11,14,15,18,19,24,25 62:4,9,11 64:10,22,25 65:4,5,9 66:2 68:3,11,16,21 69:9,13,18 70:13 71:3,10 72:8,18 73:1,3,6,10 74:2,8 75:3,25 76:2,8,23 77:21 78:1 79:20 80:21,22 81:18 83:19 84:23 85:1,4,14,23,25 86:2,5,9,10

90:14 91:2,12,21 92:19,22 93:21 94:18,19 95:22 99:6,15,18 100:1, 22 101:4,9,17,18

**yourself** 9:16 16:4 20:3 24:10,13 41:21 53:2 56:3 57:2,9,14 58:1, 17,21,23 73:3 80:15,18 84:16

**Z**

**Zelle** 87:12

**zero** 100:6

**Exhibit 4**

Employment Agreement

ECS
Engineered Comfort Systems
12480 Allen Road • Taylor, MI 48180
(734) 287-4111 • (734) 287-4011 fax

## CONFIDENTIALITY AND NON COMPETITION AGREEMENT

ENGINEERED COMFORT SYSTEMS, INC. ("ECS"), it's affiliated entities, subsidiaries, successors and assigns ("Corporation") and Theodore Borrego ("Employee") make the following agreement:

1. Effective Date: This agreement is effective as of 7.25.2011, 2011. Obligations under this Agreement shall continue after the date on which Employee may cease to be employed by Corporation.
2. Employment: Employee's employment will continue to be subject to Corporation personnel policies, including the "at will" employment policy.
3. Proprietary Information:
   a) Employee acknowledges that during (his/her) employment with Corporation (he/she) will and/or come into possession of trade secrets or other confidential and proprietary information of Corporation (all of which will be referred to in this Agreement as "proprietary information"), specifically including, among other things, the identity of customers and prospective customers of Corporation; customer files and detailed information concerning customer needs and requirements; proposals designed to meet customer needs or requirements; product designs, drawings, and specifications, or their drafts; formulas, product planning information, market surveys and forecasts; pricing, cost, and margin information; and other financial information and records of Corporation. Employee acknowledges that the foregoing types of proprietary information are highly confidential to Corporation, are valuable, give a competitive advantage to Corporation, and could not, without great expense and difficulty, be obtained or duplicated by others who have not been able to acquire such information by virtue of employment with Corporation.
   b) Employee agrees that, both during and after (his/her) employment with Corporation, unless (he/she) first obtains the prior written consent of the President of the Corporation, (he/she) shall not communicate or disclose, directly or indirectly, to any person or firm, or use at any time, any of Corporation's proprietary information, whether or not such information was developed or obtained by Employee. However, Employee may, where authorized and approved, use such information to further (his/her) employment duties with Corporation. Employee shall retain all such proprietary information in strict confidence for the sole benefit of Corporation.
4. Noncompetition:
   a) In consideration for (his/her) employment, between the date of signing this Agreement and the date of Employee's termination, and subject to termination as set forth in Section 2 above, Employee agrees that, during the period of (his/her) employment with Corporation and for a period of two (2) years after (his/her) employment with Corporation terminates, whether such termination is voluntary or involuntary, (he/she) shall not directly or indirectly, either individually or on behalf of another person or firm
      i. Call upon, solicit, or sell or attempt to sell any products or services similar to or in competition with those offered by Corporation to any

person or firm that (1) was a customer of Corporation during the two (2) year period immediately preceding termination of Employee's employment with Corporation, or that (2) was solicited by Corporation or otherwise had any contact with Corporation during the two (2) year period preceding the termination of Employee's employment with Corporation. Notwithstanding the foregoing sentence, Employee shall not be deemed to be in violation of this section if (he/she) bids or attempts to bid upon work in connection with a project which is publicly advertised by the owner for competitive bids.

b) Both parties agree that the restrictions in this Section are fair and reasonable in all respects, including the length of time that they shall remain in effect, and that Corporations employment of Employee, upon the terms and conditions of this Agreement, is fully sufficient consideration for Employee's obligation under this Section.

c) If any provisions of this Section are ever held by a court to be unreasonable, the parties agree that this Section shall be enforced to the extent it is deemed to be reasonable.

5. <u>No Interference with Employment Relations:</u> Employee agrees that (he/she) will not, either before or after termination of (his/her) employment with Corporation encourage, solicit, or otherwise attempt to persuade any other employee of Corporation to leave the employ of Corporation.

6. <u>Return of Proprietary Information:</u> Upon the termination of (his/her) employment, Employee shall return all records, documents, and other written, printed, photographic, software or physical materials of any type that belong to or pertain to Corporation, including without limitation computer printouts, customer lists or documents, customer files, sales manuals, drawings, plans, blueprints, specifications, calculations, measurements and formulas of any type, billing information, financial information, all such data stored on electronic equipment, and all other documents relating to Corporation then in Employee's possession or under (his/her) control, and Employee shall not make or retain any copies of extracts, including handwritten summations, of such documents.

7. <u>Remedies:</u> Employee acknowledges and agrees that Corporation would be irreparably harmed, damages would be difficult to establish, and Corporation would not have an adequate remedy at law if Employee were to breach this Agreement. Therefore, if any such breach occurs, Corporation will be entitled to the following relief: (a) an injunction restraining Employee from disclosing or using any proprietary information of Corporation in breach of Section 3 and liquidated damages of $10,000.00 for each violation or breach of Section 3; (b) an injunction restraining Employee from engaging in a competitive business in breach of Section 4(i) and liquidated damages of $500.00 for each day in which Employee is found to have been in breach of Section 4(i); (c) an injunction restraining Employee from violating Section 4(ii) and liquidated damages of $1,000.00 for each instance in which Employee is found to have breached Section 4(ii); an injunction restraining Employee from breaching Section 5 and liquidated damages of $1,000.00 for each employee of Corporation which Employee encourages, solicits, attempts to persuade or persuades to leave the employ of Corporation; (d) an injunction or other order requiring Employee to return Proprietary Information to the Corporation and liquidated damages of $500.00 per day that Employee retains proprietary information in breach of Section 6. Corporation shall also be entitled to the award of its costs and its actual attorney fees incurred in enforcing this Agreement.

8. Severability: Each provision of this Agreement is separate. Where necessary to effectuate the purpose of a particular provision, the Agreement shall survive the termination of Employee's employment with Corporation. If any part of this Agreement is held to be invalid or unenforceable, the remaining portions shall remain in effect.
9. Modification and Consent: To be effective and binding upon Corporation, any modification of this Agreement and any consent under it must be made in writing and signed by the President of Corporation. Employee understands that this policy permitting modification or consent only by the President, in writing, may be changed only by resolution of Corporation board of directors.
10. Miscellaneous:
    a) Any notice under this Agreement must be writing and delivered personally or registered mail to the last known address of the recipient.
    b) This Agreement contains the entire agreement of the parties regarding the subject it covers, and any and all prior agreements, representations, or promises or superseded by and/or merged into this Agreement.
    c) This Agreement shall be governed by the laws of Michigan. The parties agree that, should any litigation arise out of, in connection with, or relating to this Agreement, such litigation will be commenced in the Circuit Court for the County of Wayne, Michigan, or in the United States District Court for the Eastern District of Michigan, provided such court has subject matter jurisdiction. The parties specifically agree, however, that either of these courts shall have personal jurisdiction and venue.
    d) Although this Agreement was drafted by Corporation, the parties agree that it accurately reflects the intent and understanding of each party and should not be construed against Corporation if there is any dispute over the meaning or intent of any provisions.
    e) By their signatures below, the parties acknowledge that (i) they have had sufficient opportunity to, and have, carefully read each provision of this Agreement, (ii) they have had the opportunity to review the Agreement with legal counsel or their own choice, (iii) they understand each provision, and (iv) they are not relying upon any representations or promises that are not set forth in this Agreement.

Engineered Comfort Systems, Inc.

By: ______________________

Its: VP of Operations

Dated: July 25, 2011

Employee Name: THEODORE G Borrego

Employee Signature: ______________________

Dated: 7.25.11, 2011

**Exhibit 5**

Veronica Paz-Borrego Deposition Transcript

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re: Theodore G. Borrego and Veronica Paz Borrego, Debtors. Case Number 25-14217-RAM
______________________________/

Engineered Comfort Systems, Inc., Plaintiff, Adversary Number: 25-1323-RAM

-vs-

Theodore G. Borrego and Veronica Paz Borrego, Defendants.
______________________________/

VIDEO DEPOSITION OF VERONICA PAZ-BORREGO

taken by the Plaintiff on the 19th day of May, 2026, via Zoom, at 10:07 a.m.

APPEARANCES:

For the Plaintiff: MR. ANDREW M. CREAL (P83806)
Taft, Stettinius & Hollister, LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 727-1564
acreal@taftlaw.com

For the Defendant: MR. JAMES SCHWITALLA
The Bankruptcy Law Offices of
James Schwitalla, PA
Park Place II
12954 SW 133 Court
Miami, Florida 33186
jws@MiamiBKC.net

Videographer: John Ricker
Reported by: Angela L. Chritz, RPR, CSR-4305

FORTZ Legal

Premier Litigation Support Solutions

- Court Reporting
- Process Service
- eDiscovery
- Document Solutions
- Trial Support

production@fortzlegal.com
844.730.4066

FULL SERVICE LITIGATION SUPPORT FORTZ Legal

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re: Theodore G. Borrego and Veronica Paz Borrego,
Debtors.
_____________________________/

Case Number 25-14217-RAM

Engineered Comfort Systems, Inc.,
Plaintiff,

Adversary Number: 25-1323-RAM

-vs-

Theodore G. Borrego and Veronica Paz Borrego,
Defendants.
_____________________________/

VIDEO DEPOSITION OF VERONICA PAZ-BORREGO

taken by the Plaintiff on the 19th day of May, 2026, via Zoom, at 10:07 a.m.

APPEARANCES:

For the Plaintiff: MR. ANDREW M. CREAL (P83806)
Taft, Stettinius & Hollister, LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 727-1564
acreal@taftlaw.com

For the Defendant: MR. JAMES SCHWITALLA
The Bankruptcy Law Offices of James Schwitalla, PA
Park Place II
12954 SW 133 Court
Miami, Florida 33186
jws@MiamiBKC.net

Videographer: John Ricker
Reported by: Angela L. Chritz, RPR, CSR-4305

TABLE OF CONTENTS


| WITNESS: VERONICA PAZ-BORREGO | PAGE |
|---|---|
| Examination by Mr. Creal | 6 |
| Examination by Mr. Schwitalla | 58 |

| EXHIBITS: | IDENTIFIED |
|---|---|
| Exhibit Number 1 (Florida Department of State Filing for ASAP Air Mechanical Team, Inc.) | 10 |
| Exhibit Number 2 (Partial Company Tax Return) | 17 |
| Exhibit Number 2(A) (Electronic Articles of Incorporation for ASAP Air Mechanical Team, Inc.) | 17 |
| Exhibit Number 3 (ECS Confidentiality and Non Competition Agreement) | 26 |
| Exhibit Number 4 (ASAP Canceled Checks to Theodore Borrego dated 10/9/2023 and 10/23/2023) | 29 |
| Exhibit Number 5 (ASAP Canceled Checks dated April 2023) | 33 |
| Exhibit Number 6 (Defendants' Responses to Requests for Admission) | 34 |
| Exhibit Number 7 (Defendants' Responses to Interrogatories) | 35 |
| Exhibit Number 8 (Defendants' Responses to Requests to Produce) | 38 |
| Exhibit Number 9 (ASAP Truist Account Statement for 6/30/2023) | 43 |




TABLE OF CONTENTS (cont.)


| EXHIBITS: | IDENTIFIED |
|---|---|
| Exhibit Number 10 (ASAP Truist Account Statement for 12/29/2023) | 46 |
| Exhibit Number 11 (ASAP Truist Account Statement for 2/29/2024) | 48 |
| Exhibit Number 12 (ASAP Truist Account Statement for 4/30/2024) | 51 |
| Exhibit Number 13 (ASAP Truist Account Statement for 6/28/2024) | 52 |
| Exhibit Number 14 (ASAP Invoices for Atlantic III) | 52 |
| Exhibit Number 15 (ASAP Invoices for The Betsy Hotel) | 53 |




Tuesday, May 19, 2026 - 10:07 a.m.

VIDEOGRAPHER: Good morning. We are now on the record. The time is 10:07 a.m., on Tuesday, March 19th, 2026. This begins the videotaped deposition of Veronica Paz-Borrego taken in the matter of Engineered Comfort Systems versus Theodore Borrego, et al, Case Number of which is 24-CV-10924.

My name is John Ricker, and I'm the remote videographer for today. The court reporter is Angela Chritz, and we are both representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. CREAL: Good morning. My name is Andrew Creal. I am an attorney for the Plaintiff Engineered Comfort Systems, Inc.

MR. SCHWITALLA: James Schwitalla on behalf of the Defendant Veronica Paz-Borrego.

Mr. Ricker, could you please repeat that case number that you mentioned?

VIDEOGRAPHER: I have it as again 24-CV-10924.

MR. SCHWITALLA: That is not the correct case number. We are not here on that case.

MR. CREAL: Yeah, it's -- it's an adversary proceeding. Do you want me to give you the case number?



MR. RICKER: Yes, our system has -- that was the case number I was provided.

MR. CREAL: Yeah, the notice has something different. So it's Adversary -- Case Number 25-14217-RAM. Adversary Number 25-1323-RAM.

MR. SCHWITALLA: I agree, that's the correct case numbers.

VIDEOGRAPHER: I see that here in our system now. Thank you.

MR. CREAL: Okay. We'll get going.

COURT REPORTER: Would you raise your right hand, please.

Do you swear or affirm that the testimony you are about to give in this case will be the truth, the whole truth and nothing but the truth?

MS. PAZ-BORREGO: Yes.

COURT REPORTER: Thank you.

VERONICA PAZ BORREGO,

(At 10:09 a.m., having been called by the Plaintiff and sworn as a witness, testified as follows):

MR. CREAL: Ms. Paz-Borrego, is it okay if I cal you Veronica?

**THE WITNESS: Yes, of course.**

MR. CREAL: Veronica, my name is Andrew Creal.

I am the attorney for the Plaintiff. I appreciate you making some time today for us.

EXAMINATION

BY MR. CREAL:

Q. Have you ever been deposed before, ma'am?

**A. No.**

Q. Okay. Well, this is a deposition. It is to be used for all proper purposes under the Federal and Bankruptcy Court Rules. I'm going to go over some basic background stuff so we're on the same page. And I don't think it's going to take too long, but I want to make sure that we can move about this expeditiously and you understand the guidelines. Okay?

**A. Okay.**

Q. One of the first things -- you're off to a great start -- is we need verbal answers. So I can see you, you can see me. I might understand what you're saying if you nod or shake your head, but it's important that you give verbal answers because we have a court reporter who's taking down everything that you say and I say in order to create a transcript for this proceeding. Understood?

**A. Yes.**

Q. All right. If you don't understand a question that I ask, that's perfectly fine. You can ask me to repeat the question and I'm happy to do so. However, if you answer



the question, I'm going to assume that you both heard and understood the question. Is that fair?

**A. Yes.**

Q. Okay. This is not a test or a quiz. I just want to understand what you know here sitting today. "I don't know" is a perfectly good response if that is the truthful answer that you need to give. Okay?

**A. Okay.**

Q. If you need to take a break at any time, that's fine, just let me know. I'll just ask that you answer the pending question on the table. Fair?

**A. Yes.**

Q. All right. Veronica, how old are you?

**A. Fifty-two years.**

Q. And what's your educational background?

**A. I have some college.**

Q. From where?

**A. Ecuador.**

Q. Okay.

**A. I'm from -- I'm from Ecuador.**

Q. Okay. You were born there?

**A. Yes.**

Q. When did you move to the United States?

**A. Like 30 years ago.**

Q. Okay. Have you done any college or trade school or



anything like that since you've been in the United States?

**A. No.**

Q. Are you currently employed?

**A. Not right now.**

Q. When was the last time you were employed?

**A. 2024.**

Q. And what were you doing?

**A. I was a store manager in supplies, supply store. Beauty supply store.**

Q. Okay. What was that place called?

**A. Exclusive Beauty Supplies.**

Q. Did you own any interest in Exclusive Beauty Supply?

**A. I'm sorry, say it again.**

Q. Did you own any interest or were you just employee?

**A. Employee. Store manager.**

Q. How long did you work at Exclusive Beauty Supply?

**A. Like a little bit more than four years.**

Q. Okay. Why did you leave?

**A. Because the company was sold.**

Q. They downsized?

**A. I'm sorry?**

Q. They downsized after they were sold?

**A. Yes. I can say that. It was sold to another company.**

Q. So you haven't worked in the past two years?



**A. Yes.**

Q. Are you currently looking for work?

**A. Yes.**

Q. What types of jobs are you looking to do?

**A. Customer service. That's my main thing right now.**

Q. Okay. Where do you currently live?

**A. Homestead, Florida.**

Q. What's the address?

**A. 4116 NE 20th Street, Homestead, Florida 33033.**

Q. How long have you been at that address?

**A. Since 2017.**

Q. Do you own the house with anybody else?

**A. With my husband.**

Q. Do you have any children?

**A. Yes.**

Q. How many?

**A. Three.**

Q. I won't even ask you their names, just their ages?

**A. My oldest is 23, 19 and 13.**

Q. Okay. I'm going to ask you some questions about ASAP Air Mechanical Team, Inc. Do you understand what that company is?

**A. Yes.**

Q. What is that company?

**A. Air conditioning company.**

Q. Strictly air conditioning?
**A. Say it again, please.**
Q. Does it strictly do air conditioning services or is it a full-service HVAC company?
**A. I don't know.**
Q. Okay. I'm going to share my screen. You see this, ma'am?
**A. Yes.**
Q. Okay. This is going to be marked as Exhibit 1. This is a Division of Corporations of the State of Florida website entry for an ASAP Air Mechanical Team, Inc. Do you see that, ma'am?
**A. Yes.**
Q. Okay. It states that it was filed and created on July 26th, 2018. Does that sound right to you?
**A. I'm -- I'm just looking at the thing. I mean. . .**
Q. Right. But do you understand that -- I'm going to refer to as ASAP throughout this deposition -- do you understand ASAP was formed in or around July of 2018?
**A. Yes.**
Q. Okay. And this mailing address here, 4160 NE 20th Street, Homestead, Florida, 30333, that is the address we just talked about where you currently live?
**A. Yes.**
Q. And this is your name right here, Veronica Paz-Borrego,



underneath the registered agent name and address?
**A. Yes.**
Q. Okay. It also states that officer and director, you are the officer and director. Do you understand that to be true?
**A. Yes.**
Q. Okay. Did you fill out this form to create ASAP Air Mechanical Team, Inc.?
**A. No.**
Q. Okay. Who did?
MR. SCHWITALLA: Objection to the form of the question.
You can answer, if you know.
**THE WITNESS: My husband, I guess. Yeah.**
BY MR. CREAL:
Q. Okay. Are you saying that your husband formed this company without your knowledge?
**A. Well, it's, you know, yes.**
Q. But you now know that this company exists and that you are the owner and registered agent of ASAP, correct?
MR. SCHWITALLA: Object to the form of the question.
You can answer, if you know.
**THE WITNESS: Well, I don't know.**
BY MR. CREAL:



Q. Let me ask you this: Before today did you know that you were the owner and registered agent of ASAP Air Mechanical Team, Inc.?
MR. SCHWITALLA: Object to the form of the question.
You can answer, if you know.
**THE WITNESS: Yes.**
BY MR. CREAL:
Q. Okay. When did your husband inform you that you were the owner and registered agent of ASAP?
MR. SCHWITALLA: Objection to the form of the question.
You can answer, if you know.
**THE WITNESS: When all this case started.**
BY MR. CREAL:
Q. And you're referring to the case that was filed originally in Michigan, Eastern District of Michigan, against ASAP and you and your husband individually, correct?
**A. Yes.**
Q. That was filed by an Engineered Comfort Systems, Inc., or ECS, true?
**A. Yes.**
Q. Okay. So you first found out when that lawsuit was filed that you were affiliated with ASAP Air Mechanical Team,



Inc.?
**A. Can you repeat that question, please?**
Q. Sure. It wasn't until that lawsuit was filed in the Federal Court in the State of Michigan that you became aware of your affiliation with ASAP?
**A. Yes.**
Q. Did you find out when you were served or what was the -- what caused you to find this out?
**A. Yes. When everything, you know, was filed, when we received the papers.**
Q. Okay. What was your reaction?
**A. Surprise.**
Q. And what did your husband tell you when you asked how you were affiliated with this company?
**A. Listen, I don't have nothing to do with this. He just told me what happened and, you know, we talked with our lawyer, he explain everything. And, yeah, it was surprise because I had nothing to do with this. My name is there, but I had nothing to do with it.**
Q. Okay. Yeah. I appreciate that, ma'am, but I am going to bring you back to my question which was, you know, what did your husband say to you when you guys were served with the papers and you said why am I affiliated with this?
MR. SCHWITALLA: I'm going to ask you to hold

Page 14

on for a second, Counsel. I need to take a quick look at the husband-wife privilege in the State of Florida. I think it might be confined just to issues of -- of criminal, but just I'm going to ask for a brief pause for one moment, please. Because I don't want her to waive any husband-wife communication privilege unless -- unless she does so intelligently. So I'm going to beg your indulgence for just a moment.

VIDEOGRAPHER: Do we want to go off the record?

MR. CREAL: Yeah, we'll go off the record.

MR. SCHWITALLA: Thank you.

VIDEOGRAPHER: Off the record at 10:19 a.m.

(At 10:19 a.m., off the record.)

(At 10:21 a.m., back on the record.)

VIDEOGRAPHER: Back on the record at 10:21 a.m.

MR. SCHWITALLA: Thank you, Mr. Ricker, for the opportunity to take that brief recess.

Under Florida law the debtor, the defendant in this case, has a husband-wife privilege under -- in the State of Florida to not disclose confidential communications between them. So if Defendant, the examinee in this case, Ms. Paz-Borrego, wishes to not disclose private communications between her and her husband, she's not obligated to do so.

I will note for the record that Mr. Borrego's

Page 15

deposition is scheduled for tomorrow and you can ask him about his knowledge of things in that regard tomorrow. But it's up to Ms. Borrego if she wants to assert the privilege.

BY MR. CREAL:

Q. Ms. Borrego, do you wish to assert the privilege between communications between yourself and your husband related to the question I asked you earlier, which was what was your reaction when you were served with papers?

**A. No, I don't feel comfortable to talk about that right now.**

Q. Are you -- are you asserting your privilege, ma'am, that does not require you to speak about those communications?

**A. Ask me again. I'm sorry.**

Q. Are you asserting your privilege, which allows you to refrain from speaking about those particular communications between you and your husband?

**A. No.**

Q. No, you're not asserting that privilege?

**A. I mean you're asking me, if I'm correct, if I want to discuss with you what we talked. No.**

Q. Okay. I'm not trying to trick you, ma'am. You are -- you are asserting your privilege under Florida law to not discuss communications between yourself and your husband related to my questions?

Page 16

**A. Yes.**

Q. Correct?

**A. Yes, that's correct.**

Q. All right. Let's move on. Have you since learned that you are the sole owner, the hundred percent owner, of ASAP Air Mechanical Team, Inc.?

MR. SCHWITALLA: Object to form of the question.

BY MR. CREAL:

Q. You can answer.

**A. As in, like I said before, I don't have nothing to do with the company.**

Q. Okay. But -- but you have since learned, my question is, have you since learned that you are the 100 percent sole owner of ASAP?

**A. Yes.**

Q. Okay. Who is Maria Montesinos?

**A. Me.**

Q. Okay. Who is Veronica Paz-Borrego?

**A. I am.**

Q. Okay. Explain that to me.

**A. That was my previous -- I was married with -- that was my -- my first married last name.**

Q. Okay. And then when you remarried, you changed your last name and changed your first name to Veronica?

Page 17

**A. My name is Maria. My -- my name from birth Maria Veronica Paz. So I just when I did my citizenship I changed my name to just Veronica Paz-Borrego.**

Q. Okay. When did you become a US citizen?

**A. It was like, oh, my God, I'm not really sure what was the year, but years ago.**

Q. I'm going to introduce Exhibit 2. This was produced, let's see, partial company tax return produced as part of discovery responses from the defendants in this case. It's page 57 and you answered my question, but just to confirm, the shareholder Maria V. Montesinos, that -- that is you, ma'am?

**A. Yes.**

Q. And you'd agree that insofar as this document states, you are the hundred percent sole owner of ASAP Air Mechanical Team, Inc.?

**A. Yes.**

Q. Okay. Introducing into the record Exhibit 2(A), this also answers my question, Maria Veronica Montesinos is the registered agent under the electronic articles of incorporation for ASAP Air Mechanical Team, Inc. Ma'am, do you agree with that?

**A. Yes.**

Q. What is this address here, the principal place of business, 14473 SW 155 Place, Miami, Florida, 33196?

Page 18

**A. That was a house we used to rent years ago.**
Q. Prior to 2017 when you bought the other property?
**A. I'm not really sure because we rent a couple of properties.**
Q. Okay. You no longer rent this property?
**A. No.**
Q. Have you ever seen this document before today, ma'am, this electronic articles of incorporation?
**A. No.**
Q. Is it fair to say that you've now known about ASAP as a company and its existence for the past two years or so?
**A. I mean I knew about ASAP, but that's it. I mean. . .**
Q. What did you -- what did you know about ASAP prior to the lawsuit?
**A. That it's an air conditioning company.**
Q. Okay. Obviously you didn't know your affiliation with it in any way. But did you know about your husband in relation to that company in any way?
**A. I mean he was managing the company.**
Q. He was managing ASAP?
**A. Yes.**
Q. Okay. When did he start managing ASAP?
**A. I'm not sure.**
Q. Can you ballpark it for me?
**A. Honestly, no.**

Page 19

Q. All right. Well, you guys moved into this current house in 2017, ASAP was formed in 2018. Do you recall around that time period if he was, in your understanding, the manager of ASAP at that time?
**A. No.**
Q. It was later?
**A. Honestly, I don't know.**
Q. All right. Was it before or after March 2020 when we all went into lockdown for COVID-19?
**A. I don't know.**
Q. You remember COVID-19, right?
**A. Oh, yes. Of course.**
Q. Yeah.
So -- so when -- when we were all locked in our houses for a period of months, were -- was, to the best of your knowledge, again, not getting into conversations, but to the best of your knowledge, husband managing operations for ASAP at that time?
**A. I don't know.**
Q. Do you know how many people that ASAP employs?
**A. No.**
Q. Do you know any other employees with ASAP besides your husband?
**A. No.**
Q. Is the extent of your knowledge about the company that

Page 20

your husband is the manager of ASAP and does all the work for ASAP?
**A. Yes.**
Q. Okay. And at the time whenever you are referring to when he was doing this work, did you also understand that he was working for my client ECS?
**A. I don't know.**
Q. All right. Did you understand that in 2011 that your husband was hired by a company called ECS?
**A. Yes.**
Q. Okay. What do you know about ECS?
**A. That he opened ECS. He helped to open ECS.**
Q. When you say "open," you mean he helped to found ECS as a company?
**A. Yes.**
Q. And that would have been around 2011-ish?
**A. I'm not really sure what was the year, to be honest with you. I'm not very good with years.**
Q. Okay. That's fair.
Do you know who he founded ECS with?
**A. Yes.**
Q. Who was that?
**A. Ron Rodorigo.**
Q. Ron Rodorigo?
**A. Yes.**

Page 21

Q. How do you know Ron Rodorigo?
**A. Because he was the owner of the company.**
Q. Fair.
Prior to starting the company, did you know Ron Rodorigo personally?
**A. No.**
Q. Did you have any knowledge of who Ron Rodorigo was before he and your husband founded ECS?
**A. No.**
Q. Did you meet Ron Rodorigo after he and your husband founded ECS?
**A. Yes.**
Q. What were your impressions of Ron Rodorigo?
**A. (No response.)**
MR. CREAL: James, we're going to have to either -- we can hear the court.
MR. SCHWITALLA: Okay. The judge took the bench. I think they're going to call my matter. It's going to be brief. If we could just take a recess, I will interrupt the court proceedings and ask them to please call my matter first.
MR. CREAL: Yeah, that's fine.
MR. SCHWITALLA: Thank you very much.
MR. CREAL: Off the record.
VIDEOGRAPHER: Off the record at 10:32 a.m.

(At 10:32 a.m., off the record.)
(At 10:50 a.m., back on the record.)
VIDEOGRAPHER: Back on the record at 10:50 a.m.
MR. CREAL: Could you read the last question, please?
(At 10:50 a.m., the previous question was read back by the court reporter.)
MR. CREAL: Okay. So I'll start there.
BY MR. CREAL:
Q. Veronica, when you first met Ron Rodorigo after they had formed ECS -- "they" being Ron and your husband, according to your testimony -- what was your impressions of Mr. Rodorigo?
**A. At that time I thought he was a good person.**
Q. Did you understand at any point the ownership structure between your husband and Ron Rodorigo?
**A. No.**
Q. Did you ever ask?
**A. Well, it was just, you know, his job. My husband's job.**
Q. Well, it was your husband's company, according to your testimony, right?
**A. My husband's company?**
Q. Yeah. You testified that he was one of the founders. It wasn't just his job, it was his company, right?
**A. No. I said he help --**



Q. Okay.
**A. -- to open. It wasn't his company. It was Ron Rodorigo's company.**
Q. Okay. Does Ron Rodorigo live near you in Florida?
**A. No.**
Q. Where is he based?
**A. I don't know. I don't know right now.**
Q. Okay. So starting around 2011, your husband started working for ECS. How long did he work for ECS?
**A. For -- I'm not sure exactly how many.**
Q. When did he stop work for ECS?
**A. I'm not sure.**
Q. I know you can't tell me when exactly he started working for ASAP, but did you understand that he was working for ASAP and ECS at the same time?
**A. No.**
Q. No, you didn't understand that or no, he wasn't?
**A. No, I don't know.**
Q. Did your husband work five days a week?
**A. My husband used to work every day.**
Q. He would work seven days a week back in the late 20 teens?
**A. I'm not sure. I can't tell you that right now.**
Q. Okay. At this -- at the time in the late 20 teens were you -- you were working separately and he was working for



ECS and ASAP, right?
**A. Can you repeat the question, please?**
Q. Yeah, in the late 20-teens pre-COVID, were you actively employed at that time?
**A. '18?**
Q. Yeah. 2018, 2019.
**A. I'm not sure. '18. Well, '19 I was working in -- as a store manager.**
Q. Okay. So you were going to work five days a week. You didn't necessarily know what your husband was doing for work during that time, he just -- you just knew he was at work, fair?
**A. That's correct.**
Q. Did you have at any point in time any role with ASAP?
**A. No.**
Q. Not even like administerial, doing some bookkeeping or occasional cashing of a check?
**A. No.**
Q. Did ASAP have a business account that you were aware of?
**A. A business account. Well, I think that I -- I went to my husband with my husband to a bank to open an account.**
Q. Okay. What was that bank?
**A. Truist.**
Q. Do you know when that was?
**A. I'm not sure.**



Q. Do -- does your family also have like a family bank account or is it you and your husband have a bank account?
**A. Yeah, we have a personal bank account.**
Q. Is it also at Truist Bank?
**A. No.**
Q. Where is that?
**A. It's a Chase account.**
Q. Were you involved at all in the payment of any employees, subcontractors, bookkeepers, anybody for ASAP?
**A. No.**
Q. Okay. What is your understanding, if anything, of the differences between what ECS did for business and what ASAP does?
**A. What can I say? It's an air conditioning company.**
Q. They both are?
**A. Yes.**
Q. Do you know if they also do heating and ventilation services or. . .
**A. No.**
Q. Your understanding, to the extent that you understand the differences between the two companies, are that they do largely the same thing; is that fair to say?
**A. I'm not sure. I just know that they're air conditioning company.**

Q. That both of them are air conditioning companies, right?
**A. I'm sorry, you froze for a minute.**
Q. Yeah, no worries.
Your understanding is that both ECS and ASAP were at least, in part, air conditioning companies, right?
**A. I mean they were air conditioning companies.**
Q. Okay. Did you -- I'm going to share my screen. Did you ever see any employment contract that your husband had at ECS?
**A. Employment -- no.**
Q. Were you aware of your husband ever signing an employment contract with ECS?
**A. No.**
Q. So you would not have been aware -- I'm introducing Exhibit 3 -- of a confidentiality and noncompetition agreement as part of his employment contract with ECS?
**A. No.**
Q. You've never seen this document before?
**A. No.**
Q. Do you understand generally what a noncompetition and confidentiality agreement means?
**A. Yes.**
Q. What is that understanding?
**A. I mean I understand that, you know, if you work for a**



**company, you just work for that company. I mean. . .**
Q. Okay. So let me parse that out a little bit. Is it your understanding that, generally speaking, not referring to Exhibit 3 necessarily, but generally speaking, that noncompetition agreements signed with companies prohibit employees from competing with other companies in the same space?
**A. I'm not sure.**
Q. You've never signed a noncompetition agreement yourself at any point in time?
**A. No.**
Q. Do you have any role with ECS?
**A. No.**
Q. If you had to ballpark how many hours a week your husband used to work for ECS, what would you say that that number was?
**A. Can you repeat the question, please?**
Q. Sure. If you had to estimate how many hours a week your husband used to work for ECS, how many hours would you say that he worked?
**A. A lot.**
Q. Okay. And you said he worked seven days a week?
**A. Seven days a week?**
Q. That's what you testified.
**A. I mean he has his work, but sometimes when he has to work**



**on the weekends, you know, he did it.**
Q. Do you know if your husband was paid salary?
**A. Salary. I'm not sure.**
Q. Okay. Do you know if he earned any commission or if he was an hourly employee?
**A. I'm not sure.**
Q. He never mentioned like wow, I've got to go do this job on the weekend because it's time and a half pay or something like that?
**A. No.**
Q. Did he have to wear a particular uniform when he went to work for ECS?
**A. No. Sometimes they used the -- the shirts with the logo.**
Q. Okay. Did you ever see him wear shirts with the logos that had ASAP on it?
**A. No.**
Q. Do you know if ASAP had any clothing or uniforms that your husband would wear at any point?
**A. No.**
Q. "No," you don't know or "no," they didn't have that?
**A. No, I never saw that.**
Q. Did you understand at any point of any customers that ASAP serviced or who those customers were?
**A. No.**
Q. Do you know how much ASAP paid your husband?



**A. No.**
Q. Okay. I'm going to mark Exhibit 4 here, ma'am. These are also produced pursuant to discovery responses, page 128. Can you see this on my screen, ma'am? These are two checks.
**A. Yes.**
Q. This is Check Number 226951 and Check Number 226952. Do you agree with that?
**A. Yes.**
Q. Okay. And those are made out to Theodore Borrego. That's your husband, correct?
**A. That's correct.**
Q. And check header it says "ASAP Air Mechanical Team, Inc." True?
**A. Yes.**
Q. And then the memo line says "payroll." One's on October 9th, 2023. One's on October 23rd, 2023. Do you agree with that?
**A. I can't see it very well, but. . . It's small.**
Q. Is that clearer?
**A. Yes.**
Q. Says "payroll 10/9/2023"?
**A. Yes.**
Q. Okay. One check's for $3,000 and one's for $3300. Do you understand that to be true?

Page 30

**A. Yes.**
Q. And then this first check from 10/9, is that your husband's signature?
**A. Yes.**
Q. Who is the signature here on the bottom right on the second check?
**A. Can you put it a little bit bigger, please?**
**That's my signature.**
Q. Okay. So you agree with me that your signature is signing a check made out to your husband from ASAP Air Mechanical Team, Inc. on October 23rd, 2023, for $3300. Right?
**A. That's my signature.**
Q. Okay. Do you have any reason to believe that you actually did not sign this check?
**A. No.**
Q. Okay. So when we talked earlier about your role at ASAP and you said you never heard of it until the lawsuit, you never, you know, did any work for it, I'm going to ask you again, what other work did you do for ASAP besides creating the company, apparently, and signing this check?
**A. Nothing else. If I had to sign something, if, you know, he's my husband, you know. I didn't ask anything, you know, I trust him.**
Q. Okay. So if your husband put a check in front of you for

Page 31

ten grand and said pay this to me and just sign this, you would have signed it?
**A. Yes.**
Q. Is it fair to say you did not make the decision as to how much money to pay your husband from ASAP?
**A. No.**
Q. Is it your understanding that he made the decision what to pay himself from ASAP?
**A. Yes.**
Q. Did ASAP have a lease with any commercial building, do you know?
**A. No. I don't know.**
Q. We talked earlier about how the registered agent is your family's home address. Are you aware of any other building which ASAP was operating out of?
**A. No.**
Q. "No," you don't know, or "no," there was no other building?
**A. I don't know.**
Q. Do you know if ASAP owned any materials or things to be used in servicing air conditioners?
**A. I don't know.**
Q. Do you know if your husband ever had a truck or a van that had ASAP written on it?
**A. No. I don't know.**

Page 32

Q. When he went to work for ASAP, did he just take his normal car?
**A. Yeah. He has his car.**
Q. Okay. What kind of car is it?
**A. Now he has a black truck.**
Q. What kind of truck?
**A. It's a Chevy Silverado.**
Q. Do you know the year?
**A. I'm not sure.**
Q. Do you know when he got it?
**A. When he got it?**
Q. Yeah.
**A. A couple of years ago.**
Q. Did he buy it or lease it?
**A. Well, it's -- we buy it. We bought it.**
Q. It doesn't have any markings on it like ASAP or Mechanical or anything like that?
**A. No.**
Q. Did your husband ever mention to you if ASAP -- he was doing ASAP work at your home?
**A. Can you repeat the question, please?**
Q. Sure. Did your husband ever mention to you that he was running the ASAP business out of your home?
**A. No.**
Q. To your knowledge, did the company pay any rent to

Page 33

anybody?
**A. No. I have no idea.**
Q. I'm going to mark Exhibit 5. Ma'am, do you see this first check here? It's check 226927 for 4200?
**A. Yes.**
Q. And you agree it's on the same ASAP Mechanical Team, Inc., header and it's dated April 1st, 2023; is that fair?
**A. Yes.**
Q. Okay. And that check is made out to you, correct?
**A. Yeah. That's my name.**
Q. Signed by your husband, true?
**A. Yes.**
Q. And memo line says "Rent - January, February and March." Correct?
**A. Yes.**
Q. Okay. I know that's three years ago. Do you remember cashing this check?
**A. No.**
Q. Okay. Do you know have you ever seen this check before?
**A. No.**
Q. Do you know to whom -- or do you know why your husband would be making a check out to you for rent payments when the company was registered to your home address?
**A. No.**

Q. He never told you?
**A. No.**
Q. Ma'am, you understand that we -- "we" being ECS -- or my office sent what are called discovery requests to your attorney and you and your husband? Do you recall reviewing those and responding to those discovery requests in the past couple months?
**A. Can you repeat the question, please?**
Q. Yes. We sent -- as part of this lawsuit, we sent discovery requests. They're written questions to you and your husband through your attorney. Do you recall reviewing discovery requests in general and answering them the past couple months?
**A. I was there with my husband, yes.**
Q. I'm going to show you some of those, and we'll talk through a few of them, okay? I'm marking as Exhibit 6, these are Defendant's Responses to Requests for Admission. Does this look familiar to you, ma'am? Some of these requests for admission?
**A. Yes.**
Q. And you sat -- you sat with your husband and your counsel and filled out these responses, correct?
**A. Yeah, I was there. Yes.**
Q. Okay. You and your husband answered these questions to the best of your knowledge?



**A. I mean it was him, like I said. I don't know anything about this. I was there because I needed to be there.**
Q. Okay. You had no -- your testimony is you had no input in the answering of these questions.
**A. No.**
Q. Request for admission number "Admit that after ASAP was formed and while Defendant Borrego was still employed by ECS, ASAP solicited or performed HVAC work for at least one ECS customer."
You and your husband answered that "Defendants deny that after ASAP was formed and while Defendant Borrego was still employed by ECS, ASAP solicited HVAC for at least one ECS customer; however Defendants admit that after ASAP was formed and while Defendant Borrego was still employed by ECS, ASAP performed HVAC work for at least one former ECS customer." Do you see that?
**A. Yeah. I'm. . .**
Q. Do you recall who this former ECS customer was that your husband performed work for?
**A. No.**
Q. I want to introduce Exhibit 7. These are your responses to interrogatories. Same thing, do you recognize these requests and did you have any role in answering these?
**A. No.**
Q. I'll break that up. Do you recognize these -- these



interrogatories?
**A. I mean, yes, I seen it before.**
Q. Okay. And here at the bottom, that is your signature stating that you are signing under oath, that these are true and correct, to the best of your knowledge?
**A. Yeah. I mean what I know and what I -- I don't know. I have to sign it, right?**
Q. Yeah. You understood these to be sworn statements under oath, correct?
**A. Yes, that's correct.**
Q. So I mean you read these responses and to the best of your knowledge were contributing the answers, right?
**A. Yes.**
Q. Interrogatory Number 2 asks to identify each ASAP customer that you contacted or visited on behalf of ASAP between January 1, 2021, and October 23rd, 2023. States -- your response is that "there were none."
You never visited or contacted any customer on behalf of ASAP, correct?
**A. That's correct.**
Q. Interrogatory Number 4 requests all payments made to ASAP or any Defendants by Atlantic III, the amounts paid, and then it gets to any reported tax returns, to which the response was "ASAP's last filed tax return was for the 2019 year." Do you see that response, ma'am?



**A. Yes.**
Q. Why did ASAP not file taxes after 2019?
**A. I don't know.**
Q. Did you -- did ASAP have a CPA that it used to prepare its taxes?
**A. Oh, well, we have a person, but that person died.**
Q. Okay. Who was that person?
**A. Who it was? I don't remember the name, but I'm not really sure.**
Q. When did he or she die?
**A. I'm not sure.**
Q. All right. Is your testimony that ASAP stopped preparing tax returns because the CPA died?
**A. I mean that person, I mean he did our personal taxes. That's the way I know him, but that's it.**
Q. Okay. Do you know if he did your personal taxes and the company taxes or just your personal taxes?
**A. I guess it's the same person. I'm not sure.**
Q. Was 2019 also the last year that you and your husband filed personal tax returns?
**A. No.**
Q. You filed tax returns up to 2025?
**A. We do it every year.**
Q. Okay. Do you have any insight as to why ASAP stopped filing tax returns in 2019?

**A. No. I mean I don't know. I don't have nothing to do with that.**
Q. Did you provide any documents to your tax preparer before he passed away?
**A. No.**
Q. I'm introducing Exhibit 8. These are Defendants Responses to Requests to Produce. Same question as the last two, ma'am, do you recognize going trough these document response requests and producing documents in this case?
**A. Yes.**
Q. And we've gone over some of those documents that you've produced, right?
**A. Yes, that's correct.**
Q. Okay. Were you involved in the collection of those documents at all? There are about 360 documents.
**A. Yes, like to the bank.**
Q. So you went to the bank and pulled the bank statements?
**A. Well, yes.**
Q. Requested to pull the bank statements and then they gave you bank statements?
**A. Exactly.**
Q. Okay. We asked a lot of these are for communications relating to ASAP's formation, communications, text messages, e-mails between ASAP employees and customers.



There were no communications whatsoever in the discovery requests responses. Are you aware of any communications between yourself or your husband and any customer of ASAP?
**A. No.**
Q. Did you personally search your e-mail for any communications that might have been related to ASAP business customers?
**A. No.**
Q. Why not?
**A. Because I had nothing to do with this.**
Q. So you just said well, there's no way I have anything, I'm not even going to look?
**A. No.**
Q. Okay. So my question is why in response to these requests did you not conduct a search of your e-mails, text messages, Facebook messages, as this requires, to be able to rule out whether or not there's any communications?
**A. I'm not sure what you're asking me.**
Q. I'm asking why in response to our request for communications did you not look for any communications?
MR. SCHWITALLA: Object to the form of the question.
You can answer.



**THE WITNESS: I don't know.**
BY MR. CREAL:
Q. If I told you these requests right here require you to search for communications on your personal e-mail and your devices, would you be willing to do that in response to these requests?
**A. No, I don't have -- I never had any communication with nobody.**
Q. But you don't know that, right? Because you haven't looked?
MR. SCHWITALLA: Object to the form of the question.
You can answer.
**THE WITNESS: I don't -- I never have any -- I mean I have my e-mail, my personal e-mail. I never have like no communication with nobody.**
BY MR. CREAL:
Q. You probably don't know the answer to this question, but in response to Number 7, which requested all operating agreements, partnership agreements, shareholder agreements, membership agreements, LLC agreements and similar documents relating to any business entity in which Defendant Borrego, your husband, holds or held any ownership, management or financial interest from 2018 to present, response was "The only business entity in which



Defendant Borrego holds or held any ownership, management or financial interest, other than the employment at ECS from 2018 to present, was ASAP, but that no documents as described in this request ever existed."
Did I read that correctly ma'am?
**A. I'm not -- honestly I don't understand what -- what is this?**
Q. Well, this is you and your husband's response to a request, in which he states that he held an ownership, management or financial interest in ASAP. And my question is what ownership, management or financial interest did your husband hold in ASAP?
**A. I don't know.**
Q. Because your paperwork says that you were the 100 percent sole owner. We agree on that right?
**A. Yes, my name -- my name was there. That's it.**
Q. Right. So what ownership, management or financial interest did your husband hold at the company?
**A. Right now?**
Q. Yeah, right now.
**A. Nothing.**
Q. What about in 2018?
**A. I'm not sure.**
Q. What about any time between 2018 and right now?
**A. I don't know.**

Page 42

Q. Is your husband still working for ASAP?
**A. No.**
Q. When did he stop?
**A. I don't know.**
Q. You're not aware of any other employees that ASAP had at any point in time?
**A. No.**
Q. All right, ma'am. We talked about how you went to Truist and requested and received bank statements, right?
**A. Yes.**
Q. Did you review those bank statements prior to your deposition today?
**A. No.**
Q. Did you review your bank statements prior to producing them in response to discovery requests?
**A. No.**
Q. Do you have access to those -- that bank account?
**A. No.**
Q. Are you a signer on any of the bank records?
**A. No. The account is closed.**
Q. I understand today. But I'm saying at any point in time were you able to sign on behalf of the company?
**A. Sign? No.**
Q. Ma'am, all due respect, I looked at a check in which you cut to your husband and signed it. So at some point in

Page 43

time, you obviously were a signer on the bank account, right?
**A. I signed something because he asked me. And I -- I honestly never pay attention to those things. Because I had nothing to do with that.**
Q. What do you pay attention to day-to-day with respect to your family finances?
**A. Listen, we have a personal account. You know, we pay our bills like when I was working, and that's it. His business, you know, it was him. Just him.**
Q. So all of the -- all of the family finances came out of the personal account?
**A. No. From our jobs.**
Q. No, I understand. Your jobs deposited money into your family personal account and you would pay your expenses out of that, right?
**A. Correct.**
Q. Those funds were not coming out of ASAP's bank accounts, correct?
**A. Correct.**
Q. Okay. And you know that because you have access to the personal accounts and are able to monitor that, right?
**A. Yes.**
Q. Okay. All right. Looking at Exhibit 9 here, introducing Exhibit 9, these are some select bank statements from

Page 44

ASAP Air Mechanical Team, Inc., at Truist Bank. Do you agree with that?
**A. Yes.**
Q. This is from June 30th of 2023. These are debit card purchase receipts from June 1st to June 8th, 2023. My first question to you, ma'am, is it looks like there's a number of transactions for food and groceries. Do you see that?
**A. Yes.**
Q. Is it true that your husband would use the debit card tied to the company ASAP account to purchase food and groceries for your family?
**A. That's what I'm looking at right now.**
Q. Do you know if that was an unusual arrangement?
**A. No.**
Q. Did your husband ever tell you that sometimes he would use the company debit card to pay for family expenses?
**A. No, he never told me that.**
Q. Is this the first time you're seeing these bank account statements in detail?
**A. Yes.**
Q. Is this a surprise to you that your husband was using company funds in a company in which you were the sole owner but had no knowledge of to pay for family expenses?
**A. Surprise?**

Page 45

Q. Yeah.
**A. No. I mean what do you want me to say? It's the first time I see that.**
Q. Is it -- is it surprising to you? I mean, you know.
**A. I know at that time he has his cards. I never pay attention to which card he was using. I mean. . .**
Q. How often would you regularly check your personal family account?
MR. SCHWITALLA: Object to the form of the question. I don't -- you can answer, if you know what he's asking.
BY MR. CREAL:
Q. How often do you check your personal family bank account?
**A. Often.**
Q. So you would notice if your family went to the grocery store and your husband paid for something with a card and it didn't show up on the personal account?
**A. I mean we had -- we had our credit cards also, you know.**
Q. Right. But these are, you know, debit card purchase for Popeye's. Debit card purchase for Chili's. Debit card purchase for a bakery. I mean you would notice if those came out of the personal family bank account, right?
**A. Yes. It would have -- yeah.**
Q. But it never triggered anything to you in this time period that all these expenses that were being paid for

were no where to be seen on family personal bank accounts, correct?
MR. SCHWITALLA: Object to the form. Lack of predicate.
BY MR. CREAL:
Q. It never registered to you, ma'am, that a variety of expenses in around June of 2023 that were paid for by your husband out of the corporate ASAP bank account never made its way in the form of a debit from the personal bank account that you two shared?
**A. No.**
Q. Introducing Exhibit Number 10. I don't think you know the answer to this, ma'am, but if you do, do you have any idea what these -- this is from December of 2023. There are two $1500 charges. One on December 4th, one on December 8th for $1500. One is for a Capital One phone payment. It appears to a customer ID that has your name, and one is for an internet payment upgrade. Do you see those two charges, ma'am?
**A. Yes.**
Q. Do you have any idea what phone or internet plan would cost $1500 payable within four days of each other in December of 2023?
MR. SCHWITALLA: Object to the form of the question. This appears to be a phone payment. This does



not appear to be a charge for phone service. So object to the form of the question.
BY MR. CREAL:
Q. Do you know what phone payment would be made in the amount of $1500 to an account apparently registered under your name?
**A. No.**
Q. Do you know what your family monthly phone bill is?
**A. Yes.**
Q. Is it $1500?
**A. No.**
MR. SCHWITALLA: Counsel, this is the payment apparently to Capital One. Apparently a payment to her Capital One bank account. I think that that's what the document shows.
MR. CREAL: Oh. It says "debit phone." So I'm asking if she knows about it, unless you do, it's her deposition.
MR. SCHWITALLA: Phone payment. Capital One. Capital One is not a phone company. Capital One is a credit card.
MR. CREAL: James, if you want to testify, I'd be happy to notice your dep too, but for now it's her dep. Thank you.
BY MR. CREAL:



Q. Ma'am, is it your read of these two payments that they are family expenses, one for internet, one for phone?
**A. No. I had no idea.**
Q. You had no idea whether or not the company had any phone or internet plan?
**A. No.**
Q. Have you ever heard of a Gemaire Distribution?
**A. Gemaire's an -- I -- I hear about Gemaire, of course. As a --**
Q. What is that?
**A. No, it's a -- you can see Gemaire everywhere in here.**
Q. Right. I'm asking you to testify what is it, what is Gemaire Distribution?
**A. I'm not sure. I know it has to be -- it has to do something with air conditioner, but I'm not sure what is it.**
Q. Okay. So fair to say that this large expense, 26,544, again, to your knowledge, is something related to the air conditioning and cooling business?
**A. Something related, yes.**
Q. All right. Introducing Exhibit 11. This is a February 2024 statement. About halfway down 12/5 -- or excuse me, 2/5 debit card purchase the City of Adventura. What is City of Adventura, Florida, ma'am?
**A. It's a like homestead. Like -- it's a city here in**



**Florida.**
Q. Does it have like a theme park or an attraction or anything?
**A. A theme park? Not that I know.**
Q. No?
**A. I'm not sure.**
Q. Could this just be like taxes or something?
**A. I have no idea.**
Q. That Chase bank account we talked about earlier, your family bank account, do you know if the last four digits were 4522?
**A. Our personal bank account?**
Q. Yes.
**A. Repeat the question, please.**
Q. Yeah. Do you know if the last four digits of the personal Chase bank account that your family has is 4522?
**A. No.**
Q. "No," it's not or "no," you don't know?
**A. No, it's not.**
Q. Okay. Do you know of any other bank account that has -- that's tied to you or your husband that has the last four digits of 4522?
**A. No. I don't know.**
Q. Have you ever asked your husband where he's transferring $5,000 to a bank account that you were unaware of?

Page 50

A. **No. I don't know.**
Q. Do you know what is Winsupply is?
A. **No.**
Q. Do you know who Alfredo Nieves is?
A. **No.**
Q. What about Oscar Rodriguez?
A. **Yes. Oscar, yeah, I know who Oscar Rodriguez is.**
Q. Who's Oscar Rodriguez?
A. **He used to work with my husband.**
Q. Okay. Was he part of ECS or was he part of ASAP?
A. **ECS.**
MR. SCHWITALLA: Object to form.
BY MR. CREAL:
Q. Okay. Do you know why -- let me back up on that. Oscar used to work with your husband at ECS only?
A. **Yes.**
Q. Do you have any idea why your husband would be paying Oscar Rodriguez $1190 out of a business account held by ASAP?
A. **No. I don't know.**
Q. Do you know who Robert Cerca is? Roberto Cerca?
A. **No.**
Q. Were there any other former employees of ECS who your husband would talk about he worked with at ASAP?
A. **No.**

Page 51

Q. All right. I'm introducing Exhibit 12. This is bank statement from April 30th -- excuse me, April 2024, April 1st to April 30th. Here's that Gemaire Distribution again, ma'am, but it has your name next to it. Do you have an account with Gemaire Distribution?
A. **No.**
Q. So this would have been an account created by your husband in your name for the benefit of ASAP?
A. **I don't know.**
Q. And you're not aware of what Winsupply is? Hardware supply?
A. **No.**
Q. You see here on 4/9 and 4/12 there's a $3,000 and a $1500 transfer to a mobile account ending in 4522?
A. **Yeah, I don't know. What is that?**
Q. I was going to ask you.
Does your family have Discover credit cards?
A. **We used to.**
Q. Okay. So these have been payments towards that.
Do you agree there's purchases on here from April 22nd to April 30th at a Publix in Florida, which is a grocery store, correct?
A. **Yes, that's correct.**
Q. Do you know who Rafael Oscarito Lizzy is?
A. **No.**

Page 52

Q. This is Exhibit 13. Do you know who Hanoi Hernandez is?
A. **No.**
Q. And again, there's a $5,000 transfer and a $10,000 transfer to 4522 last four digits bank account in which you testified you have no knowledge what that bank account is, right?
A. **Yes. I don't know.**
Q. And there's another payment to Oscar Rodriguez for $1,000. Do you know if Oscar is still employed at ECS?
MR. SCHWITALLA: Object to the form.
**THE WITNESS: No.**
BY MR. CREAL:
Q. "No," you don't know?
A. **He's not.**
Q. Okay. Do you know if he still works with your husband in any capacity?
A. **No.**
Q. All right. Introducing Exhibit 14. Ma'am, do you know who Pedro Chambachumbi is?
A. **No.**
Q. Have you ever heard of company called Atlantic III?
A. **No.**
Q. You've never seen any invoice on behalf of ASAP Air Mechanical Team?
A. **No.**

Page 53

Q. This is your home address, correct? 4160 NE 20th Street, Homestead, Florida?
A. **Yes.**
Q. Do you have access to the ASAPAirMechanicalTeam@yahoo.com e-mail?
A. **No.**
Q. Did you know that e-mail existed until right now?
A. **No.**
Q. Marking Exhibit 15. Do you -- have you ever heard of The Betsy Hotel?
A. **No.**
Q. Do you know where Ocean Drive is in Miami Beach, Florida?
A. **Yes.**
Q. How far is that from your house?
A. **Like an hour, an hour and a half.**
Q. But you've never stayed at The Betsy Hotel?
A. **No.**
Q. Do you know Brandon Campbell?
A. **No.**
Q. You've never seen these invoices either from ASAP to The Betsy Hotel?
A. **No.**
Q. Did your husband ever mention to you that he was really happy that he secured a contract with The Betsy Hotel?
A. **Hello? Hello?**

Q. Ma'am, are you there?
**A. Yeah. You froze for a minute again. Can you repeat the question?**
Q. Yeah. Did your husband ever mention to you that he was excited he secured contracts to do work for The Betsy Hotel?
**A. No.**
MR. SCHWITALLA: I object to the question. I'm going to instruct the client not to answer, unless she's willing to waive her spousal privilege.
MR. CREAL: I don't see how that would implicate anybody whatsoever in whether he talked about earning a contract with a vendor.
MR. SCHWITALLA: Well, previously your questions have been framed differently. This one is specifically asking for the communication that he provided to her. You could frame it in a different way and you might get the information you're looking for, but the way you framed it is requesting for her to disclose a positive communication from him to her. She can answer it if she wants to waive the privilege, but she stated already she does not wish to waive the privilege.
COURT REPORTER: And just so we're clear, she did answer. I don't know if you heard her.
MR. CREAL: Can you repeat the answer? I think she said no.



COURT REPORTER: She said no.
**THE WITNESS: I said no.**
BY MR. CREAL:
Q. Ma'am, did you open that Truist bank account on behalf of ASAP when it was initially formed?
**A. Yes.**
Q. So aside from opening a bank account, signing at least one check on behalf of the company to your husband, is there any other work that you did for ASAP in the time that it was an active company?
**A. No.**
Q. Is it still an active company?
**A. No.**
Q. Were you ever present for any meetings, phone calls with your husband and any customer?
**A. No.**
Q. Does he ever take work calls from your home, the registered business of ASAP?
**A. No.**
Q. Have you ever seen any customer lists for ECS as part of this lawsuit that we're here for today?
**A. No.**
Q. Have you reviewed any of the documents, including the complaint that was served on you, related to the lawsuit that we're here for today?



**A. Actually, no.**
Q. Why not?
**A. Because this is nothing to do with me.**
Q. Well, it does since you're a named defendant, right?
**A. Excuse me?**
Q. It does have something to do with you since you are a named defendant in this lawsuit?
**A. Unfortunately -- unfortunately because my name was there, but it's -- it was nothing to do with me.**
Q. Who do you fault for being involved in this lawsuit?
MR. SCHWITALLA: Object to the form of the question.
BY MR. CREAL:
Q. You can answer.
**A. To be honest with you, I'm very -- I was very surprised because all this happened. My husband help Ron Rodorigo, work for him, help him to build a company, and this happened. I was -- I was surprised and very disappointed. That's. . .**
Q. Disappointed with Ron?
**A. Yes, disappointed with him and with the situation.**
Q. Okay. Have you ever heard of First Choice Mechanical?
**A. No.**
Q. Have you ever heard of the name Maury Tarrago?



**A. Maury.**
Q. Yes.
**A. Tarrago?**
Q. Yes.
**A. I don't know is the same person, but Maury works for ECS. But I don't know if it's the same person. I'm not sure.**
Q. That's who I'm talking about, yeah. Maury. Former ECS -- or he's a current ECS employee?
**A. I don't know.**
Q. He worked with your husband during the same time frame?
**A. Yes.**
Q. Do you have any understanding as to why your husband went through all this effort to create ASAP?
**A. Could you repeat the question?**
Q. Yeah. Do you have any understanding why your husband went through all this trouble to create ASAP?
**A. I mean he was -- he wanted to be better and provide for his family.**
Q. And he wasn't doing that while working for ECS?
**A. He work for another person. You know, is -- its different when you work for yourself.**
Q. So your husband wanted to be his own business owner?
**A. I mean I think at some point everybody wants that, right? To be better.**
MR. CREAL: All right. Ma'am, I have nothing

further for you. I appreciate your time this morning.
Your attorney may have a few questions.
MR. SCHWITALLA: Just -- just briefly.
EXAMINATION
BY MR. SCHWITALLA:
Q. Ms. Paz-Borrego, counsel at some point during the questioning a number of times showed you some bank statements that contained entries from debit card purchases. Do you recall that earlier today?
**A. Oh, you're asking me? Sorry.**
Q. Oh, I apologize. I have just one question. One little kind of package of questions to you ask regarding some of the bank statements that counsel showed you earlier.
Do you recall earlier in today's deposition where counsel showed you some exhibits that were bank statements that reflected debit card purchases?
**A. No.**
Q. You don't recall him showing you bank statements earlier today that reflected debit card purchases?
**A. Oh, yes.**
Q. Okay. And those bank statements also showed transfers of money. Do you recall him showing you those transfers on those bank statements?
**A. Yes.**
Q. Okay. For this question is directed to all of those



transactions, did you make any of them?
**A. No.**
Q. To the best of your knowledge, were you present at any of those places where those transactions occurred?
**A. No.**
MR. SCHWITALLA: Okay. Nothing further.
VIDEOGRAPHER: Okay. With no further questions, this concludes today's deposition, and we are off the record at 11:49 a.m.
MR. SCHWITALLA: If a transcript is prepared, we would like to read.
MR. CREAL: Yeah, we'll take a mini.
COURT REPORTER: Okay. Thank you very much.
(At 11:49 a.m., deposition concluded.)



STATE OF ____________ )
)
COUNTY OF ___________ )

I, _____________________, being first duly sworn, depose and say: That I have read the transcript of the deposition given by me on the 19th day of May, 2026, at or about 10:07 a.m., via Zoom; that the same is correct and is an exact transcript of my testimony in the above-captioned case subject to the corrections hereinafter listed; and further, deponent says nothing.

SUBSCRIBED AND SWORN TO BEFORE ME ON THE _______ day of __________________, 2026.

________________________________
Notary Public

My commission expires: _________



STATE OF MICHIGAN )
) SS
COUNTY OF MIDLAND )

I certify that this transcript, consisting of 60 pages, is a complete, true, and correct record of the testimony of VERONICA PAZ-BORREGO, held in this case on May 19, 2026.

I also certify that prior to taking this deposition VERONICA PAZ-BORREGO, was duly sworn to tell the truth.

June 1, 2026 *Angela L. Chritz*

Angela L. Chritz, RPR, CSR-4305

Notary Public
Midland County; Midland, MI
My Commission Expires: 6-11-2031

### Exhibits

**Exhibit 1** 2:7 10:9
**Exhibit 2** 2:9,11 17:7,18
**Exhibit 2A**
**Exhibit 3** 2:13 26:16 27:4
**Exhibit 4** 2:15 29:2
**Exhibit 5** 2:17 33:3
**Exhibit 6** 2:18 34:16
**Exhibit 7** 2:20 35:21
**Exhibit 8** 2:22 38:6
**Exhibit 9** 2:23 43:24,25
**Exhibit 10** 3:3 46:12
**Exhibit 11** 3:4 48:21
**Exhibit 12** 3:6 51:1
**Exhibit 13** 3:7 52:1
**Exhibit 14** 3:9 52:18
**Exhibit 15** 3:10 53:9
**Exhibit 16**

### $

**$1,000** 52:9
**$10,000** 52:3
**$1190** 50:18
**$1500** 46:15,16,22 47:5,10 51:13
**$3,000** 29:24 51:13
**$3300** 29:24 30:11
**$5,000** 49:25 52:3

### 1

**1** 10:9 36:16
**10** 46:12
**10/9** 30:2
**10/9/2023** 29:22
**100** 16:14 41:14
**10:07** 4:1,3
**10:09** 5:19
**10:19** 14:12,13
**10:21** 14:14,15
**10:32** 21:25 22:1
**10:50** 22:2,3,6
**11** 48:21
**11:49** 59:9,14
**12** 51:1
**12/5** 48:22
**128** 29:4
**13** 9:19 52:1
**14** 52:18
**14473** 17:25
**15** 53:9
**155** 17:25
**18** 24:5,7
**19** 4:1 9:19 24:7
**19th** 4:3
**1st** 33:7 44:5 51:3

### 2

**2** 17:7 36:14
**2(A)** 17:18
**2/5** 48:23
**20** 23:21,24
**20-teens** 24:3
**2011** 20:8 23:8
**2011-ish** 20:16
**2017** 9:11 18:2 19:2
**2018** 10:15,19 19:2 24:6 40:24 41:3,22,24
**2019** 24:6 36:25 37:2,19,25
**2020** 19:8
**2021** 36:16
**2023** 29:17 30:11 33:7 36:16 44:4,5 46:7,14,23
**2024** 8:7 48:22 51:2
**2025** 37:22
**2026** 4:1,4
**20th** 9:9 10:21 53:1
**226927** 33:4
**226951** 29:7
**226952** 29:7
**22nd** 51:21
**23** 9:19
**23rd** 29:17 30:11 36:16
**24-CV-10924** 4:7,21
**25-1323-RAM** 5:5
**25-14217-RAM** 5:5
**26,544** 48:17
**26th** 10:15

### 3

**3** 26:16 27:4
**30** 7:24
**30333** 10:22
**30th** 44:4 51:2,3,21
**33033** 9:9
**33196** 17:25
**360** 38:16

### 4

**4** 29:2 36:21
**4/12** 51:13
**4/9** 51:13
**4116** 9:9
**4160** 10:21 53:1
**4200** 33:4
**4522** 49:11,16,22 51:14 52:4
**4th** 46:15

**5**

**5** 33:3
**57** 17:10

**6**

**6** 34:16

**7**

**7** 35:21 40:19

**8**

**8** 38:6
**8th** 44:5 46:16

**9**

**9** 43:24,25
**9th** 29:17

**A**

**a.m.** 4:1,3 5:19 14:12,13,14,15 21:25 22:1,2,3,6 59:9,14
**able** 39:18 42:22 43:22
**about** 5:14 6:12 9:20 10:23 15:2, 10,13,16 18:10,12,13,17 19:25 20:11 30:17 31:13 35:2 38:16 41:22,24 42:8 47:17 48:8,22 49:9 50:6,24 54:12 57:7
**access** 42:17 43:21 53:4
**according** 22:12,20
**account** 24:19,20,21 25:2,3,4,8 42:17,20 43:1,8,12,15 44:11,19 45:8,13,17,22 46:8,10 47:5,14 49:9,10,12,16,20,25 50:18 51:5,7, 14 52:4,6 55:5,8
**accounts** 43:18,22 46:2
**active** 55:11,13
**actively** 24:3
**actually** 30:15 56:2
**address** 9:8,10 10:21,22 11:1 17:24 31:14 33:24 53:1
**administerial** 24:16
**admission** 34:18,19 35:6
**admit** 35:6,13
**Adventura** 48:23,24
**adversary** 4:24 5:4,5
**affiliated** 12:25 13:14,23
**affiliation** 13:5 18:16
**affirm** 5:13
**after** 4:12 8:23 19:8 21:10 22:10 35:6,11,14 37:2
**again** 4:21 8:14 10:2 15:14 19:16 30:20 48:18 51:4 52:3 54:2
**against** 12:18
**agent** 11:1,20 12:2,10 17:20 31:13
**ages** 9:18
**ago** 7:24 17:6 18:1 32:13 33:17
**agree** 5:6 17:14,22 29:8,18 30:9 33:6 41:15 44:2 51:20
**agreement** 26:17,22 27:9
**agreements** 27:5 40:20,21
**air** 9:20,25 10:1,3,11 11:7 12:2,25 16:6 17:15,21 18:15 25:15,24 26:1,5,7 29:13 30:10 31:21 44:1 48:15,18 52:23
**Alfredo** 50:4
**allows** 15:15
**already** 54:22
**also** 11:3 17:19 20:5 25:1,5,18 29:3 37:19 45:18 58:21
**am** 4:15 6:1 13:20,23 16:20
**amount** 47:5
**amounts** 36:22
**Andrew** 4:14 5:25
**Angela** 4:9
**another** 8:24 52:8 57:20
**answer** 6:25 7:7,10 11:13,23 12:6,13 16:10 39:25 40:13,18 45:10 46:13 54:9,20,24,25 56:15
**answered** 17:10 34:24 35:10
**answering** 34:12 35:4,23
**answers** 6:16,19 17:19 36:12
**any** 7:9,25 8:13,15 9:14 14:6 18:17,18 19:22 21:7 22:15 24:14 25:9 26:9 27:10,12 28:4,17,18,22 30:14,19 31:10,14,20 32:16,25 35:23 36:18,22,23 37:24 38:3 39:2,3,6,18,22 40:7,14,22,23 41:1,24 42:5,6,19,21 46:13,21 48:4 49:20 50:17,23 52:16,23 55:10,15,16,21,24 57:12,15 59:1, 3
**anybody** 9:12 25:10 33:1 54:12
**anything** 8:1 25:12 30:23 32:17 35:1 39:12 45:24 49:3
**apologize** 58:11
**apparently** 30:21 47:5,13
**appear** 47:1
**appears** 46:17,25
**appreciate** 6:1 13:20 58:1
**April** 33:7 51:2,3,21
**around** 10:19 19:2 20:16 23:8 46:7
**arrangement** 44:14
**articles** 17:20 18:8
**ASAP** 9:20 10:11,18,19 11:7,20 12:2,10,18,25 13:5 16:6,15 17:15, 21 18:10,12,13,20,22 19:2,4,18, 20,22 20:1,2 23:14,15 24:1,14,19 25:10,14 26:4 28:15,17,23,25 29:13 30:10,17,20 31:5,8,10,15, 20,24 32:1,16,19,20,23 33:6 35:6, 8,11,12,14,15 36:14,15,19,21 37:2,4,12,24 38:25 39:4,7 41:3, 10,12 42:1,5 44:1,11 46:8 50:10, 19,24 51:8 52:23 53:20 55:6,10, 19 57:13,16
**ASAP's** 36:24 38:24 43:18

**ASAPAIRMECHANICALTEAM @YAHOO.COM** 53:4

**aside** 55:8

**ask** 6:24 7:10 9:18,20 12:1 13:25 14:4 15:1,14 21:20 22:18 30:19, 23 51:16 58:12

**asked** 13:13 15:8 38:23 43:3 49:24

**asking** 15:20 39:20,21 45:11 47:17 48:12 54:16 58:10

**asks** 36:14

**assert** 15:3,6

**asserting** 15:12,15,19,23

**assume** 7:1

**Atlantic** 36:22 52:21

**attention** 43:4,6 45:6

**attorney** 4:15 6:1 34:5,11 58:2

**attraction** 49:2

**aware** 13:5 24:19 26:12,15 31:14 39:2 42:5 51:10

**away** 38:4

**B**

**back** 13:21 14:14,15 22:2,3,7 23:21 50:14

**background** 6:9 7:15

**bakery** 45:21

**ballpark** 18:24 27:14

**bank** 24:21,22 25:1,2,4,5 38:17, 18,20,21 42:9,11,14,17,19 43:1, 18,25 44:1,19 45:13,22 46:1,8,10 47:14 49:9,10,12,16,20,25 51:1 52:4,5 55:5,8 58:7,13,15,18,21,23

**Bankruptcy** 6:8

**based** 23:6

**basic** 6:9

**Beach** 53:12

**Beauty** 8:9,12,13,17

**became** 13:4

**because** 6:19 8:20 13:18 14:5 18:3 21:2 28:8 35:2 37:13 39:11 40:9 41:14 43:3,4,21 56:4,9,17

**become** 17:4

**been** 5:19 6:5 8:1 9:10 20:16 26:15 39:7 51:7,19 54:15

**before** 6:5 12:1 16:11 18:7 19:8 21:7 26:19 33:20 36:2 38:3

**beg** 14:7

**begins** 4:4

**behalf** 4:17 36:15,19 42:22 52:23 55:5,9

**being** 22:11 34:3 45:25 56:11

**believe** 30:14

**bench** 21:18

**benefit** 51:8

**besides** 19:22 30:20

**best** 19:15,17 34:25 36:5,11 59:3

**Betsy** 53:10,16,21,24 54:5

**better** 57:17,24

**between** 14:21,23 15:6,7,17,24 22:16 25:13,22 36:16 38:25 39:3 41:24

**bigger** 30:7

**bill** 47:8

**bills** 43:9

**birth** 17:1

**bit** 8:18 27:2 30:7

**black** 32:5

**bookkeepers** 25:10

**bookkeeping** 24:16

**born** 7:21

**Borrego** 4:6 5:18 15:3,6 29:10 35:7,12,14 40:23 41:1

**Borrego's** 14:25

**both** 4:10 7:1 25:16 26:1,4

**bottom** 30:5 36:3

**bought** 18:2 32:15

**Brandon** 53:18

**break** 7:9 35:25

**brief** 14:4,17 21:19

**briefly** 58:3

**bring** 13:21

**build** 56:18

**building** 31:10,15,18

**business** 17:25 24:19,20 25:13 32:23 39:8 40:22,25 43:10 48:19 50:18 55:19 57:22

**buy** 32:14,15

**C**

**cal** 5:23

**call** 21:18,21

**called** 5:19 8:11 20:9 34:4 52:21

**calls** 55:15,18

**came** 43:11 45:22

**Campbell** 53:18

**can** 6:12,16,24 8:24 11:13,23 12:6,13 13:2 15:1 16:10 18:24 21:16 24:2 25:15 27:17 29:4 30:7 32:21 34:8 39:25 40:13 45:10 48:11 54:2,20,25 56:15

**can't** 23:13,23 29:19

**capacity** 52:16

**Capital** 46:16 47:13,14,19,20

**car** 32:2,3,4

**card** 44:4,10,17 45:6,16,19,20 47:21 48:23 58:8,16,19

**cards** 45:5,18 51:17

**case** 4:6,19,22,23,25 5:2,4,7,14 12:14,16 14:19,22 17:9 38:10

**cashing** 24:17 33:18

**caused** 13:8

**Cerca** 50:21

**Chambachumbi** 52:19

**changed** 16:24,25 17:3

**charge** 47:1

**charges** 46:15,19

**Chase** 25:8 49:9,16

**check** 24:17 29:7,13 30:2,6,10, 15,21,25 33:4,10,18,20,23 42:24 45:7,13 55:9

**check's** 29:24

**checks** 29:5

**Chevy** 32:7

**children** 9:14

**Chili's** 45:20

**Choice** 56:23

**Chritz** 4:10

**citizen** 17:4

**citizenship** 17:2

**city** 48:23,24,25

**clear** 54:23

**clearer** 29:20

**client** 20:6 54:9

**closed** 42:20

**clothing** 28:17

**collection** 38:15

**college** 7:16,25

**Comfort** 4:5,16 12:21

**comfortable** 15:10

**coming** 43:18

**commercial** 31:10

**commission** 28:4

**communication** 14:6 40:7,16 54:16,20

**communications** 14:21,23 15:7,13,17,24 38:23,24 39:1,2,7, 19,22 40:4

**companies** 25:22 26:1,5,7 27:5, 6

**company** 8:20,24 9:22,24,25 10:4 11:17,19 13:14 16:12 17:8 18:11,15,18,19 19:25 20:9,14 21:2,4 22:20,22,24 23:2,3 25:15, 25 27:1 30:21 32:25 33:24 37:17 41:18 42:22 44:11,17,23 47:20 48:4 52:21 55:9,11,13 56:18

**competing** 27:6

**complaint** 55:25

**concluded** 59:14

**concludes** 59:8

**conditioner** 48:15

**conditioners** 31:21

**conditioning** 9:25 10:1,3 18:15 25:15,24 26:1,5,7 48:19

**conduct** 39:16

**confidential** 14:20

**confidentiality** 26:16,22

**confined** 14:3

**confirm** 17:11

**contacted** 36:15,18

**contained** 58:8

**contract** 26:9,13,17 53:24 54:13

**contracts** 54:5

**contributing** 36:12

**conversations** 19:16

**cooling** 48:19

**corporate** 46:8

**Corporations** 10:10

**correct** 4:22 5:6 11:20 12:19 15:20 16:2,3 24:13 29:11,12 33:10,15 34:22 36:5,9,10,19,20 38:14 43:17,19,20 46:2 51:22,23 53:1

**correctly** 41:5

**cost** 46:22

**could** 4:19 21:19 22:4 49:7 54:17 57:14

**counsel** 4:11 14:1 34:21 47:12 58:6,13,15

**couple** 18:3 32:13 34:7,13

**course** 5:24 19:12 48:8

**court** 4:9,12 5:11,17 6:9,19 13:4 21:16,20 22:7 54:23 55:2 59:13

**COVID-19** 19:9,11

**CPA** 37:4,13

**Creal** 4:14,15,24 5:3,10,22,25 6:4 11:15,25 12:8,15 14:10 15:5 16:9 21:15,22,24 22:4,8,9 40:2,17 45:12 46:5 47:3,16,22,25 50:13 52:12 54:11,25 55:4 56:14 57:25 59:12

**create** 6:20 11:7 57:13,16

**created** 10:14 51:7

**creating** 30:21

**credit** 45:18 47:21 51:17

**criminal** 14:4

**current** 19:1 57:8

**currently** 8:4 9:2,6 10:23

**customer** 9:5 35:9,13,16,18 36:15,18 39:3 46:17 55:16,21

**customers** 28:22,23 38:25 39:8

**cut** 42:25

**D**

**dated** 33:7

**day** 23:20

**day-to-day** 43:6

**days** 23:19,21 24:9 27:22,23 46:22

**debit** 44:4,10,17 45:19,20 46:9 47:16 48:23 58:8,16,19

**debtor** 14:18

**December** 46:14,15,16,23

**decision** 31:4,7

**defendant** 4:18 14:18,21 35:7, 11,14 40:23 41:1 56:5,8

**Defendant's** 34:17

**defendants** 17:9 35:10,13 36:22 38:6

**deny** 35:11

**dep** 47:23,24

**deposed** 6:5

**deposited** 43:14

**deposition** 4:4 6:7 10:18 15:1 42:12 47:18 58:14 59:8,14

**described** 41:4

**detail** 44:20

**devices** 40:5

**did** 7:23 8:13,15,17,19 11:7,10 12:1,9 13:7,13,22 17:2,4 18:13, 17,22 20:5,8 21:4,7,10 22:15,18 23:9,11,14,19 24:14,19 25:13 26:8 28:1,11,14,22 30:15,19,20 31:4,10 32:1,14,19,22,25 35:23 37:2,4,10,14,16 38:3 39:6,16,22 41:5,12,18 42:3,11,14 44:16 53:7, 23 54:4,24 55:5,10 59:1

**didn't** 18:16 23:17 24:10 28:20 30:23 45:17

**die** 37:10

**died** 37:6,13

**differences** 25:13,22

**different** 5:4 54:17 57:21

**differently** 54:15

**digits** 49:10,15,22 52:4

**directed** 58:25

**director** 11:3,4

**disappointed** 56:20,21,22

**disclose** 14:20,23 54:19

**Discover** 51:17

**discovery** 17:9 29:3 34:4,6,10, 12 39:1 42:15

**discuss** 15:21,24

**Distribution** 48:7,13 51:4,5

**District** 12:17

**Division** 10:10

**document** 17:14 18:7 26:19 38:9 47:15

**documents** 38:3,9,12,16 40:22 41:3 55:24

**does** 10:3,15 14:7 15:13 20:1 23:4 25:1,14 34:18 46:25 49:2 51:17 54:22 55:18 56:5,7

**doesn't** 32:16

**doing** 8:8 20:5 24:10,16 32:20 57:19

**don't** 6:10,23 7:5 10:5 11:24 13:15 14:5 15:10 16:11 19:7,10, 19 20:7 23:7,18 28:20 31:12,17, 19,22,25 35:1 36:6 37:3,8 38:1 40:1,7,9,14,18 41:6,13,25 42:4 45:10 46:12 49:18,23 50:1,20 51:9,15 52:7,13 54:11,24 57:5,6,9 58:18

**done** 7:25

**down** 6:20 48:22

**downsized** 8:21,23

**Drive** 53:12

**due** 42:24

**during** 24:11 57:10 58:6

**E**

**e-mail** 39:6 40:4,15 53:5,7

**e-mails** 38:25 39:16

**each** 36:14 46:22

**earlier** 15:8 30:17 31:13 49:9 58:9,13,14,18

**earned** 28:4

**earning** 54:13

**Eastern** 12:17

**ECS** 12:22 20:6,9,11,12,13,20 21:8,11 22:11 23:9,11,15 24:1 25:13 26:4,10,13,17 27:12,15,19 28:12 34:3 35:8,9,12,13,15,16,18 41:2 50:10,11,15,23 52:9 55:21 57:5,8,19

**Ecuador** 7:18,20

**educational** 7:15

**effort** 57:13

**either** 21:16 53:20

**electronic** 17:20 18:8

**else** 9:12 30:22

**employed** 8:4,6 24:4 35:7,12,15 52:9

**employee** 8:15,16 28:5 57:8

**employees** 19:22 25:9 27:6 38:25 42:5 50:23

**employment** 26:9,11,12,17 41:2

**employs** 19:20

**ending** 51:14

**Engineered** 4:5,15 12:21

**entity** 40:22,25

**entries** 58:8

**entry** 10:11

**estimate** 27:18

**et al** 4:6

**even** 9:18 24:16 39:13

**ever** 6:5 18:7 22:18 26:9,12 28:14 31:23 32:19,22 33:20 41:4 44:16 48:7 49:24 52:21 53:9,23 54:4 55:15,18,21 56:23,25

**every** 23:20 37:23

**everybody** 57:23

**everything** 6:20 13:9,17

**everywhere** 48:11

**exactly** 23:10,13 38:22

**EXAMINATION** 6:3 58:4

**examinee** 14:22

**excited** 54:5

**Exclusive** 8:12,13,17

**excuse** 48:23 51:2 56:6

**Exhibit** 10:9 17:7,18 26:16 27:4 29:2 33:3 34:16 35:21 38:6 43:24, 25 46:12 48:21 51:1 52:1,18 53:9

**exhibits** 58:15

**existed** 41:4 53:7

**existence** 18:11

**exists** 11:19

**expeditiously** 6:12

**expense** 48:17

**expenses** 43:15 44:17,24 45:25 46:7 48:2

**explain** 13:17 16:21

**extent** 19:25 25:21

**F**

**Facebook** 39:17

**fair** 7:2,11 18:10 20:19 21:3 24:12 25:23 31:4 33:8 48:17

**familiar** 34:18

**family** 25:1 43:7,11,15 44:12,17, 24 45:7,13,15,22 46:1 47:8 48:2 49:10,16 51:17 57:18

**family's** 31:14

**far** 53:14

**fault** 56:11

**February** 33:14 48:22

**Federal** 6:8 13:4

**feel** 15:10

**few** 34:16 58:2

**Fifty-two** 7:14

**file** 37:2

**filed** 10:14 12:16,21,24 13:3,9 36:24 37:20,22

**filing** 37:25

**fill** 11:7

**filled** 34:22

**finances** 43:7,11

**financial** 40:24 41:2,10,11,17

**find** 13:7,8

**fine** 6:24 7:9 21:22

**first** 6:15 12:24 16:23,25 21:21 22:10 30:2 33:4 44:6,19 45:2 56:23

**five** 23:19 24:9

**Florida** 9:7,9 10:10,22 14:2,18,20 15:23 17:25 23:4 48:24 49:1 51:21 53:2,12

**follows** 5:21

**food** 44:7,11

**form** 11:7,11,21 12:4,11 16:7 39:23 40:11 45:9 46:3,9,24 47:2 50:12 52:10 56:12

**formation** 38:24

**formed** 10:19 11:16 19:2 22:11 35:7,11,14 55:6

**former** 35:16,18 50:23 57:7

**Fortz** 4:10

**found** 12:24 20:13

**founded** 20:20 21:8,11

**founders** 22:23

**four** 8:18 46:22 49:10,15,21 52:4

**frame** 54:17 57:10

**framed** 54:15,19

**from** 7:17,20 15:16 17:1,9 27:6 30:2,10 31:5,8 40:24 41:3 43:13, 25 44:4,5 46:9,14 51:2,20 53:14, 20 54:20 55:8,18 58:8

**front** 30:25

**froze** 26:2 54:2

**full-service** 10:4

**funds** 43:18 44:23

**further** 58:1 59:6,7

**G**

**gave** 38:20

**Gemaire** 48:7,8,11,13 51:3,5

**Gemaire's** 48:8

**general** 34:12

**generally** 26:21 27:3,4

**gets** 36:23

**getting** 19:16

**give** 4:25 5:14 6:18 7:7

**go** 6:9 14:9,10 28:7

**God** 17:5

**going** 5:10 6:9,11 7:1 9:20 10:6, 9,17 13:20,25 14:4,7 17:7 21:15, 18,19 24:9 26:8 29:2 30:19 33:3 34:15 38:8 39:13 51:16 54:9

**gone** 38:12

**good** 4:2,14 7:6 20:18 22:14

**got** 28:7 32:10,11

**grand** 31:1

**great** 6:15

**groceries** 44:7,12

**grocery** 45:15 51:22

**guess** 11:14 37:18

**guidelines** 6:13

**guys** 13:22 19:1

**H**

**had** 13:18,19 22:10 26:9 27:14,18 28:15,17 30:22 31:23,24 35:3 39:11 40:7 42:5 43:5 44:24 45:18 48:3,4

**half** 28:8 53:15

**halfway** 48:22

**hand** 5:12

**Hanoi** 52:1

**happened** 13:16 56:17,19

**happy** 6:25 47:23 53:24

**Hardware** 51:10

**has** 5:1,3 14:19 27:25 32:3,5 45:5 46:17 48:14 49:16,20,21 51:4

**have** 4:21 6:5,19 7:16,25 9:10,14 13:15 16:4,11,13,14 18:7 20:16 21:7,15 24:14,19 25:1,2,4 26:15 27:12 28:11,20 30:14 31:2,10 32:16 33:2,20 35:23 36:7 37:4,6, 24 38:1 39:7,12 40:7,14,15 42:17 43:8,21 45:23 46:13,21 48:7 49:2, 8,24 50:17 51:5,7,17,19 52:5,21 53:4,9 54:15 55:21,24 56:7,23,25 57:12,15,25 58:2,11

**haven't** 8:25 40:9

**having** 5:19

**he's** 30:23 45:11 49:24 52:14 57:8

**head** 6:18

**header** 29:13 33:7

**hear** 21:16 48:8

**heard** 7:1 30:18 48:7 52:21 53:9 54:24 56:23,25

**heating** 25:18

**held** 40:23 41:1,9 50:18

**Hello** 53:25

**help** 22:25 56:17,18

**helped** 20:12,13

**here** 4:23 5:8 7:5 10:21,25 17:24 29:2 30:5 33:4 36:3 40:3 43:24 48:11,25 51:13,20 55:22 56:1

**Here's** 51:3

**Hernandez** 52:1

**hired** 20:9

**hold** 13:25 41:12,18

**holds** 40:23 41:1

**home** 31:14 32:20,23 33:24 53:1 55:18

**homestead** 9:7,9 10:22 48:25 53:2

**honest** 20:17 56:16

**honestly** 18:25 19:7 41:6 43:4

**Hotel** 53:10,16,21,24 54:6

**hour** 53:15

**hourly** 28:5

**hours** 27:14,18,19

**house** 9:12 18:1 19:1 53:14

**houses** 19:15

**how** 7:13 8:17 9:10,16 13:13 19:20 21:1 23:9,10 27:14,18,19 28:25 31:4,13 42:8 45:7,13 53:14 54:11

**however** 6:25 35:13

**hundred** 16:5 17:15

**husband** 9:13 11:14,16 12:9,18 13:13,22 14:24 15:7,17,24 18:17 19:17,23 20:1,9 21:8,10 22:11,16 23:8,19,20 24:10,21 25:2 26:9,12 27:14,19 28:2,18,25 29:11 30:10, 23,25 31:5,23 32:19,22 33:12,22 34:5,11,14,21,24 35:10,19 37:19 39:3 40:23 41:12,18 42:1,25 44:10,16,22 45:16 46:8 49:21,24 50:9,15,17,24 51:8 52:15 53:23 54:4 55:9,16 56:17 57:10,12,15, 22

**husband's** 22:19,20,22 30:3 41:8

**husband-wife** 14:2,6,19

**HVAC** 10:4 35:8,12,15

**I**

**I'D** 47:22

**I'LL** 7:10 22:8 35:25

**I'M** 4:8 6:9,25 7:1,20 8:14,22 9:20 10:6,16,17 13:25 14:4,7 15:14,20, 22 17:5,7 18:3,23 20:17,18 23:10, 12,23 24:7,25 25:24 26:2,8,15 27:8 28:3,6 29:2 30:19 32:9 33:3 34:15,16 35:17 37:8,11,18 38:6 39:13,20,21 41:6,23 42:21 44:13 47:16 48:12,14,15 49:6 51:1 54:8 56:16 57:6,7

**I'VE** 28:7

**ID** 46:17

**idea** 33:2 46:14,21 48:3,4 49:8 50:17

**identify** 36:14

**III** 36:22 52:21

**implicate** 54:12

**important** 6:18

**impressions** 21:13 22:12

**Inc** 4:16 9:21 10:11 11:8 12:3,21 13:1 16:6 17:16,21 29:13 30:11 33:7 44:1

**including** 55:24

**incorporation** 17:21 18:8

**individually** 12:18

**indulgence** 14:8

**inform** 12:9

**information** 54:18

**initially** 55:6

**input** 35:3

**insight** 37:24

**insofar** 17:14

**instruct** 54:9

**intelligently** 14:7

**interest** 8:13,15 40:24 41:2,10, 12,18

**internet** 46:18,21 48:2,5

**interrogatories** 35:22 36:1

**Interrogatory** 36:14,21

**interrupt** 21:20

**introduce** 17:7 35:21

**introducing** 17:18 26:15 38:6 43:24 46:12 48:21 51:1 52:18

**invoice** 52:23

**invoices** 53:20

**involved** 25:9 38:15 56:11

**issues** 14:3

**it's** 4:24 5:4 6:10,18 11:18 15:3 17:10 18:15 21:18 25:8,15 28:8 29:19 32:7,15 33:4,6,7 37:18 45:2 47:17,23 48:11,25 49:18,19 56:10 57:6

**J**

**James** 4:17 21:15 47:22

**January** 33:14 36:16

**job** 22:19,24 28:7

**jobs** 9:4 43:13,14

**John** 4:8

**judge** 21:17

**July** 10:15,19

**June** 44:4,5 46:7

**just** 7:4,10 8:15 9:18 10:16,23 13:15 14:3,4,8 17:2,3,10 21:19 22:19,24 24:11 25:24 27:1 31:1 32:1 37:17 39:12 43:10 49:7 54:23 58:3,11

K

**kind** 32:4,6 58:12

**knew** 18:12 24:11

**know** 7:5,6,10 10:5 11:13,18,19,23,24 12:1,6,13 13:9,16,21 18:13,16,17 19:7,10,19,20,22 20:7,11,20 21:1,4 22:19 23:7,13,18 24:10,24 25:18,24 26:25 28:1,2,4,17,20,25 30:19,22,23,24 31:11,12,17,19,20,22,23,25 32:8,10 33:17,20,22 35:1 36:6 37:3,15,16 38:1 40:1,9,18 41:13,25 42:4 43:8,10,21 44:14 45:4,5,10,18,19 46:12 47:4,8 48:14 49:4,10,15,18,20,23 50:1,2,4,7,14,20,21 51:9,15,24 52:1,7,9,13,15,18 53:7,12,18 54:24 57:5,6,9,20

**knowledge** 11:17 15:2 19:16,17,25 21:7 32:25 34:25 36:5,12 44:24 48:18 52:5 59:3

**known** 18:10

**knows** 47:17

L

**Lack** 46:3

**large** 48:17

**largely** 25:23

**last** 8:6 16:23,24 22:4 36:24 37:19 38:8 49:10,15,21 52:4

**late** 23:21,24 24:3

**later** 19:6

**law** 14:18 15:23

**lawsuit** 12:24 13:3 18:14 30:18 34:9 55:22,25 56:8,11

**lawyer** 13:17

**learned** 16:4,13,14

**lease** 31:10 32:14

**least** 26:5 35:8,13,16 55:8

**leave** 8:19

**Legal** 4:10

**let** 7:10 12:1 27:2 50:14

**let's** 16:4 17:8

**like** 7:24 8:1,18 16:11 17:5 24:16 25:1 28:7,9 32:16,17 35:1 38:17 40:16 43:9 44:6 48:25 49:2,7 53:15 59:11

**line** 29:16 33:14

**Listen** 13:15 43:8

**lists** 55:21

**little** 8:18 27:2 30:7 58:11

**live** 9:6 10:23 23:4

**Lizzy** 51:24

**LLC** 40:21

**lockdown** 19:9

**locked** 19:14

**logo** 28:13

**logos** 28:14

**long** 6:11 8:17 9:10 23:9

**longer** 18:5

**look** 14:1 34:18 39:13,22

**looked** 40:10 42:24

**looking** 9:2,4 10:16 43:24 44:13 54:18

**looks** 44:6

**lot** 27:21 38:23

M

**ma'am** 6:5 10:7,12 13:20 15:12,22 17:12,21 18:7 29:2,4 33:3 34:3,18 36:25 38:8 41:5 42:8,24 44:6 46:6,13,19 48:1,24 51:4 52:18 54:1 55:5 57:25

**made** 29:10 30:10 31:7 33:10 36:21 46:9 47:4

**mailing** 10:21

**main** 9:5

**make** 6:11 31:4 59:1

**making** 6:2 33:23

**management** 40:24 41:1,10,11,17

**manager** 8:9,16 19:4 20:1 24:8

**managing** 18:19,20,22 19:17

**many** 9:16 19:20 23:10 27:14,18,19

**March** 4:3 19:8 33:14

**Maria** 16:17 17:1,11,19

**mark** 29:2 33:3

**marked** 10:9

**marking** 34:16 53:9

**markings** 32:16

**married** 16:22,23

**materials** 31:20

**matter** 4:5 21:18,21

**Maury** 56:25 57:1,5,7

**may** 4:1 58:2

**mean** 10:16 15:20 18:12,19 20:13 26:7,25 27:1,25 35:1 36:2,6,11 37:14 38:1 40:15 45:2,4,6,18,21 57:17,23

**means** 26:22

**Mechanical** 9:21 10:11 11:8 12:3,25 16:6 17:15,21 29:13 30:11 32:17 33:6 44:1 52:24 56:23

**meet** 21:10

**meetings** 55:15

**membership** 40:21

**memo** 29:16 33:14

**mention** 32:19,22 53:23 54:4

**mentioned** 4:20 28:7

**messages** 38:25 39:17

**met** 22:10

**Miami** 17:25 53:12

**Michigan** 12:17 13:4

**might** 6:17 14:3 39:7 54:18

**mini** 59:12

**minute** 26:2 54:2

**mobile** 51:14

**moment** 14:5,8

**money** 31:5 43:14 58:22

**monitor** 43:22

**Montesinos** 16:17 17:11,19

**monthly** 47:8

**months** 19:15 34:7,13

**more** 8:18

**morning** 4:2,14 58:1

**move** 6:12 7:23 16:4

**moved** 19:1

**Mr** 4:14,17,19,22,24 5:1,3,6,10, 22,25 6:4 11:11,15,21,25 12:4,8, 11,15 13:25 14:10,11,16,25 15:5 16:7,9 21:15,17,22,23,24 22:4,8, 9,13 39:23 40:2,11,17 45:9,12 46:3,5,24 47:3,12,16,19,22,25 50:12,13 52:10,12 54:8,11,14,25 55:4 56:12,14 57:25 58:3,5 59:6, 10,12

**Ms** 5:16,22 14:22 15:3,6 58:6

**much** 21:23 28:25 31:5 59:13

**my** 4:8,14 5:25 9:5,13,19 10:6 11:14 13:18,21 15:25 16:13,22,23 17:1,2,3,5,10,19 20:6 21:18,21 22:19,22 23:20 24:20,21 26:8 29:4 30:8,13,23 33:11 34:3,14 39:15 40:15 41:10,16 44:5 50:9 56:9,17

**N**

**name** 4:8,11,14 5:25 10:25 11:1 13:18 16:23,25 17:1,3 33:11 37:8 41:16 46:17 47:6 51:4,8 56:9,25

**named** 56:5,8

**names** 9:18

**NE** 9:9 10:21 53:1

**near** 23:4

**necessarily** 24:10 27:4

**need** 6:16 7:7,9 14:1

**needed** 35:2

**never** 26:19 27:9 28:7,21 30:18, 19 34:1 36:18 40:7,14,15 43:4 44:18 45:5,24 46:6,8 52:23 53:16, 20

**next** 51:4

**Nieves** 50:4

**no** 6:6 8:3 11:9 15:10,18,19,21 18:5,6,9,25 19:5,21,24 21:6,9,14 22:17,25 23:5,16,17,18 24:15,18 25:6,11,20 26:3,11,14,18,20 27:11,13 28:10,13,16,19,20,21,24 29:1 30:16 31:6,12,16,17,25 32:18,24 33:2,19,21,25 34:2 35:3, 5,20,24 37:21 38:1,5 39:1,5,9,12, 14 40:7,16 41:3 42:2,7,13,16,18, 20,23 43:13,14 44:15,18,24 45:2 46:1,11 47:7,11 48:3,4,6,11 49:5, 8,17,18,19,23 50:1,3,5,20,22,25 51:6,12,25 52:2,5,11,13,17,20,22, 25 53:6,8,11,17,19,22 54:7 55:1, 2,3,12,14,17,20,23 56:2,24 58:17 59:2,5,7

**nobody** 40:8,16

**nod** 6:17

**noncompetition** 26:16,21 27:5, 9

**none** 36:17

**normal** 32:2

**note** 14:25

**nothing** 5:15 13:15,18,19 16:11 30:22 38:1 39:11 41:21 43:5 56:4, 10 57:25 59:6

**notice** 5:3 45:15,21 47:23

**number** 4:6,20,23,25 5:2,4,5 27:15 29:7 35:6 36:14,21 40:19 44:7 46:12 58:7

**numbers** 5:7

**O**

**oath** 36:4,9

**object** 11:21 12:4 16:7 39:23 40:11 45:9 46:3,24 47:1 50:12 52:10 54:8 56:12

**Objection** 11:11 12:11

**obligated** 14:24

**obviously** 18:16 43:1

**occasional** 24:17

**occurred** 59:4

**Ocean** 53:12

**October** 29:17 30:11 36:16

**off** 6:15 14:9,10,12,13 21:24,25 22:1 59:9

**office** 34:4

**officer** 11:3,4

**often** 45:7,13,14

**oh** 17:5 19:12 37:6 47:16 58:10, 11,20

**okay** 5:10,22 6:7,13,14 7:4,7,8, 19,21,25 8:11,19 9:6,20 10:6,9, 14,21 11:3,7,10,16 12:9,24 13:11, 20 15:22 16:13,17,19,21,24 17:4, 18 18:5,16,22 20:4,11,19 21:17 22:8 23:1,4,8,24 24:9,22 25:12 26:8 27:2,22 28:4,14 29:2,10,24 30:9,14,17,25 32:4 33:10,17,20 34:16,24 35:3 36:3 37:7,16,24 38:15,23 39:15 43:21,24 48:17 49:20 50:10,14 51:19 52:15 56:23 58:21,25 59:6,7,13

**old** 7:13

**oldest** 9:19

**one** 6:15 14:5 22:23 29:24 35:9, 13,16 46:15,16,18 47:13,14,19,20 48:2 54:15 55:9 58:11

**one's** 29:16,17,24

**only** 40:25 50:15

**open** 20:12,13 23:2 24:21 55:5

**opened** 20:12

**opening** 55:8

**operating** 31:15 40:19

**operations** 19:18

**opportunity** 14:17

**order** 6:20

**originally** 12:17

**Oscar** 50:6,7,8,14,18 52:8,9

**Oscarito** 51:24

**other** 18:2 19:22 27:6 30:20 31:14,17 41:2 42:5 46:22 49:20 50:23 55:10

**over** 6:9 38:12

**own** 8:13,15 9:12 57:22

**owned** 31:20

**owner** 11:20 12:2,10 16:5,15 17:15 21:2 41:15 44:24 57:22

**ownership** 22:15 40:24 41:1,9, 11,17

**P**

**package** 58:12

**page** 6:10 17:10 29:4

**paid** 28:2,25 36:22 45:16,25 46:7

**papers** 13:10,23 15:9

**paperwork** 41:14

**park** 49:2,4

**parse** 27:2

**part** 17:8 26:5,17 34:9 50:10 55:21

**partial** 17:8

**particular** 15:16 28:11

**partnership** 40:20

**passed** 38:4

**past** 8:25 18:11 34:7,13

**pause** 14:4

**pay** 28:8 31:1,5,8 32:25 43:4,6,8, 15 44:17,24 45:5

**payable** 46:22

**paying** 50:17

**payment** 25:9 46:17,18,25 47:4, 12,13,19 52:8

**payments** 33:23 36:21 48:1 51:19

**payroll** 29:16,22

**Paz** 5:18 17:2

**Paz-borrego** 4:5,18 5:16,22 10:25 14:22 16:19 17:3 58:6

**Pedro** 52:19

**pending** 7:11

**people** 19:20

**percent** 16:5,14 17:15 41:14

**perfectly** 6:24 7:6

**performed** 35:8,15,19

**period** 19:3,15 45:25

**person** 22:14 37:6,7,14,18 57:5, 6,20

**personal** 25:4 37:14,16,17,20 40:4,15 43:8,12,15,22 45:7,13,17, 22 46:1,9 49:12,16

**personally** 21:5 39:6

**phone** 46:16,21,25 47:1,4,8,16, 19,20 48:2,4 55:15

**place** 8:11 17:24,25

**places** 59:4

**Plaintiff** 4:15 5:20 6:1

**plan** 46:21 48:5

**please** 4:11,19 5:12 10:2 13:2 14:5 21:21 22:5 24:2 27:17 30:7 32:21 34:8 49:14

**point** 22:15 24:14 27:10 28:18,22 42:6,21,25 57:23 58:6

**Popeye's** 45:20

**positive** 54:20

**pre-covid** 24:3

**predicate** 46:4

**prepare** 37:4

**prepared** 59:10

**preparer** 38:3

**preparing** 37:12

**present** 40:25 41:3 55:15 59:3

**previous** 16:22 22:6

**previously** 54:14

**principal** 17:24

**prior** 18:2,13 21:4 42:11,14

**private** 14:23

**privilege** 14:2,6,19 15:4,6,12,15, 19,23 54:10,21,22

**probably** 40:18

**proceeding** 4:25 6:21

**proceedings** 21:20

**Produce** 38:7

**produced** 17:7,8 29:3 38:13

**producing** 38:9 42:14

**prohibit** 27:5

**proper** 6:8

**properties** 18:4

**property** 18:2,5

**provide** 38:3 57:17

**provided** 5:2 54:17

**Publix** 51:21

**pull** 38:20

**pulled** 38:18

**purchase** 44:5,11 45:19,20,21 48:23

**purchases** 51:20 58:9,16,19

**purposes** 6:8

**pursuant** 29:3

**put** 30:7,25

**Q**

**question** 6:23,25 7:1,2,11 11:12, 22 12:5,12 13:2,21 15:8 16:8,13 17:10,19 22:4,6 24:2 27:17 32:21

34:8 38:7 39:15,24 40:12,18 41:11 44:6 45:10 46:25 47:2 49:14 54:3,8 56:13 57:14 58:11, 25

**questioning** 58:7

**questions** 9:20 15:25 34:10,24 35:4 54:15 58:2,12 59:8

**quick** 14:1

**quiz** 7:4

## R

**Rafael** 51:24

**raise** 5:11

**reaction** 13:11 15:9

**read** 22:4,6 36:11 41:5 48:1 59:11

**really** 17:5 18:3 20:17 37:9 53:23

**reason** 30:14

**recall** 19:2 34:5,11 35:18 58:9,14, 18,22

**receipts** 44:5

**received** 13:10 42:9

**recess** 14:17 21:19

**recognize** 35:22,25 38:8

**record** 4:3 14:9,10,12,13,14,15, 25 17:18 21:24,25 22:1,2,3 59:9

**records** 42:19

**refer** 10:17

**referring** 12:16 20:4 27:3

**reflected** 58:16,19

**refrain** 15:16

**regard** 15:2

**regarding** 58:12

**registered** 11:1,20 12:2,10 17:20 31:13 33:24 46:6 47:5 55:19

**regularly** 45:7

**related** 15:7,25 39:7 48:18,20 55:25

**relating** 38:24 40:22

**relation** 18:18

**remarried** 16:24

**remember** 19:11 33:17 37:8

**remote** 4:8

**rent** 18:1,3,5 32:25 33:14,23

**repeat** 4:19 6:24 13:2 24:2 27:17 32:21 34:8 49:14 54:2,25 57:14

**reported** 36:23

**reporter** 4:9,12 5:11,17 6:19 22:7 54:23 55:2 59:13

**represent** 4:12

**representing** 4:10

**request** 35:6 39:21 41:4,9

**requested** 38:20 40:19 42:9

**requesting** 54:19

**requests** 34:4,7,10,12,17,19 35:23 36:21 38:7,9 39:2,16 40:3,6 42:15

**require** 15:13 40:3

**requires** 39:17

**respect** 42:24 43:6

**responding** 34:6

**response** 7:6 21:14 36:17,24,25 38:9 39:15,21 40:5,19,25 41:8 42:15

**responses** 17:9 29:3 34:17,22 35:21 36:11 38:7 39:2

**return** 17:8 36:24

**returns** 36:23 37:13,20,22,25

**review** 42:11,14

**reviewed** 55:24

**reviewing** 34:6,12

**Ricker** 4:8,19 5:1 14:16

**right** 5:11 6:23 7:13 8:5 9:5 10:15,17,25 15:10 16:4 19:1,8,11 20:8 22:21,24 23:7,23 24:1 26:1,6 30:5,12 36:7,12 37:12 38:13 40:3, 9 41:15,17,19,20,24 42:8,9 43:2, 16,22,24 44:13 45:19,22 48:12,21 51:1 52:6,18 53:7 56:5 57:23,25

**Robert** 50:21

**Roberto** 50:21

**Rodorigo** 20:23,24 21:1,5,7,10, 13 22:10,13,16 23:4 56:17

**Rodorigo's** 23:3

**Rodriguez** 50:6,7,8,18 52:8

**role** 24:14 27:12 30:17 35:23

**Ron** 20:23,24 21:1,4,7,10,13 22:10,11,16 23:2,4 56:17,21

**rule** 39:18

**Rules** 6:9

**running** 32:23

## S

**said** 13:23 16:11 22:25 27:22 30:18 31:1 35:1 39:12 55:1,2,3

**salary** 28:2,3

**same** 6:10 23:15 25:23 27:6 33:6 35:22 37:18 38:7 57:5,6,10

**sat** 34:21

**saw** 28:21

**say** 6:20 8:14,24 10:2 13:22 18:10 20:13 25:15,23 27:15,20 31:4 45:2 48:17

**saying** 6:17 11:16 42:21

**says** 29:13,16,22 33:14 41:14 47:16

**scheduled** 15:1

**school** 7:25

**Schwitalla** 4:17,22 5:6 11:11,21 12:4,11 13:25 14:11,16 16:7 21:17,23 39:23 40:11 45:9 46:3, 24 47:12,19 50:12 52:10 54:8,14 56:12 58:3,5 59:6,10

**screen** 10:6 26:8 29:4

**search** 39:6,16 40:4

**second** 14:1 30:6

**secured** 53:24 54:5

**see** 5:8 6:16 10:6,12 17:8 26:9 28:14 29:4,19 33:3 35:16 36:25

44:8 45:3 46:18 48:11 51:13 54:11

**seeing** 44:19

**seen** 18:7 26:19 33:20 36:2 46:1 52:23 53:20 55:21

**select** 43:25

**sent** 34:4,9

**separately** 23:25

**served** 13:7,22 15:9 55:25

**service** 9:5 47:1

**serviced** 28:23

**services** 10:3 25:19

**servicing** 31:21

**seven** 23:21 27:22,23

**shake** 6:18

**share** 10:6 26:8

**shared** 46:10

**shareholder** 17:11 40:20

**she** 14:7 15:3 37:10 47:17 54:20, 21,22,23 55:1,2

**she's** 14:24 54:9

**shirts** 28:13,14

**show** 34:15 45:17

**showed** 58:7,13,15,21

**showing** 58:18,22

**shows** 47:15

**sign** 30:15,22 31:1 36:7 42:22,23

**signature** 30:3,5,8,9,13 36:3

**signed** 27:5,9 31:2 33:12 42:25 43:3

**signer** 42:19 43:1

**signing** 26:12 30:10,21 36:4 55:8

**Silverado** 32:7

**similar** 40:22

**since** 8:1 9:11 16:4,13,14 56:5,7

**sitting** 7:5

**situation** 56:22

**small** 29:19

**so** 5:4 6:10,16,25 8:25 12:24 14:7,21,24 17:2 18:11 19:14 22:8 23:8 24:9 26:15 27:2 30:9,17,25 36:11 38:18 39:12,15 41:17 42:25 43:11 45:15 47:1,16 48:17 51:7, 19 54:23 55:8 57:22

**sold** 8:20,23,24

**sole** 16:5,14 17:15 41:15 44:23

**solicited** 35:8,12

**some** 6:2,9 7:16 9:20 24:16 34:15,18 38:12 42:25 43:25 57:23 58:6,7,12,15

**something** 5:3 28:9 30:22 43:3 45:16 48:15,18,20 49:7 56:7

**sometimes** 27:25 28:13 44:16

**sorry** 8:14,22 15:14 26:2 58:10

**sound** 10:15

**space** 27:7

**speak** 15:13

**speaking** 15:16 27:3,4

**specifically** 54:16

**spousal** 54:10

**start** 6:15 18:22 22:8

**started** 12:14 23:8,13

**starting** 21:4 23:8

**state** 4:11 10:10 13:4 14:2,20

**stated** 54:21

**statement** 48:22 51:2

**statements** 36:8 38:18,20,21 42:9,11,14 43:25 44:20 58:8,13, 16,18,21,23

**states** 7:23 8:2 10:14 11:3 17:14 36:17 41:9

**stating** 36:4

**stayed** 53:16

**still** 35:7,12,15 42:1 52:9,15 55:13

**stop** 23:11 42:3

**stopped** 37:12,24

**store** 8:9,10,16 24:8 45:16 51:22

**Street** 9:9 10:22 53:1

**strictly** 10:1,3

**structure** 22:15

**stuff** 6:10

**subcontractors** 25:10

**supplies** 8:9,12

**supply** 8:9,10,13,17 51:11

**Support** 4:10

**sure** 6:11 13:3 17:5 18:3,23 20:17 23:10,12,23 24:7,25 25:24 27:8, 18 28:3,6 32:9,22 37:9,11,18 39:20 41:23 48:14,15 49:6 57:6

**surprise** 13:12,18 44:22,25

**surprised** 56:16,19

**surprising** 45:4

**SW** 17:25

**swear** 4:13 5:13

**sworn** 5:20 36:8

**system** 5:1,8

**Systems** 4:6,16 12:21

**T**

**table** 7:11

**take** 6:11 7:9 14:1,17 21:19 32:1 55:18 59:12

**taken** 4:5

**taking** 6:19

**talk** 15:10 34:15 50:24

**talked** 10:23 13:16 15:21 30:17 31:13 42:8 49:9 54:12

**talking** 57:7

**Tarrago** 56:25 57:3

**tax** 17:8 36:23,24 37:13,20,22,25 38:3

**taxes** 37:2,5,14,16,17 49:7

**Team** 9:21 10:11 11:8 12:3,25 16:6 17:16,21 29:13 30:11 33:6 44:1 52:24

**teens** 23:22,24

**tell** 13:13 23:13,23 44:16

**ten** 31:1

**test** 7:4

**testified** 5:20 22:23 27:24 52:5

**testify** 47:22 48:12

**testimony** 5:13 22:12,21 35:3 37:12

**text** 38:24 39:17

**than** 8:18 41:2

**Thank** 5:9,17 14:11,16 21:23 47:24 59:13

**that** 4:19,20,22,23 5:1,8,13 6:11, 18,20,23 7:1,2,6,7,10 8:1,11,24 9:10,21,24 10:12,14,15,17,22 11:3,4,16,19 12:1,9,16,21,24,25 13:2,3,4,20 14:17,25 15:2,10,12, 19 16:4,14,21,22 17:11,12,14,22 18:1,10,15,18 19:3,4,18,20,25 20:5,8,12,16,22 22:14,23 23:14, 17,23 24:4,11,19,20,22,24 25:7, 21,22,23,24 26:1,4,9,24,25 27:1, 2,3,4,15,20 28:9,15,17,20,21,22 29:8,18,20,25 30:2,9,14 31:7,24 32:17,22 33:7,10 34:3 35:6,10,11, 14,16,18,25 36:3,4,15,17,25 37:4, 6,7,12,14,19 38:2,12 39:7 40:5,9 41:3,5,9,14,15 42:5,17 43:5,16, 21,22 44:2,8,10,14,16,18,22 45:3, 5,25 46:6,7,10,17 47:14 48:1,10, 17 49:4,9,16,20,21,25 50:14 51:3, 15,19 52:5 53:7,14,23,24 54:4,11, 16 55:5,10,11,22,25 56:1 57:19, 23 58:8,9,13,15,16,19

**that's** 5:6 6:24 7:9 9:5 16:3 18:12 20:19 21:22 24:13 27:24 29:11,12 30:8,13 33:11,17 36:10,20 37:15 38:14 41:16 43:9 44:13 47:14 49:21 51:23 56:20 57:7

**their** 9:18

**them** 14:21 21:20 26:1 34:13,16 42:15 59:1

**theme** 49:2,4

**then** 16:24 29:16 30:2 36:23 38:20

**Theodore** 4:6 29:10

**there** 7:21 13:19 22:8 31:17 34:14,23 35:2 36:17 38:16 39:1 41:16 46:14 50:23 54:1 55:10 56:9

**there's** 39:12,18 44:6 51:13,20 52:3,8

**these** 29:2,4 34:17,19,22,24 35:4, 21,22,23,25 36:4,8,11 38:6,8,23 39:15 40:3,6 43:25 44:4,19 45:19, 25 46:14 48:1 51:19 53:20

**they** 8:21,23 22:10,11 25:16,18, 22 26:7 28:13,20 38:20 48:1

**they're** 21:18 25:24 34:10

**thing** 9:5 10:16 25:23 35:22

**things** 6:15 15:2 31:20 43:4

**think** 6:10 14:3 21:18 24:20 46:12 47:14 54:25 57:23

**this** 4:4 5:14 6:7,12,21 7:4 10:6,9, 18,21,25 11:7,16,19 12:1,14 13:8, 14,15,18,24 14:19,22 17:7,9,14, 18,24 18:5,7,8 19:1 20:5 23:24 26:19 28:7 29:4,7 30:2,15,21 31:1 33:3,18,20 34:9,18 35:2,18 38:10 39:11,17 40:18 41:4,7,8 44:4,19, 22 45:24 46:13,14,25 47:12 48:17,21 49:7 51:1,7 52:1 53:1 54:15 55:22 56:4,8,11,17,18 57:13,16 58:1,25 59:8

**those** 15:13,16 28:23 29:10 34:6, 15 38:12,15 42:11,17 43:4,18 45:21 46:19 58:21,22,23,25 59:4

**thought** 22:14

**three** 9:17 33:17

**through** 34:11,16 57:13,16

**throughout** 10:18

**tied** 44:11 49:21

**time** 4:3 6:2 7:9 8:6 19:3,4,18 20:4 22:14 23:15,24 24:4,11,14 27:10 28:8 41:24 42:6,21 43:1 44:19 45:3,5,24 55:10 57:10 58:1

**times** 58:7

**today** 4:9 6:2 7:5 12:1 18:7 42:12,21 55:22 56:1 58:9,19

**today's** 58:14 59:8

**told** 13:16 34:1 40:3 44:18

**tomorrow** 15:1,2

**took** 21:17

**towards** 51:19

**trade** 7:25

**transactions** 44:7 59:1,4

**transcript** 6:21 59:10

**transfer** 51:14 52:3,4

**transferring** 49:24

**transfers** 58:21,22

**trick** 15:22

**triggered** 45:24

**trouble** 57:16

**trough** 38:8

**truck** 31:23 32:5,6

**true** 11:5 12:22 29:14,25 33:12 36:5 44:10

**Truist** 24:23 25:5 42:8 44:1 55:5

**trust** 30:24

**truth** 5:14,15

**truthful** 7:7

**trying** 15:22

**Tuesday** 4:1,3

**two** 8:25 18:11 25:22 29:5 38:8 46:10,15,19 48:1

**types** 9:4

## U

**unaware** 49:25

**under** 6:8 14:18,19 15:23 17:20 36:4,8 47:5

**underneath** 11:1

**understand** 6:12,17,23 7:5 9:21 10:17,19 11:4 20:5,8 22:15 23:14, 17 25:21 26:21,25 28:22 29:25

34:3 41:6 42:21 43:14

**understanding** 19:3 25:12,21 26:4,24 27:3 31:7 57:12,15

**understood** 6:21 7:2 36:8

**unfortunately** 56:9

**uniform** 28:11

**uniforms** 28:17

**United** 7:23 8:1

**unless** 14:6 47:17 54:9

**until** 13:3 30:18 53:7

**unusual** 44:14

**up** 15:3 35:25 37:22 45:17 50:14

**upgrade** 46:18

**us** 6:2 17:4

**use** 44:10,17

**used** 6:7 18:1 23:20 27:15,19 28:13 31:21 37:4 50:9,15 51:18

**using** 44:22 45:6

**V**

**van** 31:23

**variety** 46:6

**vendor** 54:13

**ventilation** 25:18

**verbal** 6:16,18

**Veronica** 4:4,18 5:18,23,25 7:13 10:25 16:19,25 17:2,3,19 22:10

**versus** 4:6

**very** 20:18 21:23 29:19 56:16,19 59:13

**videographer** 4:2,9,21 5:8 14:9,12,15 21:25 22:3 59:7

**videotaped** 4:4

**visited** 36:15,18

**W**

**waive** 14:5 54:10,21,22

**want** 4:25 6:11 7:4 14:5,9 15:20 35:21 45:2 47:22

**wanted** 57:17,22

**wants** 15:3 54:21 57:23

**was** 5:1,2 8:6,9,11,20,24 10:14,19 12:16,21,24 13:3,7,9,11,17,21 15:8 16:22 17:5,7 18:1,19,20 19:2,3,6,8,15 20:5,6,9,17,22 21:2,7 22:6,12,14,19,20,23,24 23:2,14,25 24:7,10,11,22,24 27:16 28:2,5 31:15,17 32:19,22 33:24 34:14,23 35:1,2,6,7,11,12,14,15,18 36:24 37:7,8,19 40:25 41:3,16 43:9,10 44:14,22 45:6 50:10 51:16 53:23 54:4 55:6,11,25 56:9,10,16,19 57:17

**wasn't** 13:3 22:24 23:2,17 57:19

**way** 18:17,18 37:15 39:12 46:9 54:17,19

**we'll** 5:10 14:10 34:15 59:12

**we're** 6:10 21:15 54:23 55:22 56:1

**we've** 38:12

**wear** 28:11,14,18

**website** 10:11

**week** 23:19,21 24:9 27:14,18,22,23

**weekend** 28:8

**weekends** 28:1

**well** 6:7 11:18,24 19:1 22:19,20 24:7,20 29:19 32:15 37:6 38:19 39:12 41:8 54:14 56:5

**went** 19:9 24:20 28:11 32:1 38:18 42:8 45:15 57:12,16

**were** 7:21 8:6,8,15,23 12:2,9,25 13:7,14,22 15:9 19:14,15 21:13 23:24,25 24:3,9,19 25:9 26:5,7,12 28:23 36:12,17 38:15 39:1 41:14 42:22 43:1,18 44:23 45:25 46:1,7 49:11,25 50:23 55:15 58:15 59:3

**what** 6:17 7:5 8:8,11 9:4,21,24 13:7,8,11,13,16,21 15:8,21 17:5,24 18:13 20:11,17 21:13 22:12 24:10,22 25:12,13,15 26:21,24 27:15,24 30:20 31:7 32:4,6 34:4 36:6 39:20 41:6,11,17,22,24 43:6 44:13 45:2,10 46:14,21 47:4,8,14 48:10,12,15,24 50:2,6 51:10,15 52:5

**what's** 7:15 9:8

**whatsoever** 39:1 54:12

**when** 7:23 8:6 12:9,14,24 13:7,9,13,22 15:9 16:24 17:2,4 18:2,22 19:8,14 20:4,13 22:10 23:11,13 24:24 27:25 28:11 30:17 32:1,10,11 33:23 37:10 42:3 43:9 55:6 57:21

**whenever** 20:4

**where** 7:17 9:6 10:23 23:6 25:7 46:1 49:24 53:12 58:15 59:4

**whether** 39:18 48:4 54:12

**which** 4:7,12 13:21 15:8,15 31:15 36:23 40:19,23,25 41:9 42:24 44:23 45:6 51:21 52:4

**while** 35:7,11,14 57:19

**who** 11:10 16:17,19 20:20,22 21:7 28:23 30:5 35:18 37:7,8 50:4,7,21,23 51:24 52:1,19 56:11 57:7

**who's** 6:19 50:8

**whole** 5:15

**whom** 4:12 33:22

**why** 8:19 13:23 33:22 37:2,24 39:10,15,21 50:14,17 56:3 57:12,15

**willing** 40:5 54:10

**Winsupply** 50:2 51:10

**wish** 15:6 54:22

**wishes** 14:22

**within** 46:22

**without** 11:17

**witness** 4:13 5:20,24 11:14,24 12:7,14 40:1,14 52:11 55:3

**won't** 9:18

**work** 8:17 9:2 20:1,5 23:9,11,19,20,21 24:9,11,12 26:25 27:1,15,19,25 28:12 30:19,20 32:1,20 35:8,15,19 50:9,15 54:5 55:10,18

56:18 57:20,21

**worked** 8:25 27:20,22 50:24 57:10

**working** 20:6 23:9,13,14,25 24:7 42:1 43:9 57:19

**works** 52:15 57:5

**worries** 26:3

**would** 5:11 20:16 23:21 26:15 27:15,19 28:18 31:2 33:23 40:5 43:15 44:10,16 45:7,15,21,23 46:21 47:4 50:17,24 51:7 54:11 59:11

**wow** 28:7

**written** 31:24 34:10

**Y**

**yeah** 4:24 5:3 11:14 13:17,20 14:10 19:13 21:22 22:23 24:3,6 25:4 26:3 32:3,12 33:11 34:23 35:17 36:6,8 41:20 45:1,23 49:15 50:7 51:15 54:2,4 57:7,15 59:12

**year** 17:6 20:17 32:8 36:25 37:19, 23

**years** 7:14,24 8:18,25 17:6 18:1, 11 20:18 32:13 33:17

**yes** 5:1,16,24 6:22 7:3,12,22 8:24 9:1,3,15,23 10:8,13,20,24 11:2,6, 18 12:7,20,23 13:6,9 16:1,3,16 17:13,17,23 18:21 19:12 20:3,10, 15,21,25 21:12 25:17 26:23 29:6, 9,15,21,23 30:1,4 31:3,9 33:5,9, 13,16 34:9,14,20,23 36:2,10,13 37:1 38:11,14,17,19 41:16 42:10 43:23 44:3,9,21 45:23 46:20 47:9 48:20 49:13 50:7,16 51:23 52:7 53:3,13 55:7 56:22 57:2,4,11 58:20,24

**you'd** 17:14

**you're** 6:15,17 12:16 15:19,20 39:20 42:5 44:19 51:10 54:18 56:5 58:10

**you've** 8:1 18:10 26:19 27:9 38:12 52:23 53:16,20

**your** 4:11 5:11 6:18 7:15 10:25 11:16,17 12:9,18 13:5,11,13,22 14:7 15:7,9,12,15,17,23,24 16:24, 25 18:16,17 19:3,16,17,22,25 20:1,8 21:8,10,13 22:11,12,16,20 23:8,19 24:10 25:1,2,12,21 26:4, 9,12 27:2,14,18 28:2,18,25 29:11 30:2,9,10,17,25 31:5,7,13,23 32:19,20,22,23,25 33:12,22,24 34:4,5,11,21,24,25 35:3,10,18,21 36:3,5,12,17 37:12,16,17,19 38:3 39:3,6,16 40:4,5,23 41:8,12,14,18 42:1,11,14,25 43:7,14,15 44:10, 12,16,22 45:7,13,15,16 46:8,17 47:6,8,23 48:1,18 49:9,16,21,24 50:15,17,23 51:4,7,8,17 52:15 53:1,14,23 54:4,14 55:9,16,18 57:10,12,15,22 58:1,2 59:3

**yourself** 15:7,24 27:9 39:3 57:21

**Exhibit 6**

Atlantic III Invoices

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: July 12, 2023
Proposal: 2023062000155Inv1P
Customer ID: Atlantic-III

To: Pedro Chambachumbi
Atlantic III
21050 Point Place,
Aventura, Florida 33180
pedrochambachumbi3@gmail.com

**Deposit 50% Upon Acceptance of this proposal.**
**Balance Due Upon Job Completion**
**Mechanical Permits are included in this project proposed.**

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Installation of (7) WSHP Units | 50% Deposit Required | Bal Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 7 units | Installation of (7) WSHP Units | $ 46,670.00 | $ 46,670.00 |
| | SCOPE OF WORK: | | |
| | Coordinate and Schedule work with Building Maintenance Team | | |
| | Mobilize Materials and Units to Job site | | |
| | Shut Down Unit at Electrical Disconnect | | |
| | Removal of existing drain lines | | |
| | Removal of existing electrical wiring | | |
| | Removal of existing Supply and Return Hoses | | |
| | Removal and disposal of (7) WSHP Units | | |
| | Furnish and Install (7) New FHP Bosch WSHP Units | | |
| | Furnish and install new drain lines as needed | | |
| | Furniture and install new electrical as needed | | |
| | Furniture and install new supply and return stainless steel hoses | | |
| | Furnish and install new tie-downs | | |
| | Start of units | | |
| | Check unit operations as per manufactures guidelines and specifications | | |
| | Provide building management with a report of all work completed | | |
| **FHP BOSCH** | **Units are described as follows:** | | |
| | 1. EM120-4VTC - 10 TON (01 unit) 460v 3ph vertical $24,700.00 | | |
| | 2. EM007-2HZC - 7,000BTU (04 units) @ at $3,500.00 265v 1ph Horizontal Right return = $14,000.00 | | |
| | 3. EM015-2VTC - 15,000 BTU (01 unit) 265v 1ph vertical Left return $4,300.00 | | |
| | 4. EM012-2VTC - 1 TON (01 unit) 265v 1ph vertical Left return $4,120.00 | | |
| **FHP - BOSCH BUNDLE PURCHASE DISCOUNT:** | | **$ (2,370.00)** | **$ 44,300.00** |
| | **50% DEPOSIT** | | **$ (22,150.00)** |
| | | Subtotal | $ 22,150.00 |
| | | Sales Tax | n/a |
| | | Total | **$ 22,150.00** |

Note:
One year workmanship warranty
One-year parts and Five year compressor warranty from manufacturer
**Quote Pricing is good for 30 days**

Approved By: ______________________________ (Signature) Print Name: ___________________________________

Approved Date: ________________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20th Street
Homestead, Florida 33033

Date: Nov. 14, 2023
Proposal: 202311140155IF
Customer ID: Atlantic-III

To: Pedro Chambachumbi
Atlantic III
21050 Point Place,
Aventura, Florida 33180
pedrochambachumbi3@gmail.com

**FINAL PAYMENT**

**Deposit 50% Upon Acceptance of this proposal.**
**Balance Due Upon Job Completion**
**Mechanical Permits Included**
**All Units are Exact Replacements (Like for Like)**

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Installation of (7) Bosch WSHP Units & (1) DX Unit Phase 2 | Balance Upon Completion | Bal Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 8 Units | Installation of (7) Bosch WSHP Units & (1) DX Unit Phase 2 | $ 53,860.00 | $ 53,860.00 |
| | SCOPE OF WORK: | | |
| | Coordinate and Schedule work with Building Maintenance Team | | |
| | Mobilize Materials and Units to Job site | | |
| | Shut Down Unit at Electrical Disconnect | | |
| | Removal of existing drain lines | | |
| | Removal of existing electrical wiring | | |
| | Removal of existing Supply and Return Hoses | | |
| | Removal and disposal of (7) WSHP Units & (1) DX Unit | | |
| | Furnish and Install (7) New Bosch WSHP Units | | |
| | Furnish and install new drain lines as needed | | |
| | Furnish and install new electrical as needed | | |
| | Furnish and install new supply and return stainless steel hoses | | |
| | Furnish and Install (1) New Trane-Ox Box DX System | | |
| | Furnish and Install New Armaflex Insulation | | |
| | Furnish and Install New Copper Piping | | |
| | Furnish as Install R-410 Refrigerant | | |
| | Furnish and install new tie-downs | | |
| | Start of units | | |
| | Check unit operations as per manufactures guidelines and specifications | | |
| | Provide building management with a report of all work completed | | |
| BOSCH | **Units are described as follows:** | | |
| | 1. EC096-4VTC (1 UNIT) | | |
| | 2. EM007-2HVC (1 UNIT) | | |
| | 3. EM031-2VTC (1 UNIT) | | |
| | 4. EM036-2VTC (1 UNIT) | | |
| | 5. EM028-2VTC (1 UNIT) | | |
| | 6. EM015-2VTC (1 UNIT) | | |
| | 7. EM018-2VTC (1 UNIT) | | |
| | 8. 2 TON Trane-Ox Box DX System (1 UNIT) | | |
| | **50% DEPOSIT** | $ (26,930.00) | $ (26,930.00) |

All Credit Card Transactions will have a 4.5% transaction fee

Note: One year workmanship warranty from Asap Air Mechanical Team
One year parts per manufacturer warranty
Five year compressor war per manufacturer warranty

| | |
|---|---|
| Subtotal | $ 26,930.00 |
| Sales Tax | n/a |
| Total | **$ 26,930.00** |

Approved By: ______________________ (Signature) Print Name: ______________________

Approved Date: ______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: January 16, 2024
Proposal: 20240115009981
Customer ID: Atlantic-III

To: Pedro Chambachumbi
Atlantic III
21050 Point Place,
Aventura, Florida 33180
pedrochambachumbi3@gmail.com

**Balance Due Upon Job Completion**

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Replacement of (2) exhaust fans | Bal Upon Completion | Bal Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 2 | Replacement of (2) exhaust fans | $ 1,860.00 | $ 3,720.00 |
| SCOPE OF WORK: | Coordinate work with building management team | | |
| | Mobilize all materials to job site | | |
| | Shut down exhaust fans at electrical service disconnect | | |
| | Remove and dispose of two exhaust fans | | |
| | Furnish and install two new exhaust fans | | |
| | Turn on units at service disconnects | | |
| | Start up units | | |
| | Check unit operations as per manufacturer guidelines | | |
| | Provide customer with a full detailed report of all work completed. | | |

All Credit Card Transactions will have a 4.5% transaction fee

| | | |
|---|---|---|
| Subtotal | $ | 3,720.00 |
| Sales Tax | | 279.00 |
| Total | **$** | **3,999.00** |

Approved By: ______________________ (Signature) Print Name: ______________________

Approved Date: ____________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

# Exhibit 7

Bank Statements

884-06-01-00 50266 5 C 001 30 S 55 004
ASAP AIR MECHANICAL TEAM INC
4160 NE 20TH ST
HOMESTEAD FL 33033-5357

# Your account statement

For 06/30/2023

## Contact us

Truist.com

(844) 4TRUIST or
(844) 487-8478

■ TRUIST SIMPLE BUSINESS CHECKIN[redacted]

**Account summary**

| | |
|---|---|
| Your previous balance as of 05/31/2023 | $12,258.34 |
| Checks | - 18,150.00 |
| Other withdrawals, debits and service charges | - 8,009.48 |
| Deposits, credits and interest | + 37,076.25 |
| Your new balance as of 06/30/2023 | = $23,175.11 |

**Checks**

| DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) |
|---|---|---|---|---|---|---|---|---|
| 06/23 | 226937 | 2,000.00 | 06/05 | 226939 | 4,200.00 | 06/13 | *7009324 | 8,500.00 |
| 06/06 | 226938 | 450.00 | 06/21 | 226940 | 3,000.00 | | | |

* indicates a skip in sequential check numbers above this item

Total checks = $18,150.00

**Other withdrawals, debits and service charges**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/01 | DEBIT CARD PURCHASE CRAFTY CRAB HOMEST 05-30 HOMESTEAD FL 0918 | 193.82 |
| 06/01 | DEBIT CARD PURCHASE-PIN 05-31-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 239.40 |
| 06/02 | DEBIT CARD PURCHASE IN *LEWIS MILLWORK 06-01 MIAMI FL 0918 | 145.48 |
| 06/02 | DEBIT CARD PURCHASE-PIN 06-01-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 99.21 |
| 06/02 | DEBIT CARD PURCHASE CHINA YAN INC. 06-02 HOMESTEAD FL 0918 | 63.67 |
| 06/05 | DEBIT CARD PURCHASE TACO BELL 30520030 06-01 MIRAMAR FL 0918 | 12.00 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-02-23 HOMESTEAD FL 0918 WALGREENS STORE 2800 NE 8 | 23.06 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-02-23 MIAMI FL 0918 CASA MARTINEZ CORP | 337.21 |
| 06/05 | DEBIT CARD PURCHASE TST* Mama mias Piz 06-02 Homestead FL 0918 | 38.34 |
| 06/05 | DEBIT CARD PURCHASE AMAZON.COM*JE9S01V 06-03 AMZN.COM/BILL WA 0918 | 52.42 |
| 06/05 | DEBIT CARD PURCHASE LL FLOORING 1335 06-03 FLORIDA CITY FL 0918 | 49.07 |
| 06/05 | DEBIT CARD PURCHASE SORIANO BROTHERS 06-03 305-2473717 FL 0918 | 109.66 |
| 06/05 | DEBIT CARD PURCHASE SQ *VICKY BAKERY H 06-03 Homestead FL 0918 | 19.75 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-03-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 99.21 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-03-23 FLORIDA CITY FL 0918 THE HOME DEPOT #6355 | 78.87 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-04-23 HOMESTEAD FL 0918 NAVARRO DISCOUNT 10724--2 | 2.12 |
| 06/05 | DEBIT CARD PURCHASE-PIN 06-04-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 188.05 |
| 06/06 | DEBIT CARD PURCHASE AMZN Mktp US*5R0GE 06-05 Amzn.com/bill WA 0918 | 47.06 |
| 06/06 | DEBIT CARD PURCHASE TST* Casavana Home 06-05 Homestead FL 0918 | 29.11 |
| 06/06 | DEBIT CARD PURCHASE KFC E320150 06-05 HOMESTEAD FL 0918 | 13.00 |
| 06/06 | DEBIT CARD PURCHASE-PIN 06-06-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 86.95 |
| 06/07 | DEBIT CARD PURCHASE SQ *VICKY BAKERY H 06-06 Homestead FL 0918 | 30.06 |
| 06/08 | DEBIT CARD PURCHASE SONNYS BBQ - FLA C 06-06 FLORIDA CITY FL 0918 | 87.85 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] (continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/08 | DEBIT CARD PURCHASE DUNKIN #354199 06-07 MIRAMAR FL 0918 | 6.43 |
| 06/08 | DEBIT CARD PURCHASE-PIN 06-07-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 183.38 |
| 06/08 | ACH CORP DEBIT 230608P2 Square Inc Asap Air Mechanical Te CUSTOMER ID L21543465551 | 1,460.87 |
| 06/09 | DEBIT CARD PURCHASE TST* Sergios Resta 06-08 Miami FL 0918 | 122.22 |
| 06/09 | DEBIT CARD PURCHASE-PIN 06-08-23 MIAMI FL 0918 BJS WHOLESALE #0 16200 SW | 109.98 |
| 06/09 | DEBIT CARD PURCHASE-PIN 06-08-23 MIAMI FL 0918 BJS WHOLESALE #0 16200 SW | 32.47 |
| 06/12 | DEBIT CARD PURCHASE-PIN 06-09-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 160.28 |
| 06/12 | DEBIT CARD PURCHASE MACITAS RESTAURANT 06-10 MIAMI FL 0918 | 26.28 |
| 06/12 | DEBIT CARD PURCHASE MACITAS RESTAURANT 06-10 MIAMI FL 0918 | 58.43 |
| 06/12 | DEBIT CARD PURCHASE-PIN 06-12-23 HOMESTEAD FL 0918 LOWE'S #2707 | 12.26 |
| 06/13 | DEBIT CARD PURCHASE RACETRAC 194 0000 06-11 FLORIDA CITY FL 0918 | 49.33 |
| 06/13 | DEBIT CARD PURCHASE-PIN 06-12-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 106.79 |
| 06/13 | DEBIT CARD PURCHASE MCDONALD'S F36983 06-12 HOMESTEAD FL 0918 | 5.75 |
| 06/13 | DEBIT CARD PURCHASE-PIN 06-12-23 MIAMI FL 0918 FOOT LOCKER | 117.70 |
| 06/14 | DEBIT CARD PURCHASE Microsoft*Store 06-12 msbill.info WA 0918 | 69.99 |
| 06/14 | DEBIT CARD PURCHASE MCDONALD'S F36983 06-13 HOMESTEAD FL 0918 | 4.15 |
| 06/14 | DEBIT CARD PURCHASE-PIN 06-13-23 HOMESTEAD FL 0918 LOWE'S #2707 | 182.29 |
| 06/14 | DEBIT CARD PURCHASE PUBLIX #1136 06-13 HOMESTEAD FL 0918 | 24.99 |
| 06/15 | DEBIT CARD PURCHASE CRAFTY CRAB HOMEST 06-13 HOMESTEAD FL 0918 | 48.15 |
| 06/15 | DEBIT CARD PURCHASE-PIN 06-14-23 MIAMI 0918 THE BIG CHEESE | 35.46 |
| 06/15 | DEBIT CARD PURCHASE-PIN 06-14-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 124.88 |
| 06/20 | DEBIT CARD PURCHASE FLANIGANS #25 - MI 06-15 954-2514734 FL 0918 | 64.90 |
| 06/20 | DEBIT CARD PURCHASE Amazon.com*7I0TQ4V 06-16 Amzn.com/bill WA 0918 | 17.17 |
| 06/20 | DEBIT CARD PURCHASE-PIN 06-16-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 112.44 |
| 06/20 | DEBIT CARD PURCHASE-PIN 06-16-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 167.46 |
| 06/20 | DEBIT CARD PURCHASE AMZN Mktp US*HF90X 06-18 Amzn.com/bill WA 0918 | 20.32 |
| 06/20 | DEBIT CARD PURCHASE-PIN 06-17-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 183.46 |
| 06/20 | DEBIT CARD PURCHASE-PIN 06-17-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 132.86 |
| 06/20 | DEBIT CARD PURCHASE AMAZON.COM*8O7U882 06-19 AMZN.COM/BILL WA 0918 | 61.09 |
| 06/20 | DEBIT CARD PURCHASE AMZN Mktp US*XY5ZE 06-20 Amzn.com/bill WA 0918 | 11.76 |
| 06/20 | DEBIT CARD PURCHASE-PIN 06-19-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 97.98 |
| 06/21 | DEBIT CARD PURCHASE TST* LC Bird Road 06-19 Miami FL 0918 | 18.70 |
| 06/21 | DEBIT CARD PURCHASE NORTHERN TOOL EQUI 06-19 CUTLER RIDGE FL 0918 | 9.62 |
| 06/21 | DEBIT CARD PURCHASE Rinconcito Latin C 06-20 miami FL 0918 | 26.32 |
| 06/21 | DEBIT CARD PURCHASE-PIN 06-20-23 FLORIDA CITY 0918 HARBOR FREIGHT TOOLS 7 | 23.53 |
| 06/21 | ACH CORP DEBIT EDI/ACH Deluxe Small Bus 0008ASAP AIR MECHANI CUSTOMER ID 17082000273139 | 103.78 |
| 06/21 | TRUIST ATM CASH WITHDRAWAL 06-21-23 0918 SOUTH KENDALL BRANCH | 800.00 |
| 06/21 | SERVICE CHARGES - PRIOR PERIOD | 1.50 |
| 06/26 | DEBIT CARD PURCHASE MARCOS PIZZA 8105 06-22 MIAMI FL 0918 | 13.95 |
| 06/26 | DEBIT CARD PURCHASE POPEYES #12055 06-23 NAPLES FL 0918 | 28.85 |
| 06/26 | DEBIT CARD PURCHASE-PIN 06-23-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 174.15 |
| 06/26 | DEBIT CARD PURCHASE-PIN 06-23-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 145.61 |
| 06/26 | DEBIT CARD PURCHASE-PIN 06-24-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 221.80 |
| 06/26 | DEBIT CARD PURCHASE CHILI'S HOMESTEAD 06-25 HOMESTEAD FL 0918 | 161.83 |
| 06/26 | DEBIT CARD PURCHASE-PIN 06-25-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 34.23 |
| 06/27 | DEBIT CARD PURCHASE PARTY CAKE BAKERY 06-26 MIAMI FL 0918 | 16.10 |
| 06/28 | DEBIT CARD PURCHASE MCDONALD'S F14372 06-27 MIAMI BEACH FL 0918 | 7.95 |
| 06/28 | DEBIT CARD PURCHASE ADVANCE AUTO PARTS 06-27 HOMESTEAD FL 0918 | 11.75 |
| 06/28 | DEBIT CARD PURCHASE SQ *VICKY BAKERY H 06-27 Homestead FL 0918 | 13.84 |
| 06/28 | DEBIT CARD PURCHASE-PIN 06-28-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 107.57 |
| 06/29 | DEBIT CARD PURCHASE-PIN 06-28-23 HOMESTEAD FL 0918 WALGREENS STORE 3090 NE 4 | 16.78 |
| 06/29 | DEBIT CARD PURCHASE SQ *VICKY BAKERY H 06-28 Homestead FL 0918 | 8.26 |
| 06/30 | DEBIT CARD PURCHASE CRAFTY CRAB HOMEST 06-27 HOMESTEAD FL 0918 | 40.13 |
| 06/30 | DEBIT CARD PURCHASE Rinconcito Latin C 06-29 miami FL 0918 | 12.17 |
| 06/30 | DEBIT CARD PURCHASE-PIN 06-29-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 154.17 |
| | Total other withdrawals, debits and service charges | = $8,009.48 |

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/02 | DEPOSIT | 3,408.50 |
| 06/02 | DEPOSIT | 8,500.00 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/05 | DEPOSIT | 10,530.70 |
| 06/06 | SQ230606 Square Inc Asap Air Mechanical Te CUSTOMER ID T3C9VQ89BQPWA4D | 5,936.59 |
| 06/16 | RTP CREDIT SQUARE San Francisco 00 94103 T200618852563 | 1,306.23 |
| 06/21 | RTP CREDIT SQUARE San Francisco 00 94103 T200620779952 | 1,306.23 |
| 06/27 | DEPOSIT | 498.00 |
| 06/29 | DEPOSIT | 5,590.00 |
| Total deposits, credits and interest | | = $37,076.25 |

**Changes are being made effective September 15, 2023** to the Commercial Bank Services Agreement ("CBSA") that governs your account. Continued use of your account after the effective date constitutes your acceptance of the changes. The most current version of the CBSA can be obtained at any Truist branch or online at www.truist.com/CBSA (search "Learn about commercial checking"). All future transactions on your account will be governed by the amended CBSA. If you have any questions about this change, contact your local Truist branch, your relationship manager, or call 844-4TRUIST (844-487-8478).

884-06-01-00 50266 2 C 001 30 S 55 004
ASAP AIR MECHANICAL TEAM INC
4160 NE 20TH ST
HOMESTEAD FL 33033-5357

# Your account statement

For 12/29/2023

## Contact us

Truist.com

(844) 4TRUIST or
(844) 487-8478

### ■ TRUIST SIMPLE BUSINESS CHECKING [redacted]

**Account summary**

| | |
|---|---|
| Your previous balance as of 11/30/2023 | $83,148.65 |
| Checks | - 4,980.00 |
| Other withdrawals, debits and service charges | - 52,422.12 |
| Deposits, credits and interest | + 31,026.15 |
| Your new balance as of 12/29/2023 | = $56,772.68 |

**Checks**

| DATE | CHECK # | AMOUNT($) |
|---|---|---|
| 12/14 | 226954 | 1,680.00 |
| 12/18 | * 226959 | 3,300.00 |
| Total checks | | = $ 4,980.00 |

* indicates a skip in sequential check numbers above this item

**Other withdrawals, debits and service charges**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 12/01 | INTERNET PAYMENT PAYMENT APPLECARD GSBANK 106142954 | 989.77 |
| 12/01 | ZELLE BUSINESS PAYMENT TO Manuel Reboiro PAYMENT ID BBT205551902 | 1,200.00 |
| 12/04 | DEBIT CARD PURCHASE CHEVRON 0307157 12-01 855-285-9595 FL 0918 | 30.18 |
| 12/04 | DEBIT CARD PURCHASE TST* CASAVANA HOME 12-01 Homestead FL 0918 | 25.87 |
| 12/04 | DEBIT CARD PURCHASE-PIN 12-01-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 167.06 |
| 12/04 | DEBIT CARD PURCHASE-PIN 12-01-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 116.72 |
| 12/04 | DEBIT CARD PURCHASE-PIN 12-02-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 268.89 |
| 12/04 | ACH CORP DEBIT PHONE PYMT CAPITAL ONE VERONICA PAZ BORREGO CUSTOMER ID 3SSXFQB42ZBGJAU | 1,500.00 |
| 12/04 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 4,213.33 |
| 12/05 | DEBIT CARD PURCHASE-PIN 12-04-23 MIAMI 0918 THE BIG CHEESE | 20.68 |
| 12/05 | DEBIT CARD PURCHASE-PIN 12-04-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 191.99 |
| 12/05 | DEBIT CARD PURCHASE POLLO TROPICAL 100 12-04 HOMESTEAD FL 0918 | 45.75 |
| 12/05 | ZELLE BUSINESS PAYMENT TO Beverly Hoover PAYMENT ID BBT206305607 | 200.00 |
| 12/06 | DEBIT CARD PURCHASE AMAZON.COM*CU1HW0L 12-05 SEATTLE WA 0918 | 29.70 |
| 12/06 | DEBIT CARD PURCHASE CHILI'S HOMESTEAD 12-05 HOMESTEAD FL 0918 | 90.56 |
| 12/07 | DEBIT CARD PURCHASE TST* LATIN CAFE 20 12-05 Miami FL 0918 | 10.50 |
| 12/07 | DEBIT CARD PURCHASE Amazon.com*Y52P87L 12-07 Amzn.com/bill WA 0918 | 28.48 |
| 12/07 | INTERNET PAYMENT PAYMENT APPLECARD GSBANK 106142954 | 1,261.91 |
| 12/08 | DEBIT CARD PURCHASE-PIN 12-07-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 222.96 |
| 12/08 | INTERNET PAYMENT PAYMENT UPGRADE, INC. 51005651 | 1,500.00 |
| 12/08 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT206924514 | 600.00 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] (continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 12/11 | DEBIT CARD PURCHASE CHEVRON 0047611 12-08 855-285-9595 FL 0918 | 33.11 |
| 12/11 | DEBIT CARD PURCHASE AUTOZONE 6845 12-09 786-572-6145 FL 0918 | 50.28 |
| 12/11 | INTERNET PAYMENT CONSUMER SANTANDER 0027298943 | 1,250.00 |
| 12/13 | DEBIT CARD PURCHASE-PIN 12-12-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 258.15 |
| 12/14 | DEBIT CARD PURCHASE TST* LA ESQUINA DE 12-13 MIAMI FL 0918 | 90.57 |
| 12/14 | DEBIT CARD PURCHASE-PIN 12-13-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 272.93 |
| 12/15 | DEBIT CARD PURCHASE AMZN Mktp US*3U775 12-15 Amzn.com/bill WA 0918 | 12.79 |
| 12/15 | DEBIT CARD PURCHASE SHELL OIL 57543704 12-13 MIAMI FL 0918 | 20.10 |
| 12/15 | INTERNET PAYMENT PAYMENT APPLECARD GSBANK 106142954 | 132.67 |
| 12/18 | DEBIT CARD PURCHASE MANHATTAN CHICAGO 12-14 MIAMI FL 0918 | 31.80 |
| 12/18 | DEBIT CARD PURCHASE CHEVRON 0047611 12-15 855-285-9595 FL 0918 | 36.48 |
| 12/18 | DEBIT CARD PURCHASE Amazon.com*FK88B4C 12-17 Amzn.com/bill WA 0918 | 27.07 |
| 12/18 | ACH CORP DEBIT 1 GEMAIRE DISTRIBU 1400310000037283936690 CUSTOMER ID 19395234 | 26,544.99 |
| 12/18 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT208436827 | 2,750.00 |
| 12/19 | DEBIT CARD PURCHASE WINSUPPLY MIAMI FL 12-18 DORAL FL 0918 | 2,608.34 |
| 12/19 | PREM COLL GEICO 1513 Theodore Borrego | 423.42 |
| 12/20 | DEBIT CARD PURCHASE ECONOMIC ELECTRIC 12-18 DORAL FL 0918 | 485.25 |
| 12/20 | DEBIT CARD PURCHASE ECONOMIC ELECTRIC 12-18 DORAL FL 0918 | 1,580.44 |
| 12/20 | ZELLE BUSINESS PAYMENT TO Beverly Hoover PAYMENT ID BBT208870334 | 200.00 |
| 12/21 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT209037440 | 400.00 |
| 12/21 | SERVICE CHARGES - PRIOR PERIOD | 4.00 |
| 12/22 | DEBIT CARD PURCHASE OUTBACK #2037 12-21 HOMESTEAD FL 0918 | 163.33 |
| 12/22 | ZELLE BUSINESS PAYMENT TO Beverly Hoover PAYMENT ID BBT209069709 | 300.00 |
| 12/22 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT209069785 | 250.00 |
| 12/26 | DEBIT CARD PURCHASE-PIN 12-22-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 154.51 |
| 12/26 | DEBIT CARD PURCHASE CHEVRON 0047611 12-22 855-285-9595 FL 0918 | 37.51 |
| 12/26 | DEBIT CARD PURCHASE-PIN 12-23-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 274.94 |
| 12/26 | DEBIT CARD PURCHASE-PIN 12-24-23 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 83.78 |
| 12/26 | DEBIT CARD PURCHASE TST* CASAVANA HOME 12-24 Homestead FL 0918 | 19.78 |
| 12/26 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT209609835 | 400.00 |
| 12/27 | DEBIT CARD PURCHASE-PIN 12-26-23 HOMESTEAD FL 0918 AT&T Q261 16502 | 65.10 |
| 12/27 | DEBIT CARD PURCHASE-PIN 12-26-23 HOMESTEAD FL 0918 AT&T Q261 16502 | 65.10 |
| 12/27 | DEBIT CARD PURCHASE-PIN 12-26-23 HOMESTEAD FL 0918 AT&T Q261 16502 | 274.99 |
| 12/28 | DEBIT CARD PURCHASE AT&T COR DF 12-27 8003310500 TX 0918 | 98.00 |
| 12/28 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 12-27 AR@GUARD.COM PA 0918 | 265.14 |
| 12/29 | DEBIT CARD PURCHASE DENNYS LATIN CAFE 12-28 KEY LARGO FL 0918 | 43.20 |
| Total other withdrawals, debits and service charges | | = $52,422.12 |

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 12/07 | TRUIST ATM MIXED DEPOSIT 12-07-23 09:33 AH63 OASIS PLAZA BRANCH 58639531 | 7,645.65 |
| 12/14 | PAYABLES VIXXO OPERATING ASAP Air Mechanical Te CUSTOMER ID 1434674 | 1,230.50 |
| 12/19 | TRUIST ATM MIXED DEPOSIT 12-19-23 17:50 AH63 OASIS PLAZA BRANCH 58632987 | 22,150.00 |
| Total deposits, credits and interest | | = $31,026.15 |

Changes are being made effective February 2, 2024, to the Commercial Bank Services Agreement ("CBSA") that governs your account, including a new paragraph titled Fraud Detection Products. Continued use of your account after the effective date constitutes your acceptance of the changes. The most current version of the CBSA can be obtained at any Truist branch or online at www.truist.com/CBSA. All future transactions on your account will be governed by the amended CBSA. If you have any questions about this change, contact your local Truist branch, your relationship manager, or call 844-4TRUIST (844-487-8478).

884-06-01-00 50266 3 C 001 30 S 55 004
ASAP AIR MECHANICAL TEAM INC
4160 NE 20TH ST
HOMESTEAD FL 33033-5357

# Your account statement

For 02/29/2024

## Contact us

Truist.com

(844) 4TRUIST or
(844) 487-8478

■ TRUIST SIMPLE BUSINESS CHECKING [redacted]

**Account summary**

| | |
|---|---|
| Your previous balance as of 01/31/2024 | $64,014.04 |
| Checks | - 13,380.00 |
| Other withdrawals, debits and service charges | - 50,964.16 |
| Deposits, credits and interest | + 26,202.07 |
| Your new balance as of 02/29/2024 | = $25,871.95 |

**Checks**

| DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) |
|---|---|---|---|---|---|---|---|---|
| 02/20 | 226955 | 5,680.00 | 02/29 | 226956 | 2,700.00 | 02/22 | *226961 | 5,000.00 |

* indicates a skip in sequential check numbers above this item

Total checks = $13,380.00

**Other withdrawals, debits and service charges**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 02/01 | DEBIT CARD PURCHASE ECONOMIC ELECTRIC 01-30 DORAL FL 0918 | 1,090.35 |
| 02/01 | DEBIT CARD PURCHASE KFC E320150 01-31 HOMESTEAD FL 0918 | 21.40 |
| 02/01 | DEBIT CARD PURCHASE-PIN 01-31-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 90.92 |
| 02/01 | DEBIT CARD PURCHASE-PIN 01-31-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 3060 NE | 90.32 |
| 02/01 | ZELLE BUSINESS PAYMENT TO Manuel Reboiro PAYMENT ID BBT215476683 | 1,200.00 |
| 02/01 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT215570401 | 250.00 |
| 02/02 | DEBIT CARD PURCHASE CHEVRON 0307157 02-01 855-285-9595 FL 0918 | 50.74 |
| 02/02 | DEBIT CARD PURCHASE-PIN 02-01-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 162.72 |
| 02/05 | DEBIT CARD PURCHASE EL FLORIDITA SEAFO 02-01 305-2211511 FL 0918 | 30.94 |
| 02/05 | DEBIT CARD PURCHASE CITYOFAVENTURA*SER 02-01 718-7822823 NY 0918 | 27.81 |
| 02/05 | DEBIT CARD PURCHASE CITY OF AVENTURA 02-01 AVENTURA FL 0918 | 996.75 |
| 02/05 | DEBIT CARD PURCHASE OUTBACK #2037 02-01 HOMESTEAD FL 0918 | 123.81 |
| 02/05 | DEBIT CARD PURCHASE AMERICAN FASTENERS 02-02 MIAMI FL 0918 | 41.47 |
| 02/05 | DEBIT CARD PURCHASE TROPICAL VILLAGE F 02-02 MIAMI FL 0918 | 37.76 |
| 02/05 | DEBIT CARD PURCHASE AMZN Mktp US*R25BR 02-03 Amzn.com/bill WA 0918 | 76.78 |
| 02/05 | DEBIT CARD PURCHASE AMZN Mktp US*RB6RK 02-04 Amzn.com/bill WA 0918 | 29.18 |
| 02/05 | DEBIT CARD PURCHASE-PIN 02-03-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 129.57 |
| 02/05 | INTERNET PAYMENT PAYMENT UPGRADE, INC. 53874401 | 2,500.00 |
| 02/06 | DEBIT CARD PURCHASE-PIN 02-05-24 MIAMI 0918 HARBOR FREIGHT TOOLS 5 | 213.99 |
| 02/07 | DEBIT CARD PURCHASE AMZN Mktp US*RB8N2 02-06 Amzn.com/bill WA 0918 | 24.58 |
| 02/08 | DEBIT CARD PURCHASE TST* CAO BAKERY AN 02-07 MIAMI BEACH FL 0918 | 22.59 |
| 02/12 | DEBIT CARD PURCHASE AMZN Mktp US*RB6R3 02-09 Amzn.com/bill WA 0918 | 12.84 |
| 02/12 | DEBIT CARD PURCHASE SUNPASS*ACC1245099 02-10 888-865-5352 FL 0918 | 249.39 |
| 02/12 | DEBIT CARD PURCHASE AMAZON.COM*RB8JX6K 02-11 SEATTLE WA 0918 | 50.68 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] (continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 02/12 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT217294160 | 325.00 |
| 02/12 | DEBIT CARD PURCHASE-PIN 02-11-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 145.39 |
| 02/12 | DEBIT CARD PURCHASE CHEVRON 0307157 02-11 855-285-9595 FL 0918 | 45.26 |
| 02/12 | INTERNET PAYMENT CONSUMER SANTANDER 0027298943 | 1,154.60 |
| 02/13 | INTERNET PAYMENT Payment ATT 327382002SMT2B | 430.82 |
| 02/14 | DEBIT CARD PURCHASE BIBERK INSURANCE 02-13 844-472-0967 PA 0918 | 293.00 |
| 02/14 | DEBIT CARD PURCHASE TST* CHEF ADRIANNE 02-13 Miami FL 0918 | 425.70 |
| 02/14 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT217819379 | 100.00 |
| 02/14 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 5,000.00 |
| 02/15 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 02-14 AR@GUARD.COM PA 0918 | 18.31 |
| 02/15 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 02-14 AR@GUARD.COM PA 0918 | 156.97 |
| 02/15 | DEBIT CARD PURCHASE SUNPASS*ACC1245099 02-14 888-865-5352 FL 0918 | 50.00 |
| 02/15 | ACH CORP DEBIT HRDWRESPLY WINSPLY MIAMI FL ASAP AIR MECHANICAL *T CUSTOMER ID 9581631 | 10,372.30 |
| 02/16 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT218027999 | 100.00 |
| 02/16 | INTERNET PAYMENT PAYMENT UPGRADE, INC. 54524378 | 2,000.00 |
| 02/16 | TELEPHONE PAYMENT DIRECT PAY LGBS FL TURNPIKE 240215101054W6I | 4,744.70 |
| 02/16 | ACH CORP DEBIT 1 GEMAIRE DISTRIBU 1400310000037435962112 CUSTOMER ID 20464758 | 9,176.81 |
| 02/16 | ZELLE BUSINESS PAYMENT TO Beverly Hoover PAYMENT ID BBT218116499 | 150.00 |
| 02/20 | DEBIT CARD PURCHASE STARBUCKS STORE 09 02-16 MIAMI FL 0918 | 18.23 |
| 02/20 | DEBIT CARD PURCHASE STARBUCKS STORE 09 02-16 MIAMI FL 0918 | 7.30 |
| 02/20 | DEBIT CARD PURCHASE EMBROIDERY BY GABI 02-16 305-2564022 FL 0918 | 333.88 |
| 02/20 | DEBIT CARD PURCHASE AMICIS TRATTORIA I 02-16 MIAMI FL 0918 | 192.29 |
| 02/20 | DEBIT CARD PURCHASE POOLSUPPLYEXPRESS. 02-19 POOLSUPPLYEXP AZ 0918 | 3,782.87 |
| 02/20 | DEBIT CARD PURCHASE TST* CAO BAKERY AN 02-20 MIAMI FL 0918 | 9.55 |
| 02/20 | DEBIT CARD PURCHASE-PIN 02-19-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 210.47 |
| 02/20 | DEBIT CARD PURCHASE CHEVRON 0307157 02-19 855-285-9595 FL 0918 | 51.11 |
| 02/20 | PREM COLL GEICO 8018 Theodore Borrego | 427.35 |
| 02/21 | SERVICE CHARGES - PRIOR PERIOD | 7.00 |
| 02/22 | DEBIT CARD PURCHASE SUNPASS*ACC1245099 02-21 888-865-5352 FL 0918 | 48.07 |
| 02/22 | DEBIT CARD PURCHASE POLLO TROPICAL 100 02-21 HOMESTEAD FL 0918 | 25.23 |
| 02/23 | DEBIT CARD PURCHASE-PIN 02-22-24 MIAMI FL 0918 THE HOME DEPOT #0207 | 57.72 |
| 02/26 | DEBIT CARD PURCHASE STARBUCKS STORE 09 02-22 MIAMI FL 0918 | 17.57 |
| 02/26 | DEBIT CARD PURCHASE CHEVRON 0307157 02-23 HOMESTEAD FL 0918 | 72.48 |
| 02/26 | DEBIT CARD PURCHASE-PIN 02-24-24 HIALEAH FL 0918 MARINE EXPRESS | 80.49 |
| 02/26 | TRUIST ATM CASH WITHDRAWAL 02-24-24 0918 OASIS PLAZA BRANCH | 800.00 |
| 02/26 | ZELLE BUSINESS PAYMENT TO Alfredo Nieves Mechanic PAYMENT ID BBT219542048 | 220.00 |
| 02/27 | DEBIT CARD PURCHASE TST* DR LIMON - HO 02-25 Homestead FL 0918 | 125.44 |
| 02/27 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT219920835 | 1,190.00 |
| 02/28 | DEBIT CARD PURCHASE-PIN 02-27-24 MIAMI 0918 RIVER MARINE SUPPLY IN | 70.92 |
| 02/28 | DEBIT CARD PURCHASE CHEVRON 0047611 02-27 855-285-9595 FL 0918 | 45.85 |
| 02/29 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 02-28 AR@GUARD.COM PA 0918 | 265.14 |
| 02/29 | DEBIT CARD PURCHASE-PIN 02-28-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 191.75 |
| 02/29 | ZELLE BUSINESS PAYMENT TO Roberto Cerca PAYMENT ID BBT220232718 | 500.00 |
| Total other withdrawals, debits and service charges | | = $50,964.16 |

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 02/01 | PAYABLES VIXXO OPERATING ASAP Air Mechanical Te CUSTOMER ID 1438438 | 4,098.80 |
| 02/20 | DEBIT CARD RETURN POOLSUPPLYEXPRESS. 02-19 POOLSUPPLYEXP AZ 0918 | 3,782.87 |
| 02/22 | PAYABLES VIXXO OPERATING ASAP Air Mechanical Te CUSTOMER ID 1439956 | 536.40 |
| 02/28 | DEPOSIT | 17,544.00 |
| 02/29 | PAYABLES VIXXO OPERATING ASAP Air Mechanical Te CUSTOMER ID 1440437 | 240.00 |
| Total deposits, credits and interest | | = $26,202.07 |

884-06-01-00 50266 5 C 001 30 S 55 004
ASAP AIR MECHANICAL TEAM INC
4160 NE 20TH ST
HOMESTEAD FL 33033-5357

# Your account statement

For 04/30/2024

## Contact us

Truist.com

(844) 4TRUIST or
(844) 487-8478

■ TRUIST SIMPLE BUSINESS CHECKIN[redacted]

**Account summary**

| | |
|---|---|
| Your previous balance as of 03/29/2024 | $31,343.12 |
| Checks | - 37,701.33 |
| Other withdrawals, debits and service charges | - 64,354.79 |
| Deposits, credits and interest | + 89,069.38 |
| Your new balance as of 04/30/2024 | = $18,356.38 |

**Checks**

| DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) | DATE | CHECK # | AMOUNT($) |
|---|---|---|---|---|---|---|---|---|
| 04/25 | 226947 | 20,000.00 | 04/04 | *226963 | 3,701.33 | 04/16 | 226965 | 5,200.00 |
| 04/22 | 226948 | 3,800.00 | 04/09 | 226964 | 5,000.00 | | | |

* indicates a skip in sequential check numbers above this item

Total checks = $37,701.33

**Other withdrawals, debits and service charges**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 04/01 | DEBIT CARD PURCHASE-PIN 03-29-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 154.17 |
| 04/02 | ZELLE BUSINESS PAYMENT TO Manuel Reboiro PAYMENT ID BBT226101664 | 1,200.00 |
| 04/03 | DEBIT CARD PURCHASE CHEVRON 0047611 04-02 855-285-9595 FL 0918 | 47.63 |
| 04/04 | INTERNET PAYMENT CONSUMER SANTANDER 0027298943 | 1,350.00 |
| 04/04 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT226523601 | 310.00 |
| 04/04 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT226532100 | 110.00 |
| 04/05 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT226809721 | 100.00 |
| 04/08 | DEBIT CARD PURCHASE AMZN Mktp US*6H2BO 04-06 Amzn.com/bill WA 0918 | 118.16 |
| 04/08 | DEBIT CARD PURCHASE IFC - ISLAMORADA, 04-07 ISLAMORADA FL 0918 | 193.92 |
| 04/08 | DEBIT CARD PURCHASE CHEVRON 0307157 04-07 HOMESTEAD FL 0918 | 50.35 |
| 04/08 | ZELLE BUSINESS PAYMENT TO Hanoi Hernandez PAYMENT ID BBT227253233 | 900.00 |
| 04/09 | ACH CORP DEBIT 1 GEMAIRE DISTRIBU Borrego Veronica CUSTOMER ID 21400670 | 1,590.93 |
| 04/09 | ACH CORP DEBIT HRDWRESPLY WINSPLY MIAMI FL ASAP AIR MECHANICAL *T CUSTOMER ID 6362049 | 28,294.09 |
| 04/09 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 3,000.00 |
| 04/10 | INTERNET PAYMENT Payment ATT 621263001SMT2G | 317.56 |
| 04/10 | INTERNET PAYMENT E-PAYMENT DISCOVER 0908 | 3,644.35 |
| 04/10 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 4,000.00 |
| 04/11 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT227787669 | 75.00 |
| 04/12 | INTERNET PAYMENT PAYMENT UPGRADE, INC. 57356200 | 2,500.00 |
| 04/12 | ZELLE BUSINESS PAYMENT TO Joshua PAYMENT ID BBT227910047 | 1,200.00 |
| 04/12 | ZELLE BUSINESS PAYMENT TO Bev H PAYMENT ID BBT227925729 | 175.00 |
| 04/12 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 1,500.00 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] (continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 04/15 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 04-12 AR@GUARD.COM PA 0918 | 18.31 |
| 04/15 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 04-12 AR@GUARD.COM PA 0918 | 156.97 |
| 04/15 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT228064781 | 90.00 |
| 04/16 | DEBIT CARD PURCHASE BIBERK INSURANCE 04-15 844-472-0967 PA 0918 | 293.00 |
| 04/16 | DEBIT CARD PURCHASE-PIN 04-15-24 MIAMI 0918 TAX MIAMI, LLC 6080 BI | 225.00 |
| 04/18 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 2,000.00 |
| 04/19 | DEBIT CARD PURCHASE AMZN Mktp US*U94MH 04-18 Amzn.com/bill WA 0918 | 149.78 |
| 04/19 | DEBIT CARD PURCHASE CHEVRON 0307157 04-19 855-285-9595 FL 0918 | 52.87 |
| 04/19 | PREM COLL GEICO 6514 Theodore Borrego | 427.35 |
| 04/19 | INTERNET PAYMENT CONSUMER SANTANDER 0027298943 | 1,250.00 |
| 04/19 | INTERNET PAYMENT PAYMENT UPGRADE, INC. 57720389 | 1,951.91 |
| 04/22 | DEBIT CARD PURCHASE-PIN 04-21-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 106.11 |
| 04/22 | SERVICE CHARGES - PRIOR PERIOD | 7.50 |
| 04/23 | DEBIT CARD PURCHASE-PIN 04-22-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 197.51 |
| 04/24 | DEBIT CARD PURCHASE POLLO TROPICAL 100 04-23 HOMESTEAD FL 0918 | 27.26 |
| 04/24 | DEBIT CARD PURCHASE-PIN 04-23-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 127.26 |
| 04/24 | ZELLE BUSINESS PAYMENT TO Rafael Oscarito Lizzy PAYMENT ID BBT229950036 | 500.00 |
| 04/25 | DEBIT CARD PURCHASE NATIONAL AUTO PART 04-24 800-344-0368 FL 0918 | 26.96 |
| 04/25 | DEBIT CARD PURCHASE-PIN 04-24-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 231.47 |
| 04/25 | DEBIT CARD PURCHASE-PIN 04-24-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 2.19 |
| 04/29 | DEBIT CARD PURCHASE OUTBACK #2037 04-24 HOMESTEAD FL 0918 | 107.99 |
| 04/29 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 04-26 AR@GUARD.COM PA 0918 | 265.14 |
| 04/29 | DEBIT CARD PURCHASE TST* LA PATA GORDA 04-27 CORAL GABLES FL 0918 | 170.30 |
| 04/29 | DEBIT CARD PURCHASE-PIN 04-26-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 154.17 |
| 04/29 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 2,671.32 |
| 04/30 | DEBIT CARD PURCHASE-PIN 04-29-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 84.66 |
| 04/30 | DEBIT CARD PURCHASE-PIN 04-29-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 116.38 |
| 04/30 | DEBIT CARD PURCHASE CHEVRON 0047611 04-29 855-285-9595 FL 0918 | 50.65 |
| 04/30 | INTERNET PAYMENT PAYMENT APPLECARD GSBANK 106142954 | 1,611.57 |
| 04/30 | ZELLE BUSINESS PAYMENT TO Rafael Oscarito Lizzy PAYMENT ID BBT231041009 | 450.00 |
| Total other withdrawals, debits and service charges | | = $64,354.79 |

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 04/08 | DEPOSIT | 75,355.07 |
| 04/24 | DEPOSIT | 13,714.31 |
| Total deposits, credits and interest | | = $89,069.38 |

884-06-01-00 50266 0 C 001 30 S 55 004
ASAP AIR MECHANICAL TEAM INC
4160 NE 20TH ST
HOMESTEAD FL 33033-5357

# Your account statement

For 06/28/2024

## Contact us

Truist.com

(844) 4TRUIST or
(844) 487-8478

■ TRUIST SIMPLE BUSINESS CHECKING [redacted]

**Account summary**

| | |
|---|---|
| Your previous balance as of 05/31/2024 | $3,115.29 |
| Checks | - 0.00 |
| Other withdrawals, debits and service charges | - 46,219.97 |
| Deposits, credits and interest | + 45,827.27 |
| Your new balance as of 06/28/2024 | = $2,722.59 |

**Other withdrawals, debits and service charges**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/03 | ZELLE BUSINESS PAYMENT TO Manuel Reboiro PAYMENT ID BBT237006843 | 1,200.00 |
| 06/12 | DEBIT CARD PURCHASE CHEVRON 0047611 06-11 855-285-9595 FL 0918 | 55.38 |
| 06/12 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT239114338 | 400.00 |
| 06/13 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 06-12 AR@GUARD.COM PA 0918 | 156.97 |
| 06/13 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 06-12 AR@GUARD.COM PA 0918 | 18.31 |
| 06/13 | ZELLE BUSINESS PAYMENT TO Joshua PAYMENT ID BBT239380835 | 45.00 |
| 06/14 | DEBIT CARD PURCHASE BIBERK INSURANCE 06-13 844-472-0967 PA 0918 | 293.00 |
| 06/14 | DEBIT CARD RECURRING PYMT Microsoft*Microsof 06-13 425-6816830 WA 0918 | 69.99 |
| 06/17 | DEBIT CARD PURCHASE DAIKIN APPLIED 06-13 7635535437 MN 0918 | 687.29 |
| 06/17 | INTERNET PAYMENT Payment ATT 455169002COL1K | 341.60 |
| 06/17 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 550.00 |
| 06/20 | DEBIT CARD PURCHASE CHEVRON 0047611 06-19 855-285-9595 FL 0918 | 49.83 |
| 06/20 | PREM COLL GEICO 3076 Theodore Borrego | 427.35 |
| 06/21 | ZELLE BUSINESS PAYMENT TO Hanoi Hernandez PAYMENT ID BBT240715447 | 2,000.00 |
| 06/21 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 5,000.00 |
| 06/21 | SERVICE CHARGES - PRIOR PERIOD | 82.50 |
| 06/24 | DEBIT CARD PURCHASE-PIN 06-21-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 172.57 |
| 06/24 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 10,000.00 |
| 06/24 | DEBIT CARD PURCHASE-PIN 06-22-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 116.72 |
| 06/24 | INTERNET PAYMENT E-PAYMENT DISCOVER 8818 | 1,480.43 |
| 06/24 | ZELLE BUSINESS PAYMENT TO Stephanie Villanueva PAYMENT ID BBT241379569 | 768.30 |
| 06/25 | DEBIT CARD PURCHASE AMAZON MKTPL*RG1NK 06-24 Amzn.com/bill WA 0918 | 33.37 |
| 06/25 | DEBIT CARD PURCHASE-PIN 06-24-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 147.84 |
| 06/25 | INTERNET PAYMENT CONSUMER SANTANDER 0027298943 | 2,000.00 |
| 06/26 | DEBIT CARD PURCHASE-PIN 06-25-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 188.18 |
| 06/26 | TRUIST ONLINE TRANSFER MOBILE TO ****4522 - | 5,000.00 |
| 06/27 | DEBIT CARD PURCHASE DAIKIN APPLIED 06-14 7635535437 MN 0918 | 10,959.07 |
| 06/27 | OVERDRAFT FEE NOT CHARGED 36 | 36.00 |
| 06/27 | DEBIT CARD RECURRING PYMT BIBERK INSURANCE 06-26 AR@GUARD.COM PA 0918 | 265.14 |

*continued*

■ TRUIST SIMPLE BUSINESS CHECKING [redacted] (continued)

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/27 | OVERDRAFT FEE NOT CHARGED 36 | 36.00 |
| 06/27 | DEBIT CARD PURCHASE DAIKIN APPLIED 06-26 7635535437 MN 0918 | 2,022.30 |
| 06/27 | OVERDRAFT FEE NOT CHARGED 36 | 36.00 |
| 06/27 | DEBIT CARD PURCHASE-PIN 06-26-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 184.23 |
| 06/27 | OVERDRAFT ITEM FEE ($36/ITEM) 36 | 36.00 |
| 06/27 | DEBIT CARD PURCHASE KFC E320150 06-26 HOMESTEAD FL 0918 | 21.40 |
| 06/27 | OVERDRAFT FEE NOT CHARGED 36 | 36.00 |
| 06/27 | DEBIT CARD PURCHASE CHEVRON 0047611 06-26 855-285-9595 FL 0918 | 47.10 |
| 06/27 | OVERDRAFT ITEM FEE ($36/ITEM) 36 | 36.00 |
| 06/27 | ZELLE BUSINESS PAYMENT TO Oscar Rodriguez PAYMENT ID BBT241834989 | 1,000.00 |
| 06/27 | OVERDRAFT ITEM FEE ($36/ITEM) 36 | 36.00 |
| 06/28 | DEBIT CARD PURCHASE-PIN 06-27-24 HOMESTEAD FL 0918 PUBLIX SUPER MAR 2950 NE | 184.10 |
| Total other withdrawals, debits and service charges | | = $46,219.97 |

**Deposits, credits and interest**

| DATE | DESCRIPTION | AMOUNT($) |
|---|---|---|
| 06/12 | TRUIST ONLINE TRANSFER MOBILE FROM ****4522 - | 15,000.00 |
| 06/13 | PAYABLES VIXXO OPERATING ASAP Air Mechanical Te CUSTOMER ID 1448352 | 497.55 |
| 06/13 | DEPOSIT | 10,432.87 |
| 06/21 | TRUIST ATM MIXED DEPOSIT 06-21-24 14:25 AH63 OASIS PLAZA BRANCH 58637786 | 9,752.85 |
| 06/27 | NO CHARGE POSITIVE AVAIL BAL 36 | 36.00 |
| 06/27 | NO CHARGE POSITIVE AVAIL BAL 36 | 36.00 |
| 06/27 | NO CHARGE POSITIVE AVAIL BAL 36 | 36.00 |
| 06/27 | NO CHARGE POSITIVE AVAIL BAL 36 | 36.00 |
| 06/28 | TRUIST ONLINE TRANSFER MOBILE FROM ****4522 - | 10,000.00 |
| Total deposits, credits and interest | | = $45,827.27 |

Effective February 12, 2024, Truist discontinued charging the Paper Statement Fee for deposit accounts.

The current version of the Business Deposit Accounts Fee Schedule can be obtained at any Truist branch or online at www.truist.com/business-fee-schedule. If you have any questions, please contact your local Truist branch, your relationship manager, or call 844-4TRUIST (844-487-8478).

**Exhibit 8**

The Betsy Hotel Invoices

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: February 9, 2024
Proposal: 20240209001991
Customer ID: TBH 031623

Provide customer with Two (2) unit actuators.

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion

Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Provide customer with Two (2) unit actuators. | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 2 | Provide customer with Two (2) unit actuators. | $ 158.00 | $ 316.00 |

All Credit Card Transactions will have a 4.5% transaction fee $ 15.29

| | |
|---|---|
| Subtotal | $ 316.00 |
| Sales Tax | 23.70 |
| Total | $ 339.70 |

Approved By: ______________________________ (Signature) Print Name: ______________________________

Approved Date: _______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: April 10, 2024
Proposal: 20240410090911
Customer ID: TBH 031623

**Job Completed 3-12-2024**

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Install Kitchen RTU (1) condenser fan motor and (1) Capacitor | Upnn Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Install Kitchen RTU (1) condenser fan motor and (1) Capacitor | $ 912.42 | $ 912.42 |
| 1 | Spare Motor Included in Price | | |
| 1 | Spare Capacitor Included in Price | | |

All Credit Card Transactions will have a 4.5% transaction fee $ 44.14

| | |
|---|---|
| Subtotal | $ 912.42 |
| Sales Tax | 68.43 |
| Total | **$ 980.85** |

Approved By: ____________________ (Signature) Print Name: ____________________

Approved Date: ______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: April 12, 2024
Proposal: 20240412010911
Customer ID: TBH 031623

Job Completed 4-12-2024

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Perform coil cleaning on (2) kitchen DX systems & (1) restaurant DX system. | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Perform coil cleaning on (2) kitchen DX systems & (1) restaurant DX system. | $ 2,400.00 | $ 2,400.00 |

Scope of work:
- Coordinated all work with building management
- Arrived on site
- Mobilize all materials to perform coil cleanings
- Shut down condensers at electrical service disconnects
- Chemically cleaned condenser coils
- Shut down existing electrical disconnects
- Chemically cleaned existing air handler coils
- Started up units
- Checked unit operations as per manufacturer guidelines
- Cleaned up work area
- Provide customer with a full detailed report of all work completed.

Note: All work was completed after hours.

All Credit Card Transactions will have a 4.5% transaction fee $ 116.10

| | |
|---|---|
| Subtotal | $ 2,400.00 |
| Sales Tax | 180.00 |
| Total | $ 2,580.00 |

Approved By: ______________________ (Signature) Print Name: ______________________
Approved Date: ______________

ASAP AIR MECHANICAL TEAM
**Thank you for your business!**
4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP
Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: May 1, 2024
Proposal: 20240501009101
Customer ID: TBH 031623

**Job Completed**

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Replacement of two (2) DX AC systems Rm 223 & 325 | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Replacement of two (2) DX AC systems Rm 223 & 325 | $ 2,400.00 | $ 2,400.00 |

Scope of work:
- Coordinate work with building management
- Shut down units at electrical disconnects
- Recovery Refrigerant as per EPA guidelines
- Removal and disposal of two DX split systems
- Installation of two (2) DX split systems " provided by customer".
- Check all work for leaks
- Charge systems
- Start up units
- Provide customer with a full detailed report of all work completed

All Credit Card Transactions will have a 4.5% transaction fee $ 116.10

| | | |
|---|---|---|
| Subtotal | $ | 2,400.00 |
| Sales Tax | | 180.00 |
| Total | $ | **2,580.00** |

Approved By: ______________________ (Signature) Print Name: ______________________

Approved Date: ______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: May 31, 2024
Proposal: 202405310104
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Replace (2) 3 Ton Mitsubishi split systems | Upon Completion of Job | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Replace (2) 3 Ton Mitsubishi split systems | $ 11,724.00 | $ 11,724.00 |

Scope of Work:
Arrived on site
Shut down units at electrical disconnect
Recovered Refrigerant
Disconnected existing electrical
Disconnected existing copper piping
Disconnected existing drain lines
Furnish and install two (2) new Mitsubishi 3 Ton split systems
Connected existing electrical

All Credit Card Transactions will have a 4.5% transaction fee $ 567.15

| | |
|---|---|
| Subtotal | $ 11,724.00 |
| Sales Tax | 879.30 |
| Total | **$ 12,603.30** |

Approved By: ______________________________ (Signature) Print Name: ____________________________________

Approved Date: ________________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: May 31, 2024
Proposal: 202405310103
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Replace pump motor | Upon Completion of Job | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Replace pump motor | $ 1,200.00 | $ 1,200.00 |
| Scope of Work: | Arrived on site | | |
| | Shut down pump at electrical disconnect | | |
| | Removed existing pump motor | | |
| | Cleaned existing pump motor mount with wire brush | | |
| | Furnace and installed new gasket | | |
| | Installed new motor | | |
| | Start up chiller pump | | |
| | Checked unit operations as per manufacturer guidelines | | |
| All Credit Card Transactions will have a 4.5% transaction fee | | $ 58.05 | |
| | | Subtotal | $ 1,200.00 |
| | | Sales Tax | 90.00 |
| | | Total | **$ 1,290.00** |

Approved By: ______________________________ (Signature) Print Name: ___________________________________

Approved Date: ________________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: June 20, 2024
Proposal: 202406200123.0
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Install Kitchen Condenser fan motor and (1) Capacitor | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Install Kitchen Condenser fan motor and (1) Capacitor | $ 712.42 | $ 712.42 |
| | All Credit Card Transactions will have a 4.5% transaction fee | $ 34.46 | |
| | | Subtotal | $ 712.42 |
| | | Sales Tax | 53.43 |
| | | Total | $ 765.85 |

Approved By: ______________________ (Signature) Print Name: ______________________
Approved Date: ______________

ASAP AIR MECHANICAL TEAM
**Thank you for your business!**
4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP
Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: June 30, 2024
Proposal: 20240630093.0
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Perform coil cleaning on two kitchen DX systems and one restaurant DX system. | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Perform coil cleaning on two kitchen DX systems and one restaurant DX system | $ 2,220.00 | $ 2,220.00 |

Scope of work:
- Coordinated all work with building management
- Arrived on site
- Mobilize all materials to perform coil cleanings
- Shut down condensers at electrical service disconnects
- Chemically cleaned condenser coils
- Shut down existing electrical disconnects
- Chemically cleaned existing air handler coils
- Started up units
- Checked unit operations as per manufacturer guidelines
- Cleaned up work area
- Provide customer with a full detailed report of all work completed.

Note:
All work was completed after hours.

All Credit Card Transactions will have a 4.5% transaction fee $ 107.39

| | | |
|---|---|---|
| Subtotal | $ | 2,220.00 |
| Sales Tax | | 166.50 |
| Total | $ | **2,386.50** |

Approved By: ______________________________ (Signature) Print Name: ______________________________
Approved Date: ______________

ASAP AIR MECHANICAL TEAM
**Thank you for your business!**
4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP
Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: June 30, 2024
Proposal: 202406300901.0
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive - Kitchen

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Provided Customer with Two (2) OEM DAIKEN MOTORS , ECM & PROGRAM 1/8HP 120V SINGLE SHAFT | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 2 | Provided Customer with Two (2) OEM DAIKEN MOTORS , ECM & PROGRAM 1/8HP 120V SINGLE SHAFT | $ 1,163.55 | $ 2,327.10 |
| | All Credit Card Transactions will have a 4.5% transaction fee | $ 112.57 | |
| | | Subtotal | $ 2,327.10 |
| | | Sales Tax | 174.53 |
| | | Total | **$ 2,501.63** |

Approved By: ______________________ (Signature) Print Name: ______________________

Approved Date: ______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: July 30, 2024
Proposal: 2024073000112.0
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Clean five (5) Commercial Ice Makers | Upon Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Clean five (5) Commercial Ice Makers | $ 3,500.00 | $ 3,500.00 |
| Scope of Work: | Coordiinate work with building Engineer | | |
| | Gain Access to Icemakers designated for cleaning | | |
| | Perform Complete Cleaning of five (5) Commercial Ice makers | | |
| | Provide Customer with full detailed report of work completed | | |

All Credit Card Transactions will have a 4.5% transaction fee $ 169.31

| | | |
|---|---|---|
| Subtotal | $ | 3,500.00 |
| Sales Tax | | 262.50 |
| Total | $ | 3,762.50 |

Approved By: ______________________ (Signature) Print Name: ______________________

Approved Date: ______________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
4160 NE 20TH Street
Homestead, Florida 33033

Date: August 22, 2024
Proposal: 20240830099.0
Customer ID: TBH 031623

To: The Betsy Hotel
1440 Ocean Drive
Miami Beach , Florida 33139
Attn: Brandon Campbell
B.Campbell@the betsyhotel.com

Balance Due Upon Job Completion
Site: 1440 Ocean Drive

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Provided customer with Ten (10) 25 pound R410 refrigerant tanks. | Upon Job Completion | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 10 | Provided customer with Ten (10) 25 pound R410 refrigerant tanks. | $ 285.00 | $ 2,850.00 |
| | All Credit Card Transactions will have a 4.5% transaction fee | $ 137.87 | |
| | | Subtotal | $ 2,850.00 |
| | | Sales Tax | 213.75 |
| | | Total | $ 3,063.75 |

Approved By: ____________________ (Signature) Print Name: ____________________

Approved Date: ____________

ASAP AIR MECHANICAL TEAM

**Thank you for your business!**

4160 NE 20th St. Homestead, Florida 33033 asapairmechanicalteam@yahoo.com P: 786-803-6285

ASAP Air Mechanical Team

# Invoice

ASAP AIR MECHANICAL TEAM
[illegible] NE 20TH Street
[illegible], Florida [illegible]

Date: September 3, 2024
Proposal: 202405240223!
Customer ID: Rachel Castillo

To: Rachel Castillo
achelcastillo@busycon.net

Balance Due Upon Job Completion

PROPOSAL # 202405240223.00

## Final Payment

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| VP | Furnish and Install One (1) New Carrier 2-Ton 16 seer two (2) speed split system with electric heat and programmable thermostat. | 50% Deposit | Upon Completion |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Furnish and Install One (1) New Carrier 2-Ton 16 seer two (2) speed split system with electric heat and programmable thermostat | $ 16,900.00 | $ 16,900.00 |

Scope of work:

- Coordinate all work with Project Management Team
- Mobilize all materials to the job site.
- Furnish and Install One (1) New Carrier 2-Ton 16 seer two speed split system with electric heat and programmable thermostat. M# 24TPA724 M# FT4BNXB24
- Furnish and Install New flex ductwork as per plan and specifications.
- Furnish and install all diffusers as per plans and specifications.
- Furnish and install Outside air duct with backdraft damper and motorized damper ducted to wall cap with screen as per plans is specifications.
- Furnish and Install Dryer Exhaust ducted to wall cap as per plans and specifications.
- Furnish and Install Bathroom exhaust fan ducted to wall cap as per plans and specifications.
- Furnish and Install New Carrier Condensing unit mounted on concrete slab.
- Check all new work.
- Clean up work area.
- Furnace customer with a full detailed report of our work completed

NOTE: Job will be done in regular working hours

**7/1/2024 INVOICE FOR 50% DEPOSIT $ 8,450.00**

All Credit Card Transactions will have a 4.5% transaction fee $ 380.25

| | | |
|---|---|---|
| Subtotal | $ | 8,450.00 |
| Sales Tax | | |
| DEPOSIT | $ | **8,450.00** |

Approved By: ______________________ (Signature) Print Name: ______________________
Approved Date: ____________

ASAP AIR MECHANICAL TEAM

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I served a copy of the forgoing and this ***Certificate of Service*** via first class mail and email upon Defendants' counsel of record, James Schwitalla at:

jws@MiamiBKC.net

and

The Bankruptcy Law Offices of James Schwitalla, P.A.
Park Place II
12954 SW 133 Court
Miami, FL 33186

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Date: August 14, 2026

*/s/Kimberly Ross Clayson*
Stuart M. Schwartz (P62752)
Kimberly Ross Clayson (P69804)
Andrew M. Creal (P83806)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
sschwartz@taftlaw.com
kclayson@taftlaw.com
acreal@taftlaw.com

*Attorneys for Plaintiff*